1   Joseph R. Saveri (State Bar No. 130064)
    Nicomedes Sy Herrera (State Bar No. 275332)
2   Kevin Rayhill (State Bar No. 267496)
    Kyla Gibboney (State Bar No. 301441)
3   V Chai Oliver Prentice (State Bar No. 309807)
    JOSEPH SAVERI LAW FIRM, INC.
4   601 California Street, Suite 1000
    San Francisco, California 94108
5   Telephone: (415) 500-6800
    Facsimile:  (415) 395-9940
6   Email: jsaveri@saverilawfirm.com
            nherrera@saverilawfirm.com
7           krayhill@saverilawfirm.com
            kgibboney@saverilawfirm.com
8           vprentice@saverilawfirm.com

**SEALED**
**BY COURT ORDER**

9   *Attorneys for Plaintiffs*

10                     UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13   UNITED STATES OF AMERICA; STATES      Case No.:   **C V   18   1496**
14   OF CALIFORNIA, COLORADO,
     CONNECTICUT, DELAWARE, FLORIDA,       **COMPLAINT FOR VIOLATIONS OF:**
15   GEORGIA, HAWAII, ILLINOIS, INDIANA,
     IOWA, LOUISIANA, MARYLAND,            1.  **THE FEDERAL FALSE CLAIMS**
16   MICHIGAN, MINNESOTA, MONTANA,             **ACT, 31 U.S.C. §§ 3729–3733; AND**
     NEVADA, NEW HAMPSHIRE, NEW
17   JERSEY, NEW MEXICO, NEW YORK,         2.  **THE FALSE CLAIMS ACTS OF**
     NORTH CAROLINA, OKLAHOMA, RHODE           **THE PLAINTIFF STATES,**
18   ISLAND, TENNESSEE, TEXAS, VERMONT,        **COMMONWEALTHS, AND THE**
     AND WASHINGTON; THE                       **DISTRICT OF COLUMBIA**
19   COMMONWEALTHS OF
     MASSACHUSETTS AND VIRGINIA; AND
20   THE DISTRICT OF COLUMBIA,            *QUI TAM* **ACTION FILED**
                                         *IN CAMERA* **AND UNDER SEAL**
21   *ex rel.* ZACHARY SILBERSHER,
                                         **DO NOT PLACE IN PRESS BOX**
22                    Plaintiffs,        **DO NOT ENTER ON PACER**

23                 v.                    **JURY TRIAL DEMANDED**

24   VALEANT PHARMACEUTICALS
     INTERNATIONAL, INC., VALEANT
25   PHARMACEUTICALS INTERNATIONAL,
     SALIX PHARMACEUTICALS, LTD., SALIX
26   PHARMACEUTICALS, INC., AND DR.
     FALK PHARMA GMBH,
27
                      Defendants.
28

     COMPLAINT                                              CASE NO.

1    Plaintiff-Relator Zachary Silbersher ("Relator"), through his attorneys the Joseph Saveri

2  Law Firm, Inc., on behalf of the United States of America; the States of California, Colorado,

3  Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland,

4  Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York,

5  North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington; the

6  Commonwealths of Massachusetts and Virginia; and the District of Columbia (the foregoing states,

7  commonwealths and the District of Columbia collectively, "the Plaintiff States"), for his Complaint

8  against defendants Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals

9  International (collectively with Valeant Pharmaceuticals International, Inc., "Valeant"), Salix

10  Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc. (collectively with Salix Pharmaceuticals, Ltd.,

11  "Salix"), Dr. Falk Pharma GmbH ("Dr. Falk") (Valeant, Salix, and Dr. Falk collectively,

12  "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and

13  belief, as follows:

14  **I.    INTRODUCTION**

15      **A.    Overview of Defendants' False Claims**

16      1.      This is an action to recover damages and civil penalties on behalf of the United States

17  of America and the Plaintiff States arising from Defendants' violations of the federal False Claims

18  Act, 31 U.S.C. §§ 3729–3733 (the "Federal FCA"); and the false claims acts of the Plaintiff States

19  (the "State FCAs").

20      2.      Defendants manufacture, sell, and distribute Apriso® (mesalamine)[1] Extended

21  Release Capsules, the application for which was approved by the FDA on October 31, 2008. Doctors

22  widely prescribe Apriso® to treat patients with ulcerative colitis. Ulcerative colitis is an

23  inflammatory-bowel disease that causes inflammation and ulcers within the colon. The active-

24  pharmaceutical ingredient in Apriso® is mesalamine. Mesalamine has been widely used for decades

25  in numerous pharmaceutical formulations to treat ulcerative colitis, and has long been off-patent.

26

27

28  [1] Mesalamine is sometimes also referred to as mesalazine, 5-aminosalicylic acid, or 5-ASA.

- 1 -

COMPLAINT                                                                    CASE NO.

1    3.    Mesalamine acts topically upon the sores within the colon. When orally administered,
2  mesalamine must travel through the stomach and reach the colon to be therapeutically effective. The
3  difficulty, however, is that mesalamine is easily metabolized in the stomach. When metabolized,
4  mesalamine will be absorbed into the blood stream, which is known as "systemic" absorption. When
5  systemically absorbed, the drug will not pass through the stomach and into the colon. Thus, oral
6  mesalamine drugs are typically formulated so that the drug can pass through the stomach, without
7  being metabolized, and eventually reach the colon, where it can act topically upon the ulcers. The
8  extent to which the drug is released in the colon is sometimes referred to as "colonic bioavailability."

9    4.    To increase colonic bioavailability, Apriso® encases the drug within an enteric
10  coating, to delay release of the drug. Apriso® also uses a polymer matrix core to extend release of the
11  drug through as much of the colon as possible. An enteric coating will only dissolve above a certain
12  pH-threshold. Thus, because the pH of the stomach is typically lower than that of the colon, enteric
13  coatings have been used with oral mesalamine formulations so that the drug can pass through the
14  stomach without being metabolized. When the drug reaches the colon, where the pH is higher, the
15  enteric coating dissolves, and the drug is released.

16    5.    Defendants hold a fraudulently-obtained patent that grants them a monopoly on the
17  sale of Apriso®. On information and belief, the patent was obtained through fraudulent and
18  misleading statements to the United States Patent and Trademark Office (the "Patent Office"). As a
19  result of Defendants' unlawfully-acquired monopoly, Defendants have been successful in wrongfully
20  excluding generic competition for Apriso®, and Defendants can and do set an artificially high price
21  for the drug.

22    6.    Apriso® is covered by Medicare, Medicaid, and various federal and state government-
23  funded health programs. Government health funds pay a significant portion of Apriso®'s artificially
24  high prices. Each and every claim submitted to one of these government agencies for payment or
25  reimbursement for Apriso® is a false claim in violation of the Federal FCA and (where applicable) a
26  relevant State FCA, because Defendants knowingly and intentionally caused each claim to be
27  submitted for an artificially high price that Defendants charged as a result of their fraudulently-
28  obtained patent.

- 2 -

1    7.    There are two sets of patents relating to Apriso®. The first set consists of a single

2  method of use patent: U.S. Patent No. 8,865,688 ("the '688 Patent"). The '688 Patent was issued

3  on October 21, 2014 and will not expire until May 1, 2030.

4    8.    The '688 Patent claims a method for administering certain granulated mesalamine

5  formulations *without* food. The Apriso® formulation is covered by the granulated mesalamine

6  formulation claimed in the '688 Patent. As previously discussed, the granulated mesalamine

7  formulation combines an enteric pH-dependent coating, which provides for delayed release, and a

8  polymer matrix core, which provides for extended release.

9    9.    During prosecution of the '688 Patent application, Defendants argued to the Patent

10  Office that administering the claimed granulated mesalamine formulation without food was *not*

11  obvious. After a lengthy prosecution, the Patent Office granted the '688 Patent based on this

12  purported novelty. Defendants, however, intentionally withheld material information showing that

13  the claimed granulated mesalamine formulation would be effective when administered without food.

14    10.    First, Defendants withheld disclosure of two scientific studies—published before

15  Defendants applied for the '688 Patent—that disclosed administering granulated mesalamine

16  formulations, such as those in Apriso®, would be effective without food (the "Brunner" and the

17  "Marakhouski" studies).[2] Defendants not only were aware of these studies: they *participated* in

18  them. Dr. Falk's head of research and development, Roland H. Greinwald, Ph.D., was a co-author of

19  both studies. In addition, Dr. Falk provided the granulated mesalamine formulations used in the

20  Brunner study, and it underwrote the Marakhouski study. Yet, Defendants failed to disclose the

21  studies to the Patent Office during prosecution of the '688 Patent.

22    11.    Second, Defendants withheld information showing that the colonic bioavailability of

23  other pH-dependent mesalamine drugs using enteric coatings decreased when administered with

24  food. This was all the more shocking because Defendants had disclosed these other drugs to the

25

26  [2] Brunner *et al.*, "Gastrointestinal Transit and Release of 5-Aminosalicylic Acid From 153Sm-Labelled
Mesalazine Pellets vs. Tablets in Male Healthy Volunteers." *Aliment Pharmacol. Ther.* 17:1163-1169
27  (2003) ("Brunner"); and, Marakhouski *et al.*, "A Double-Blind Dose-Escalating Trial Comparing
Novel Mesalazine Pellets With Mesalazine Tablets in Active Ulcerative Colitis." *Aliment Pharmacol.*
28  *Ther.* 21:133-140 (2005) ("Marakhouski").

- 3 -

1  Patent Office a few years earlier when Defendants argued that it was not obvious to administer a
2  different mesalamine drug *with* food. Specifically, on July 16, 2009, in connection with Defendants'
3  prosecution of an earlier patent, Defendants told the Patent Office: "one of ordinary skill in the art,
4  upon review of all the information available at the time the instant application was filed, would have
5  expected the bioavailability [at the colon] of balsalazide to decrease when taken with food, and not
6  increase, as maintained by the Examiner." In other words, administration of balsalazide (a
7  mesalamine prodrug) *with* food was unexpected, and therefore novel, at that time. Five years later,
8  while prosecuting the '688 Patent, Defendants claimed administering mesalamine *without food* was
9  unexpected. Defendants knowingly and intentionally omitted information that did not support their
10 new claim, including information about similar mesalamine formulations that they had relied on in
11 their earlier arguments to the Patent Office. These omissions during prosecution of the '688 Patent
12 were intentional. Indeed, the '688 Patent and the earlier patent each shared an inventor (Lorin
13 Johnson), and they were prosecuted by the same patent attorney (Jonathan Sparks).

14      12.     Defendants' willful deceit was confirmed on May 19, 2017, when the Patent Office's
15 Patent Trial and Appeal Board ("PTAB") invalidated the '688 Patent on the grounds it was obvious
16 in light of the Brunner and Marakhouski articles. *See GeneriCo, LLC v. Dr. Falk Pharma GmbH*,
17 No. IPR2016-00297, Final Written Decision, Dkt. 55 at 21-22 (P.T.A.B. May 19, 2017)
18 ("*GeneriCo*").[3] Specifically, the PTAB held that administration of Apriso® "without food" would
19 have been obvious in light of the Brunner and Marakhouski articles. The PTAB quoted the two
20 articles as stating mesalamine can be taken "independent of concomitant food intake" or
21 "independent of meals," respectively.

22
23
24

25 [3] Valeant is appealing the PTAB's decision and a similar district court opinion (*Salix Pharmaceuticals Inc.
   *v. Mylan Pharmaceuticals, Inc.*, No. 1:15-cv-00109-IMK, Slip Op., Dkt. 255 (N.D.W. Va. Sept. 12, 2017))
26 to the Federal Circuit. The two appeals have been assigned to the same merits panel and are being heard
   as companion cases. *See Dr. Falk Pharma GmbH v. GeneriCo, LLC*, No. 17-2312, Dkt. 37 (Fed. Cir. Nov.
27 7, 2017) (PTAB appeal), and *Dr. Falk Pharma GmbH v. GeneriCo, LLC*, No. 17-2636, Dkt. 30 (Fed. Cir.
   Nov. 7, 2017) (N.D.W. Va. appeal).
28

- 4 -

1      13.     The second set of patents are known collectively as the "Otterbeck Patents."[4] The

2   Otterbeck Patents all expire on April 20, 2018. However, Defendants have not asserted (or have

3   withdrawn their assertions) that the Otterbeck Patents restrict certain pharmaceutical manufacturers

4   from introducing generic alternatives to Apriso®. On information and belief, Defendants have not

5   pressed the Otterbeck Patents against generic competitors because the Otterbeck Patents are invalid,

6   and Defendants know it. As set forth in greater detail below, Defendants did not disclose material

7   information that would have shown that the allegedly novel innovations claimed in the Otterbeck

8   Patents had been disclosed in or were obvious in light of prior art. Specifically, at least four prior art

9   patents anticipate all or nearly all of the alleged inventions claimed in the Otterbeck Patents,

10   rendering them unpatentable. Defendants failed to disclose this prior art to the Patent Office.

11      14.     Apriso® was originally approved by the United States Food and Drug Administration

12   (the "FDA") on October 31, 2008 (Application No. N022301), and Apriso®'s FDA-approved

13   exclusivity expired on October 31, 2011. Generic manufacturers were ready to enter the market soon

14   after the FDA exclusivity period expired. The first to file an Abbreviated New Drug Application

15   ("ANDA") for FDA approval to introduce a generic version of Apriso® was Lupin Pharmaceuticals,

16   Inc. ("Lupin"). Valeant filed an infringement action asserting the Otterbeck Patents against Lupin

17   on September 7, 2012 (the '688 Patent had not yet issued at that time). On September 11, 2014, the

18   Patent Office notified Valeant that it would issue the '688 Patent upon payment of the issue fee. The

19   next day, on September 12, 2014, Lupin and Valeant reached a settlement under which Valeant

20   dismissed all claims relating to the Otterbeck Patents, and Lupin agreed not to introduce a generic

21   until 2022.

22      15.     But for the fraudulently acquired '688 Patent, Lupin would not have agreed to stay

23   out of the market until four years after the Otterbeck Patents were due to expire. Moreover, but for

24   the '688 Patent, the FDA would have granted Lupin's ANDA soon after Defendants' withdrawal of

25   the claims relating to the Otterbeck Patents.

26

27   [4] The Otterbeck Patents are U.S. Patent Nos. 6,551,620 ("the '620 Patent"), 8,337,886 ("the '886
Patent"), 8,496,965 ("the '965 Patent"), 8,911,778 ("the '778 Patent"), 8,940,328 ("the '328 Patent")
28   and 8,956,647 ("the '647 Patent").

- 5 -

1    16.    Because the '688 Patent was fraudulently obtained and unenforceable, Lupin would
2    have entered the market soon after Defendants ceased enforcing the Otterbeck Patents.

3    17.    After dismissing its infringement claims relating to the Otterbeck Patents against
4    Lupin, Defendants dismissed their infringement claims relating to the Otterbeck Patents against
5    other generic manufacturers. But for the '688 Patent, those other manufacturers would have also
6    introduced generic alternatives to Apriso® soon after Defendants' withdrawal of their claims relating
7    to the Otterbeck Patents against them, and the FDA would have likely granted these pending
8    ANDAs sooner.

9    18.    Such generic competition would have reduced the price of Apriso® by at least 80%,
10   and Defendants would have reasonably expected to lose at least 90% of Apriso®'s market share.
11   Defendants' illegally acquired monopoly on sales of Apriso® has allowed them unlawfully to set and
12   maintain artificially inflated prices for Apriso®. The federal government and the Plaintiff States,
13   through Medicare, Medicaid, and their various health services, have paid artificially inflated prices
14   for Apriso® throughout the intervening time. Because Defendants are able to charge inflated prices
15   for Apriso® due to their false or misleading statements, each claim for Apriso® is a violation of the
16   False Claims Act.

17   19.    The additional protection granted by the '688 Patent gave Defendants added leverage
18   in litigation with potential generic manufacturers of Apriso®. Defendants used this leverage to avoid
19   defending the validity of the Otterbeck Patents, which in turn allowed Defendants to extend their ill-
20   gotten monopoly on Apriso®.

21   20.    The delay caused by Defendants' manipulation of the regulatory structure for generic
22   approval (described below) has allowed Defendants to reap a windfall of hundreds of millions of
23   dollars in Apriso® revenue to date, a windfall that will continue while the FDA withholds preliminary
24   approval for the generics pending resolution of Defendants' appeal of the PTAB decision
25   invalidating the '688 Patent. Much of this windfall has come at the expense of federal and state
26   government health funds.

27

28

- 6 -

COMPLAINT                                                                              CASE NO.

**B.    The Federal and State False Claims Acts**

21.    The Federal FCA and the State FCAs provide a mechanism for the federal and state governments to protect their health care funds from such unlawful predation. Relator brings this *qui tam* action to do so.

22.    As set forth below, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States Government and each of the Plaintiff States in connection with the sale of Apriso® (each, a "False Claim"). These False Claims include, without limitation: (a) claims for Medicare and Medicaid reimbursement for Apriso® prescriptions; and (b) claims for payment for direct purchases of Apriso® under certain government programs.

23.    Defendants willfully made false and materially misleading statements to the Patent Office to fraudulently obtain the '688 Patent. Defendants unlawfully used the '688 Patent to create and extend their monopoly in the sale of Apriso® and exclude generic competition from the market.

24.    Each and every False Claim for payment or reimbursement for Apriso® submitted by (or caused to be submitted by) Defendants violated the Federal FCA and the respective State FCAs. Among other reasons, each False Claim was for payment based on an unlawfully elevated price for Apriso® contrary to an express or implied certification by Defendants that the price of Apriso® was not unlawfully elevated, maintained, or stabilized in violation of applicable law, including applicable antitrust laws. Moreover, Defendants made false, fraudulent, and misleading statements to the Patent Office in connection the submission of each False Claim because the price of Apriso® reflected in each False Claim was unlawfully elevated as a result of Defendants' false, fraudulent, and misleading statements to the Patent Office.

25.    According to the Centers for Medicare & Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services ("DHHS"), between 2011 and 2015 (the last year for which figures are available), Medicare reimbursed approximately 462,491 prescriptions for Apriso® for approximately $183 million.

26.    Between 2011 and 2015, the number of prescriptions for Apriso® covered by Medicare Part D increased on average 45% per year, per-unit prices increased on average by 13% per year, and

- 7 -

1  total reimbursements increased on average 67% per year during that time. Thus, it is reasonable to
2  infer that the number and cost of false claims Defendants submitted or caused to be submitted to
3  patients, insurers and health care providers continued to increase in 2016 and 2017.

4      27.    Apriso® is also covered by Medicaid programs for all Plaintiff States, making
5  payments relating to Apriso® purchases and reimbursements a substantial burden on Medicaid funds.
6  On information and belief, Medicaid reimbursements to the Plaintiff States increased in similar
7  proportions to the Medicare payments in the same time period.

8      28.    The United States Government also purchases Apriso® through government-funded
9  health programs, including, without limitation, CHIP; the Indian Health Service; the Federal Bureau
10 of Prisons' Health Services Division; the Veterans Health Administration; the Military Health
11 System; the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); the
12 Defense Health Agency / TRICARE; and the Coast Guard's Office of Health Services.

13     29.    Each and every time that Defendants submitted, or caused to be submitted, any False
14 Claim for payment or reimbursement for Apriso® to the United States Government or any of the
15 Plaintiff States, Defendants violated the federal False Claims Act, 31 U.S.C. §§ 3729–3733 (the
16 "Federal FCA"), and the state false claims act of the respective Plaintiff State (each, a "State
17 FCA") in which such submission was made, as applicable.

18     30.    As set forth herein, Defendants' actions alleged in this Complaint violate the Federal
19 FCA and the following State FCAs: The California False Claims Act, Cal. Gov't Code §§ 12650–
20 12656; Colorado Medicaid False Claims Act, Colo. Rev. Stat §§ 25.5-4-303.5 to -310; Connecticut
21 False Claims Act, Conn. Gen. Stat. §§ 4-274 to -289; Delaware False Claims and Reporting Act, Del.
22 Code Ann. tit. 6, §§ 1201-1211; District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to
23 .09; Florida False Claims Act, Fla. Stat. §§ 68.081–.09; Georgia False Medicaid Claims Act, Ga.
24 Code Ann. §§ 49-4-168 to 168.6; Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 to -31; Illinois
25 False Claims Act, 740 Ill. Comp. Stat. 175/1–175/8; Indiana False Claims and Whistleblower
26 Protection Act, Ind. Code §§ 5-11-5.5-1 to -18; Iowa False Claims Act, Iowa Code §§ 685.1–.7;
27 Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437–:440; Maryland
28 False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 to -611; Massachusetts False

- 8 -

1  Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–5O; Michigan Medicaid False Claims Act, Mich. Comp.
2  Laws. §§ 400.601–.615; Minnesota False Claims Act, Minn. Stat, §§ 15C.01–.16; Montana False
3  Claims Act, Mont. Code Ann. §§ 17-8-401 to -413; Nevada statute concerning Submission of False
4  Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250; New Hampshire Health
5  Care False Claims Law, N.H. Rev. Stat. Ann. §§ 167:61-b to :61-e; New Jersey False Claims Act, N.J.
6  Stat. Ann. §§ 2A:32C-1 to -18; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1
7  to -15, and New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14; New York
8  False Claims Act, N.Y. State Fin. Law §§ 187–194; North Carolina False Claims Act, N.C. Gen.
9  Stat. §§ 1-605 to -618; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7;
10 Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9; Tennessee Medicaid False Claims
11 Act, Tenn. Code Ann. §§ 71-5-181 to -185; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res.
12 Code Ann. §§ 36.001–.132; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, §§ 630–642; Virginia
13 Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 to .19; and Washington State Medicaid Fraud
14 False Claims Act, Wash. Rev. Code §§ 74.66.005–.130.

15 **II.  PARTIES**

16  31.  The Relator Zachary Silbersher is a citizen of New York. Through his independent
17 investigation, Relator has uncovered non-public information supporting the claims set forth herein.
18 The Relator's independent research and investigation has generated information that is independent
19 of and materially adds to any publicly disclosed allegations and transactions.

20  32.  Relator is an "original source" of information within the meaning of 31 U.S.C.
21 § 3730(e)(4)(B) and all applicable state statutes for the Plaintiff States. Relator has voluntarily
22 provided the information on which the allegations or transactions alleged herein are based to the
23 Government and the Plaintiff States before filing this action.

24  33.  Relator seeks to recover all available damages, civil penalties, and other relief for
25 federal and state-law violations alleged herein. In particular Relator sues to recover on behalf of the
26 United States Government and its various agencies administering federally funded health care
27 programs, including, without limitation, CHIP; the Indian Health Service; the Federal Bureau of
28 Prisons' Health Services Division; the Veterans Health Administration; the Military Health System;

- 9 -

1  the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); the Defense
2  Health Agency / TRICARE; and the Coast Guard's Office of Health Services. Relator also sue to
3  recover on behalf of the Plaintiff States and their respective agencies administering State programs
4  for prescription drug coverage, including, without limitation, Medicaid contributions.

5      34.    Defendant Valeant Pharmaceuticals International is a Canadian corporation with its
6  principal place of business at 2150 St. Elzéar Boulevard West, Laval, Quebec H7L 4A8. At all times
7  relevant to the purposes of this litigation, Valeant Pharmaceuticals International sold Apriso® either
8  directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

9      35.    Defendant Valeant Pharmaceuticals International, Inc., is a corporation organized and
10  existing under the laws of Delaware, with its principal place of business at 400 Somerset Corporate
11  Boulevard, Bridgewater, NJ 08807. Valeant Pharmaceuticals International, Inc., is a wholly-owned
12  subsidiary of Valeant Pharmaceuticals International.

13      36.    Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of
14  California, having its principal place of business at 8510 Colonnade Center Drive, Raleigh, North
15  Carolina 27615. Salix Pharmaceuticals, Ltd. was acquired by Valeant Pharmaceuticals International,
16  Inc., an indirect, wholly-owned subsidiary of Valeant Pharmaceuticals International on April 1, 2015.

17      37.    Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of
18  California, having its principal place of business at 8510 Colonnade Center Drive, Raleigh, North
19  Carolina 27615. Salix is a wholly-owned subsidiary of Salix Pharmaceuticals, Ltd., which was
20  acquired by Valeant Pharmaceuticals International, Inc., an indirect, wholly-owned subsidiary of
21  Valeant Pharmaceuticals International on April 1, 2015. At all times relevant to the purposes of this
22  litigation, Salix Pharmaceuticals, Inc. has been the exclusive licensee of all United States patents
23  relating to Apriso®.

24      38.    Defendant Dr. Falk Pharma GmbH is a German corporation having its principal place
25  of business at Leinenweberstr. 5, 79108 Freiburg im Breisgau, Germany. At all times relevant to the
26  purposes of this litigation, Dr. Falk has been the sole assignee of all rights pertaining to all United
27  States patents relating to Apriso®.

28

- 10 -

1    39.    Defendants sell Apriso® in the United States pursuant to New Drug Application

2  ("NDA") No. N022301, which was approved by the United States Food and Drug Administration

3  ("FDA") on October 31, 2008.

4  **III.    JURISDICTION AND VENUE**

5    40.    This Court has jurisdiction over the subject matter of this action pursuant to

6  28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which

7  specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and

8  3730. In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the state

9  law claims.

10    41.    Under 31 U.S.C. § 3730(e), and under the comparable provisions of the Plaintiff State

11  statutes, there has been no statutorily relevant public disclosure of the "allegations or transactions"

12  in this Complaint. Moreover, whether or not such a disclosure had occurred, Relator would qualify

13  as an "original source" of the information in this Complaint. Relator has independent knowledge of

14  the information on which the allegations herein are based; such knowledge materially adds to any

15  publicly disclosed allegations or transactions; and Relator voluntarily provided the information to the

16  Government before filing this action and before any public disclosure of the allegations and

17  transactions in this Complaint material to the false claims alleged herein.

18    42.    This Court has personal jurisdiction over each of the Defendants pursuant to

19  31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the

20  Defendants maintains minimum contacts with the United States, and each can be found, transacts

21  business, and has presented or caused to be presented and continues to present or cause to be

22  presented false or fraudulent claims for payment, in this District.

23    43.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and

24  31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. At all

25  times relevant to this Complaint, each of the Defendants regularly conducted substantial business

26  within this District and made significant sales within this District. Moreover, numerous acts violating

27  31 U.S.C. §§ 3729–3733 occurred in this District, and a substantial part of the events giving rise to

28  the claims alleged herein occurred here.

- 11 -

1    44.    Many of the acts underlying the false claims allegations herein occurred in this
2  District.

3  **IV.    FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS**

4    45.    Government-funded health care programs cover medical services and prescriptions
5  for one-third of the United States population.

6    **A.    Medicare**

7    46.    Medicare is a federally-funded health insurance program primarily benefitting the
8  elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.

9    47.    The Medicare program has four parts: Part A, Part B, Part C, and Part D. Medicare
10  Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services
11  and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan,
12  covers the cost of services performed by physicians and certain other health care providers, both
13  inpatient and outpatient, if the services are medically necessary and directly and personally provided
14  by the provider. Medicare Part C covers certain managed care plans. Medicare Part D provides
15  subsidized prescription drug coverage for Medicare beneficiaries.

16    48.    Medicare provides benefits for patients being treated with Apriso® under Part D.

17    49.    The Medicare program is administered through CMS at the DHHS.

18    **B.    Medicaid**

19    50.    Medicaid is jointly administered by the United States and each of the separate states,
20  including the Plaintiff States.

21    51.    Individual state Medicaid programs are administered by each individual state, subject
22  to oversight by the United States in accordance with statutes and regulations promulgated by the
23  United States and the Secretary of the DHHS. Pursuant to these statutes and regulations, the United
24  States provides financial assistance to each of the state Medicaid programs by providing each state
25  with financing equal to at least 50% of the costs incurred by the state Medicaid programs. In some
26  instances, the United States provides financing equal to as much as 75% of program costs incurred,
27  including the costs incurred for reimbursing providers for dispensing prescription drug products
28  (such as Apriso®) to Medicaid beneficiaries.

- 12 -

1      52.      Each state Medicaid program obtains federal financial assistance by submitting

2   quarterly claims to the United States for federal financial assistance related to the costs incurred for

3   administering the state Medicaid programs.

4          **C.      Other Government-Funded Health Programs**

5      53.      The other major government-funded health programs—including CHIP; the Indian

6   Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health

7   Administration; the Military Health System; the Civilian Health and Medical Program of the

8   Uniformed Services (CHAMPUS); the Defense Health Agency / TRICARE; and the Coast Guard's

9   Office of Health Services—purchase significant amounts of Apriso® for their covered patients.

10  **V.     THE REGULATORY STRUCTURE THAT DEFENDANTS MANIPULATED TO
            BLOCK GENERIC COMPETITORS TO APRISO®**

11

12         **A.     The Regulatory Structure for Approval of Generic Drugs**

13                  **i.      The United States Federal Food, Drug and Cosmetic Act**

14     54.      Under the United States Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer

15  must obtain FDA approval to sell a new drug by filing a New Drug Application ("NDA"). 21 U.S.C.

16  §§ 301–392. An NDA must include submission of specific data concerning the safety and

17  effectiveness of the drug, and identify any patent that allegedly claims either the approved drug or

18  approved methods of use of the drug and could reasonably be asserted against a generic manufacturer

19  that makes, uses, or sells a generic version of the brand drug prior to the expiration of the listed

20  patent(s). 21 U.S.C. § 355(a), (b). When the FDA approves an NDA, it publishes the patents

21  identified by the brand manufacturer in a database called "Approved Drug Products with

22  Therapeutic Equivalence Evaluations," commonly known as the "Orange Book." Patents issued

23  after NDA approval may be listed in the Orange Book within thirty days of issuance. 21 U.S.C.

24  §§ 355(b)(1) & (c)(2).

25     55.      The FDA relies completely on the brand manufacturer's truthfulness about patent

26  validity and applicability, as it does not have the resources or authority to verify that the

27  manufacturer's patents were not procured through fraud. In listing patents in the Orange Book, the

28  FDA merely performs a ministerial act. Therefore, pharmaceutical companies that list patents in the

- 13 -

1 | Orange Book that they claim protect a particular drug have a duty to list only those patents that they
2 | believe in good faith restrict generic entry.

3 | ### ii. The Hatch-Waxman Amendments

4 | 56. The Hatch-Waxman Amendments to the FDCA, enacted in 1984, simplified the
5 | regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file
6 | lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L.
7 | No. 98-417, 98 Stat. (1984). A generic manufacturer seeking approval to sell a generic version of a
8 | brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on
9 | the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA,
10 | and must show that the generic drug contains the same active ingredient(s), dosage form, route of
11 | administration, and strength as the brand drug, and is absorbed at the same rate and to the same
12 | extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and
13 | bioequivalent (together, "therapeutically equivalent") to the brand drug. *See generally* 21 U.S.C.
14 | § 355(j) *et seq.*

15 | 57. The FDCA and Hatch-Waxman Amendments operate on the principle that
16 | bioequivalent drug products containing identical amounts of the same active ingredients, having the
17 | same route of administration, dosage and form, and meeting applicable standards of strength, quality,
18 | purity and identity, are therapeutically equivalent and may be substituted for one another.
19 | Bioequivalence demonstrates that the active ingredient of the proposed generic drug is absorbed at
20 | the site of drug action to the same extent and for the same amount of time as the branded
21 | counterpart. 21 U.S.C. § 355(j)(8)(B). Thus, a generic drug is identical to a brand name drug in
22 | dosage, form, safety, strength, route of administration, and intended use.

23 | 58. Generic drugs that are therapeutically equivalent to their brand counterparts are given
24 | an "AB" rating by the FDA, allowing their substitution for the brand when a patient presents a
25 | prescription for the brand product.

26 | 59. Congress enacted the Hatch-Waxman Amendments to expedite the entry of generic
27 | competitors, thereby reducing healthcare expenses nationwide. As a result, generic drugs became an
28 | increasingly large part of prescription drug revenues, and a growing threat to brand name drug

- 14 -

1  profits. In 1984, prescription drug revenue for brand and generic drugs totaled $21.6 billion, with

2  generic drugs accounting for 18.6% of total prescriptions. By 2013, total prescription drug revenue

3  had climbed to more than $329.2 billion, with generic drugs accounting for 84% of prescriptions. *See*

4  IMS Institute for Healthcare Informatics, *Medicine and Shifting Costs of Healthcare* 30, 51 (2014).

5              **iii.    Paragraph I, II, III, and IV Certifications**

6       60.    To obtain FDA approval of an ANDA, a generic manufacturer must certify that the

7  generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book. Under

8  the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four

9  certifications for each Orange Book-listed patent:

10          a.   That no patent for the brand name drug has been filed with the FDA (a "Paragraph I

11               certification");

12          b.   that the patent for the brand drug has expired (a "Paragraph II certification");

13          c.   that the patent for the brand name drug will expire on a particular date and the generic

14               company does not seek to market its generic product before that date (a "Paragraph

15               III certification"); or

16          d.   that the patent for the brand drug is invalid or will not be infringed by the generic

17               manufacturer's proposed product (a "Paragraph IV certification").

18       61.    Because ANDAs with Paragraph I, II, or III certifications face no potential patent

19  challenge, FDA approval of these ANDAs is relatively expeditious.

20       62.    However, when a generic manufacturer is forced to file a Paragraph IV certification

21  because the Orange Book lists a drug that has not or will not expire by the time of the planned generic

22  entry, the brand manufacturer is able trigger extensive regulatory delays that will block FDA

23  approval of generic entry—potentially for many years.

24       63.    When a generic manufacturer files a Paragraph IV certification, it must promptly

25  provide notice to the brand manufacturer. Filing an ANDA with a Paragraph IV certification gives

26  rise to a cause of action for patent infringement regardless of the merits of the action. If the brand

27  manufacturer initiates a patent infringement action against the generic filer within forty-five days of

28  receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will

- 15 -

1   not grant final approval to the ANDA until the earlier of (a) the passage of thirty months from the

2   notification date, or (b) the issuance of a decision by a court that the patent is invalid or not infringed

3   by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant

4   "tentative approval," but cannot authorize the generic manufacturer to go to market with its

5   product. Tentative approval means the ANDA would be ready for final approval but for the 30-

6   month stay. As a practical matter, the initiation of a patent infringement action provides the brand

7   manufacturer with the equivalent of an automatic 30-month injunction that prevents the generic

8   manufacturer from releasing a competing generic product, regardless of the merits of the

9   infringement action.

10          **B.      United States Patent Law**

11          64.      United States patents grant the patent owner or assignee the exclusive right to

12  exclude others from practicing the patent product for a fixed period of time from the patent's priority

13  date.

14          65.      Under applicable patent law, an application for a patent will be rejected by the Patent

15  Office if the invention was "patented, described in a printed publication, or in public use, on sale, or

16  otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C.

17  § 102. Even if the invention was not disclosed in detail as set forth in section 102, a claim is

18  unpatentable if the differences between the subject matter sought to be patented and the prior art are

19  such that the subject matter as a whole would have been obvious at the time the invention was made to a

20  person having ordinary skill in the art. 35 U.S.C. § 103. If the Patent Office uncovers prior art that

21  satisfies sections 102 or 103, it establishes a *prima facie* case of obviousness.  To overcome a *prima*

22  *facie* case of obviousness, the patent applicant has a number of options, including: (i) narrowing the

23  invention to distinguish over the prior art; (ii) arguing the prior art does not render the claim obvious;

24  or (iii) submitting objective evidence of secondary considerations, including commercial success,

25  long-felt but unsolved need, and failure of others. A person or entity can challenge the validity of an

26  issued patent by filing a petition for *inter partes* review with the PTAB. 35 U.S.C. § 311.

27          66.      A patent applicant has an affirmative duty of candor and good faith when prosecuting

28  a patent application, which includes an affirmative duty to disclose all material prior art known to the

- 16 -

1  applicant at the time of the application. 37 C.F.R. § 1.56. Failure to disclose material prior art can
2  render a patent unenforceable. *See e.g.*, *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1367 (Fed. Cir.
3  1998) ("Fraud in obtaining a United States patent is a classical ground of invalidity or
4  unenforceability of the patent."). Moreover, concealing a material fact in a matter within the
5  jurisdiction of a federal executive agency is a criminal offense punishable by fine and imprisonment.
6  18 U.S.C. § 1001.

7        **C.      The Economic Benefits of Blocking Generic Entry, Even When Frivolous**

8        67.     AB-rated generic drugs contain the same active ingredient, and are determined by the
9  FDA to be just as safe and effective as their branded counterparts. The only material difference
10  between generic drugs and branded drugs is their price: when multiple generic drug manufacturer
11  competitors enter the market for a given branded drug, generic drugs cost, on average, 80%-85%
12  lower than the branded drug prior to generic entry. Moreover, the Federal Trade Commission
13  (FTC) estimates that about one year after market entry, a generic drug takes over 90% of the branded
14  drug's unit sales.

15        68.     When multiple generics enter the market, competition accelerates and prices drop to
16  their lowest levels. Competition from several generic sellers drives drug prices down toward marginal
17  manufacturing costs. Defendants prevented this from happening with Apriso® by applying for and
18  obtaining the '688 Patent, which would have extended Defendants' monopoly on sales of Apriso®
19  through 2030. The '688 Patent was obtained through false and misleading statements to the Patent
20  Office. But for this illegally acquired patent, generics would have entered the marketplace much
21  sooner, which would have lowered prices for generic Apriso® by 85 to 90 percent.

22  **VI.     ALLEGATIONS CONCERNING DEFENDANTS' FALSE CLAIMS**

23        **A.      Defendants Fraudulently Obtained the '688 Patent Through False and
24                Misleading Statements.**

25              **i.      About Apriso®**

26        69.     Defendants manufacture, sell, and distribute Apriso® (mesalamine), which doctors
27  prescribe widely to patients with ulcerative colitis, a chronic inflammatory gastrointestinal disorder
28  affecting the colon. Patients typically take Apriso® on a prolonged basis to maintain remission of

- 17 -

1  ulcerative colitis. There are a number of ulcerative colitis drugs on the market that use mesalamine,
2  and mesalamine itself has been off patent protection for years (if not decades), as Defendants
3  concede in their patents. *See e.g.*, U.S. Patent No. 6,551,620 at col. 5, lines 15-19.

4      70.    Apriso® is a granulated mesalamine formulation that combines an enteric pH-
5  dependent coating, which provides for delayed release, and a polymer matrix core, which provides
6  for extended release.

7      71.    Mesalamine works topically on the affected areas of the colon, meaning it requires
8  targeted and sustained delivery to the colon. This challenge is complicated because mesalamine is
9  quickly metabolized in the stomach and absorbed into the bloodstream (referred to as "systemic
10 absorption") before it reaches the colon, negating its effectiveness. Some orally administered
11 mesalamine drugs on the market today typically accomplish targeted delivery by using an enteric
12 coating. An enteric coating will resist dissolution in the stomach (where the pH is more acidic), but
13 permit dissolution in the colon (where the pH is more basic). Apriso® uses a pH-sensitive enteric
14 coating that will not dissolve in pH levels found in the stomach but will dissolve in pH levels found
15 further down in the digestive tract, where the mesalamine will then be released within the colon.
16 Defendants concede that use of enteric coatings to target delivery to the colon is widely known in the
17 prior art. Sustained delivery is then accomplished by embedding the mesalamine within a polymer
18 matrix, wherein the matrix is insoluble in intestinal fluids but the active ingredient is not. The
19 polymer matrix is permeable, allowing the intestinal fluids to gradually enter and disperse the active
20 ingredient, ensuring that the mesalamine is released gradually and consistently so as to increase
21 exposure to more of the colon. Defendants concede that use of polymer matrices to ensure sustained
22 release of an active ingredient was previously known in the prior art, but they assert that use of a
23 "non gel-forming" polymer matrix "surprisingly" decreased systemic absorption and increased
24 targeted delivery of the mesalamine. As set forth in more detail below, the use of non gel-forming
25 polymer matrices was disclosed in prior art that Defendants failed to disclose to the Patent Office.

26     72.    A one-month prescription of Apriso® in the United States has an average retail price
27 of $595. Defendants generate over $200 million in Apriso® sales annually in the United States.

28

- 18 -

73.     Defendants jointly collaborate in the development, manufacture, sale and distribution of Apriso®.

### ii.     Defendants' Fraudulent Prosecution of the '688 Patent

74.     Defendants applied for a new patent relating to Apriso® on October 2, 2009, which eventually issued as the '688 Patent on October 21, 2014. During the five years it took to prosecute the '688 Patent, the application was rejected and amended at least six times. Defendants also submitted two additional office-action responses that included unsuccessful attempts to persuade the Examiner to allow the patent without amendment.

75.     On May 9, 2014, Defendants amended the claims in the pending '688 Patent application so that the claimed methods for "maintaining the remission of ulcerative colitis" included administering the claimed granulated mesalamine formulation "with or without food." On June 5, 2014, the Examiner maintained the rejection of the claims despite this amendment.

76.     On June 20, 2014, Defendants further amended the '688 claims to include a method for administering the claimed granulated mesalamine formulation "without food." In support of this amendment, Defendants stated: "unlike other 5-mesalamine drugs available at the time of the invention, Defendants has demonstrated that the claimed methods are equally safe and effective when granulated mesalamine is administered to a subject without food."

### iii.     Defendants Withheld the Brunner and Marakhouski Studies.

77.     Two studies published several years before Defendants applied for the '688 Patent showed that Apriso® could be taken without food. The first, authored by Martin Brunner *et al.*, was entitled "Gastrointestinal Transit and Release of 5-Aminosalicylic Acid From 153Sm-Labelled Mesalazine Pellets vs. Tablets in Male Healthy Volunteers." *Aliment Pharmacol. Ther.* 17:1163-1169 (2003) ("Brunner"). In the Brunner study, mesalamine pellets were taken orally after an overnight fast, leading the authors to conclude mesalamine could be taken "independent of concomitant food intake." *Id.* at 1167. The second study, authored by Yuri Marakhouski *et al.*, was entitled "A Double-Blind Dose-Escalating Trial Comparing Novel Mesalazine Pellets With Mesalazine Tablets in Active Ulcerative Colitis." *Aliment Pharmacol. Ther.* 21:133-140 (2005). In the Marakhouski study, subjects

- 19 -

1  took granulated mesalamine pellets an hour before meals, leading the authors to conclude that
2  mesalamine "can be taken independent of meals." *Id.* at 134.

3      78.    Defendants were aware of the Marakhouski and Brunner studies. Indeed, one of the
4  studies used mesalamine pellets provided by Dr. Falk (the assignee of the '688 Patent) and the other
5  was underwritten by Dr. Falk, and both studies were co-authored by Dr. Falk's head of research and
6  development, Roland Greinwald. Defendants have conceded, and the PTAB found, that
7  Marakhouski and Brunner relate to Defendant Falk's Salofalk® Granu-Stix® formulation, which is
8  similar to the Apriso® granulated mesalamine formulation, and Defendants admitted, and the PTAB
9  found, that Marakhouski, and Brunner relate to a granulated mesalamine formulation within the
10  scope of the '688 Patent claims.

11      79.    Despite being aware of the Marakhouski and Brunner studies, and in fact participating
12  in them, Defendants failed to disclose either of these papers to the Patent Office during its
13  prosecution of the '688 Patent.

14      80.    Under 37 C.F.R. § 1.56, each individual involved in the prosecution of Defendants'
15  patents has "a duty of candor and good faith in dealing with the [Patent] Office, which includes a
16  duty to disclose to the Office all information known to that individual to be material to
17  patentability . . . ." Information is material when it is not cumulative and either compels a conclusion
18  that a claim is unpatentable or it refutes or is inconsistent with a position an applicant takes in
19  support of a patent claim. *Id.* Defendants failed to meet their duty of candor and good faith by failing
20  to disclose the Marakhouski and Brunner studies, both of which are clearly material to Defendants'
21  claim that taking the granulated mesalamine formulation claimed in the '688 Patent without food was
22  not obvious in light of prior art. Defendants' omission of these studies amounts to a false and
23  misleading statement that the Patent Office relied on in approving the '688 Patent.

24      81.    Indeed, on May 19, 2017, the '688 Patent was held invalid by the United States Patent
25  and Trademark Office's Patent Trial and Appeal Board ("PTAB"), which relied on the Brunner and
26  Marakhouski studies as primary prior art references to find that taking the claimed granulated
27  mesalamine formulation without food would have been obvious to a person of skill in the art based on

28

- 20 -

1  prior art. *GeneriCo, LLC v. Dr. Falk Pharma GmbH*, No. IPR2016-00297, Final Written Decision,

2  Dkt. 55 at 22 (P.T.A.B. May 19, 2017).

3                  **iv.**       **Defendants' Claims in Prosecuting the '688 Patent Were Inconsistent With Claims Defendants had Previously Made to the Patent Office.**

4

5       82.    Other statements Defendants made while prosecuting the '688 Patent are

6  contradicted by statements Defendants made while prosecuting another 5-aminosalicylic acid (*i.e.*,

7  mesalamine) patent. In 2006 Defendants filed a patent application that was allowed on December 30,

8  2014, and issued as United States Patent No. 8,921,344 ("the '344 Patent"). The '344 Patent

9  described a "method of decreasing the systemic absorption of balsalazide and metabolites 5-

10  aminosalicylic acid (5-ASA) and N-acetyl-5-ASA (NASA) comprising administering to a subject a

11  therapeutically effective amount of at least one tablet or capsule comprising balsalazide with food,

12  wherein the systemic adsorption of balsalazide, 5-ASA or NASA is decreased compared to

13  administering balsalazide without food." The '344 Patent states that the disclosed "invention is due,

14  in part, to the *unexpected* finding that administration of balsalazide *with food* increases both the

15  [colonic] bioavailability and decreases the systemic adsorption of 5-ASA [*i.e.*, mesalamine] . . . ."

16  (col. 1:60-63, emphasis added). While prosecuting the '344 Patent to the Patent Office, Defendants

17  stated:

18          [O]ne of ordinary skill in the art, upon review of all the information available at the time the instant application was filed, would have

19          expected the bioavailability of balsalazide to *decrease* when taken with food, and not increase, as maintained by the Examiner. Said another way,

20          based on the data available at the time of the filing, the ordinary skill artisan would have expected the systemic absorption of balsalazide to

21          increase when taken with food. In contrast, it was unexpectedly discovered that the systemic absorption decreased when taken with food.

22          These unexpected results rebut any *prima facie* case of obviousness raised by the Examiner.[5]

23

24       83.    The "data available at the time" included the following **Table 1** that Defendants

25  disclosed to the Patent Office. Defendants told the Patent Office that Table 1 "shows that when each

26  of the other drugs in the same class as balsalazide was administered with food, the colonic

27  ───────────────────────────────

28  [5] Defendants' *Response to Final Office Action*, filed with the Patent Office on Defendants' behalf by attorney Jonathan Sparks, Ph.D., July 16, 2009 (emphasis in original).

COMPLAINT                                        CASE NO.

1  bioavailability of those drugs in the colon decreased or remained unchanged." Yet when Defendants

2  prosecuted the '688 Patent, they intentionally obscured this same information, knowing it would be

3  material to the patentability of the '688 Patent. As shown in the table, Defendants characterized

4  mesalamine drugs as within the same class as balsalazide.

5      84.    During prosecution of the '688 Patent, Defendants were clearly aware of the data

6  from Table 1 for at least two reasons. First, the same patent attorney, Jonathan Sparks, prosecuted

7  both the '344 Patent and the '688 Patent. Second, both the '344 Patent and the '688 Patent share an

8  inventor, Lorin Johnson.

9

10  Table 1

| Generic Name | Brand Name | Delivery Site | Food Effect on 5-ASA Colonic Bioavailability | Reference |
|---|---|---|---|---|
| **Azo-bonded Drugs** | | | | |
| Balsalazide | Colazal capsule® | Colon | Increases | USSN 11/835,897/Colazal® Package Insert |
| Balsalazide | GI-azo tablet® | Colon | Increases | USSN 11/835,897 |
| Sulfasalazine | Azulfadine® | Colon | Unknown | - |
| Olsalazine | Dipentum® | Colon | Decreases | *Eur J Clin Pharmacol.* 1988;34(5):481-8. |
| **Mesalamine Drugs** | | | | |
| Suspension | 5-ASA | Small bowel | N/A | *Clin Pharmacol Ther.* 1990 Jul;48(1):26-33. |
| Extended release Capsules | Pentasa® | Small Bowel | N/A | Summary Basis of Approval |
| pH-dependent delayed release tablets | Claversal® | Ileum-Colon | Decreases | *Br J Clin Pharmacol.* 1992 Feb;33(2):179-82. |
| pH-dependent delayed release tablets | Asacol® | Ileum-Colon | Decreases | Summary Basis of Approval |
| pH/Extended release granules | Falk GranuStix® | Ileum - Colon | No effect | Salix study No. MPPK1002 |
| pH/Hydrophobic Matrix | Lialda® | Colon | Decreases | Lialda®, Approved Package Insert, February 2007 |

    **v.**    **Defendants Intentionally Withheld Material Information Regarding Lialda®.**

25      85.    While prosecuting the '688 Patent Defendants argued that "one of ordinary skill in

28  the art would look to the teachings of the most similar formulation to determine if administration

- 22 -

1  with food is required," but this time reached the opposite conclusion: "unlike other 5-mesalamine
2  drugs available at the time of the invention, Applicant has demonstrated that the claimed methods
3  are equally safe and effective when granulated mesalamine is administered to a subject without
4  food." (emphasis added). Defendants focused on Lialda®, which they claimed was the only other
5  "delayed and extended-release oral mesalamine" formulation approved by the FDA. Defendants
6  relied on Lialda®'s prescribing information, which purportedly states that Lialda® should be taken
7  "with food." However, as Table 1 from the '344 Patent prosecution history shows, Defendants
8  intentionally withheld information material to that statement. Table 1 shows that Defendants were
9  aware that the colonic bioavailability of Lialda® (*i.e.*, its efficacy) decreased when administered with
10 food. This fact was material to the determination by the Patent Office to allow the '688 Patent.
11 Indeed, the Examiner's Reasons for Allowance stated, "[o]ne skilled in the art would reasonably
12 expect the formulation to be administered with food, since similar mesalamine formulations are
13 directed to be administered with food (see Lialda® information pamphlet, submitted by Applicants
14 with response to filed 20 June 2014)."

15                          **vi.    Defendants Intentionally Withheld Material Information Regarding
16                                   Claversal® and Asacol®.**

17       86.     During prosecution of the '688 Patent, on June 14, 2014, Defendants' attorney Dr.
18 Jonathan Sparks told the Patent Office that "[a]t the time of the invention, one of ordinary skill in the
19 art would look to the teachings of the most similar formulation to determine if administration with
20 food is required." Defendants disclosed (albeit incomplete) information regarding Lialda® and
21 Pentasa®. Defendants also emphasized that one reason that Lialda® and the pending claims were
22 "similar formulations" is because each is directed to delayed and extended-release formulations.

23       87.     Defendants intentionally withheld information regarding Claversal® and Asacol®. In
24 2009, in connection with prosecuting the '344 Patent, the same prosecuting attorney (Dr. Sparks)
25 disclosed the information summarized in Table 1 (*supra*), which indicates that colonic bioavailability
26 of mesalamine (5-ASA) from both Claversal® and Asacol® decreases when administered with food.
27 ('854 Application, July 16, 2009 Amendment Response, Table 1). Further, both Claversal® and
28 Asacol® are "pH-dependent delayed release" formulations that use enteric coatings, similar to the

                                          - 23 -

COMPLAINT                                                              CASE NO.

1 granulated mesalamine formulation claimed in the '688 Patent, which also uses an enteric coating for

2 pH-dependent for delayed release. Additional distinctions between Apriso®'s formulations of

3 Claversal® and Asacol® are irrelevant.

4     88.     Moreover, during prosecution of the '688 Patent, Defendants expressly argued that

5 persons of skill would purportedly have to look to other oral mesalamine formulations for guidance

6 on whether it was obvious to administer oral mesalamine with food.[6] Defendants disclosed Lialda®

7 and Pentasa®, but withheld disclosure of Claversal® and Asacol®. They did so despite previously

8 disclosing Claversal® and Asacol® in connection with the '344 Patent to argue that taking certain

9 mesalamine formulations *with* food was not obvious.

10     89.     Defendants withholding of food data regarding Claversal® and Asacol® is also notable

11 because Defendants represented to the Patent Office that persons of skill would need to look to other

12 oral mesalamine formulations, yet failed to disclose the close similarity of Apriso® to Claversal® and

13 Asacol®. Both Claversal® and Asacol® are pH-dependent delayed release mesalamine formulations,

14 as shown in Table 1. Indeed, the Patent Office subsequently found that the pH-dependent delayed

15 release feature of Apriso® is especially material to whether it can be efficaciously administered with

16 food. In its Final Written Decision invalidating the '688 Patent, the PTAB concluded, based upon

17 expert testimony, that the presence of food in the stomach raises its pH and suppresses gastric

18 emptying.[7] Because pH-dependent enteric coatings dissolve at higher pH, the PTAB found that

19 administering the drug with food likely keeps it in the stomach at higher pH for a longer period of

20 time, and thus risks premature release and systemic absorption. On information and belief,

21 Defendants were aware of these facts given their development of a pH-dependent delayed release

22 formulation for an oral mesalamine drug that can be administered without food. Indeed, this is

23 evident from the fact, as disclosed by Defendants in Table 1, that Claversal® and Asacol®—two pH-

24 dependent drugs utilizing enteric coatings—showed decreased colonic availability when

25 administered with food. Defendants thus knew this information, which would have been material to

26

27 [6] Defendants' *Amendment and Response to Office Action*, in connection with the '688 Patent application (U.S. Patent Application No. 12/573,081), June 20, 2014, pg. 6.

28 [7] IPR2016-00297 (Paper 55) May 19, 2017, pp. 41-42.

- 24 -

1  the patentability of the '688 Patent in light of the Examiner's Reasons for Allowance, but
2  nonetheless withheld it from the Patent Office.

3      90.     Given the foregoing facts, and in light of the important relationship between the
4  potential impact of food on Apriso®'s enteric coating, any differences between the formulations for
5  Apriso® on the one hand, and Claversal® and Asacol® on the other, were immaterial to the
6  patentability of the '688 Patent. Defendants' withholding of their knowledge that Claversal® and
7  Asacol® had decreased colonic bioavailability when administered with food were therefore material
8  omissions that rendered Defendants' submissions to the Patent Office misleading and fraudulent.

9      91.     Defendants—and Defendants' prosecuting attorney—were clearly knowledgeable of
10 data showing that the colonic bioavailability (*i.e.*, their efficacy) of two additional pH-dependent
11 delayed release formulations (Claversal® and Asacol®) decreased when administered with food. Yet,
12 Defendants intentionally withheld this information from the Patent Office during prosecution of the
13 '688 Patent.

14     92.     Defendants' omission of these facts was material to the determination by the Patent
15 Office to allow the '688 Patent, and the Patent Office relied on Defendants' false and misleading
16 representations when it issued the '688 Patent. The Examiner's "Reasons for Allowance" stated:

17
18     [t]he cited prior art is silent with respect to whether or not the mesalamine
       formulation is administered with or without food. One skilled in the art
       would reasonably expect the formulation to be administered with food,
19     since similar mesalamine formulations are directed to be administered
       with food (see Lialda® information pamphlet, submitted by Applicants
20     with response to filed 20 June 2014).

21     93.     The Examiner further stated:

22     [a]ddditionally, one skilled in the art would be motivated to administer the
       mesalamine formulation with food, since 5-aminosalicylate compounds,
23     including mesalamine, are known to have increased bioavailability when
       administered with food.
24

25     94.     In sum, on information and belief, the '688 Patent was obtained on the basis of false
26 and misleading statements made to the Patent Office. Defendants knowingly and deliberately
27 withheld the Marakhouski and Brunner papers because they knew these papers would render the
28 patent invalid as obvious in light of prior art. Defendants' withholding these articles misled the

- 25 -

1 | Patent Office into approving the '688 Patent based on incomplete information. Defendants created
2 | the false impression that taking Apriso® without food was not obvious in light of prior art, a
3 | statement that was directly at odds with statements Defendants had previously made to the Patent
4 | Office.

5 | 95. Defendants have knowingly presented, or caused to be presented, false or fraudulent
6 | claims for payment or approval by the United States Government and each of the States in
7 | connection with purchases of, and Medicare / Medicaid reimbursement for, Apriso®. Defendants
8 | unlawfully acquired the '688 Patent through false and misleading statements. This patent prevented
9 | generic drug manufacturers from entering the market, giving Defendants an illegally acquired and
10 | maintained monopoly on sales of Apriso®, which Defendants exploited to raise, maintain, and
11 | stabilize artificially high prices for Apriso®. Each and every time that Defendants submitted, or
12 | caused to be submitted, any claim for payment or reimbursement for Apriso® (each, a "False
13 | Claim") from the United States Government and any of the States, Defendants violated the federal
14 | False Claims Act, 31 U.S.C. §§ 3729–3733 (the "Federal FCA"), and the state false claims act of the
15 | respective State (each, a "State FCA") in which such submission was made.

16 | 96. Each and every submission of a False Claim for Apriso® violated the Federal FCA and
17 | the respective State FCA because, among other reasons, each False Claim was for an unlawfully
18 | elevated, maintained, or stabilized price contrary to an express or implied certification by Defendants
19 | that the price of Apriso® reflected in each False Claim was not unlawfully elevated, maintained or
20 | stabilized in violation of applicable law, including the Sherman Act. Moreover, Defendants made
21 | false, fraudulent, and misleading statements to the Patent Office in connection with the submission
22 | of each False Claim, because, without limitation, the price of Apriso® incorporated in each False
23 | Claim was unlawfully elevated, maintained or stabilized as a result of Defendants' false, fraudulent,
24 | and misleading statements to the Patent Office.

25 | 97. In making each of these fraudulent or misleading statements to the Patent Office,
26 | Defendants knew that the prior art that Defendants knowingly and intentionally omitted was highly
27 | material to the issue of patentability of the claims in the '688 Patent.

28 |

- 26 -

1    98.    Valeant's misrepresentations were material; they led directly to the Patent Office's

2 approval of the '688 Patent. Valeant knew that they were misleading the Patent Office because the

3 same attorney (Dr. Sparks), representing the same client (Valeant), had made the exactly opposing

4 argument to the Patent Office only five years earlier. Valeant's other attempts to gain approval for

5 the '688 Patent, including amending the claim to state "with or without food," had all failed. Valeant

6 knowingly and intentionally made false or misleading statements to the Patent Office in order to gain

7 approval of the '688 Patent. The '688 Patent extended Valeant's monopoly on sales of Apriso® for at

8 least twelve years, and gave Valeant added leverage with which to obtain concessions from the

9 generic manufacturers during infringement litigation, leverage that allowed Valeant to prevent the

10 Otterbeck Patents from being fully litigated. Valeant's unlawfully obtained monopoly empowers

11 them to charge artificially and illegally inflated prices for Apriso®. Agencies of the federal

12 government and the States have overpaid for Apriso® as a direct result of Valeant's false and

13 misleading statements. Accordingly, each claim for payment or reimbursement for Apriso® paid by

14 the federal government or the states is itself a False Claim in violation of the federal False Claims Act

15 and the False Claims Acts of the States.

16    **B.    The Otterbeck Patents are Invalid Based on Prior Art that Defendants Failed to Disclose to the Patent Office**

17

18    99.    The Otterbeck Patents consist of six patents, all of which descend from a common

19 parent application. While the claims in the Otterbeck Patents vary slightly, they all relate to the same

20 formulation as described in Claim 1 of the first Otterbeck Patent to be approved, United States

21 Patent No. 6,551,620 ("the '620 Patent"),[8] which describes:

22            1. An orally administrable pharmaceutical pellet formulation having a
             controlled release profile for the treatment of the intestinal tract, which
23           comprises a core and an enteric coating and optionally pharmaceutically
             tolerable additives, the core including, as a pharmaceutical active
24           compound, aminosalicylic acid or a pharmaceutically acceptable salt,
             wherein the active compound is present in the core in a non gel-forming
25           polymer matrix which is essentially insoluble in the intestinal tract and
             permeable to intestinal fluids and the active compound, the matrix-
26

27 _____
[8] The '620 Patent was approved on April 22, 2003. Thus, it was the only patent in effect when the FDA
28 approved Apriso® in 2008 and when the first generic ANDA was filed in July 2012. The rest of the
Otterbeck Patents were approved between December 2012 and February 2015.

- 27 -

> forming polymer making up at least 1% by weight of the total weight of the core, and wherein the matrix-forming polymer is selected from the group consisting of poly(ethyl acrylate, methyl methacrylate) and poly(ethyl acrylate, methyl methacrylate, trimethylammonioethyl methacrylate chloride).

*Id.* at col. 9, lines 31-44.

100. The Otterbeck Patents all share the same specification, wherein Defendants conceded that some of the characteristics described above were already known in the prior art, including the use of enteric coatings to delay release of the active ingredient, and the use of mesalamine to treat ulcerative colitis. *Id.* at col. 5, lines 15-19, 47-50. However, many of the allegedly novel aspects of Claim 1 were also obvious in light of prior art that Defendants failed to disclose to the Patent Office during prosecution of the Otterbeck Patents.

101. For example, the Otterbeck Patents state that "it has now been found that pellet formulations are particularly suitable" for the purpose of "spread[ing] the pharmaceutical form reproducibly over wide areas of the intestine[,] and are thus particularly suitable for treatment of inflammatory processes, which often affect relatively large sections of the intestinal tract." *Id.* at col. 2, lines 40-46. But the description also concedes that "[i]n the prior art, tablets and pellets are known which are coated with an enteric coating in order to thus prevent a premature release of the active compounds." *Id.* at col. 1, lines 48-50. Moreover, United States Patent No. 6,290,990 ("the '990 Patent"), approved on September 18, 2001, describes slow-release matrix pellets, "preferably for pharmaceutical purposes, from which the active substance is released with an adjustable release profile, ie. [*sic*] as slow as required, but completely." *Id.* at col. 2, lines 26-29. Thus, the pellet formulations specified in the Otterbeck Patents are disclosed in the prior art. Defendants did not disclose the '990 Patent to the Patent Office.

102. Claim 1 of the '620 Patent describes the core as having a "active compound is present in the core in a non gel-forming polymer matrix which is essentially insoluble in the intestinal tract and permeable to intestinal fluids and the active compound." *Id.* at col. 9, lines 36-39. Yet each of the elements in this claim are disclosed in the prior art.

103. First, the use of a polymer matrix to ensure controlled release was widely known in the prior art. *See e.g.,* the '990 Patent at col. 3, lines 6-7 ("The polymer matrix according to the

- 28 -

1   invention for matrix slow-release pellets is a novel combination . . . ."); U.S. Patent No. 4,892,742 at

2   col. 1, lines 6-10 (filed Nov. 18, 1985) ("the '742 Patent") ("a controlled release composition is

3   provided comprising a table core containing a water soluble active ingredient in a water insoluble

4   polymeric matrix surrounded with a rate controlling membrane coating"); U.S. Patent No. 4,784,858

5   at col. 1, lines 29-31 (filed Aug. 22, 1986) ("the '858 Patent") ("at least one water-soluble

6   pharmaceutically active substance which is dispersed in a water-insoluble, nondigestible polymeric

7   excipient"); European Patent 0169821A2 at 6, lines 1-4 (issued Feb. 6, 1991) (the "EP0169821A2

8   Patent") ("delivery device for zero-order release of an active principle into a dissolution fluid

9   therefor comprises a solid matrix-type reservoir formed of a polymer material")[9] These patents were

10  all in the prior art when Defendants prosecuted the Otterbeck Patents. Yet Defendants failed to

11  disclose any of these patents to the Patent Office.

12      104.   Second, use of "non gel-forming" polymer matrices was known in the prior art. The

13  Description section of the Otterbeck Patents asserts "it has surprisingly been found" that use of an

14  insoluble non gel-forming polymer matrix resulted in lower systemic absorption into the bloodstream

15  and increased targeted delivery to the colon as compared with gel-forming polymer matrices

16  allegedly found in the prior art. '990 Patent at col. 2, lines 49-51. Defendants allege that "use of a

17  swellable, gel-forming matrix . . . is not suitable" because the mesalamine "would . . . be released

18  virtually immediately (about 30 min)." '620 Patent at col. 2, lines 52-57. This statement is in conflict

19  with—and potentially a misrepresentation of—the '990 Patent, which claims it is "possible to

20  achieve` release profiles which can be adjusted over wide ranges solely by the composition of the

21  polymer matrix . . ." using a swellable polymer matrix. '990 Patent at col. 2, lines 49-51. Moreover,

22  prior art available when Defendants were prosecuting the '620 Patent demonstrates that insoluble

23  and non-swellable polymer matrices were known to the industry to achieve delayed and controlled

24  release of an active pharmaceutical ingredient. For example, the EP0169821A2 Patent describes a

25  "solid matrix-type reservoir formed of a polymer material which is insoluble and unswellable in the

26

27  [9] *See also*, Gwen M. Jantzen and Joseph R. Robinson, *Sustained- and Controlled-Release Drug Delivery Systems*, Modern Pharmaceuticals, 586-587 (Gilbert S. Banker & Christopher T. Rhodes eds., 3rd Ed.
28  1996) ("A matrix device . . . consists of [a] drug dispersed throughout a polymer matrix . . . .").

- 29 -

COMPLAINT                                                                        CASE NO.

1    dissolution fluid." *Id*. at 6, lines 3-5. "The polymer material should be unswellable and insoluble in

2    the active principle's dissolution fluid in order to avoid alterations of the release rate-controlling

3    membrane." *Id*. at 6, lines 7-9. And the '742 Patent describes a controlled-release tablet that employs

4    an insoluble polymer matrix and an enteric coating to release the active ingredient at a slow and

5    constant rate (a so-called "zero order release"). '742 Patent at col. 1, lines 6-13. These patents

6    anticipate Defendants' claim for a "non gel-forming polymer matrix." Yet Defendants did not

7    disclose the '990, EP0169821A2, or'742 Patents to the Patent Office.

8         105.    Third, use of polymers that are "insoluble in the intestinal tract and permeable to

9    intestinal fluids and the active compound" were widely known in the prior art when Defendants

10   prosecuted the Otterbeck Patents. The '858 Patent describes "an elastic, water-insoluble and

11   semipermeable diffusion film of a polymer." *Id*. at col. 5, lines 1-3. And the EP0169821A2 Patent

12   describes a "film-forming polymer material insoluble in the dissolution fluid and permeable to the

13   substance." *Id*. at 6, lines 16-17.

14        106.    Moreover, the chemical compounds specified in the Otterbeck Patents were also

15   widely known in the prior art for the uses indicated in the Otterbeck Patents. For example, the '620

16   Patent states that "the matrix-forming polymer is selected from the group consisting of poly(ethyl

17   acrylate, methyl methacrylate) and poly(ethyl acrylate, methyl methacrylate, trimethylammonioethyl

18   methacrylate chloride)." *Id*. at col. 9, lines 41-44. These chemicals were disclosed in the '858 Patent,

19   which describes a "polymeric excipient being a member of the group consisting of (i)

20   polyvinylchloride and (ii) a homo- or copolymer of lower alkyl acrylates, lower alkyl methacrylates, or

21   lower alkyl acrylate and lower alkyl methacrylate." *Id*. at col. 5, lines 8-13. Similarly, the

22   EP0169821A2 Patent states, "[t]ypical materials [for the polymer matrix] include . . .

23   polymethacrylates." *Id*. at 10, lines 11-13. Thus, the polymer matrix and its potential component

24   materials were known in the prior art. Yet Defendants did not disclose the '858 Patent or the

25   EP0169821A2 Patent during prosecution of any of the Otterbeck Patent applications.

26        107.    The '620 Patent enumerates several possible chemicals for an enteric coating,

27   including "a methacrylic acid copolymer or methylhydroxypropyl cellulose phthalate," or a

28   "methacrylic acid containing copolymer comprises co-poly(methacrylic acid, methyl

- 30 -

1 methacrylate)." *Id.* at col. 10, lines 4-5. Ten years earlier, the EP0169821A2 Patent described a

2 "release rate-controlling membrane" and cited "vinyl polymers and copolymers, . . . acrylic

3 polymers and copolymers and the like" as suitable materials for the membrane. *Id.* at 13, lines 5-8.

4 Indeed, EP0169821A2 calls for use of the same commercially available enteric coating (Eudragit RL)

5 that the Otterbeck Patents specify. Similarly, the '858 Patent posited an "ethyl acrylate/methyl

6 methacrylate copolymer" as a potential coating." *Id.* at col. 5, line 25. These potential coatings are all

7 identical to or closely related to the coatings described by Defendants, yet Defendants omitted these

8 patents from the Otterbeck Patent applications.

9       108.    The Otterbeck Patents also describe Apriso®'s pellet formulation and a process for

10 manufacturing the pellets. For example, the '886 Patent describes mixing the core ingredients into a

11 moist mass, extruding and cutting the moist mass into 1 mm pieces which a shaped by a spheronizer

12 and dried at 60° C. The pieces are then coated with the enteric coating, including poly(methacrylic

13 acid, methylmethacrylate). *Id.* at col. 9, lines 30-67; col. 10, lines 1-12. The pellets are described as

14 being 0.1 - 3 mm in size. *Id.* at col. 10, lines 35-37. Yet another pre-existing patent, the '990 Patent,

15 specifies slow-release spherical pellets with uniform maximum diameters in the range of from 0.5 to

16 4 mm containing a biologically active element. *Id.* at col. 13, lines 50-52. Both patents specify

17 dispersion of an active pharmaceutical ingredient in a polymer matrix. Both patents describe

18 extruding and shaping of the pellets at 60°C. Yet Defendants never disclosed the '990 Patent to the

19 Patent Office.

20       109.    Additional prior art that likely invalidates the Otterbeck Patents include European

21 Patent Application No. 0 453 001 A1; PCT Publication No. WO 91/07949; European Patent

22 Application No. 0 377 477 A1; U.S. Patent No. 6,004,581.

23       **C.**    **Defendants Wrongfully Blocked Generic Competition**

24       110.    When the FDA approved Defendants' NDA for Apriso® on October 31, 2008, it

25 granted Defendants a three-year exclusivity period, which ended on October 31, 2011. The Otterbeck

26 Patents extended Defendants' monopoly until April 20, 2018. Defendants' fraudulently obtained

27 '688 Patent extended Defendants' monopoly another twelve years, through 2030. If the '688 Patent

28

- 31 -

had been upheld, Defendants would have held a monopoly on sales of Apriso® for a total of 22 years, despite having made no changes to the formulation or dosage of Apriso®.

111.   Several generic manufacturers were ready to enter the market soon after Valeant's FDA-granted exclusivity expired in 2011. Lupin, Novel Laboratories, Inc. (later replaced by G & W Laboratories), Mylan Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. all filed ANDAs for generic versions of Apriso® that included Paragraph IV Certifications that Valeant's patents were invalid. In addition, GeneriCo LLC, Mylan, and MycoNovo, Inc. filed petitions for *Inter Partes* review of the '688 Patent with the PTAB. The petitions were consolidated and resulted in the PTAB's decision invalidating the '688 Patent.

112.   Lupin was the first generic to file an ANDA, in July 2012. Valeant initiated its infringement action against Lupin on September 7, 2012. On September 11, 2014, the Patent Office mailed its notice of allowance stating that it would approve the '688 Patent. The very next day, on September 12, 2014, Valeant dismissed all claims against Lupin relating to the Otterbeck Patents without prejudice, and Lupin agreed to refrain from introducing a generic version of Apriso® until 2022, four years after the expiration of the Otterbeck Patents.

113.   Defendants' listing of the '688 Patent in the Orange Book constituted a false and fraudulent statement to the U.S. government.

114.   Because Defendants fraudulently obtained the '688 Patent and improperly listed it in the Orange Book, Defendants forced the ANDA Filers to file Paragraph IV certifications. Defendants instituted objectively baseless litigation against the ANDA Filers, alleging infringement of Defendants' invalid, unenforceable, and fraudulently-obtained '688 Patent. By filing the infringement lawsuits, Defendants triggered the 30-month stays on FDA approval of the ANDA Filers' applications to market generic alternatives to Apriso®. Defendants commenced these sham litigations for the anticompetitive and unlawful purpose of delaying or preventing generic entry into the relevant market. By appealing the PTAB's decision invalidating the '688 Patent and the Northern District of West Virginia's decision holding that Mylan's ANDA does not infringe the '688 Patent, Defendants have ensured that no generic can enter the market until those appeals are resolved, a process

1  that could take months or years. Accordingly, Defendants have unlawfully but successfully blocked
2  generics from entering the market since at least September 12, 2014.

3      115.    Because of Defendants' false and misleading statements to the Patent Office in
4  procuring the '688 Patent, consumers have been deprived of, and continue to be deprived of, a lower-
5  cost generic form of Apriso®.

6      **D.      Defendants' Fraudulent Scheme Has Resulted in Thousands of False Claims**

7      116.    Defendants initiated the fraudulent scheme alleged herein to allow them to continue
8  selling Apriso® at monopoly prices after the expiration of the FDA exclusivity period. Defendants
9  knew and intended to unlawfully sell Apriso® at monopoly prices during the 30-month stay and
10  pending the Hatch-Waxman litigations resulting from Defendants' improper listing of the '688
11  Patent in the Orange Book.

12      117.    Defendants' fraudulent scheme erected significant barriers to the introduction of
13  generic alternatives to Apriso® in interstate commerce and constitutes a willful attempt to retain
14  monopoly power over the relevant market. Defendants' wrongful conduct has restrained competition
15  in violation of federal and state antitrust laws, enabling Defendants to charge the United States
16  Government and the Plaintiff States illegally-inflated prices for mesalamine.

17      118.    Defendants have used their illegal monopoly to overcharge the United States
18  Government and the Plaintiff States for mesalamine.

19      119.    Defendants knew that the United States and the Plaintiff States would be purchasers
20  and third-party payers for Apriso® through direct or indirect sales of Apriso® or the payment of
21  claims for prescription drug reimbursement submitted by providers under government programs,
22  including Medicare and Medicaid.

23      120.    Defendants knew that they would be submitting claims to the United States and the
24  Plaintiff States and causing or inducing others to submit claims based on Defendants' illegally-
25  inflated pricing for Apriso®. Defendants were also well-aware of the statutory structures that govern
26  the methods by which the United States and the Plaintiff States reimbursed outpatient drugs covered
27  under Medicare and Medicaid.

28

- 33 -

1    121.    Defendants, their employees and agents, individually and in concert, knowingly

2  submitted or caused to be submitted false claims to the United States Government and the Plaintiff

3  States to secure payments for illegally-inflated prices for mesalamine.

4    122.    The United States Government and the Plaintiff States were unaware of Defendants'

5  fraudulent scheme, misrepresentations to the Patent Office, and wrongful listing of the '688 Patent

6  in the Orange Book at the time they paid False Claims.

7    123.    Defendants' misrepresentations and fraudulent course of conduct were material to

8  the United States Government and the Plaintiff States paying the False Claims. In purchasing drugs

9  or reimbursing for prescriptions as an end-payor, the United States Government and the Plaintiff

10  States require that the prices they pay or the amounts they reimburse have not been manipulated,

11  inflated or maintained through the wrongful suppression of competition or other wrongful conduct.

12    a.    Because Apriso® did not have any FDA-approved competitors—and therefore

13  there was no "adequate price competition"—Defendants were required to provide the Government

14  full and accurate cost or pricing data as a condition to receiving payment.

15    b.    Defendants' disclosure was required because the Government may pay only a

16  "fair and reasonable" price for pharmaceuticals.

17    c.    As part of its required disclosure, Defendants were obligated to include all

18  facts that a prudent buyer or seller would reasonably expect to affect prices—such as whether the

19  prices have been inflated through anticompetitive conduct.

20    d.    Upon information and belief, Defendants certified that the cost or pricing data

21  they provided to the Government was "accurate, complete and current." Contrary to their

22  certification, however, Defendants failed to disclose to the Government that the prices they were

23  charging for Apriso® were monopoly prices based on Defendants' fraudulent exclusion of generic

24  competition. Because the Government may pay only a "fair and reasonable price" for

25  pharmaceuticals based on "accurate, complete and current" cost or pricing data, Defendants'

26  misrepresentations and fraudulent conduct were material to the Government's payments of the

27  False Claims alleged herein. Had the Government or the Plaintiff States known about Defendants'

28  misrepresentations and fraudulent scheme to obtain the '688 Patent to block generic competition for

- 34 -

1    mesalamine, the Government and the Plaintiff States would not have paid or reimbursed for Apriso®
2    at Defendants' monopoly prices.

3              e.       Moreover, reimbursements under the Medicare framework assume that a
4    drug's price has not been wrongfully inflated or maintained through anticompetitive conduct or the
5    wrongful exclusion of competitors. The Centers for Medicare & Medicaid Services ("CMS"), which
6    is part of the DHHS and administers various programs including Medicare and Medicaid. CMS
7    requires drug manufacturers (such as Defendants) to provide it with accurate manufacturer prices
8    for compilation in CMS's Average Manufacturer Price ("AMP") and Average Selling Price
9    ("ASP") database files. CMS uses their AMP and ASP calculations to set certain price limits and
10   reimbursement levels for pharmaceutical products under the Medicare and Medicaid program. An
11   integral assumption in CMS's reimbursement decisions is that pharmaceutical prices reflect
12   competitive market prices that have not been unlawfully inflated or maintained through
13   anticompetitive conduct or the wrongful exclusion of competitors. Therefore, Defendants'
14   misleading statements and fraudulent conduct are necessarily material to the Government's
15   payments of the False Claims alleged herein.

16             f.       For example, CMS calculates Medicare reimbursement rates for certain
17   outpatient drugs based on a percentage ASP. For drugs with therapeutic equivalents, CMS is
18   required to weigh the calculation of ASPs based on drug utilization (or volume of sales). Because of
19   the number of generic competitors that would have entered the market in September 2014, generic
20   versions of mesalamine would have quickly captured at least 90% of the market. Therefore, CMS's
21   ASP calculations would have been heavily weighted towards the average lower generic selling prices.

22             g.       As another example, CMS calculates every month a "Federal Upper Limit"
23   for Medicaid reimbursements of covered pharmaceuticals based on a percentage of the AMP. The
24   AMP calculation must include the prices of pharmaceutically and therapeutically equivalent generic
25   alternatives and be weighted towards those drugs with the highest utilization or *volume* of sales.
26   Because of the number of generic competitors that would have entered the market in September
27   2014, generic versions of mesalamine would have quickly captured at least 90% of the market, and the
28   Federal Upper Limit for Apriso® prescriptions would have been heavily weighted towards the

- 35 -

1  average lower generic selling prices. Therefore, Defendants' misrepresentations and fraudulent
2  conduct were *necessarily* material to the Government's and Plaintiff States' payments of the False
3  Claims because they would have been statutory *prohibited* from paying the higher amount requested
4  in the False Claims.

5        124.   Defendants' misrepresentations and fraudulent conduct allowed Defendants to bill
6  (or cause the submission to and payment of reimbursement claims by) the United States
7  Government and the Plaintiff States for a higher priced good (*i.e.,* a patented drug with no generic
8  competitors) than what was actually provided (a non-patented drug that should have had numerous
9  generic competitors). On information and belief, the United States Government and the Plaintiff
10  States paid or reimbursed for Apriso® at Defendants' unlawfully inflated monopoly prices, but they
11  would not have entered into such contracts or paid such amounts had they known the true facts at
12  the time of contracting or payment. The United States Government and the Plaintiff States would
13  not have accepted or made payments on invoices for patented Apriso® but for the fraudulently-
14  obtained '688 Patent.

15        125.   But for Defendants' misrepresentations and fraudulent conduct, approximately 90%
16  or more of the False Claims to the United States Government and the Plaintiff States for Apriso®
17  would have instead been for significantly lower-priced generic mesalamine.

18        126.   Using its fraudulently-obtained patent rights, Defendants have submitted or caused to
19  be submitted thousands of False Claims to the United States Government and the Plaintiff States,
20  either through direct sales of Apriso® or False Claims for reimbursement for Apriso® submitted to
21  the Medicare and Medicaid programs. Defendants submitted the False Claims or caused the False
22  Claims to be submitted to the United States Government and the Plaintiff States based on unlawful
23  pricing above the what the fair market value of mesalamine would have been but for Defendants'
24  unlawful and fraudulent blocking of generic entry.

25        127.   Defendants submitted or caused submission of False Claims with false certifications
26  of compliance with law. The United States Government and the Plaintiff States conditioned payment
27  or reimbursement for Apriso® upon these false certifications. Unaware of Defendants' fraudulent

28

- 36 -

1  scheme, the United States Government and the Plaintiff States issued payment on those False

2  Claims.

**Count I**
**False Claims Act**
**31 U.S.C. §§ 3729–3733**

5  128.   Relator realleges and incorporates by reference all foregoing allegations as though

6  fully set forth herein.

7  129.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C.

8  §§ 3729–3733, as amended.

9  130.   Through the acts described above, Defendants knowingly presented, or caused to be

10  presented, false or fraudulent claims for payment of Apriso®.

11  131.   Relator cannot at this time identify all of the false claims for payment that were caused

12  by Defendants' conduct. The false claims were presented by numerous separate entities across the

13  United States. Relator has no control over, or dealings with, such entities, and has no access to the

14  records in their possession.

15  132.   The Government, unaware of the falsity of the records, statements and claims made

16  or caused to be made by Defendants, paid and continues to pay the claims that the Government

17  would not have paid but for Defendants' illegal conduct.

18  133.   By reason of Defendants' acts, the United States has been damaged, and continues to

19  be damaged, in substantial amount to be determined at trial.

20  134.   Additionally, the United States is entitled to a maximum penalty of up to $22,363 for

21  each and every violation alleged herein.

**Count II**
**California False Claims Act**
**Cal. Gov't Code §§ 12650–12656**

24  135.   Relator realleges and incorporates by reference all foregoing allegations as though

25  fully set forth herein.

26  136.   This is a claim for treble damages and penalties under the California False Claims Act.

27

28

- 37 -

137.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

138.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

139.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

140.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of California—through any state funded program, including, without limitation, Medicaid—for Apriso®.

141.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of California.

142.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

143.     The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

144.     By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

145.     Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

146.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

- 38 -

**Count III**
**Colorado Medicaid False Claims Act**
**Colo. Rev. Stat. §§ 25.5-4-303.5 to -310**

147.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

148.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

149.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

150.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

151.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

152.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Colorado—through any state funded program, including, without limitation, Medicaid—for Apriso®.

153.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Colorado.

154.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Colorado. Relator has no control over or dealings with such entities and has no access to the records in their possession.

155.     The State of Colorado, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Connecticut would not have paid but for Defendants' illegal conduct.

- 39 -

1     156.    By reason of Defendants' acts, the State of Colorado has been damaged, and

2 continues to be damaged, in substantial amount to be determined at trial.

3     157.    Additionally, the State of Colorado is entitled to a statutory penalty for each and every

4 violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5     158.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6 State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

**Count IV**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**

9     159.    Relator realleges and incorporates by reference all foregoing allegations as though

10 fully set forth herein.

11    160.    This is a claim for treble damages and penalties under the Connecticut False Claims

12 Act.

13    161.    Through the acts described above, Defendants knowingly, intentionally, and willfully

14 presented, or caused to be presented, false or fraudulent claims for payment and approval for

15 prescriptions for Apriso®.

16    162.    Through the acts described above, Defendants knowingly, intentionally, and willfully

17 made or used a false record or statement material to a false or fraudulent claim for payment and

18 approval for prescriptions for Apriso®.

19    163.    Through the acts described above, Defendants conspired to (a) present, or cause to be

20 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

21 statement material to a false or fraudulent claim for payment and approval for prescriptions for

22 Apriso®.

23    164.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

24 were not entitled to be paid by the State of Connecticut—through any state funded program,

25 including, without limitation, Medicaid—for Apriso®.

26    165.    Through the acts described herein, Defendants knowingly presented, or caused to be

27 presented, false or fraudulent claims to the State of Connecticut.

28

- 40 -

1     166.    Relator cannot at this time identify all of the false claims for payment that were caused

2  by Defendants' conduct. The false claims were presented by numerous separate entities across the

3  State of Connecticut. Relator has no control over or dealings with such entities and has no access to

4  the records in their possession.

5     167.    The State of Connecticut, unaware of the falsity of the records, statements and claims

6  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

7  Connecticut would not have paid but for Defendants' illegal conduct.

8     168.    By reason of Defendants' acts, the State of Connecticut has been damaged, and

9  continues to be damaged, in substantial amount to be determined at trial.

10     169.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

11  State of Connecticut pursuant to Conn. Gen. Stat. § 4-277(a).

**Count V**
**Delaware False Claims and Reporting Act**
**Del. Code Ann. tit. 6, §§ 1201–1211**

14     170.    Relator realleges and incorporates by reference all foregoing allegations as though

15  fully set forth herein.

16     171.    This is a claim for treble damages and penalties under the Delaware False Claims and

17  Reporting Act.

18     172.    Through the acts described above, Defendants knowingly, intentionally, and willfully

19  presented, or caused to be presented, false or fraudulent claims for payment and approval for

20  prescriptions for Apriso®.

21     173.    Through the acts described above, Defendants knowingly, intentionally, and willfully

22  made or used a false record or statement material to a false or fraudulent claim for payment and

23  approval for prescriptions for Apriso®.

24     174.    Through the acts described above, Defendants conspired to (a) present, or cause to be

25  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

26  statement material to a false or fraudulent claim for payment and approval for prescriptions for

27  Apriso®.

28

- 41 -

175.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Delaware —through any state funded program, including, without limitation, Medicaid—for Apriso®.

176.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Delaware.

177.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Delaware. Relator has no control over or dealings with such entities and has no access to the records in their possession.

178.     The State of Delaware, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Delaware would not have paid but for Defendants' illegal conduct.

179.     By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

180.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b)(1).

**Count VI**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081–.09**

181.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

182.     This is a claim for treble damages and penalties under the Florida False Claims Act.

183.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

184.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

- 42 -

1      185.    Through the acts described above, Defendants conspired to (a) present, or cause to be

2 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

3 statement material to a false or fraudulent claim for payment and approval for prescriptions for

4 Apriso®.

5      186.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

6 were not entitled to be paid by the State of Florida —through any state funded program, including,

7 without limitation, Medicaid—for Apriso®.

8      187.    Through the acts described herein, Defendants knowingly presented, or caused to be

9 presented, false or fraudulent claims to the State of Florida.

10      188.    Relator cannot at this time identify all of the false claims for payment that were caused

11 by Defendants' conduct. The false claims were presented by numerous separate entities across the

12 State of Florida. Relator has no control over or dealings with such entities and has no access to the

13 records in their possession.

14      189.    The State of Florida, unaware of the falsity of the records, statements and claims

15 made or caused to be made by Defendants, paid and continues to pay the claims that the State of

16 Florida would not have paid but for Defendants' illegal conduct.

17      190.    By reason of Defendants' acts, the State of Florida has been damaged, and continues

18 to be damaged, in substantial amount to be determined at trial.

19      191.    Additionally, the State of Florida is entitled to a statutory penalty for each and every

20 violation alleged herein to be determined by the Court in accordance with the relevant statutes.

21      192.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

22 State of Florida pursuant to Fla. Stat. § 68.083(2).

23

**Count VII**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §§ 49-4-168 to -168.6**

24

25      193.    Relator realleges and incorporates by reference all foregoing allegations as though

26 fully set forth herein.

27      194.    This is a claim for treble damages and penalties under the Georgia False Medicaid

28 Claims Act.

- 43 -

195. Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

196. Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

197. Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

198. Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Georgia —through any state funded program, including, without limitation, Medicaid—for Apriso®.

199. Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Georgia.

200. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Georgia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

201. The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Georgia would not have paid but for Defendants' illegal conduct.

202. By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

203. Additionally, the State of Georgia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

204. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.2(b).

- 44 -

**Count VIII**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21 to -31**

205.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

206.    This is a claim for treble damages and penalties under Hawaii False Claims Act.

207.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

208.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

209.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

210.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Hawaii —through any state funded program, including, without limitation, Medicaid—for Apriso®.

211.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Hawaii.

212.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Hawaii. Relator has no control over or dealings with such entities and has no access to the records in their possession.

213.    The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Hawaii would not have paid but for Defendants' illegal conduct.

- 45 -

COMPLAINT                                                                                          CASE NO.

1    214.   By reason of Defendants' acts, the State of Hawaii has been damaged, and continues

2   to be damaged, in substantial amount to be determined at trial.

3    215.   Additionally, the State of Hawaii is entitled to a statutory penalty for each and every

4   violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5    216.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6   State of Hawaii pursuant to Haw. Rev. Stat. § 661-25(a).

**Count IX**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1–175/8**

9    217.   Relator realleges and incorporates by reference all foregoing allegations as though

10   fully set forth herein.

11   218.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

12   219.   Through the acts described above, Defendants knowingly, intentionally, and willfully

13   presented, or caused to be presented, false or fraudulent claims for payment and approval for

14   prescriptions for Apriso®.

15   220.   Through the acts described above, Defendants knowingly, intentionally, and willfully

16   made or used a false record or statement material to a false or fraudulent claim for payment and

17   approval for prescriptions for Apriso®.

18   221.   Through the acts described above, Defendants conspired to (a) present, or cause to be

19   presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

20   statement material to a false or fraudulent claim for payment and approval for prescriptions for

21   Apriso®.

22   222.   Because of Defendants' violations the false claims statutes alleged herein, Defendants

23   were not entitled to be paid by the State of Illinois —through any state funded program, including,

24   without limitation, Medicaid—for Apriso®.

25   223.   Through the acts described herein, Defendants knowingly presented, or caused to be

26   presented, false or fraudulent claims to the State of Illinois.

27   224.   Relator cannot at this time identify all of the false claims for payment that were caused

28   by Defendants' conduct. The false claims were presented by numerous separate entities across the

- 46 -

1    State of Illinois. Relator has no control over or dealings with such entities and has no access to the

2    records in their possession.

3        225.    The State of Illinois, unaware of the falsity of the records, statements and claims made

4    or caused to be made by Defendants, paid and continues to pay the claims that the State of Illinois

5    would not have paid but for Defendants' illegal conduct.

6        226.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues

7    to be damaged, in substantial amount to be determined at trial.

8        227.    Additionally, the State of Illinois is entitled to a statutory penalty for each and every

9    violation alleged herein to be determined by the Court in accordance with the relevant statutes.

10       228.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

11   State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b)(1).

12                                          **Count X**
                        **Indiana False Claims and Whistleblower Protection Act**
13                              **Ind. Code §§ 5-11-5.5-1 to -18**

14       229.    Relator realleges and incorporates by reference all foregoing allegations as though

15   fully set forth herein.

16       230.    This is a claim for treble damages and penalties under the Indiana False Claims and

17   Whistleblower Protection Act.

18       231.    Through the acts described above, Defendants knowingly, intentionally, and willfully

19   presented, or caused to be presented, false or fraudulent claims for payment and approval for

20   prescriptions for Apriso®.

21       232.    Through the acts described above, Defendants knowingly, intentionally, and willfully

22   made or used a false record or statement material to a false or fraudulent claim for payment and

23   approval for prescriptions for Apriso®.

24       233.    Through the acts described above, Defendants conspired to (a) present, or cause to be

25   presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

26   statement material to a false or fraudulent claim for payment and approval for prescriptions for

27   Apriso®.

28

- 47 -

COMPLAINT                                                              CASE NO.

234.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Indiana —through any state funded program, including, without limitation, Medicaid—for Apriso®.

235.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Indiana.

236.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Indiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

237.    The State of Indiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Indiana would not have paid but for Defendants' illegal conduct.

238.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

239.    Additionally, the State of Indiana is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

240.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Indiana pursuant to Ind. Code § 5-11-5.5-4(a).

**Count XI**
**Iowa False Claims Act**
**Iowa Code §§ 685.1–.7**

241.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

242.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

243.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

- 48 -

244. Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

245. Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

246. Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Iowa —through any state funded program, including, without limitation, Medicaid—for Apriso®.

247. Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Iowa.

248. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Iowa. Relator has no control over or dealings with such entities and has no access to the records in their possession.

249. The State of Iowa, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Iowa would not have paid but for Defendants' illegal conduct.

250. By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

251. Additionally, the State of Iowa is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

252. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2)(a).

- 49 -

**Count XII**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. §§ 46:437–:440**

253.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

254.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

255.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

256.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

257.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

258.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Louisiana —through any state funded program, including, without limitation, Medicaid—for Apriso®.

259.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana.

260.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Louisiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

261.     The State of Louisiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Louisiana would not have paid but for Defendants' illegal conduct.

- 50 -

1    262.   By reason of Defendants' acts, the State of Louisiana has been damaged, and
2  continues to be damaged, in substantial amount to be determined at trial.

3    263.   Additionally, the State of Louisiana is entitled to a statutory penalty for each and
4  every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5    264.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
6  State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

7                              **Count XIII**
                    **Maryland False Health Claims Act**
8              **Md. Code Ann., Health-Gen. §§ 2-601 to -611**

9    265.   Relator realleges and incorporates by reference all foregoing allegations as though
10  fully set forth herein.

11    266.   This is a claim for treble damages and penalties under the Maryland False Health
12  Claims Act.

13    267.   Through the acts described above, Defendants knowingly, intentionally, and willfully
14  presented, or caused to be presented, false or fraudulent claims for payment and approval for
15  prescriptions for Apriso®.

16    268.   Through the acts described above, Defendants knowingly, intentionally, and willfully
17  made or used a false record or statement material to a false or fraudulent claim for payment and
18  approval for prescriptions for Apriso®.

19    269.   Through the acts described above, Defendants conspired to (a) present, or cause to be
20  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
21  statement material to a false or fraudulent claim for payment and approval for prescriptions for
22  Apriso®.

23    270.   Because of Defendants' violations the false claims statutes alleged herein, Defendants
24  were not entitled to be paid by the State of Maryland —through any state funded program, including,
25  without limitation, Medicaid—for Apriso®.

26    271.   Through the acts described herein, Defendants knowingly presented, or caused to be
27  presented, false or fraudulent claims to the State of Maryland.

28

- 51 -

COMPLAINT                                                        CASE NO.

1    272.   Relator cannot at this time identify all of the false claims for payment that were caused

2  by Defendants' conduct. The false claims were presented by numerous separate entities across the

3  State of Maryland. Relator has no control over or dealings with such entities and has no access to the

4  records in their possession.

5    273.   The State of Maryland, unaware of the falsity of the records, statements and claims

6  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

7  Maryland would not have paid but for Defendants' illegal conduct.

8    274.   By reason of Defendants' acts, the State of Maryland has been damaged, and

9  continues to be damaged, in substantial amount to be determined at trial.

10    275.   Additionally, the State of Maryland is entitled to a statutory penalty for each and

11  every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

12    276.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

13  State of Maryland pursuant to Md. Code Ann., Health-Gen. § 2-604(a)(1).

14  **Count XIV**<br>**Massachusetts False Claims Act**<br>**Mass. Gen. Laws ch. 12, §§ 5A–5O**

15

16    277.   Relator realleges and incorporates by reference all foregoing allegations as though

17  fully set forth herein.

18    278.   This is a claim for treble damages and penalties under the Massachusetts False Claims

19  Act.

20    279.   Through the acts described above, Defendants knowingly, intentionally, and willfully

21  presented, or caused to be presented, false or fraudulent claims for payment and approval for

22  prescriptions for Apriso®.

23    280.   Through the acts described above, Defendants knowingly, intentionally, and willfully

24  made or used a false record or statement material to a false or fraudulent claim for payment and

25  approval for prescriptions for Apriso®.

26    281.   Through the acts described above, Defendants conspired to (a) present, or cause to be

27  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

28

- 52 -

1  statement material to a false or fraudulent claim for payment and approval for prescriptions for
2  Apriso®.

3      282.    Because of Defendants' violations the false claims statutes alleged herein, Defendants
4  were not entitled to be paid by the Commonwealth of Massachusetts —through any state funded
5  program, including, without limitation, Medicaid—for Apriso®.

6      283.    Through the acts described herein, Defendants knowingly presented, or caused to be
7  presented, false or fraudulent claims to the Commonwealth of Massachusetts.

8      284.    Relator cannot at this time identify all of the false claims for payment that were caused
9  by Defendants' conduct. The false claims were presented by numerous separate entities across the
10 Commonwealth of Massachusetts. Relator has no control over or dealings with such entities and has
11 no access to the records in their possession.

12     285.    The Commonwealth of Massachusetts, unaware of the falsity of the records,
13 statements and claims made or caused to be made by Defendants, paid and continues to pay the
14 claims that the Commonwealth of Massachusetts would not have paid but for Defendants' illegal
15 conduct.

16     286.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been
17 damaged, and continues to be damaged, in substantial amount to be determined at trial.

18     287.    Additionally, the Commonwealth of Massachusetts is entitled to a statutory penalty
19 for each and every violation alleged herein to be determined by the Court in accordance with the
20 relevant statutes.

21     288.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
22 Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

**Count XV**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws §§ 400.601-.615**

25     289.    Relator realleges and incorporates by reference all foregoing allegations as though
26 fully set forth herein.

27     290.    This is a claim for treble damages and penalties under the Michigan Medicaid False
28 Claims Act.

291.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

292.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

293.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

294.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Michigan —through any state funded program, including, without limitation, Medicaid—for Apriso®.

295.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Michigan.

296.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Michigan. Relator has no control over or dealings with such entities and has no access to the records in their possession.

297.    The State of Michigan, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Michigan would not have paid but for Defendants' illegal conduct.

298.    By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

299.    Additionally, the State of Michigan is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

300.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 400.610a(1).

- 54 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Count XVI
### Minnesota False Claims Act
### Minn. Stat. §§ 15C.01–.16

301.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

302.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

303.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

304.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

305.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

306.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Minnesota —through any state funded program, including, without limitation, Medicaid—for Apriso®.

307.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Minnesota.

308.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Minnesota. Relator has no control over or dealings with such entities and has no access to the records in their possession.

309.    The State of Minnesota, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Minnesota would not have paid but for Defendants' illegal conduct.

- 55 -

COMPLAINT                                                                                    CASE NO.

1       310.     By reason of Defendants' acts, the State of Minnesota has been damaged, and

2 continues to be damaged, in substantial amount to be determined at trial.

3       311.     Additionally, the State of Minnesota is entitled to a statutory penalty for each and

4 every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5       312.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6 State of Minnesota pursuant to Minn. Stat. § 15C.05.

7 **Count XVII**<br>**Montana False Claims Act**<br>**Mont. Code Ann. §§ 17-8-401 to -413**

8

9       313.     Relator realleges and incorporates by reference all foregoing allegations as though

10 fully set forth herein.

11       314.     This is a claim for treble damages and penalties under the Montana False Claims Act.

12       315.     Through the acts described above, Defendants knowingly, intentionally, and willfully

13 presented, or caused to be presented, false or fraudulent claims for payment and approval for

14 prescriptions for Apriso®.

15       316.     Through the acts described above, Defendants knowingly, intentionally, and willfully

16 made or used a false record or statement material to a false or fraudulent claim for payment and

17 approval for prescriptions for Apriso®.

18       317.     Through the acts described above, Defendants conspired to (a) present, or cause to be

19 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

20 statement material to a false or fraudulent claim for payment and approval for prescriptions for

21 Apriso®.

22       318.     Because of Defendants' violations the false claims statutes alleged herein, Defendants

23 were not entitled to be paid by the State of Montana —through any state funded program, including,

24 without limitation, Medicaid—for Apriso®.

25       319.     Through the acts described herein, Defendants knowingly presented, or caused to be

26 presented, false or fraudulent claims to the State of Montana.

27       320.     Relator cannot at this time identify all of the false claims for payment that were caused

28 by Defendants' conduct. The false claims were presented by numerous separate entities across the

- 56 -

COMPLAINT                                                CASE NO.

1   State of Montana. Relator has no control over or dealings with such entities and has no access to the

2   records in their possession.

3       321.    The State of Montana, unaware of the falsity of the records, statements and claims

4   made or caused to be made by Defendants, paid and continues to pay the claims that the State of

5   Montana would not have paid but for Defendants' illegal conduct.

6       322.    By reason of Defendants' acts, the State of Montana has been damaged, and

7   continues to be damaged, in substantial amount to be determined at trial.

8       323.    Additionally, the State of Montana is entitled to a statutory penalty for each and every

9   violation alleged herein to be determined by the Court in accordance with the relevant statutes.

10      324.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

11  State of Montana pursuant to Mont. Code Ann. § 17-8-406(1).

12                                      **Count XVIII**
                    **Nevada Submission of False Claims to State or Local Government**
13                          **Nev. Rev. Stat. §§ 357.010–.250**

14      325.    Relator realleges and incorporates by reference all foregoing allegations as though

15  fully set forth herein.

16      326.    This is a claim for treble damages and penalties under the Nevada statute relating to

17  the Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250

18      327.    Through the acts described above, Defendants knowingly, intentionally, and willfully

19  presented, or caused to be presented, false or fraudulent claims for payment and approval for

20  prescriptions for Apriso®.

21      328.    Through the acts described above, Defendants knowingly, intentionally, and willfully

22  made or used a false record or statement material to a false or fraudulent claim for payment and

23  approval for prescriptions for Apriso®.

24      329.    Through the acts described above, Defendants conspired to (a) present, or cause to be

25  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

26  statement material to a false or fraudulent claim for payment and approval for prescriptions for

27  Apriso®.

28

- 57 -

COMPLAINT                                                                    CASE NO.

330.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Nevada —through any state funded program, including, without limitation, Medicaid—for Apriso®.

331.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Nevada.

332.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Nevada. Relator has no control over or dealings with such entities and has no access to the records in their possession.

333.    The State of Nevada, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Nevada would not have paid but for Defendants' illegal conduct.

334.    By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

335.    Additionally, the State of Nevada is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

336.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

**Count XIX**
**New Hampshire Health Care False Claims Law**
**N.H. Rev. Stat. Ann. §§ 167:61-b to :61-e**

337.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

338.    This is a claim for treble damages and penalties under the New Hampshire Health Care False Claims Law.

339.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

- 58 -

1    340.   Through the acts described above, Defendants knowingly, intentionally, and willfully

2 made or used a false record or statement material to a false or fraudulent claim for payment and

3 approval for prescriptions for Apriso®.

4    341.   Through the acts described above, Defendants conspired to (a) present, or cause to be

5 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

6 statement material to a false or fraudulent claim for payment and approval for prescriptions for

7 Apriso®.

8    342.   Because of Defendants' violations the false claims statutes alleged herein, Defendants

9 were not entitled to be paid by the State of New Hampshire —through any state funded program,

10 including, without limitation, Medicaid—for Apriso®.

11    343.   Through the acts described herein, Defendants knowingly presented, or caused to be

12 presented, false or fraudulent claims to the State of New Hampshire.

13    344.   Relator cannot at this time identify all of the false claims for payment that were caused

14 by Defendants' conduct. The false claims were presented by numerous separate entities across the

15 State of New Hampshire. Relator has no control over or dealings with such entities and has no access

16 to the records in their possession.

17    345.   The State of New Hampshire, unaware of the falsity of the records, statements and

18 claims made or caused to be made by Defendants, paid and continues to pay the claims that the State

19 of New Hampshire would not have paid but for Defendants' illegal conduct.

20    346.   By reason of Defendants' acts, the State of New Hampshire has been damaged, and

21 continues to be damaged, in substantial amount to be determined at trial.

22    347.   Additionally, the State of New Hampshire is entitled to a statutory penalty for each

23 and every violation alleged herein to be determined by the Court in accordance with the relevant

24 statutes.

25    348.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

26 State of New Hampshire pursuant to N.H. Rev. Stat. Ann. § 167:61-c(II)(a).

27

28

- 59 -

COMPLAINT                                                    CASE NO.

**Count XX**
**New Jersey False Claims Act**
**N.J. Stat. Ann. §§ 2A:32C-1 to -18**

349.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

350.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

351.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

352.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

353.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

354.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Jersey —through any state funded program, including, without limitation, Medicaid—for Apriso®.

355.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Jersey.

356.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Jersey. Relator has no control over or dealings with such entities and has no access to the records in their possession.

357.    The State of New Jersey, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Jersey would not have paid but for Defendants' illegal conduct.

- 60 -

1    358.    By reason of Defendants' acts, the State of New Jersey has been damaged, and
2    continues to be damaged, in substantial amount to be determined at trial.

3    359.    Additionally, the State of New Jersey is entitled to a statutory penalty for each and
4    every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5    360.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
6    State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5(b).

7                              **Count XXI**
8                     **New Mexico Medicaid False Claims**
                      **N.M. Stat. Ann. §§ 27-14-1 to -15**

9    361.    Relator realleges and incorporates by reference all foregoing allegations as though
10   fully set forth herein.

11   362.    This is a claim for treble damages and penalties under the New Mexico Medicaid
12   False Claims Act.

13   363.    Through the acts described above, Defendants knowingly, intentionally, and willfully
14   presented, or caused to be presented, false or fraudulent claims for payment and approval for
15   prescriptions for Apriso®.

16   364.    Through the acts described above, Defendants knowingly, intentionally, and willfully
17   made or used a false record or statement material to a false or fraudulent claim for payment and
18   approval for prescriptions for Apriso®.

19   365.    Through the acts described above, Defendants conspired to (a) present, or cause to be
20   presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
21   statement material to a false or fraudulent claim for payment and approval for prescriptions for
22   Apriso®.

23   366.    Because of Defendants' violations the false claims statutes alleged herein, Defendants
24   were not entitled to be paid by the State of New Mexico—through any state funded program,
25   including, without limitation, Medicaid—for Apriso®.

26   367.    Through the acts described herein, Defendants knowingly presented, or caused to be
27   presented, false or fraudulent claims to the State of New Mexico.

28

                                   - 61 -

1    368.    Relator cannot at this time identify all of the false claims for payment that were caused

2  by Defendants' conduct. The false claims were presented by numerous separate entities across the

3  State of New Mexico. Relator has no control over or dealings with such entities and has no access to

4  the records in their possession.

5    369.    The State of New Mexico, unaware of the falsity of the records, statements and claims

6  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

7  New Mexico would not have paid but for Defendants' illegal conduct.

8    370.    By reason of Defendants' acts, the State of New Mexico has been damaged, and

9  continues to be damaged, in substantial amount to be determined at trial.

10    371.    Additionally, the State of New Mexico is entitled to a statutory penalty for each and

11  every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

12    372.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

13  State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-7.

14                          **Count XXII**
                  **New Mexico Fraud Against Taxpayers Act**
15                    **N.M. Stat. Ann. §§ 44-9-1 to -14**

16    373.    Relator realleges and incorporates by reference all foregoing allegations as though

17  fully set forth herein.

18    374.    This is a claim for treble damages and penalties under the New Mexico Fraud Against

19  Taxpayers Act.

20    375.    Through the acts described herein, Defendants knowingly, intentionally, and willfully

21  violated the New Mexico Fraud Against Taxpayers Act.

22    376.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

23  State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

24                          **Count XXIII**
                      **New York False Claims Act**
25                    **N.Y. State Fin. Law §§ 187–194**

26    377.    Relator realleges and incorporates by reference all foregoing allegations as though

27  fully set forth herein.

28

                                  - 62 -
COMPLAINT                                                    CASE NO.

1    378.    This is a claim for treble damages and penalties under the New York False Claims
2  Act.

3    379.    Through the acts described above, Defendants knowingly, intentionally, and willfully
4  presented, or caused to be presented, false or fraudulent claims for payment and approval for
5  prescriptions for Apriso®.

6    380.    Through the acts described above, Defendants knowingly, intentionally, and willfully
7  made or used a false record or statement material to a false or fraudulent claim for payment and
8  approval for prescriptions for Apriso®.

9    381.    Through the acts described above, Defendants conspired to (a) present, or cause to be
10  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
11  statement material to a false or fraudulent claim for payment and approval for prescriptions for
12  Apriso®.

13    382.    Because of Defendants' violations the false claims statutes alleged herein, Defendants
14  were not entitled to be paid by the State of New York—through any state funded program, including,
15  without limitation, Medicaid—for Apriso®.

16    383.    Through the acts described herein, Defendants knowingly presented, or caused to be
17  presented, false or fraudulent claims to the State of New York.

18    384.    Relator cannot at this time identify all of the false claims for payment that were caused
19  by Defendants' conduct. The false claims were presented by numerous separate entities across the
20  State of New York. Relator has no control over or dealings with such entities and has no access to the
21  records in their possession.

22    385.    The State of New York, unaware of the falsity of the records, statements and claims
23  made or caused to be made by Defendants, paid and continues to pay the claims that the State of
24  New York would not have paid but for Defendants' illegal conduct.

25    386.    By reason of Defendants' acts, the State of New York has been damaged, and
26  continues to be damaged, in substantial amount to be determined at trial.

27    387.    Additionally, the State of New York is entitled to a statutory penalty for each and
28  every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

- 63 -

1       388.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

2   State of New York pursuant to N.Y. State Fin. Law § 190(2)(a).

3                                        **Count XXIV**
                                **North Carolina False Claims Act**
4                               **N.C. Gen. Stat. §§ 1-605 to -618**

5       389.    Relator realleges and incorporates by reference all foregoing allegations as though

6   fully set forth herein.

7       390.    This is a claim for treble damages and penalties under the North Carolina False

8   Claims Act.

9       391.    Through the acts described above, Defendants knowingly, intentionally, and willfully

10  presented, or caused to be presented, false or fraudulent claims for payment and approval for

11  prescriptions for Apriso®.

12      392.    Through the acts described above, Defendants knowingly, intentionally, and willfully

13  made or used a false record or statement material to a false or fraudulent claim for payment and

14  approval for prescriptions for Apriso®.

15      393.    Through the acts described above, Defendants conspired to (a) present, or cause to be

16  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

17  statement material to a false or fraudulent claim for payment and approval for prescriptions for

18  Apriso®.

19      394.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

20  were not entitled to be paid by the State of North Carolina—through any state funded program,

21  including, without limitation, Medicaid—for Apriso®.

22      395.    Through the acts described herein, Defendants knowingly presented, or caused to be

23  presented, false or fraudulent claims to the State of North Carolina.

24      396.    Relator cannot at this time identify all of the false claims for payment that were caused

25  by Defendants' conduct. The false claims were presented by numerous separate entities across the

26  State of North Carolina. Relator has no control over or dealings with such entities and has no access

27  to the records in their possession.

28

- 64 -

1    397.    The State North Carolina, unaware of the falsity of the records, statements and claims

2    made or caused to be made by Defendants, paid and continues to pay the claims that the State of

3    North Carolina would not have paid but for Defendants' illegal conduct.

4    398.    By reason of Defendants' acts, the State of North Carolina has been damaged, and

5    continues to be damaged, in substantial amount to be determined at trial.

6    399.    Additionally, the State of North Carolina is entitled to a statutory penalty for each and

7    every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

8    400.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

9    State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

10   **Count XXV**
     **Oklahoma Medicaid False Claims Act**
11   **Okla. Stat. tit. 63, §§ 5053–5053.7**

12   401.    Relator realleges and incorporates by reference all foregoing allegations as though

13   fully set forth herein.

14   402.    This is a claim for treble damages and penalties under the Oklahoma False Claims

15   Act.

16   403.    Through the acts described above, Defendants knowingly, intentionally, and willfully

17   presented, or caused to be presented, false or fraudulent claims for payment and approval for

18   prescriptions for Apriso®.

19   404.    Through the acts described above, Defendants knowingly, intentionally, and willfully

20   made or used a false record or statement material to a false or fraudulent claim for payment and

21   approval for prescriptions for Apriso®.

22   405.    Through the acts described above, Defendants conspired to (a) present, or cause to be

23   presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

24   statement material to a false or fraudulent claim for payment and approval for prescriptions for

25   Apriso®.

26   406.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

27   were not entitled to be paid by the State of Oklahoma—through any state funded program, including,

28   without limitation, Medicaid—for Apriso®.

- 65 -

1    407.    Through the acts described herein, Defendants knowingly presented, or caused to be
2    presented, false or fraudulent claims to the State of Oklahoma.

3    408.    Relator cannot at this time identify all of the false claims for payment that were caused
4    by Defendants' conduct. The false claims were presented by numerous separate entities across the
5    State of Oklahoma. Relator has no control over or dealings with such entities and has no access to the
6    records in their possession.

7    409.    The State of Oklahoma, unaware of the falsity of the records, statements and claims
8    made or caused to be made by Defendants, paid and continues to pay the claims that the State of
9    Oklahoma would not have paid but for Defendants' illegal conduct.

10    410.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and
11    continues to be damaged, in substantial amount to be determined at trial.

12    411.    Additionally, the State of Oklahoma is entitled to a statutory penalty for each and
13    every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

14    412.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
15    State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.2(B)(1).

16    **Count XXVI**
      **Rhode Island False Claims Act**
17    **R.I. Gen. Laws §§ 9-1.1-1 to -9**

18    413.    Relator realleges and incorporates by reference all foregoing allegations as though
19    fully set forth herein.

20    414.    This is a claim for treble damages and penalties under the Rhode Island False Claims
21    Act.

22    415.    Through the acts described above, Defendants knowingly, intentionally, and willfully
23    presented, or caused to be presented, false or fraudulent claims for payment and approval for
24    prescriptions for Apriso®.

25    416.    Through the acts described above, Defendants knowingly, intentionally, and willfully
26    made or used a false record or statement material to a false or fraudulent claim for payment and
27    approval for prescriptions for Apriso®.

28

- 66 -

1    417.   Through the acts described above, Defendants conspired to (a) present, or cause to be

2    presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

3    statement material to a false or fraudulent claim for payment and approval for prescriptions for

4    Apriso®.

5    418.   Because of Defendants' violations the false claims statutes alleged herein, Defendants

6    were not entitled to be paid by the State of Rhode Island —through any state funded program,

7    including, without limitation, Medicaid—for Apriso®.

8    419.   Through the acts described herein, Defendants knowingly presented, or caused to be

9    presented, false or fraudulent claims to the State of Rhode Island.

10   420.   Relator cannot at this time identify all of the false claims for payment that were caused

11   by Defendants' conduct. The false claims were presented by numerous separate entities across the

12   State of Rhode Island. Relator has no control over or dealings with such entities and has no access to

13   the records in their possession.

14   421.   The State of Rhode Island, unaware of the falsity of the records, statements and

15   claims made or caused to be made by Defendants, paid and continues to pay the claims that the State

16   of Rhode Island would not have paid but for Defendants' illegal conduct.

17   422.   By reason of Defendants' acts, the State of Rhode Island has been damaged, and

18   continues to be damaged, in substantial amount to be determined at trial.

19   423.   Additionally, the State of Rhode Island is entitled to a statutory penalty for each and

20   every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

21   424.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

22   State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

23   **Count XXVII**
     **Tennessee Medicaid False Claims Act**
24   **Tenn. Code Ann. §§ 7-5-181 to -185**

25   425.   Relator realleges and incorporates by reference all foregoing allegations as though

26   fully set forth herein.

27   426.   This is a claim for treble damages and penalties under the Tennessee Medicaid False

28   Claims Act.

- 67 -

COMPLAINT                                                              CASE NO.

427.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

428.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

429.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

430.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Tennessee—through any state funded program, including, without limitation, Medicaid—for Apriso®.

431.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Tennessee.

432.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Tennessee. Relator has no control over or dealings with such entities and has no access to the records in their possession.

433.    The State of Tennessee, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Tennessee would not have paid but for Defendants' illegal conduct.

434.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

435.    Additionally, the State of Tennessee is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

436.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b)(1).

- 68 -

**Count XXVIII**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §§ 36.001–.132**

437.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

438.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

439.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

440.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

441.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

442.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Texas—through any state funded program, including, without limitation, Medicaid—for Apriso®.

443.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Texas.

444.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Texas. Relator has no control over or dealings with such entities and has no access to the records in their possession.

445.    The State of Texas, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Texas would not have paid but for Defendants' illegal conduct.

- 69 -

1      446.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to
2  be damaged, in substantial amount to be determined at trial.

3      447.    Additionally, the State of Texas is entitled to a statutory penalty for each and every
4  violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5      448.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
6  State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

**Count XXIX**
**Vermont False Claims Act**
**Vt. Stat. Ann. tit. 32, §§ 630–642**

9      449.    Relator realleges and incorporates by reference all foregoing allegations as though
10  fully set forth herein.

11      450.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

12      451.    Through the acts described above, Defendants knowingly, intentionally, and willfully
13  presented, or caused to be presented, false or fraudulent claims for payment and approval for
14  prescriptions for Apriso®.

15      452.    Through the acts described above, Defendants knowingly, intentionally, and willfully
16  made or used a false record or statement material to a false or fraudulent claim for payment and
17  approval for prescriptions for Apriso®.

18      453.    Through the acts described above, Defendants conspired to (a) present, or cause to be
19  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
20  statement material to a false or fraudulent claim for payment and approval for prescriptions for
21  Apriso®.

22      454.    Because of Defendants' violations the false claims statutes alleged herein, Defendants
23  were not entitled to be paid by the State of Vermont —through any state funded program, including,
24  without limitation, Medicaid—for Apriso®.

25      455.    Through the acts described herein, Defendants knowingly presented, or caused to be
26  presented, false or fraudulent claims to the State of Vermont.

27      456.    Relator cannot at this time identify all of the false claims for payment that were caused
28  by Defendants' conduct. The false claims were presented by numerous separate entities across the

- 70 -

1  State of Vermont. Relator has no control over or dealings with such entities and has no access to the

2  records in their possession.

3      457.    The State of Vermont, unaware of the falsity of the records, statements and claims

4  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

5  Vermont would not have paid but for Defendants' illegal conduct.

6      458.    By reason of Defendants' acts, the State of Vermont has been damaged, and continues

7  to be damaged, in substantial amount to be determined at trial.

8      459.    Additionally, the State of Vermont is entitled to a statutory penalty for each and every

9  violation alleged herein to be determined by the Court in accordance with the relevant statutes.

10     460.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

11  State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

**Count XXX**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §§ 8.01-216.1 to .19**

14     461.    Relator realleges and incorporates by reference all foregoing allegations as though

15  fully set forth herein.

16     462.    This is a claim for treble damages and penalties under the Virginia Fraud Against

17  Taxpayers Act.

18     463.    Through the acts described above, Defendants knowingly, intentionally, and willfully

19  presented, or caused to be presented, false or fraudulent claims for payment and approval for

20  prescriptions for Apriso®.

21     464.    Through the acts described above, Defendants knowingly, intentionally, and willfully

22  made or used a false record or statement material to a false or fraudulent claim for payment and

23  approval for prescriptions for Apriso®.

24     465.    Through the acts described above, Defendants conspired to (a) present, or cause to be

25  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

26  statement material to a false or fraudulent claim for payment and approval for prescriptions for

27  Apriso®.

28

- 71 -

1    466.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

2  were not entitled to be paid by the Commonwealth of Virginia—through any state funded program,

3  including, without limitation, Medicaid—for Apriso®.

4    467.    Through the acts described herein, Defendants knowingly presented, or caused to be

5  presented, false or fraudulent claims to the Commonwealth of Virginia.

6    468.    Relator cannot at this time identify all of the false claims for payment that were caused

7  by Defendants' conduct. The false claims were presented by numerous separate entities across the

8  Commonwealth of Virginia. Relator has no control over or dealings with such entities and has no

9  access to the records in their possession.

10    469.    The Commonwealth of Virginia, unaware of the falsity of the records, statements and

11  claims made or caused to be made by Defendants, paid and continues to pay the claims that the

12  Commonwealth of Virginia would not have paid but for Defendants' illegal conduct.

13    470.    By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and

14  continues to be damaged, in substantial amount to be determined at trial.

15    471.    Additionally, the Commonwealth of Virginia is entitled to a statutory penalty for each

16  and every violation alleged herein to be determined by the Court in accordance with the relevant

17  statutes.

18    472.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

19  Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(A).

20                                   **Count XXXI**
                    **Washington State Medicaid Fraud False Claims Act**
21                       **Wash. Rev. Code §§ 74.66.005–.130**

22    473.    Relator realleges and incorporates by reference all foregoing allegations as though

23  fully set forth herein.

24    474.    This is a claim for treble damages and penalties under the Washington State Medicaid

25  Fraud False Claims Act.

26    475.    Through the acts described above, Defendants knowingly, intentionally, and willfully

27  presented, or caused to be presented, false or fraudulent claims for payment and approval for

28  prescriptions for Apriso®.

- 72 -

COMPLAINT                                                    CASE NO.

476.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

477.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

478.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Washington—through any state funded program, including, without limitation, Medicaid—for Apriso®.

479.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Washington.

480.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Washington. Relator has no control over or dealings with such entities and has no access to the records in their possession.

481.     The State of Washington, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Washington would not have paid but for Defendants' illegal conduct.

482.     By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

483.     Additionally, the State of Washington is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

484.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050.

- 73 -

### Count XXXII
### The District of Columbia False Claims Law
### D.C. Code §§ 2-381.01 to .09

485.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

486.    This is a claim for treble damages and penalties under the District of Columbia False Claims Law.

487.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

488.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

489.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

490.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the District of Columbia —through any state funded program, including, without limitation, Medicaid—for Apriso®.

491.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the District of Columbia.

492.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the District of Columbia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

493.    The District of Columbia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that District of Columbia would not have paid but for Defendants' illegal conduct.

- 74 -

1      494.    By reason of Defendants' acts, the District of Columbia has been damaged, and

2  continues to be damaged, in substantial amount to be determined at trial.

3      495.    Additionally, the District of Columbia is entitled to a statutory penalty for each and

4  every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5      496.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6  District of Columbia pursuant to D.C. Code § 2-381.03(b)(1).

- 75 -

COMPLAINT                                    CASE NO.

1

**PRAYER FOR RELIEF**

2 WHEREFORE, Relator prays for judgment against Defendants as follows:

3 A. That Defendants cease and desist from violating 31 U.S.C. §§ 3729–3733, and the
4 relevant parts of each statute applicable to the Plaintiff States as set forth above;

5 B. That this Court enter judgment against Defendants in an amount equal to three times
6 the amount of damages the United States has sustained because of Defendants' actions, plus a civil
7 penalty of not less than $5,500 and not more than $22,363 for each violation of 31 U.S.C. §§ 3729–
8 3733;

9 C. That this Court enter judgment against Defendants in an amount equal to three times
10 the amount of damages the State of California has sustained because of Defendants' actions, plus a
11 civil penalty for the maximum amount allowed by statute, for each violation of the California False
12 Claims Act, Cal. Gov't Code §§ 12650–12656;

13 D. That this Court enter judgment against Defendants in an amount equal to three times
14 the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a
15 civil penalty for the maximum amount allowed by statute, for each violation of the Colorado
16 Medicaid False Claims Act, Colo. Rev. Stat §§ 25.5-4-303.5 to -310;

17 E. That this Court enter judgment against Defendants in an amount equal to three times
18 the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a
19 civil penalty for the maximum amount allowed by statute, for each violation of the Connecticut False
20 Claims Act, Conn. Gen. Stat. §§ 4-274 to -289;

21 F. That this Court enter judgment against Defendants in an amount equal to three times
22 the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a
23 civil penalty for the maximum amount allowed by statute, for each violation of the Delaware False
24 Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201–1211;

25 G. That this Court enter judgment against Defendants in an amount equal to three times
26 the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil
27 penalty for the maximum amount allowed by statute, for each violation of the Florida False Claims
28 Act, Fla. Stat. §§ 68.081–.09;

- 76 -

1    H.    That this Court enter judgment against Defendants in an amount equal to three times
2  the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil
3  penalty for the maximum amount allowed by statute, for each violation of the Georgia False
4  Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 to -168.6;

5    I.    That this Court enter judgment against Defendants in an amount equal to three times
6  the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil
7  penalty for the maximum amount allowed by statute, for each violation of the Hawaii False Claims
8  Act, Haw. Rev. Stat. §§ 661-21 to -31;

9    J.    That this Court enter judgment against Defendants in an amount equal to three times
10  the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil
11  penalty for the maximum amount allowed by statute, for each violation of the Illinois False Claims
12  Act, 740 Ill. Comp. Stat. 175/1–175/8;

13    K.    That this Court enter judgment against Defendants in an amount equal to three times
14  the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil
15  penalty for the maximum amount allowed by statute, for each violation of the Indiana False Claims
16  and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to -18;

17    L.    That this Court enter judgment against Defendants in an amount equal to three times
18  the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil
19  penalty for the maximum amount allowed by statute, for each violation of Iowa False Claims Act,
20  Iowa Code §§ 685.1–.7;

21    M.    That this Court enter judgment against Defendants in an amount equal to three times
22  the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a
23  civil penalty for the maximum amount allowed by statute, for each violation of the Louisiana Medical
24  Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437–:440;

25    N.    That this Court enter judgment against Defendants in an amount equal to three times
26  the amount of damages the State of Maryland has sustained because of Defendants' actions, plus a
27  civil penalty for the maximum amount allowed by statute, for each violation of the Maryland False
28  Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 to -611;

- 77 -

1    O.    That this Court enter judgment against Defendants in an amount equal to three times
2  the amount of damages Commonwealth of Massachusetts has sustained because of Defendants'
3  actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the
4  Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–5O;

5    P.    That this Court enter judgment against Defendants in an amount equal to three times
6  the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a
7  civil penalty for the maximum amount allowed by statute, for each violation of the Michigan
8  Medicaid False Claims Act, Mich. Comp. Laws. §§ 400.601–.615;

9    Q.    That this Court enter judgment against Defendants in an amount equal to three times
10  the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus a
11  civil penalty for the maximum amount allowed by statute, for each violation of the Minnesota False
12  Claims Act, Minn. Stat, §§ 15C.01–.16;

13    R.    That this Court enter judgment against Defendants in an amount equal to three times
14  the amount of damages the State of Montana has sustained because of Defendants' actions, plus a
15  civil penalty for the maximum amount allowed by statute, for each violation of the Montana False
16  Claims Act, Mont. Code Ann. §§ 17-8-401 to -413;

17    S.    That this Court enter judgment against Defendants in an amount equal to three times
18  the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil
19  penalty for the maximum amount allowed by statute, for each violation of the Nevada statute
20  concerning Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–
21  .250;

22    T.    That this Court enter judgment against Defendants in an amount equal to three times
23  the amount of damages the State of Hampshire has sustained because of Defendants' actions, plus a
24  civil penalty for the maximum amount allowed by statute, for each violation of the New Hampshire
25  Health Care False Claims Law, N.H. Rev. Stat. Ann. §§ 167:61-b to :61-e;

26    U.    That this Court enter judgment against Defendants in an amount equal to three times
27  the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a

28

- 78 -

1   civil penalty for the maximum amount allowed by statute, for each violation of the New Jersey False

2   Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 to -18;

3        V.     That this Court enter judgment against Defendants in an amount equal to three times

4   the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus

5   a civil penalty for the maximum amount allowed by statute, for each violation of the New Mexico

6   Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 to -15; and the New Mexico Fraud Against

7   Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14.

8        W.     That this Court enter judgment against Defendants in an amount equal to three times

9   the amount of damages the State of New York has sustained because of Defendants' actions, plus a

10   civil penalty for the maximum amount allowed by statute, for each violation of the New York False

11   Claims Act, N.Y. State Fin. Law §§ 187–194;

12        X.     That this Court enter judgment against Defendants in an amount equal to three times

13   the amount of damages the State of North Carolina has sustained because of Defendants' actions,

14   plus a civil penalty for the maximum amount allowed by statute, for each violation of the North

15   Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 to -618;

16        Y.     That this Court enter judgment against Defendants in an amount equal to three times

17   the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a

18   civil penalty for the maximum amount allowed by statute, for each violation of the Oklahoma

19   Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7;

20        Z.     That this Court enter judgment against Defendants in an amount equal to three times

21   the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus

22   a civil penalty for the maximum amount allowed by statute, for each violation of the Rhode Island

23   False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9;

24        AA.     That this Court enter judgment against Defendants in an amount equal to three times

25   the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a

26   civil penalty for the maximum amount allowed by statute, for each violation of the Tennessee

27   Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to -185;

28

- 79 -

1        BB.     That this Court enter judgment against Defendants in an amount equal to three times

2  the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil

3  penalty for the maximum amount allowed by statute, for each violation of the Texas Medicaid Fraud

4  Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001–.132;

5        CC.     That this Court enter judgment against Defendants in an amount equal to three times

6  the amount of damages the State of Vermont has sustained because of Defendants' actions, plus a

7  civil penalty for the maximum amount allowed by statute, for each violation of the Vermont False

8  Claims Act, Vt. Stat. Ann. tit. 32, §§ 630–642;

9        DD.     That this Court enter judgment against Defendants in an amount equal to three times

10  the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions,

11  plus a civil penalty for the maximum amount allowed by statute, for each violation of the Virginia

12  Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to .19;

13        EE.     That this Court enter judgment against Defendants in an amount equal to three times

14  the amount of damages the State of Washington has sustained because of Defendants' actions, plus a

15  civil penalty for the maximum amount allowed by statute, for each violation of the Washington State

16  Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005–.130;

17        FF.     That this Court enter judgment against Defendants in an amount equal to three times

18  the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a

19  civil penalty for the maximum amount allowed by statute, for each violation of the District of

20  Columbia False Claims Act, D.C. Code §§ 2-381.01 to .09;

21        GG.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C.

22  § 3730(d), and the relevant provisions of each statute applicable to the Plaintiff States as set forth

23  above;

24        HH.     That Relator be awarded all costs of this action;

25        II.     That the Relator be awarded reasonable attorneys' fees; and

26        JJ.     That Relator recover such further and other relief as the Court deems just and proper.

27

28

COMPLAINT                                  CASE NO.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: March 8, 2018

Joseph R. Saveri (State Bar No. 130064)
Nicomedes Sy Herrera (State Bar No. 275332)
Kevin Rayhill (State Bar No. 267496)
Kyla Gibboney (State Bar No. 301441)
V Chai Oliver Prentice (State Bar No. 309807)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

By: _____
        Joseph R. Saveri

*Attorneys for Plaintiffs*

United States of America; the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington; the Commonwealths of Massachusetts and Virginia; and the District of Columbia, *ex rel.* Zachary Silbersher

- 81 -

COMPLAINT                                                                  CASE NO.