SEALED BY ORDER
OF THE COURT



FILED

OCT 23 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

1   Joseph R. Saveri (State Bar No. 130064)
    Steven N. Williams (State Bar No. 175489)
2   Nicomedes Sy Herrera (State Bar No. 275332)
    Kevin Rayhill (State Bar No. 267496)
3   Kyla Gibboney (State Bar No. 301441)
    V Chai Oliver Prentice (State Bar No. 309807)
4   JOSEPH SAVERI LAW FIRM, INC.
    601 California Street, Suite 1000
5   San Francisco, California 94108
    Telephone: (415) 500-6800
6   Facsimile:  (415) 395-9940
    Email: jsaveri@saverilawfirm.com
7          swilliams@saverilawfirm.com
           nherrera@saverilawfirm.com
8          krayhill@saverilawfirm.com
           kgibboney@saverilawfirm.com
9          vprentice@saverilawfirm.com

10  *Attorneys for Plaintiffs*

11              **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                   **OAKLAND DIVISION**

14  UNITED STATES OF AMERICA; STATES          Case No.: 4:18-cv-01496-DMR
    OF CALIFORNIA, COLORADO,
15  CONNECTICUT, DELAWARE, FLORIDA,           **CORRECTED FIRST AMENDED
    GEORGIA, HAWAII, ILLINOIS, INDIANA,       COMPLAINT FOR VIOLATIONS OF:**
16  IOWA, LOUISIANA, MARYLAND,
    MICHIGAN, MINNESOTA, MONTANA,          1.  **THE FEDERAL FALSE CLAIMS
17  NEVADA, NEW JERSEY, NEW MEXICO,            ACT, 31 U.S.C. §§ 3729–3733; AND**
    NEW YORK, NORTH CAROLINA,
18  OKLAHOMA, RHODE ISLAND,                 2.  **THE FALSE CLAIMS ACTS OF
    TENNESSEE, TEXAS, VERMONT, AND             THE PLAINTIFF STATES,
19  WASHINGTON; THE COMMONWEALTHS             COMMONWEALTHS, AND THE
    OF MASSACHUSETTS AND VIRGINIA;           DISTRICT OF COLUMBIA**
20  AND THE DISTRICT OF COLUMBIA,

21  *ex rel.* ZACHARY SILBERSHER,             *QUI TAM* **ACTION FILED
                                             *IN CAMERA* AND UNDER SEAL**
22                     Plaintiffs,
                                             **DO NOT PLACE IN PRESS BOX
23              v.                            DO NOT ENTER ON PACER**

24  VALEANT PHARMACEUTICALS                   **JURY TRIAL DEMANDED**
    INTERNATIONAL, INC., VALEANT
25  PHARMACEUTICALS INTERNATIONAL,
    SALIX PHARMACEUTICALS, LTD., SALIX
26  PHARMACEUTICALS, INC., AND DR.
    FALK PHARMA GMBH,
27
                       Defendants.
28

FIRST AMENDED COMPLAINT                           CASE NO. 4:18-CV-01496-DMR

Plaintiff-Relator Zachary Silbersher ("Relator"), through his attorneys the Joseph Saveri Law Firm, Inc., on behalf of the United States of America; the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington; the Commonwealths of Massachusetts and Virginia; and the District of Columbia (the foregoing states, commonwealths and the District of Columbia collectively, "the Plaintiff States"), for his Complaint against defendants Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International (collectively with Valeant Pharmaceuticals International, Inc., "Valeant"), Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc. (collectively with Salix Pharmaceuticals, Ltd., "Salix"), Dr. Falk Pharma GmbH ("Dr. Falk") (Valeant, Salix, and Dr. Falk collectively, "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

# I.   INTRODUCTION

## A.   Overview of Defendants' False Claims

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and the Plaintiff States arising from Defendants' violations of the federal False Claims Act, 31 U.S.C. §§ 3729–3733 (the "Federal FCA"); and the false claims acts of the Plaintiff States (the "State FCAs").

2.     Defendants manufacture, sell, and distribute Apriso® (mesalamine) Extended Release Capsules, the application for which was approved by the FDA on October 31, 2008. Mesalamine is sometimes also referred to as mesalazine, 5-aminosalicylic acid, or 5-ASA. Doctors widely prescribe Apriso® to treat patients with ulcerative colitis. Ulcerative colitis is an inflammatory-bowel disease that causes inflammation and ulcers within the colon. The active-pharmaceutical ingredient in Apriso® is mesalamine. Mesalamine has been widely used for decades in numerous pharmaceutical formulations to treat ulcerative colitis, and has long been off-patent.

3.     Mesalamine acts topically upon the sores within the colon. When orally administered, mesalamine must travel through the stomach and reach the colon to be therapeutically effective. The difficulty, however, is that mesalamine is easily metabolized in the stomach. When metabolized,

- 1 -

1   mesalamine will be absorbed into the blood stream, which is known as "systemic" absorption. When

2   systemically absorbed, the drug will not pass through the stomach and into the colon. Thus, oral

3   mesalamine drugs are typically formulated so that the drug can pass through the stomach, without

4   being metabolized, and eventually reach the colon, where it can act topically upon the ulcers. The

5   extent to which the drug is released in the colon is sometimes referred to as "colonic bioavailability."

6         4.      To increase colonic bioavailability, Apriso® encases the drug within an enteric coating

7   to delay release of the drug. Apriso® also uses a polymer matrix core to extend release of the drug

8   through as much of the colon as possible. An enteric coating will only dissolve above a certain pH-

9   threshold. Thus, because the pH of the stomach is typically lower than that of the colon, enteric

10  coatings have been used with oral mesalamine formulations so that the drug can pass through the

11  stomach without being metabolized. When the drug reaches the colon, where the pH is higher, the

12  enteric coating dissolves, and the drug is released.

13        5.      Defendants hold a fraudulently-obtained patent that has excluded generic alternatives

14  to Apriso®. On information and belief, the patent was obtained through fraudulent and misleading

15  statements to the United States Patent and Trademark Office (the "Patent Office"). As a result of

16  Defendants' unlawful conduct that has excluded generic competition for Apriso®, Defendants have

17  excluded generic competition for Apriso® and charge an artificially high price for the drug.

18        6.      Apriso® is covered by Medicare, Medicaid, and various federal and state government-

19  funded health programs. Government health funds pay a significant portion of Apriso®'s artificially

20  high prices. Each and every claim submitted to one of these government agencies for payment or

21  reimbursement for Apriso® is a false claim in violation of the Federal FCA and (where applicable) a

22  relevant State FCA, because Defendants gave the federal government and the Plaintiff States

23  multiple express and implied assurances that the price Defendants were charging for Apriso® was

24  "fair and reasonable." It was not. The federal government and the Plaintiff States materially relied

25  on Defendants' false and misleading statements and certifications when paying or reimbursing claims

26  for Apriso®. Defendants knowingly and intentionally caused each claim to be submitted for an

27  artificially high price that Defendants charged as a result of their fraudulently-obtained patent.

28

FIRST AMENDED COMPLAINT                                           CASE NO. 4:18-CV-01496-DMR

7.     There are two sets of patents relating to Apriso®. The first set consists of a single method of use patent: U.S. Patent No. 8,865,688 ("the '688 Patent"). The '688 Patent was issued on October 21, 2014 and will not expire until May 1, 2030.

8.     The '688 Patent claims a method for administering certain granulated mesalamine formulations *without* food. The Apriso® formulation is covered by the granulated mesalamine formulation claimed in the '688 Patent. As previously discussed, the granulated mesalamine formulation combines an enteric pH-dependent coating, which provides for delayed release, and a polymer matrix core, which provides for extended release.

9.     During prosecution of the '688 Patent application, Defendants argued to the Patent Office that administering the claimed granulated mesalamine formulation without food was *not* obvious. After a lengthy prosecution, the Patent Office granted the '688 Patent based on this purported novelty. Defendants, however, intentionally withheld material information demonstrating that it was obvious in light of prior art that Valeant's claimed granulated mesalamine formulation would be effective when administered without food. Valeant intentionally withheld such information for the purpose of obtaining the '688 Patent, excluding generic competitors, and charging supracompetitive prices for Apriso®.

10.     First, Defendants withheld disclosure of two scientific studies—published before Defendants applied for the '688 Patent—that disclosed administering granulated mesalamine formulations, such as those in Apriso®, would be effective without food. These studies were Martin Brunner, *et al.*, "Gastrointestinal Transit and Release of 5-Aminosalicylic Acid From 153Sm-Labelled Mesalazine Pellets vs. Tablets in Male Healthy Volunteers," *Aliment Pharmacol. Ther.* 17:1163-1169 (2003) ("Brunner"); and Yuri Marakhouski *et al.*, "A Double-Blind Dose-Escalating Trial Comparing Novel Mesalazine Pellets With Mesalazine Tablets in Active Ulcerative Colitis." *Aliment Pharmacol. Ther.* 21:133-140 (2005) ("Marakhouski").

11.     Defendants not only were aware of these studies: they *participated* in them. Dr. Falk's head of research and development, Roland H. Greinwald, Ph.D., was a co-author of both studies. In addition, Dr. Falk provided the granulated mesalamine formulations used in the Brunner study, and

FIRST AMENDED COMPLAINT                                                    CASE NO. 4:18-CV-01496-DMR

1   it underwrote the Marakhouski study. Yet, Defendants failed to disclose the studies to the Patent

2   Office during prosecution of the '688 Patent.

3         12.     Second, Defendants withheld information showing that the colonic bioavailability of

4   other pH-dependent mesalamine drugs using enteric coatings decreased when administered with

5   food. This was all the more shocking because Defendants had disclosed these other drugs to the

6   Patent Office a few years earlier when Defendants argued the *opposite* position: that it was not

7   obvious to administer a different mesalamine drug *with* food.

8         13.     Specifically, on July 16, 2009, in connection with Defendants' prosecution of an

9   earlier patent, Defendants told the Patent Office: "one of ordinary skill in the art, upon review of all

10  the information available at the time the instant application was filed, would have expected the

11  bioavailability [at the colon] of balsalazide to decrease when taken with food, and not increase, as

12  maintained by the Examiner."  At that time, Defendants also gave the Patent Office data

13  demonstrating that for three other commercially available mesalamine formulations (including

14  Lialda, Claversal and Asacol), colonic bioavailability (*i.e.*, efficacy) *decreased* when taken *with food.*

15  In other words, Defendants had represented to the Patent Office in 2009 that administration of

16  mesalamine *with* food was unexpected and novel (because those possessing ordinary skill in the

17  relevant arts would have expected to administer mesalamine *without* food, because doing so would

18  have increased the colonic bioavailability and therefore efficacy of the drug).

19        14.     Five years later, however, while prosecuting the '688 Patent, Defendants claimed the

20  opposite, falsely representing to the Patent Office that administering mesalamine *without food* was

21  unexpected. Defendants knowingly and intentionally omitted information that did not support their

22  new claim, including information about similar mesalamine formulations that they had relied on in

23  their earlier and inconsistent arguments to the Patent Office. Defendants' omissions during

24  prosecution of the '688 Patent were intentional. Indeed, the '688 Patent and the earlier patent each

25  shared an inventor (Lorin Johnson), and they were prosecuted by the same patent attorney (Jonathan

26  Sparks).

27        15.     Defendants' willful deceit was confirmed on May 19, 2017, when the Patent Office's

28  Patent Trial and Appeal Board ("PTAB") invalidated the '688 Patent on the grounds it was obvious

1  in light of the Brunner and Marakhouski articles. *See GeneriCo, LLC v. Dr. Falk Pharma GmbH,*

2  No. IPR2016-00297, Final Written Decision, Dkt. 55 at 21-22 (P.T.A.B. May 19, 2017)

3  ("*GeneriCo*"). Specifically, the PTAB held that administration of Apriso® "without food" would

4  have been obvious in light of the Brunner and Marakhouski articles, which Defendants intentionally

5  withheld from the Patent Office.

6      16.    Valeant is appealing the PTAB's decision and a similar district court opinion (*Salix*

7  *Pharmaceuticals Inc. v. Mylan Pharmaceuticals, Inc.*, No. 1:15-cv-00109-IMK, Slip Op., Dkt. 255

8  (N.D.W. Va. Sept. 12, 2017)) to the Federal Circuit. The two appeals have been assigned to the same

9  merits panel and are being heard as companion cases. *See Dr. Falk Pharma GmbH v. GeneriCo, LLC,*

10  No. 17-2312, Dkt. 37 (Fed. Cir. Nov. 7, 2017) (PTAB appeal), and *Dr. Falk Pharma GmbH v.*

11  *GeneriCo, LLC*, No. 17-2636, Dkt. 30 (Fed. Cir. Nov. 7, 2017) (N.D.W. Va. appeal).

12      17.    The second set of patents are known collectively as the "Otterbeck Patents." The

13  Otterbeck Patents are U.S. Patent Nos. 6,551,620 ("the '620 Patent"), 8,337,886 ("the '886

14  Patent"), 8,496,965 ("the '965 Patent"), 8,911,778 ("the '778 Patent"), 8,940,328 ("the '328

15  Patent") and 8,956,647 ("the '647 Patent").

16      18.    The Otterbeck Patents all expired on April 20, 2018. However, Defendants have not

17  asserted (or have withdrawn their assertions) that the Otterbeck Patents restrict certain

18  pharmaceutical manufacturers from introducing generic alternatives to Apriso®. On information and

19  belief, Defendants have not pressed the Otterbeck Patents against generic competitors because the

20  Otterbeck Patents are invalid, and Defendants know it. As set forth in greater detail below,

21  Defendants did not disclose material information that would have shown that the allegedly novel

22  innovations claimed in the Otterbeck Patents had been disclosed in or were obvious in light of prior

23  art. Specifically, at least four prior art patents anticipate all or nearly all of the alleged inventions

24  claimed in the Otterbeck Patents, rendering them unpatentable. Defendants failed to disclose this

25  prior art to the Patent Office.

26      19.    Apriso® was originally approved by the United States Food and Drug Administration

27  (the "FDA") on October 31, 2008 (Application No. N022301). Apriso®'s FDA-approved exclusivity

28  expired on October 31, 2011. Generic manufacturers were ready to enter the market soon after the

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

1  FDA exclusivity period expired, and they would have been able to adequately to supply the
2  commercial quantities of generic Apriso® necessary to meet market demand.

3      20.    The first generic manufacturer to file an Abbreviated New Drug Application
4  ("ANDA") for FDA approval to introduce a generic version of Apriso® was Lupin Pharmaceuticals,
5  Inc. ("Lupin"). Valeant filed an infringement action asserting the Otterbeck Patents against Lupin
6  on September 7, 2012 (the '688 Patent had not yet issued at that time). On September 11, 2014, the
7  Patent Office notified Valeant that it would issue the '688 Patent upon payment of the issue fee. The
8  next day, on September 12, 2014, Lupin and Valeant reached a settlement under which Valeant
9  dismissed all claims relating to the Otterbeck Patents, and Lupin agreed not to introduce a generic
10 until 2022.

11     21.    But for the fraudulently acquired '688 Patent, Lupin would not have agreed to stay
12 out of the market until four years after the Otterbeck Patents were due to expire. Moreover, but for
13 the '688 Patent, the FDA would have granted Lupin's ANDA soon after Defendants' withdrawal of
14 the claims relating to the Otterbeck Patents.

15     22.    Because the '688 Patent was fraudulently obtained and unenforceable, Lupin would
16 have entered the market soon after Defendants ceased enforcing the Otterbeck Patents.

17     23.    After dismissing its infringement claims relating to the Otterbeck Patents against
18 Lupin, Defendants dismissed their infringement claims relating to the Otterbeck Patents against
19 other generic manufacturers. But for the '688 Patent, those other manufacturers would have also
20 introduced generic alternatives to Apriso® soon after Defendants' withdrawal of their claims relating
21 to the Otterbeck Patents against them, and the FDA would have granted these pending ANDAs
22 sooner.

23     24.    Such generic competition would have reduced the price of Apriso® by at least 80%,
24 and Defendants would have reasonably expected to lose at least 90% of Apriso®'s market share.
25 Defendants' misconduct has allowed them unlawfully to set and maintain artificially inflated prices
26 for Apriso®. The federal government and the Plaintiff States, through Medicare, Medicaid, and their
27 various health services, have paid artificially inflated prices for Apriso® throughout the intervening
28 time. Because Defendants are able to charge inflated prices for Apriso® due to their false or

- 6 -

1    misleading statements, each claim for Apriso® is a violation of the False Claims Act. Moreover,

2    through Defendants' unlawful conduct, they have been able to obtain payment or reimbursement for

3    prescriptions of Apriso® that would have otherwise been filled with less expensive generic

4    alternatives.

5            25.    The additional protection granted by the '688 Patent gave Defendants added leverage

6    in litigation with potential generic manufacturers of Apriso®. Defendants used this leverage to avoid

7    defending the validity of the Otterbeck Patents, which in turn allowed Defendants to continue

8    excluding generic alternatives to Apriso® from entering the market.

9            26.    The delay caused by Defendants' manipulation of the regulatory structure for generic

10   approval (described below) has allowed Defendants to reap a windfall of hundreds of millions of

11   dollars in additional Apriso® revenue to date, a windfall that will continue while the FDA withholds

12   preliminary approval for the generics pending resolution of Defendants' appeal of the PTAB decision

13   invalidating the '688 Patent. Much of this windfall has come at the expense of federal and state

14   government health funds.

15       **B.    The Federal and State False Claims Acts**

16           27.    The Federal FCA and the State FCAs provide a mechanism for the federal and state

17   governments to protect their health care funds from unlawful predation. Relator brings this *qui tam*

18   action to do so.

19           28.    As set forth below, Defendants have knowingly presented, or caused to be presented,

20   false or fraudulent claims for payment or approval by the United States Government and each of the

21   Plaintiff States in connection with the sale of Apriso® (each, a "False Claim"). These False Claims

22   include, without limitation: (a) claims for Medicare and Medicaid reimbursement for Apriso®

23   prescriptions; and (b) claims for payment for direct purchases of Apriso® under certain government

24   programs.

25           29.    Defendants willfully made false and materially misleading statements to the Patent

26   Office to fraudulently obtain the '688 Patent. Defendants unlawfully used the '688 Patent to exclude

27   generic competition from the market. As a result, Defendants were able to charge artificially inflated

28

FIRST AMENDED COMPLAINT                                           CASE NO. 4:18-CV-01496-DMR

1   prices for Apriso®. Moreover, each and every claim for payment or reimbursement for Apriso® that

2   would have been substituted for a less expensive generic equivalent also constituted a False Claim.

3         30.     Each and every False Claim for payment or reimbursement for Apriso® submitted by

4   (or caused to be submitted by) Defendants violated the Federal FCA and the respective State FCAs

5   because, among other reasons, each False Claim was for an unlawfully elevated, maintained, or

6   stabilized price contrary to express representations and implied certifications by Defendants to the

7   federal government that the price of Apriso reflected in each False Claim was "fair and reasonable,"

8   and not unlawfully elevated, maintained or stabilized in violation of applicable law, including

9   applicable antitrust laws. Despite knowing their prices were unlawfully inflated, Defendants gave the

10  federal government and the Plaintiff States multiple express representations and implied assurances

11  that the prices Defendants were charging for Apriso® were "fair and reasonable," which the federal

12  government and the Plaintiff States materially relied upon when paying or reimbursing claims for

13  Apriso®. Moreover, Defendants made false, fraudulent, and misleading statements to the Patent

14  Office in connection the submission of each False Claim because the price of Apriso® reflected in

15  each False Claim was unlawfully elevated as a result of Defendants' false, fraudulent, and misleading

16  statements to the Patent Office. Finally, each claim for reimbursement or payment for a prescription

17  of Apriso® that would have been filled by a generic alternative had Defendants not unlawfully

18  excluded such competitors from entering the market also constituted a False Claim.

19        31.     According to the Centers for Medicare & Medicaid Services ("CMS"), a federal

20  agency within the United States Department of Health and Human Services ("DHHS"), between

21  2011 and 2016 (the last year for which figures are available), Medicare reimbursed approximately

22  462,491 claims for Apriso® for approximately $183 million.

23        32.     Between 2011 and 2016, the number of claims for Apriso® covered by Medicare

24  increased on average 37% per year, per-unit prices increased on average by 13% per year, and total

25  reimbursements increased on average 63% per year during that time. Thus, it is reasonable to infer

26  that the number and cost of false claims Defendants submitted or caused to be submitted to patients,

27  insurers and health care providers continued to increase in 2017 and 2018.

28

- 8 -

33.     Apriso® is also covered by Medicaid programs for all Plaintiff States, making payments relating to Apriso® purchases and reimbursements a substantial burden on Medicaid funds. Between 2012 and 2016, Medicaid reimbursed 177,213 claims for Apriso® for approximately $65 million. The number of claims for Apriso® paid by Medicaid increased by an average of 41% per year between 2012 and 2016, and total reimbursements increased by an average of 58% per year during that time. Thus, it is reasonable to infer that the number and cost of false claims Defendants submitted or caused to be submitted to patients, insurers and health care providers continued to increase in 2017 and 2018.

34.     The United States Government also purchases Apriso® through government-funded health programs, including, without limitation, CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System; the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); the Defense Health Agency / TRICARE; and the Coast Guard's Office of Health Services.

35.     Each and every time that Defendants submitted, or caused to be submitted, any False Claim for payment or reimbursement for Apriso® to the United States Government or any of the Plaintiff States, Defendants violated the federal False Claims Act, 31 U.S.C. §§ 3729–3733 (the "Federal FCA"), and the state false claims act of the respective Plaintiff State (each, a "State FCA") in which such submission was made, as applicable.

36.     As set forth herein, Defendants' actions alleged in this Complaint violate the Federal FCA and the following State FCAs: The California False Claims Act, Cal. Gov't Code §§ 12650–12656; Colorado Medicaid False Claims Act, Colo. Rev. Stat §§ 25.5-4-303.5 to -310; Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 to -289; Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1211; District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to .09; Florida False Claims Act, Fla. Stat. §§ 68.081-.09; Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 to 168.6; Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 to -31; Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1–175/8; Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to -18; Iowa False Claims Act, Iowa Code §§ 685.1–.7; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437-:440; Maryland

- 9 -

False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 to -611; Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–5O; Michigan Medicaid False Claims Act, Mich. Comp. Laws. §§ 400.601–.615; Minnesota False Claims Act, Minn. Stat, §§ 15C.01–.16; Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 to -413; Nevada statute concerning Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250; New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 to -18; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 to -15, and New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14; New York False Claims Act, N.Y. State Fin. Law §§ 187–194; North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 to -618; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7; Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9; Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to -185; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001–.132; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, §§ 630–642; Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 to .19; and Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005–.130.

## II.   PARTIES

37.     The Relator Zachary Silbersher is a citizen of New York. Through his independent investigation, Relator has uncovered non-public information supporting the claims set forth herein. The Relator's independent research and investigation has generated information that is independent of and materially adds to any publicly disclosed allegations and transactions.

38.     Relator is an "original source" of information within the meaning of 31 U.S.C. § 3730(e)(4)(B) and all applicable state statutes for the Plaintiff States. Relator has voluntarily provided the information on which the allegations or transactions alleged herein are based to the Government and the Plaintiff States before filing this action.

39.     Relator seeks to recover all available damages, civil penalties, and other relief for federal and state-law violations alleged herein. In particular, Relator sues to recover on behalf of the United States Government and its various agencies administering federally-funded health care programs, including, without limitation, CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System;

1  the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); the Defense

2  Health Agency / TRICARE; and the Coast Guard's Office of Health Services. Relator also sues to

3  recover on behalf of the Plaintiff States and their respective agencies administering State programs

4  for prescription drug coverage, including, without limitation, Medicaid contributions.

5       40.    Defendant Valeant Pharmaceuticals International is a Canadian corporation with its

6  principal place of business at 2150 St. Elzéar Boulevard West, Laval, Quebec H7L 4A8. At all times

7  relevant to the purposes of this litigation, Valeant Pharmaceuticals International sold Apriso® either

8  directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

9       41.    Defendant Valeant Pharmaceuticals International, Inc., is a corporation organized and

10  existing under the laws of Delaware, with its principal place of business at 400 Somerset Corporate

11  Boulevard, Bridgewater, NJ 08807. Valeant Pharmaceuticals International, Inc., is a wholly-owned

12  subsidiary of Valeant Pharmaceuticals International.

13       42.    Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of

14  California, having its principal place of business at 8510 Colonnade Center Drive, Raleigh, North

15  Carolina 27615. Salix Pharmaceuticals, Ltd. was acquired by Valeant Pharmaceuticals International,

16  Inc., an indirect, wholly-owned subsidiary of Valeant Pharmaceuticals International on April 1, 2015.

17       43.    Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of

18  California, having its principal place of business at 8510 Colonnade Center Drive, Raleigh, North

19  Carolina 27615. Salix is a wholly-owned subsidiary of Salix Pharmaceuticals, Ltd., which was

20  acquired by Valeant Pharmaceuticals International, Inc., an indirect, wholly-owned subsidiary of

21  Valeant Pharmaceuticals International on April 1, 2015. At all times relevant to the purposes of this

22  litigation, Salix Pharmaceuticals, Inc. has been the exclusive licensee of all United States patents

23  relating to Apriso®.

24       44.    Defendant Dr. Falk Pharma GmbH is a German corporation having its principal place

25  of business at Leinenweberstr. 5, 79108 Freiburg im Breisgau, Germany. At all times relevant to the

26  purposes of this litigation, Dr. Falk has been the sole assignee of all rights pertaining to all United

27  States patents relating to Apriso®.

28

- 11 -

45.     Defendants sell Apriso® in the United States pursuant to New Drug Application ("NDA") No. N022301, which was approved by the United States Food and Drug Administration ("FDA") on October 31, 2008.

## III.     JURISDICTION AND VENUE

46.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the state law claims.

47.     Under 31 U.S.C. § 3730(e), and under the comparable provisions of the Plaintiff State statutes, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, whether or not such a disclosure had occurred, Relator would qualify as an "original source" of the information in this Complaint. Relator has independent knowledge of the information on which the allegations herein are based; such knowledge materially adds to any publicly disclosed allegations or transactions; and Relator voluntarily provided the information to the Government before filing this action and before any public disclosure of the allegations and transactions in this Complaint material to the false claims alleged herein.

48.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintains minimum contacts with the United States. Each of the Defendants can be found, transacts business, and has presented or caused to be presented and continues to present or cause to be presented false or fraudulent claims for payment in this District.

49.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted substantial business within this District and made significant sales within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729–3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

- 12 -

50. Many of the acts underlying the false claims allegations herein occurred in this District.

## IV.   FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS

51. Government-funded health care programs cover medical services and prescriptions for one-third of the United States population.

### A.   Medicare

52. Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.

53. The Medicare program has four parts: Part A, Part B, Part C, and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans. Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

54. Medicare provides benefits for patients being treated with Apriso®.

55. The Medicare program is administered through CMS at the DHHS.

### B.   Medicaid

56. Medicaid is jointly administered by the United States and each of the separate states, including the Plaintiff States.

57. Individual state Medicaid programs are administered by each individual state, subject to oversight by the United States in accordance with statutes and regulations promulgated by the United States and the Secretary of the DHHS. Pursuant to these statutes and regulations, the United States provides financial assistance to each of the state Medicaid programs by providing each state with financing equal to at least 50% of the costs incurred by the state Medicaid programs. In some instances, the United States provides financing equal to as much as 75% of program costs incurred, including the costs incurred for reimbursing providers for dispensing prescription drug products (such as Apriso®) to Medicaid beneficiaries.

- 13 -

58.   Each state Medicaid program obtains federal financial assistance by submitting quarterly claims to the United States for federal financial assistance related to the costs incurred for administering the state Medicaid programs.

**C.   Other Government-Funded Health Programs**

59.   The other major government-funded health programs—including CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System; the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); the Defense Health Agency / TRICARE; and the Coast Guard's Office of Health Services—purchase significant amounts of Apriso® for their covered patients.

**V.   THE REGULATORY STRUCTURE THAT DEFENDANTS MANIPULATED TO BLOCK GENERIC COMPETITORS TO APRISO®**

**A.   The Regulatory Structure for Approval of Generic Drugs**

**i.   The United States Federal Food, Drug and Cosmetic Act**

60.   Under the United States Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer must obtain FDA approval to sell a new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301–392. An NDA must include submission of specific data concerning the safety and effectiveness of the drug. An NDA must also identify any patent that allegedly claims either the approved drug or approved methods of use of the drug that could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the approved brand drug prior to the expiration of the listed patent(s). 21 U.S.C. § 355(a), (b). When the FDA approves an NDA, it publishes the patents identified by the brand manufacturer in a database called "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book." Patents issued after NDA approval may be listed in the Orange Book within thirty days of issuance. 21 U.S.C. §§ 355(b)(1) & (c)(2).

61.   The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability because the agency does not have the resources or authority to verify that the manufacturer's patents were not procured through fraud. In listing patents in the Orange Book, the FDA merely performs a ministerial act. Therefore, pharmaceutical companies that list patents in

- 14 -

1  the Orange Book that they claim protect a particular drug have a duty to list only those patents that

2  they believe in good faith restrict generic entry.

3           ii.      **The Hatch-Waxman Amendments**

4        62.     The Hatch-Waxman Amendments to the FDCA, enacted in 1984, simplified the

5  regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file

6  lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L.

7  No. 98-417, 98 Stat. (1984). A generic manufacturer seeking approval to sell a generic version of a

8  brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on

9  the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA.

10  An ANDA applicant must demonstrate that the proposed generic drug is pharmaceutically

11  equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug. *See generally*

12  21 U.S.C. § 355(j) *et seq.* To do so, an applicant must show that the generic drug contains the same

13  active ingredient(s), dosage form, route of administration, and strength as the brand drug.

14  Additionally, an applicant must prove that the generic drug is absorbed at the same rate and to the

15  same extent as the brand drug.

16        63.     The FDCA and Hatch-Waxman Amendments operate on the principle that

17  bioequivalent drug products containing identical amounts of the same active ingredients; having the

18  same route of administration, dosage and form; and meeting applicable standards of strength, quality,

19  purity and identity, are therapeutically equivalent and may be substituted for one another.

20  Bioequivalence demonstrates that the active ingredient of the proposed generic drug is absorbed at

21  the site of drug action to the same extent and for the same amount of time as the branded

22  counterpart. 21 U.S.C. § 355(j)(8)(B). Thus, a generic drug is identical to a brand name drug in

23  dosage, form, safety, strength, route of administration, and intended use.

24        64.     Generic drugs that are therapeutically equivalent to their brand counterparts are given

25  an "AB" rating by the FDA, allowing their substitution for the brand when a patient presents a

26  prescription for the brand product.

27        65.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of generic

28  competitors, thereby reducing healthcare expenses nationwide. As a result, generic drugs became an

- 15 -

FIRST AMENDED COMPLAINT                                          CASE NO. 4:18-CV-01496-DMR

1   increasingly large part of prescription drug revenues and a growing threat to brand name drug profits.

2   In 1984, prescription drug revenue for brand and generic drugs totaled $21.6 billion, with generic

3   drugs accounting for 18.6% of total prescriptions. By 2013, total prescription drug revenue had

4   climbed to more than $329.2 billion, with generic drugs accounting for 84% of prescriptions. *See* IMS

5   Institute for Healthcare Informatics, *Medicine and Shifting Costs of Healthcare* 30, 51 (2014).

6          **iii.   Paragraph I, II, III, and IV Certifications**

7       66.   To obtain FDA approval of an ANDA, a generic manufacturer must certify that the

8   generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book. Under

9   the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four

10   certifications for each Orange Book-listed patent:

11         a.   That no patent for the brand name drug has been filed with the FDA (a "Paragraph I

12            certification");

13         b.   that the patent for the brand drug has expired (a "Paragraph II certification");

14         c.   that the patent for the brand name drug will expire on a particular date and the generic

15            company does not seek to market its generic product before that date (a "Paragraph

16            III certification"); or

17         d.   that the patent for the brand drug is invalid or will not be infringed by the generic

18            manufacturer's proposed product (a "Paragraph IV certification").

19       67.   Because ANDAs with Paragraph I, II, or III certifications face no potential patent

20   challenge, FDA approval of these ANDAs is relatively expeditious.

21       68.   However, when a generic manufacturer is forced to file a Paragraph IV certification

22   because the Orange Book lists a drug that has not or will not expire by the time of the planned generic

23   entry, the brand manufacturer is able trigger extensive regulatory delays that will block FDA

24   approval of generic entry—potentially for many years. Moreover, the filing of Paragraph IV

25   certifications and the resulting patent infringement actions delay ANDA approval by the FDA and

26   divert resources from prompt ANDA approval and the introduction of generic alternatives into

27   market.

28

- 16 -

69.     When a generic manufacturer files a Paragraph IV certification, it must promptly provide notice to the brand manufacturer. Filing an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement regardless of the merits of the action. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of thirty months from the notification date, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Until one of those conditions occurs, the FDA may grant "tentative approval" but cannot authorize the generic manufacturer to go to market with its product. Tentative approval means the ANDA would be ready for final approval but for the 30-month stay. As a practical matter, the initiation of a patent infringement action provides the brand manufacturer with the equivalent of an automatic 30-month injunction that prevents the generic manufacturer from releasing a competing generic product, regardless of the merits of the infringement action.

**B.     United States Patent Law**

70.     United States patents grant the patent owner or assignee the exclusive right to exclude others from practicing the patent product for a fixed period of time from the patent's priority date.

71.     Under applicable patent law, an application for a patent will be rejected by the Patent Office if the invention was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102. Even if the invention was not disclosed in detail as set forth in § 102, a claim is unpatentable if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C. § 103. If the Patent Office uncovers prior art that satisfies sections 102 or 103, it establishes a *prima facie* case of obviousness.  To overcome a *prima facie* case of obviousness, the patent applicant has a number of options, including: (i) narrowing the invention to distinguish over the prior art; (ii) arguing the prior art does not render the claim obvious; or (iii) submitting objective evidence of secondary considerations, including commercial success, long-felt

- 17 -

1 but unsolved need, and failure of others. A person or entity can challenge the validity of an issued

2 patent by filing a petition for *inter partes* review with the PTAB. 35 U.S.C. § 311.

3     72.    A patent applicant has an affirmative duty of candor and good faith when prosecuting

4 a patent application, which includes an affirmative duty to disclose all material prior art known to the

5 applicant at the time of the application. 37 C.F.R. § 1.56. Failure to disclose material prior art can

6 render a patent unenforceable. *See e.g., C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1367 (Fed. Cir.

7 1998) ("Fraud in obtaining a United States patent is a classical ground of invalidity or

8 unenforceability of the patent."). Moreover, concealing a material fact in a matter within the

9 jurisdiction of a federal executive agency is a criminal offense punishable by fine and imprisonment.

10 18 U.S.C. § 1001.

11     **C.**    **The Economic Benefits of Blocking Generic Entry, Even When Frivolous**

12     73.    AB-rated generic drugs contain the same active ingredient—and are determined by

13 the FDA to be just as safe and effective—as their branded counterparts. The only material difference

14 between generic drugs and branded drugs is their price: when multiple generic drug manufacturer

15 competitors enter the market for a given branded drug, generic drugs cost, on average, 80%-85%

16 lower than the branded drug prior to generic entry. Moreover, the Federal Trade Commission

17 (FTC) estimates that about one year after market entry, a generic drug takes over 90% of the branded

18 drug's unit sales.

19     74.    When multiple generics enter the market, competition accelerates, and prices drop to

20 their lowest levels. Competition from several generic sellers drives drug prices down toward marginal

21 manufacturing costs. Defendants prevented this from happening with Apriso® by applying for and

22 obtaining the '688 Patent, which would have excluded generic alternatives to Apriso® through 2030.

23 The '688 Patent was obtained through false and misleading statements to the Patent Office. But for

24 this illegally acquired patent, generics would have entered the marketplace much sooner, which

25 would have lowered prices for generic Apriso® by 85 to 90 percent.

26

27

28

FIRST AMENDED COMPLAINT                                CASE NO. 4:18-CV-01496-DMR

## VI.   ALLEGATIONS CONCERNING DEFENDANTS' FALSE CLAIMS

### A.   Defendants Fraudulently Obtained the '688 Patent Through False and Misleading Statements.

#### i.   About Apriso®

75.     Defendants manufacture, sell, and distribute Apriso® (mesalamine), which doctors prescribe widely to patients with ulcerative colitis, a chronic inflammatory gastrointestinal disorder affecting the colon. Patients typically take Apriso® on a prolonged basis to maintain remission of ulcerative colitis. There are a number of ulcerative colitis drugs on the market that use mesalamine, and mesalamine itself has been off patent protection for years (if not decades), as Defendants concede in their patents. *See e.g.*, U.S. Patent No. 6,551,620 at col. 5, lines 15-19.

76.     Apriso® is a granulated mesalamine formulation that combines an enteric pH-dependent coating, which provides for delayed release; and a polymer matrix core, which provides for extended release.

77.     Mesalamine works topically on the affected areas of the colon, meaning it requires targeted and sustained delivery to the colon. This challenge is complicated because mesalamine is quickly metabolized in the stomach and absorbed into the bloodstream (referred to as "systemic absorption") before it reaches the colon, negating its effectiveness. Some orally administered mesalamine drugs on the market today typically accomplish targeted delivery by using an enteric coating. An enteric coating will resist dissolution in the stomach (where the pH is more acidic), but it will permit dissolution in the colon (where the pH is more basic). Apriso® uses a pH-sensitive enteric coating that will not dissolve in pH levels found in the stomach but will dissolve in pH levels found further down in the digestive tract, where the mesalamine will then be released within the colon.

78.     A one-month prescription of Apriso® in the United States has an average retail price of $595. Defendants generate over $200 million in Apriso® sales annually in the United States.

79.     Defendants jointly collaborate in the development, manufacture, sale and distribution of Apriso®.

FIRST AMENDED COMPLAINT                                     CASE NO. 4:18-CV-01496-DMR

ii.   **Defendants' Fraudulent Prosecution of the '688 Patent**

80.   Defendants applied for a new patent relating to Apriso® on October 2, 2009, which eventually issued as the '688 Patent on October 21, 2014. During the five years it took to prosecute the '688 Patent, the application was rejected and amended at least six times. Defendants also submitted two additional office-action responses that included unsuccessful attempts to persuade the Examiner to allow the patent without amendment.

81.   On May 9, 2014, Defendants amended the claims in the pending '688 Patent application so that the claimed methods for "maintaining the remission of ulcerative colitis" included administering the claimed granulated mesalamine formulation "with or without food." On June 5, 2014, the Examiner maintained the rejection of the claims despite this amendment.

82.   On June 20, 2014, Defendants further amended the '688 claims to include a method for administering the claimed granulated mesalamine formulation "without food." In support of this amendment, Defendants stated: "unlike other 5-mesalamine drugs available at the time of the invention, Defendants has demonstrated that the claimed methods are equally safe and effective when granulated mesalamine is administered to a subject without food."

iii.   **Defendants Withheld the Brunner and Marakhouski Studies.**

83.   Two studies published several years before Defendants applied for the '688 Patent showed that Apriso® could be taken without food. First, in the Brunner study, mesalamine pellets were taken orally after an overnight fast, leading the authors to conclude mesalamine could be taken "independent of concomitant food intake." *Id.* at 1167. Second, in the Marakhouski study, subjects took granulated mesalamine pellets an hour before meals, leading the authors to conclude that mesalamine "can be taken independent of meals." *Id.* at 134.

84.   Defendants were aware of the Marakhouski and Brunner studies. Indeed, one of the studies used mesalamine pellets provided by Dr. Falk (the assignee of the '688 Patent) and the other was underwritten by Dr. Falk, and both studies were co-authored by Dr. Falk's head of research and development, Roland Greinwald. Defendants have conceded, and the PTAB found, that Marakhouski and Brunner relate to Defendant Falk's Salofalk® Granu-Stix® formulation, which is similar to the Apriso® granulated mesalamine formulation, and Defendants admitted, and the PTAB

- 20 -

1    found, that Marakhouski, and Brunner relate to a granulated mesalamine formulation within the

2    scope of the '688 Patent claims.

3          85.     Despite being aware of the Marakhouski and Brunner studies, and in fact participating

4    in them, Defendants failed to disclose either of these papers to the Patent Office during its

5    prosecution of the '688 Patent.

6          86.     Under 37 C.F.R. § 1.56, each individual involved in the prosecution of Defendants'

7    patents has "a duty of candor and good faith in dealing with the [Patent] Office, which includes a

8    duty to disclose to the Office all information known to that individual to be material to

9    patentability . . . ." Information is material when it is not cumulative and either compels a conclusion

10   that a claim is unpatentable or it refutes or is inconsistent with a position an applicant takes in

11   support of a patent claim. *Id.* Defendants failed to meet their duty of candor and good faith by failing

12   to disclose the Marakhouski and Brunner studies, both of which are clearly material to Defendants'

13   claim that taking the granulated mesalamine formulation claimed in the '688 Patent without food was

14   not obvious in light of prior art. Defendants' omission of these studies amounts to a false and

15   misleading statement that the Patent Office relied on in approving the '688 Patent.

16         87.     Indeed, on May 19, 2017, the '688 Patent was held invalid by the United States Patent

17   and Trademark Office's Patent Trial and Appeal Board ("PTAB"), which relied on the Brunner and

18   Marakhouski studies as primary prior art references to find that taking the claimed granulated

19   mesalamine formulation without food would have been obvious to a person of skill in the art based on

20   prior art. *GeneriCo, LLC v. Dr. Falk Pharma GmbH*, No. IPR2016-00297, Final Written Decision,

21   Dkt. 55 at 22 (P.T.A.B. May 19, 2017).

22              iv.   **Defendants' Claims in Prosecuting the '688 Patent Were Inconsistent With
                      Claims Defendants had Previously Made to the Patent Office.**

23

24         88.     Other statements Defendants made while prosecuting the '688 Patent are

25   contradicted by statements Defendants made while prosecuting another 5-aminosalicylic acid (*i.e.*,

26   mesalamine) patent. In 2006, Defendants filed a patent application that was allowed on December

27   30, 2014 and issued as United States Patent No. 8,921,344 ("the '344 Patent"). The '344 Patent

28   described a "method of decreasing the systemic absorption of balsalazide and metabolites 5-

                                            - 21 -

FIRST AMENDED COMPLAINT                                      CASE NO. 4:18-CV-01496-DMR

1   aminosalicylic acid (5-ASA) and N-acetyl-5-ASA (NASA) comprising administering to a subject a

2   therapeutically effective amount of at least one tablet or capsule comprising balsalazide with food,

3   wherein the systemic adsorption of balsalazide, 5-ASA or NASA is decreased compared to

4   administering balsalazide without food." The '344 Patent states that the disclosed "invention is due,

5   in part, to the *unexpected* finding that administration of balsalazide *with food* increases both the

6   [colonic] bioavailability and decreases the systemic adsorption of 5-ASA [*i.e.*, mesalamine] . . . ."

7   (col. 1:60-63, emphasis added). While prosecuting the '344 Patent to the Patent Office, Defendants

8   stated:

> [O]ne of ordinary skill in the art, upon review of all the information available at the time the instant application was filed, would have expected the bioavailability of balsalazide to *decrease* when taken with food, and not increase, as maintained by the Examiner. Said another way, based on the data available at the time of the filing, the ordinary skill artisan would have expected the systemic absorption of balsalazide to increase when taken with food. In contrast, it was unexpectedly discovered that the systemic absorption decreased when taken with food. These unexpected results rebut any *prima facie* case of obviousness raised by the Examiner.

Defendants' *Response to Final Office Action*, filed with the Patent Office on Defendants' behalf by

attorney Jonathan Sparks, Ph.D., July 16, 2009 (emphasis in original).

89.   The "data available at the time" included the following **Table 1** that Defendants

disclosed to the Patent Office. Defendants told the Patent Office that Table 1 "shows that when each

of the other drugs in the same class as balsalazide was administered with food, the colonic

bioavailability of those drugs in the colon decreased or remained unchanged." Yet, when Defendants

prosecuted the '688 Patent, they intentionally obscured this same information, knowing it would be

material to the patentability of the '688 Patent. As shown in Table 1, Defendants characterized the

same mesalamine drugs to which they referred when prosecuting the '688 Patent (*i.e.*, Claversal®,

Asacol®, and Lialda®) as also being within the same class as balsalazide and demonstrating that

bioavailability and therefore efficacy *decreased* when taken *with* food.

Table 1

| Generic Name | Brand Name | Delivery Site | Food Effect on 5-ASA Colonic Bioavailability | Reference |
|---|---|---|---|---|
| **Azo-bonded Drugs** | | | | |
| Balsalazide | Colazal capsule® | Colon | Increases | USSN 11/835,897/Colazal® Package Insert |
| Balsalazide | GI-azo tablet® | Colon | Increases | USSN 11/835,897 |
| Sulfasalazine | Azulfadine® | Colon | Unknown | - |
| Olsalazine | Dipentum® | Colon | Decreases | *Eur J Clin Pharmacol.* 1988;34(5):481-8. |
| **Mesalamine Drugs** | | | | |
| Suspension | 5-ASA | Small bowel | N/A | *Clin Pharmacol Ther.* 1990 Jul;48(1):26-33. |
| Extended release Capsules | Pentasa® | Small Bowel | N/A | Summary Basis of Approval |
| pH-dependent delayed release tablets | Claversal® | Ileum-Colon | Decreases | *Br J Clin Pharmacol.* 1992 Feb;33(2):179-82. |
| pH-dependent delayed release tablets | Asacol® | Ileum-Colon | Decreases | Summary Basis of Approval |
| pH/Extended release granules | Falk GranuStix® | Ileum - Colon | No effect | Salix study No. MPPK1002 |
| pH/Hydrophobic Matrix | Lialda® | Colon | Decreases | Lialda®, Approved Package Insert, February 2007 |

During prosecution of the '688 Patent, Defendants were clearly aware of the data from Table 1 for at least two reasons. First, the same patent attorney, Jonathan Sparks, prosecuted both the '344 Patent and the '688 Patent. Second, both the '344 Patent and the '688 Patent share an inventor, Lorin Johnson.

v.      <strong>Defendants Intentionally Withheld Material Information Regarding Lialda®.</strong>

90.     While prosecuting the '688 Patent, Defendants stated that "one of ordinary skill in the art would look to the teachings of the most similar formulation to determine if administration with food is required." Defendants, however, represented to the Patent Office: "unlike other 5-mesalamine drugs available at the time of the invention, Applicant has demonstrated that the claimed methods are equally safe and effective when granulated mesalamine is administered to a subject *without food*" (emphasis added). Defendants focused on Lialda®, which they claimed was the only

- 23 -

1   other "delayed and extended-release oral mesalamine" formulation approved by the FDA.

2   Defendants relied on Lialda®'s prescribing information, which purportedly states that Lialda® should

3   be taken "with food." However, as Table 1 from the '344 Patent prosecution history shows,

4   Defendants intentionally withheld information material to that statement. Table 1 shows that

5   Defendants were aware that the colonic bioavailability of Lialda® (*i.e.*, its efficacy) decreased when

6   administered with food. This fact was material to the determination by the Patent Office to allow the

7   '688 Patent. Indeed, the Examiner's Reasons for Allowance stated, "[o]ne skilled in the art would

8   reasonably expect the formulation to be administered with food, since similar mesalamine

9   formulations are directed to be administered with food (see Lialda® information pamphlet, submitted

10   by Applicants with response to filed 20 June 2014)."

11                    vi.    **Defendants Intentionally Withheld Material Information Regarding**
                            **Claversal® and Asacol®.**
12

13        91.    During prosecution of the '688 Patent, on June 14, 2014, Defendants' attorney Dr.

14   Jonathan Sparks told the Patent Office that "[a]t the time of the invention, one of ordinary skill in the

15   art would look to the teachings of the most similar formulation to determine if administration with

16   food is required." Defendants disclosed (albeit incomplete) information regarding Lialda® and

17   Pentasa®. Defendants also emphasized that one reason that Lialda® and the pending claims were

18   "similar formulations" is because each is directed to delayed and extended-release formulations.

19        92.    Defendants intentionally withheld information regarding Claversal® and Asacol®. In

20   2009, in connection with prosecuting the '344 Patent, the same prosecuting attorney (Dr. Sparks)

21   disclosed the information summarized in Table 1 (*supra*), which indicates that colonic bioavailability

22   of mesalamine (5-ASA) from both Claversal® and Asacol® decreased when administered with food.

23   ('854 Application, July 16, 2009 Amendment Response, Table 1). Further, both Claversal® and

24   Asacol® are "pH-dependent delayed release" formulations that use enteric coatings similar to the

25   granulated mesalamine formulation claimed in the '688 Patent, which also uses an enteric coating for

26   pH-dependent for delayed release. Additional distinctions between Apriso®'s formulations of

27   Claversal® and Asacol® are irrelevant.

28
                                                -24-

93.     Moreover, during prosecution of the '688 Patent, Defendants expressly argued that persons of skill would purportedly have to look to other oral mesalamine formulations for guidance on whether it was obvious to administer oral mesalamine with food. (*See* Defendants' *Amendment and Response to Office Action*, in connection with the '688 Patent application (U.S. Patent Application No. 12/573,081), June 20, 2014, pg. 6.) Defendants disclosed Lialda® and Pentasa®, but withheld disclosure of Claversal® and Asacol®. They did so despite previously disclosing Claversal® and Asacol® in connection with the '344 Patent to argue that taking certain mesalamine formulations *with* food was not obvious.

94.     Both Claversal® and Asacol® are pH-dependent delayed release mesalamine formulations, as shown in Table 1. Indeed, the Patent Office subsequently found that the pH-dependent delayed release feature of Apriso® is particularly material to whether it can be efficaciously administered with food. In its Final Written Decision invalidating the '688 Patent, the PTAB concluded, based upon expert testimony, that the presence of food in the stomach raises its pH and suppresses gastric emptying. *See* IPR2016-00297 (Paper 55) May 19, 2017, pp. 41-42. Because pH-dependent enteric coatings dissolve at higher pH, the PTAB found that administering the drug with food likely keeps it in the stomach at higher pH for a longer period of time, and thus risks premature release and systemic absorption. On information and belief, Defendants were aware of these facts given their development of a pH-dependent delayed release formulation for an oral mesalamine drug that can be administered without food. Indeed, this is evident from the fact, as disclosed by Defendants in Table 1, that Claversal® and Asacol®—two pH-dependent drugs utilizing enteric coatings—showed decreased colonic availability when administered with food. Defendants thus knew this information, which would have been material to the patentability of the '688 Patent in light of the Examiner's Reasons for Allowance, but nonetheless withheld it from the Patent Office.

95.     Given the foregoing facts, and in light of the important relationship between the potential impact of food on Apriso®'s enteric coating, any differences between the formulations for Apriso® on the one hand, and Claversal® and Asacol® on the other, were immaterial to the patentability of the '688 Patent. Defendants' withholding of their knowledge that Claversal® and

- 25 -

1  Asacol® had decreased colonic bioavailability when administered with food were therefore material

2  omissions that rendered Defendants' submissions to the Patent Office misleading and fraudulent.

3      96.     Defendants—and Defendants' prosecuting attorney—were clearly knowledgeable of

4  data showing that the colonic bioavailability (*i.e.*, efficacy) of two additional pH-dependent delayed

5  release formulations (Claversal® and Asacol®) decreased when administered with food. Yet,

6  Defendants intentionally withheld this information from the Patent Office during prosecution of the

7  '688 Patent.

8      97.     Defendants' omission of these facts was material to the determination by the Patent

9  Office to allow the '688 Patent, and the Patent Office relied on Defendants' false and misleading

10 representations when it issued the '688 Patent. The Examiner's "Reasons for Allowance" stated:

11          [t]he cited prior art is silent with respect to whether or not the mesalamine
12          formulation is administered with or without food. One skilled in the art
            would reasonably expect the formulation to be administered with food,
13          since similar mesalamine formulations are directed to be administered
            with food (see Lialda® information pamphlet, submitted by Applicants
14          with response to filed 20 June 2014).

15     98.     The Examiner further stated:

16          [a]dditionally, one skilled in the art would be motivated to administer the
            mesalamine formulation with food, since 5-aminosalicylate compounds,
17          including mesalamine, are known to have increased bioavailability when
            administered with food.
18

19     99.     In sum, the '688 Patent was obtained on the basis of false and misleading statements

20 made to the Patent Office. Defendants knowingly and deliberately withheld the Marakhouski and

21 Brunner papers because they knew these papers would render the patent invalid as obvious in light of

22 prior art. Defendants' withholding these articles misled the Patent Office into approving the '688

23 Patent based on incomplete information. Defendants created the false impression that taking Apriso®

24 without food was not obvious in light of prior art, a statement that was directly at odds with

25 statements and data Defendants knew and previously had provided to the Patent Office in

26 connection with a different patent application, when such disclosure benefited Defendants.

27

28

FIRST AMENDED COMPLAINT                          CASE NO. 4:18-CV-01496-DMR

**B.     The Otterbeck Patents are Invalid Based on Prior Art that Defendants Failed to Disclose to the Patent Office**

100.     The Otterbeck Patents consist of six patents, all of which descend from a common parent application. While the claims in the Otterbeck Patents vary slightly, they all relate to the same formulation as described in Claim 1 of the first Otterbeck Patent to be approved, United States Patent No. 6,551,620 ("the '620 Patent"). The '620 Patent issued on April 22, 2003. Thus, it was the only patent in effect when the FDA approved Apriso® in 2008 and when the first generic ANDA was filed in July 2012. The rest of the Otterbeck Patents issued between December 2012 and February 2015.

101.     The '620 Patent describes:

> 1. An orally administrable pharmaceutical pellet formulation having a controlled release profile for the treatment of the intestinal tract, which comprises a core and an enteric coating and optionally pharmaceutically tolerable additives, the core including, as a pharmaceutical active compound, aminosalicylic acid or a pharmaceutically acceptable salt, wherein the active compound is present in the core in a non gel-forming polymer matrix which is essentially insoluble in the intestinal tract and permeable to intestinal fluids and the active compound, the matrix-forming polymer making up at least 1% by weight of the total weight of the core, and wherein the matrix-forming polymer is selected from the group consisting of poly(ethyl acrylate, methyl methacrylate) and poly(ethyl acrylate, methyl methacrylate, trimethylammonioethyl methacrylate chloride).

*Id.* at col. 9, lines 31-44.

102.     The Otterbeck Patents all share the same specification, wherein Defendants conceded that some of the characteristics described above were already known in the prior art, including the use of enteric coatings to delay release of the active ingredient, and the use of mesalamine to treat ulcerative colitis. *Id.* at col. 5, lines 15-19, 47-50. However, many of the allegedly novel aspects of Claim 1 were also obvious in light of prior art that Defendants failed to disclose to the Patent Office during prosecution of the Otterbeck Patents.

103.     Defendants concede that use of enteric coatings to target delivery to the colon was widely known in the prior art. Sustained delivery is accomplished by embedding the mesalamine within a polymer matrix, wherein the matrix is insoluble in intestinal fluids, but the active ingredient is not. The polymer matrix is permeable, allowing the intestinal fluids to gradually enter and disperse

- 27 -

1   the active ingredient, ensuring that the mesalamine is released gradually and consistently to increase

2   exposure to more of the colon. Defendants concede that use of polymer matrices to ensure sustained

3   release of an active ingredient was previously known in the prior art, but they assert that use of a

4   "non gel-forming" polymer matrix "surprisingly" decreased systemic absorption and increased

5   targeted delivery of the mesalamine. As set forth in more detail below, the use of non gel-forming

6   polymer matrices was disclosed in prior art that Defendants failed to disclose to the Patent Office

7        104.    Thus, the Otterbeck Patents state that "it has now been found that pellet

8   formulations are particularly suitable" for the purpose of "spread[ing] the pharmaceutical form

9   reproducibly over wide areas of the intestine[,] and are thus particularly suitable for treatment of

10  inflammatory processes, which often affect relatively large sections of the intestinal tract." *Id.* at col.

11  2, lines 40-46. The description concedes that "[i]n the prior art, tablets and pellets are known which

12  are coated with an enteric coating in order to thus prevent a premature release of the active

13  compounds." *Id.* at col. 1, lines 48-50. While making this concession, however, Defendants did not

14  disclose prior art that specifically rendered obvious the claims in the Otterbeck patents that

15  Defendants represented were surprising and therefore not obvious.

16       105.    Claim 1 of the '620 Patent describes the core as having a "active compound is present

17  in the core in a non gel-forming polymer matrix which is essentially insoluble in the intestinal tract

18  and permeable to intestinal fluids and the active compound." *Id.* at col. 9, lines 36-39. Despite

19  Defendants' misrepresentations concerning the "surprising" effect of such a non gel-forming

20  polymer matrix on efficacy, each of the claimed elements were in fact disclosed in the prior art and

21  not at all surprising.

22       106.    United States Patent No. 6,290,990 ("the '990 Patent"), approved on September 18,

23  2001, describes slow-release matrix pellets, "preferably for pharmaceutical purposes, from which the

24  active substance is released with an adjustable release profile, ie. [*sic*] as slow as required, but

25  completely." *Id.* at col. 2, lines 26-29. The '990 Patent also disclosed at col. 3, lines 6-7 that the

26  "polymer matrix according to the invention for matrix slow-release pellets is a novel combination

27  . . . .").

28

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

107.    U.S. Patent No. 4,892,742 at col. 1, lines 6-10 (filed Nov. 18, 1985) ("the '742 Patent") disclosed "a controlled release composition . . . comprising a table core containing a water soluble active ingredient in a water insoluble polymeric matrix surrounded with a rate controlling membrane coating").

108.    U.S. Patent No. 4,784,858 at col. 1, lines 29-31 (filed Aug. 22, 1986) ("the '858 Patent") disclosed "at least one water-soluble pharmaceutically active substance which is dispersed in a water-insoluble, nondigestible polymeric excipient."

109.    European Patent 0169821A2 at 6, lines 1-4 (issued Feb. 6, 1991) (the "EP0169821A2 Patent") disclosed a "delivery device for zero-order release of an active principle into a dissolution fluid therefor comprises a solid matrix-type reservoir formed of a polymer material." *See also*, Gwen M. Jantzen and Joseph R. Robinson, *Sustained- and Controlled-Release Drug Delivery Systems*, Modern Pharmaceuticals, 586-587 (Gilbert S. Banker & Christopher T. Rhodes eds., 3rd Ed. 1996) ("A matrix device . . . consists of [a] drug dispersed throughout a polymer matrix . . . .").

110.    Defendants knew that '990 Patent, the '742 Patent, the '858 Patent, and the "EP0169821A2 Patent patents were all in the prior art when Defendants prosecuted the Otterbeck Patents. Yet, Defendants intentionally failed to disclose any of these patents to the Patent Office.

111.    Moreover, use of a "non gel-forming" polymer matrices was well-known in the prior art. The Description section of the Otterbeck Patents asserts "it has surprisingly been found" that use of an insoluble non gel-forming polymer matrix resulted in lower systemic absorption into the bloodstream and increased targeted delivery to the colon as compared with gel-forming polymer matrices allegedly found in the prior art. '990 Patent at col. 2, lines 49-51. Defendants allege that "use of a swellable, gel-forming matrix . . . is not suitable" because the mesalamine "would . . . be released virtually immediately (about 30 min)." '620 Patent at col. 2, lines 52-57. This statement is in conflict with the '990 Patent, which claims it is "possible to achieve release profiles which can be adjusted over wide ranges solely by the composition of the polymer matrix . . ." using a swellable polymer matrix. '990 Patent at col. 2, lines 49-51. Moreover, prior art available when Defendants were prosecuting the '620 Patent demonstrates that insoluble and non-swellable polymer matrices were known to the industry to achieve delayed and controlled release of an active pharmaceutical

- 29 -

1   ingredient. For example, the EP0169821A2 Patent describes a "solid matrix-type reservoir formed of
2   a polymer material which is insoluble and unswellable in the dissolution fluid." *Id.* at 6, lines 3-5.
3   "The polymer material should be unswellable and insoluble in the active principle's dissolution fluid
4   in order to avoid alterations of the release rate-controlling membrane." *Id.* at 6, lines 7-9. And the
5   '742 Patent describes a controlled-release tablet that employs an insoluble polymer matrix and an
6   enteric coating to release the active ingredient at a slow and constant rate (a so-called "zero order
7   release"). '742 Patent at col. 1, lines 6-13. All of these patents anticipate Defendants' claim for a
8   "non gel-forming polymer matrix." Yet, Defendants failed to disclose any of them to the Patent
9   Office.

10        112.    The use of polymers that are "insoluble in the intestinal tract and permeable to
11   intestinal fluids and the active compound" were also widely known in the prior art when Defendants
12   prosecuted the Otterbeck Patents. The '858 Patent describes "an elastic, water-insoluble and
13   semipermeable diffusion film of a polymer." *Id.* at col. 5, lines 1-3. And the EP0169821A2 Patent
14   describes a "film-forming polymer material insoluble in the dissolution fluid and permeable to the
15   substance." *Id.* at 6, lines 16-17.

16        113.    The chemical compounds specified in the Otterbeck Patents were also widely known
17   in the prior art for the uses indicated in the Otterbeck Patents. For example, the '620 Patent states
18   that "the matrix-forming polymer is selected from the group consisting of poly(ethyl acrylate, methyl
19   methacrylate) and poly(ethyl acrylate, methyl methacrylate, trimethylammonioethyl methacrylate
20   chloride)." *Id.* at col. 9, lines 41-44. These chemicals were disclosed in the '858 Patent, which
21   describes a "polymeric excipient being a member of the group consisting of (i) polyvinylchloride and
22   (ii) a homo- or copolymer of lower alkyl acrylates, lower alkyl methacrylates, or lower alkyl acrylate
23   and lower alkyl methacrylate." *Id.* at col. 5, lines 8-13. Similarly, the EP0169821A2 Patent states,
24   "[t]ypical materials [for the polymer matrix] include . . . polymethacrylates." *Id.* at 10, lines 11-13.
25   Thus, the polymer matrix and its potential component materials were known in the prior art. Yet
26   Defendants did not disclose the '858 Patent or the EP0169821A2 Patent during prosecution of any of
27   the Otterbeck Patent applications.

28

FIRST AMENDED COMPLAINT                                         CASE NO. 4:18-CV-01496-DMR

114.     The '620 Patent enumerates several possible chemicals for an enteric coating, including "a methacrylic acid copolymer or methylhydroxypropyl cellulose phthalate," or a "methacrylic acid containing copolymer comprises co-poly(methacrylic acid, methyl methacrylate)." *Id.* at col. 10, lines 4-5. Ten years earlier, the EP0169821A2 Patent described a "release rate-controlling membrane" and cited "vinyl polymers and copolymers, . . . acrylic polymers and copolymers and the like" as suitable materials for the membrane. *Id.* at 13, lines 5-8. Indeed, EP0169821A2 calls for use of the same commercially available enteric coating (Eudragit RL) that the Otterbeck Patents specify. Similarly, the '858 Patent posited an "ethyl acrylate/methyl methacrylate copolymer" as a potential coating." *Id.* at col. 5, line 25. These potential coatings are all identical to or closely related to the coatings described by Defendants. Once again, Defendants omitted these patents from the Otterbeck Patent applications.

115.     The Otterbeck Patents also describe Apriso®'s pellet formulation and a process for manufacturing the pellets. For example, the '886 Patent describes mixing the core ingredients into a moist mass, extruding and cutting the moist mass into 1 mm pieces which a shaped by a spheronizer and dried at 60° C. The pieces are then coated with the enteric coating, including poly(methacrylic acid, methylmethacrylate). *Id.* at col. 9, lines 30-67; col. 10, lines 1-12. The pellets are described as being 0.1 - 3 mm in size. *Id.* at col. 10, lines 35-37. Yet another pre-existing patent, the '990 Patent, specifies slow-release spherical pellets with uniform maximum diameters in the range of from 0.5 to 4 mm containing a biologically active element. *Id.* at col. 13, lines 50-52. Both patents specify dispersion of an active pharmaceutical ingredient in a polymer matrix. Both patents describe extruding and shaping of the pellets at 60°C. Yet, Defendants never disclosed the '990 Patent to the Patent Office.

116.     Additional prior art that likely invalidates the Otterbeck Patents include European Patent Application No. 0 453 001 A1; PCT Publication No. WO 91/07949; European Patent Application No. 0 377 477 A1; U.S. Patent No. 6,004,581.

## C.   Defendants Wrongfully Blocked Generic Competition

117.     When the FDA approved Defendants' NDA for Apriso® on October 31, 2008, it granted Defendants a three-year exclusivity period, which ended on October 31, 2011. The Otterbeck

- 31 -

1   Patents expired on April 20, 2018. Defendants' fraudulently obtained '688 Patent would exclude

2   generic competition for another twelve years, through 2030. If the '688 Patent had been upheld,

3   Defendants would have excluded generic competition for Apriso® for a total of 22 years, despite

4   having made no changes to the formulation or dosage of Apriso®.

5        118.    Several generic manufacturers were ready to enter the market soon after Valeant's

6   FDA-granted exclusivity expired in 2011. Lupin, Novel Laboratories, Inc. (later replaced by G & W

7   Laboratories), Mylan Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. all filed ANDAs for

8   generic versions of Apriso® that included Paragraph IV Certifications that Valeant's patents were

9   invalid. In addition, GeneriCo LLC, Mylan, and MycoNovo, Inc. filed petitions for *Inter Partes*

10  review of the '688 Patent with the PTAB. The petitions were consolidated and resulted in the

11  PTAB's decision invalidating the '688 Patent.

12       119.    Lupin was the first generic to file an ANDA, in July 2012. Valeant initiated its

13  infringement action against Lupin on September 7, 2012. On September 11, 2014, the Patent Office

14  mailed its notice of allowance stating that it would approve the '688 Patent. The very next day, on

15  September 12, 2014, Valeant dismissed all claims against Lupin relating to the Otterbeck Patents

16  without prejudice, and Lupin agreed to refrain from introducing a generic version of Apriso® until

17  2022, four years after the expiration of the Otterbeck Patents.

18       120.    Defendants' listing of the '688 Patent in the Orange Book constituted a false and

19  fraudulent statement to the U.S. government.

20       121.    Because Defendants fraudulently obtained the '688 Patent and improperly listed it in

21  the Orange Book, Defendants forced the ANDA Filers to file Paragraph IV certifications. Defendants

22  instituted objectively baseless litigation against the ANDA Filers, alleging infringement of

23  Defendants' invalid, unenforceable, and fraudulently-obtained '688 Patent. By filing the

24  infringement lawsuits, Defendants triggered the 30-month stays on FDA approval of the ANDA

25  Filers' applications to market generic alternatives to Apriso®. Defendants commenced these sham

26  litigations for the anticompetitive and unlawful purpose of delaying or preventing generic entry into

27  the relevant market. Defendants knew at the time that there was no objective merit to these suits.

28

FIRST AMENDED COMPLAINT                              CASE NO. 4:18-CV-01496-DMR

122. By appealing the PTAB's decision invalidating the '688 Patent and the Northern District of West Virginia's decision holding that Mylan's ANDA does not infringe the '688 Patent, Defendants have ensured that no generic can enter the market until those appeals are resolved, a process that could take months or years. Accordingly, Defendants have unlawfully but successfully blocked generics from entering the market since at least September 12, 2014, and possibly as early as July 2012, when the first generic manufacturer filed for FDA approval.

123. But for Defendants' misconduct as alleged herein, one or more of the ANDA Filers would have been able to supply the commercial quantities of generic Apriso® necessary to meet market demand since at least September 12, 2014, and possibly as early as July 2012.

124. Because of Defendants' false and misleading statements to the Patent Office in procuring the '688 Patent, consumers have been deprived of, and continue to be deprived of, a lower-cost generic form of Apriso®.

**D. Defendants' Fraudulent Scheme Has Resulted in Thousands of False Claims**

125. Defendants initiated the fraudulent scheme alleged herein to allow them to continue selling Apriso® at supracompetitive prices after the expiration of the FDA exclusivity period. Defendants knew and intended unlawfully to sell Apriso® at supracompetitive prices during the 30-month stay and pending the Hatch-Waxman litigations resulting from Defendants' improper listing of the '688 Patent in the Orange Book.

126. Defendants' fraudulent scheme erected significant barriers to the introduction of generic alternatives to Apriso® in interstate commerce and constitutes a willful attempt to exclude generic competition in the relevant market. Defendants' wrongful conduct has enabled Defendants to charge the United States Government and the Plaintiff States illegally-inflated prices for mesalamine. Defendants' wrongful conduct has also enabled Defendants to charge the United States Government and the Plaintiff States for Apriso®, when the prescriptions would have otherwise been filled by much lower-cost generic alternatives.

127. Defendants knew that the United States and the Plaintiff States would be purchasers and third-party payers for Apriso® through direct or indirect sales of Apriso® or the payment of

1   claims for prescription drug reimbursement submitted by providers under government programs,

2   including Medicare and Medicaid.

3       128.   Defendants knew that they would be submitting claims to the United States and the

4   Plaintiff States and causing or inducing others to submit claims based on Defendants' illegally-

5   inflated pricing for Apriso®. Defendants were also well-aware of the statutory structures that govern

6   the methods by which the United States and the Plaintiff States reimbursed outpatient drugs covered

7   under Medicare and Medicaid.

8       129.   Defendants, their employees and agents, individually and in concert, knowingly

9   submitted or caused to be submitted false claims to the United States Government and the Plaintiff

10  States to secure payments for illegally-inflated prices for mesalamine.

11      130.   The United States Government and the Plaintiff States were unaware of Defendants'

12  fraudulent scheme, misrepresentations to the Patent Office, and wrongful listing of the '688 Patent

13  in the Orange Book at the time they paid False Claims.

14      **E.   Defendants Made False Statements to The Federal And State Governments Regarding Fair And Reasonable Pricing That Was Material to The Government's Payments.**

15

16      131.   For a drug manufacturer to sell pharmaceutical products to the federal government—

17  either directly through sales to a government agency, or indirectly by receiving reimbursement for

18  sales through Medicare or Medicaid—the manufacturer must enter into several agreements with the

19  federal government in which the manufacturer reports prices and business practices that establish

20  the purchase price or reimbursement amounts are "fair and reasonable" under federal acquisition

21  regulations.

22      132.   Thus, for Defendants to sell Apriso® to federal agencies or otherwise qualify Apriso®

23  for reimbursement under Medicare and Medicaid, Defendants must list Apriso®'s prices on the

24  Federal Supply Schedule (the "FSS"), a program run by the General Services Administration (the

25  "GSA"). To do so, Defendants would have been required to sign a standard Master Agreement

26  ("MA") and a Pharmaceutical Price Agreement ("PPA"). *See* 38 U.S.C. § 8126 (a). The PPA must

27  be renewed annually and include the non-federal average manufacturer price ("AMP") for the prior

28  year. Moreover, drug manufacturers are required to update their AMP information to CMS every

- 34 -

1  calendar quarter. *See* 42 C.F.R. § 414.804(a)(5). The AMP is used to calculate the Federal Ceiling
2  Price ("FCP"), which is 76 percent of the AMP plus a discount pegged to the cost of living index. As
3  part of this process, Defendants must periodically provide the federal government with Apriso®'s
4  commercial list price, the lowest price charged to any commercial customer (the "Most Favored
5  Customer"), and the name and pricing information for a "Tracking Customer," which is the
6  "customer or class of customers whose pricing is tracked against the awarded FSS pricing for the
7  purposes of ensuring that prices remain *fair and reasonable* throughout the life of the contract."
8  (Emphasis added.)

9      133.   As part of the GSA's assessment of Apriso®'s pricing, Defendants were required to
10  supply a "written justification for offered pricing, a mechanism for future potential pricing
11  adjustments, and proof that the price is fair and reasonable." *See* About GSA Schedules, available for
12  download at, https://www.gsa.gov/acquisition/purchasing-programs/gsa-schedules/about-gsa-
13  schedules. Defendants, however, had artificially inflated Apriso®'s price through the unlawful
14  exclusion of generic competitors. By definition, Apriso®'s pricing that Defendants supplied in
15  connection with the FSS was *not* fair and reasonable, and Defendants' statements to the GSA were
16  expressly false statements.

17      134.   Drug manufacturers such as Defendants have an express obligation to provide truthful
18  information about AMP pricing to the government, and such manufacturers may be subject to
19  substantial penalties if they provide inaccurate AMP information. For example, the FSS Solicitation
20  Document relating to drugs, pharmaceuticals & hematology related products provides that:
21  "[a]ccuracy of information and computation of prices is the responsibility of the Contractor . . . .
22  Inclusion of incorrect information will cause the Contractor to resubmit/correct and redistribute the
23  Federal Supply Schedule Price List, and may constitute sufficient cause for Cancellation . . . and
24  application of any other remedies as provided by law—including monetary recovery." *See*, GSA
25  Drugs, Pharmaceuticals & Hematology Related Products Solicitation, 01 - Solicitation Document,
26  pp. 39-40.

27      135.   Moreover, to receive payment or reimbursement under Medicaid or Medicare Part B
28  for Apriso, Defendants must participate in the Medicaid Drug Rebate Program (MDRP). Under the

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

1   MDRP, the manufacturer must submit product and pricing data for all of its drugs that are eligible for

2   coverage under Medicaid to the Centers for Medicare and Medicaid Services ("CMS") *via* the Drug

3   Data Reporting for Medicaid (DDR) system. Under the agreement, the manufacturer must supply

4   the AMP and the number of units sold to the Department of Health and Human Services

5   ("DHHS"). Drug manufacturers are required to provide truthful information and are subject to

6   substantial civil penalties if they provide false information to the government. *See* 42 U.S.C. 1396r-

7   8(b)(3)(C)(ii).

8       136.    Defendants are also required to participate in the Section 340B Drug Pricing Program,

9   administered by the Office of Pharmacy Affairs in the DHHS. Under this program, Defendants are

10  required provide its drugs to eligible health care organizations and certain other entities at reduced

11  prices based on pricing data supplied to the federal government, including with respect to the

12  foregoing information provided to the DHHS and the GSA through the DDR and FSS, respectively.

13      137.    Defendants' express and implied misrepresentations that its prices were fair and

14  reasonable—and not artificially inflated through the unlawful exclusion of competitors—are *per se*

15  material to the government's payment decision. The structure of the Medicare and Medicaid

16  programs rely on prices that have not been manipulated through anticompetitive or otherwise

17  wrongful actions. But for Defendants' fraudulent statements, government health programs

18  *necessarily* would have paid less for the drugs based on generic competition.

19      138.    Because Apriso® did not have any FDA-approved competitors—and therefore there

20  was no "adequate price competition"—Defendants were required to provide the Government full

21  and accurate cost or pricing data as a condition to receiving payment.

22      139.    Defendants' misrepresentations and fraudulent conduct allowed Defendants to bill

23  (or cause the submission to and payment of reimbursement claims by) the United States

24  Government and the Plaintiff States for a higher priced good (*i.e.,* a patented drug with no generic

25  competitors) than what was actually provided (a non-patented drug that should have had numerous

26  generic competitors). On information and belief, the United States Government and the Plaintiff

27  States paid or reimbursed for Apriso® at Defendants' unlawfully inflated prices, but they would not

28  have entered into such contracts or paid such amounts had they known the true facts at the time of

- 36 -

1   contracting or payment. The United States Government and the Plaintiff States would not have

2   accepted or made payments on invoices for patented Apriso® at the prices at which they paid but for

3   the fraudulently-obtained '688 Patent.

4       140.    Many states require or permit pharmacists to substitute available generic unless the

5   prescription specifically requires that that a brand drug be dispensed. Moreover, even in such states

6   without such substitution rules, many patients would have also chosen to take a bioequivalent and

7   less expensive generic alternative.

8       141.    But for Defendants' misrepresentations and fraudulent conduct, approximately 90%

9   or more of the False Claims to the United States Government and the Plaintiff States for Apriso®

10  would have instead been for significantly lower-priced generic mesalamine.

11      142.    Each and every claim for payment or reimbursement for Apriso® that would have

12  been substituted for a less expensive generic equivalent also constituted a False Claim.

13      143.    Using its fraudulently-obtained patent rights, Defendants have submitted or caused to

14  be submitted thousands of False Claims to the United States Government and the Plaintiff States,

15  either through direct sales of Apriso® or False Claims for reimbursement for Apriso® submitted to

16  the Medicare and Medicaid programs. Defendants submitted the False Claims or caused the False

17  Claims to be submitted to the United States Government and the Plaintiff States based on unlawful

18  pricing above the what the fair market value of mesalamine would have been but for Defendants'

19  unlawful and fraudulent blocking of generic entry.

20      144.    Defendants submitted or caused submission of False Claims with false certifications

21  of compliance with law. The United States Government and the Plaintiff States conditioned payment

22  or reimbursement for Apriso® upon these false certifications. Unaware of Defendants' fraudulent

23  scheme, the United States Government and the Plaintiff States issued payment on those False

24  Claims.

25

26

27

28

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

**Count I**
**False Claims Act**
**31 U.S.C. §§ 3729–3733**

145.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

146.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729–3733, as amended.

147.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment of Apriso®.

148.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

149.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Government would not have paid but for Defendants' illegal conduct.

150.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

151.    Additionally, the United States is entitled to a maximum penalty of up to $22,363 for each and every violation alleged herein.

**Count II**
**California False Claims Act**
**Cal. Gov't Code §§ 12650–12656**

152.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

153.    This is a claim for treble damages and penalties under the California False Claims Act.

154.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

- 38 -

155.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

156.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

157.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of California—through any state funded program, including, without limitation, Medicaid—for Apriso®.

158.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of California.

159.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

160.     The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

161.     By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

162.     Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

163.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

- 39 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Count III
### Colorado Medicaid False Claims Act
### Colo. Rev. Stat. §§ 25.5-4-303.5 to -310

164.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

165.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

166.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

167.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

168.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

169.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Colorado—through any state funded program, including, without limitation, Medicaid—for Apriso®.

170.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Colorado.

171.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Colorado. Relator has no control over or dealings with such entities and has no access to the records in their possession.

172.    The State of Colorado, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Connecticut would not have paid but for Defendants' illegal conduct.

- 40 -

1      173.    By reason of Defendants' acts, the State of Colorado has been damaged, and

2 continues to be damaged, in substantial amount to be determined at trial.

3      174.    Additionally, the State of Colorado is entitled to a statutory penalty for each and every

4 violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5      175.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6 State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

**Count IV**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**

9      176.    Relator realleges and incorporates by reference all foregoing allegations as though

10 fully set forth herein.

11      177.    This is a claim for treble damages and penalties under the Connecticut False Claims

12 Act.

13      178.    Through the acts described above, Defendants knowingly, intentionally, and willfully

14 presented, or caused to be presented, false or fraudulent claims for payment and approval for

15 prescriptions for Apriso®.

16      179.    Through the acts described above, Defendants knowingly, intentionally, and willfully

17 made or used a false record or statement material to a false or fraudulent claim for payment and

18 approval for prescriptions for Apriso®.

19      180.    Through the acts described above, Defendants conspired to (a) present, or cause to be

20 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

21 statement material to a false or fraudulent claim for payment and approval for prescriptions for

22 Apriso®.

23      181.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

24 were not entitled to be paid by the State of Connecticut—through any state funded program,

25 including, without limitation, Medicaid—for Apriso®.

26      182.    Through the acts described herein, Defendants knowingly presented, or caused to be

27 presented, false or fraudulent claims to the State of Connecticut.

28

- 41 -

1    183.    Relator cannot at this time identify all of the false claims for payment that were caused
2  by Defendants' conduct. The false claims were presented by numerous separate entities across the
3  State of Connecticut. Relator has no control over or dealings with such entities and has no access to
4  the records in their possession.

5    184.    The State of Connecticut, unaware of the falsity of the records, statements and claims
6  made or caused to be made by Defendants, paid and continues to pay the claims that the State of
7  Connecticut would not have paid but for Defendants' illegal conduct.

8    185.    By reason of Defendants' acts, the State of Connecticut has been damaged, and
9  continues to be damaged, in substantial amount to be determined at trial.

10    186.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
11  State of Connecticut pursuant to Conn. Gen. Stat. § 4-277(a).

12  **Count V**<br>**Delaware False Claims and Reporting Act**<br>**Del. Code Ann. tit. 6, §§ 1201–1211**
13

14    187.    Relator realleges and incorporates by reference all foregoing allegations as though
15  fully set forth herein.

16    188.    This is a claim for treble damages and penalties under the Delaware False Claims and
17  Reporting Act.

18    189.    Through the acts described above, Defendants knowingly, intentionally, and willfully
19  presented, or caused to be presented, false or fraudulent claims for payment and approval for
20  prescriptions for Apriso®.

21    190.    Through the acts described above, Defendants knowingly, intentionally, and willfully
22  made or used a false record or statement material to a false or fraudulent claim for payment and
23  approval for prescriptions for Apriso®.

24    191.    Through the acts described above, Defendants conspired to (a) present, or cause to be
25  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
26  statement material to a false or fraudulent claim for payment and approval for prescriptions for
27  Apriso®.

28

- 42 -

1      192.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

2  were not entitled to be paid by the State of Delaware —through any state funded program, including,

3  without limitation, Medicaid—for Apriso®.

4      193.    Through the acts described herein, Defendants knowingly presented, or caused to be

5  presented, false or fraudulent claims to the State of Delaware.

6      194.    Relator cannot at this time identify all of the false claims for payment that were caused

7  by Defendants' conduct. The false claims were presented by numerous separate entities across the

8  State of Delaware. Relator has no control over or dealings with such entities and has no access to the

9  records in their possession.

10     195.    The State of Delaware, unaware of the falsity of the records, statements and claims

11  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

12  Delaware would not have paid but for Defendants' illegal conduct.

13     196.    By reason of Defendants' acts, the State of Delaware has been damaged, and

14  continues to be damaged, in substantial amount to be determined at trial.

15     197.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

16  State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b)(1).

17                                **Count VI**
                          **Florida False Claims Act**
18                         **Fla. Stat. §§ 68.081–.09**

19     198.    Relator realleges and incorporates by reference all foregoing allegations as though

20  fully set forth herein.

21     199.    This is a claim for treble damages and penalties under the Florida False Claims Act.

22     200.    Through the acts described above, Defendants knowingly, intentionally, and willfully

23  presented, or caused to be presented, false or fraudulent claims for payment and approval for

24  prescriptions for Apriso®.

25     201.    Through the acts described above, Defendants knowingly, intentionally, and willfully

26  made or used a false record or statement material to a false or fraudulent claim for payment and

27  approval for prescriptions for Apriso®.

28

- 43 -

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

1    202.    Through the acts described above, Defendants conspired to (a) present, or cause to be

2    presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

3    statement material to a false or fraudulent claim for payment and approval for prescriptions for

4    Apriso®.

5    203.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

6    were not entitled to be paid by the State of Florida —through any state funded program, including,

7    without limitation, Medicaid—for Apriso®.

8    204.    Through the acts described herein, Defendants knowingly presented, or caused to be

9    presented, false or fraudulent claims to the State of Florida.

10   205.    Relator cannot at this time identify all of the false claims for payment that were caused

11   by Defendants' conduct. The false claims were presented by numerous separate entities across the

12   State of Florida. Relator has no control over or dealings with such entities and has no access to the

13   records in their possession.

14   206.    The State of Florida, unaware of the falsity of the records, statements and claims

15   made or caused to be made by Defendants, paid and continues to pay the claims that the State of

16   Florida would not have paid but for Defendants' illegal conduct.

17   207.    By reason of Defendants' acts, the State of Florida has been damaged, and continues

18   to be damaged, in substantial amount to be determined at trial.

19   208.    Additionally, the State of Florida is entitled to a statutory penalty for each and every

20   violation alleged herein to be determined by the Court in accordance with the relevant statutes.

21   209.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

22   State of Florida pursuant to Fla. Stat. § 68.083(2).

23
                              **Count VII**
                   **Georgia False Medicaid Claims Act**
24                 **Ga. Code Ann. §§ 49-4-168 to -168.6**

25   210.    Relator realleges and incorporates by reference all foregoing allegations as though

26   fully set forth herein.

27   211.    This is a claim for treble damages and penalties under the Georgia False Medicaid

28   Claims Act.

- 44 -

212.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

213.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

214.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

215.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Georgia —through any state funded program, including, without limitation, Medicaid—for Apriso®.

216.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Georgia.

217.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Georgia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

218.     The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Georgia would not have paid but for Defendants' illegal conduct.

219.     By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

220.     Additionally, the State of Georgia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

221.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.2(b).

- 45 -

## Count VIII
### Hawaii False Claims Act
### Haw. Rev. Stat. §§ 661-21 to -31

222.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

223.    This is a claim for treble damages and penalties under Hawaii False Claims Act.

224.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

225.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

226.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

227.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Hawaii —through any state funded program, including, without limitation, Medicaid—for Apriso®.

228.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Hawaii.

229.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Hawaii. Relator has no control over or dealings with such entities and has no access to the records in their possession.

230.    The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Hawaii would not have paid but for Defendants' illegal conduct.

- 46 -

1      231.    By reason of Defendants' acts, the State of Hawaii has been damaged, and continues

2  to be damaged, in substantial amount to be determined at trial.

3      232.    Additionally, the State of Hawaii is entitled to a statutory penalty for each and every

4  violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5      233.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6  State of Hawaii pursuant to Haw. Rev. Stat. § 661-25(a).

7
8

**Count IX**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1–175/8**

9      234.    Relator realleges and incorporates by reference all foregoing allegations as though

10  fully set forth herein.

11      235.    This is a claim for treble damages and penalties under the Illinois False Claims Act.

12      236.    Through the acts described above, Defendants knowingly, intentionally, and willfully

13  presented, or caused to be presented, false or fraudulent claims for payment and approval for

14  prescriptions for Apriso®.

15      237.    Through the acts described above, Defendants knowingly, intentionally, and willfully

16  made or used a false record or statement material to a false or fraudulent claim for payment and

17  approval for prescriptions for Apriso®.

18      238.    Through the acts described above, Defendants conspired to (a) present, or cause to be

19  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

20  statement material to a false or fraudulent claim for payment and approval for prescriptions for

21  Apriso®.

22      239.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

23  were not entitled to be paid by the State of Illinois —through any state funded program, including,

24  without limitation, Medicaid—for Apriso®.

25      240.    Through the acts described herein, Defendants knowingly presented, or caused to be

26  presented, false or fraudulent claims to the State of Illinois.

27      241.    Relator cannot at this time identify all of the false claims for payment that were caused

28  by Defendants' conduct. The false claims were presented by numerous separate entities across the

- 47 -

1  State of Illinois. Relator has no control over or dealings with such entities and has no access to the

2  records in their possession.

3      242.    The State of Illinois, unaware of the falsity of the records, statements and claims made

4  or caused to be made by Defendants, paid and continues to pay the claims that the State of Illinois

5  would not have paid but for Defendants' illegal conduct.

6      243.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues

7  to be damaged, in substantial amount to be determined at trial.

8      244.    Additionally, the State of Illinois is entitled to a statutory penalty for each and every

9  violation alleged herein to be determined by the Court in accordance with the relevant statutes.

10     245.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

11  State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b)(1).

12

**Count X**
**Indiana False Claims and Whistleblower Protection Act**
**Ind. Code §§ 5-11-5.5-1 to -18**

13

14     246.    Relator realleges and incorporates by reference all foregoing allegations as though

15  fully set forth herein.

16     247.    This is a claim for treble damages and penalties under the Indiana False Claims and

17  Whistleblower Protection Act.

18     248.    Through the acts described above, Defendants knowingly, intentionally, and willfully

19  presented, or caused to be presented, false or fraudulent claims for payment and approval for

20  prescriptions for Apriso®.

21     249.    Through the acts described above, Defendants knowingly, intentionally, and willfully

22  made or used a false record or statement material to a false or fraudulent claim for payment and

23  approval for prescriptions for Apriso®.

24     250.    Through the acts described above, Defendants conspired to (a) present, or cause to be

25  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

26  statement material to a false or fraudulent claim for payment and approval for prescriptions for

27  Apriso®.

28

FIRST AMENDED COMPLAINT                          CASE NO. 4:18-CV-01496-DMR

1    251.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

2    were not entitled to be paid by the State of Indiana —through any state funded program, including,

3    without limitation, Medicaid—for Apriso®.

4    252.    Through the acts described herein, Defendants knowingly presented, or caused to be

5    presented, false or fraudulent claims to the State of Indiana.

6    253.    Relator cannot at this time identify all of the false claims for payment that were caused

7    by Defendants' conduct. The false claims were presented by numerous separate entities across the

8    State of Indiana. Relator has no control over or dealings with such entities and has no access to the

9    records in their possession.

10    254.    The State of Indiana, unaware of the falsity of the records, statements and claims

11    made or caused to be made by Defendants, paid and continues to pay the claims that the State of

12    Indiana would not have paid but for Defendants' illegal conduct.

13    255.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues

14    to be damaged, in substantial amount to be determined at trial.

15    256.    Additionally, the State of Indiana is entitled to a statutory penalty for each and every

16    violation alleged herein to be determined by the Court in accordance with the relevant statutes.

17    257.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

18    State of Indiana pursuant to Ind. Code § 5-11-5.5-4(a).

19                                    **Count XI**
                                **Iowa False Claims Act**
20                              **Iowa Code §§ 685.1–.7**

21    258.    Relator realleges and incorporates by reference all foregoing allegations as though

22    fully set forth herein.

23    259.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

24    260.    Through the acts described above, Defendants knowingly, intentionally, and willfully

25    presented, or caused to be presented, false or fraudulent claims for payment and approval for

26    prescriptions for Apriso®.

27

28

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

261. Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

262. Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

263. Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Iowa —through any state funded program, including, without limitation, Medicaid—for Apriso®.

264. Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Iowa.

265. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Iowa. Relator has no control over or dealings with such entities and has no access to the records in their possession.

266. The State of Iowa, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Iowa would not have paid but for Defendants' illegal conduct.

267. By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

268. Additionally, the State of Iowa is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

269. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2)(a).

**Count XII**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. §§ 46:437–:440**

270.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

271.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

272.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

273.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

274.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

275.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Louisiana —through any state funded program, including, without limitation, Medicaid—for Apriso®.

276.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana.

277.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Louisiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

278.    The State of Louisiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Louisiana would not have paid but for Defendants' illegal conduct.

- 51 -

1    279.    By reason of Defendants' acts, the State of Louisiana has been damaged, and
2    continues to be damaged, in substantial amount to be determined at trial.

3    280.    Additionally, the State of Louisiana is entitled to a statutory penalty for each and
4    every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5    281.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
6    State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

7                                **Count XIII**
                        **Maryland False Health Claims Act**
8                   **Md. Code Ann., Health-Gen. §§ 2-601 to -611**

9    282.    Relator realleges and incorporates by reference all foregoing allegations as though
10   fully set forth herein.

11   283.    This is a claim for treble damages and penalties under the Maryland False Health
12   Claims Act.

13   284.    Through the acts described above, Defendants knowingly, intentionally, and willfully
14   presented, or caused to be presented, false or fraudulent claims for payment and approval for
15   prescriptions for Apriso®.

16   285.    Through the acts described above, Defendants knowingly, intentionally, and willfully
17   made or used a false record or statement material to a false or fraudulent claim for payment and
18   approval for prescriptions for Apriso®.

19   286.    Through the acts described above, Defendants conspired to (a) present, or cause to be
20   presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
21   statement material to a false or fraudulent claim for payment and approval for prescriptions for
22   Apriso®.

23   287.    Because of Defendants' violations the false claims statutes alleged herein, Defendants
24   were not entitled to be paid by the State of Maryland —through any state funded program, including,
25   without limitation, Medicaid—for Apriso®.

26   288.    Through the acts described herein, Defendants knowingly presented, or caused to be
27   presented, false or fraudulent claims to the State of Maryland.

28

- 52 -

289.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Maryland. Relator has no control over or dealings with such entities and has no access to the records in their possession.

290.   The State of Maryland, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Maryland would not have paid but for Defendants' illegal conduct.

291.   By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

292.   Additionally, the State of Maryland is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

293.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Maryland pursuant to Md. Code Ann., Health-Gen. § 2-604(a)(1).

## Count XIV
### Massachusetts False Claims Act
### Mass. Gen. Laws ch. 12, §§ 5A-5O

294.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

295.   This is a claim for treble damages and penalties under the Massachusetts False Claims Act.

296.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

297.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

298.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

1  statement material to a false or fraudulent claim for payment and approval for prescriptions for
2  Apriso®.

3       299.    Because of Defendants' violations the false claims statutes alleged herein, Defendants
4  were not entitled to be paid by the Commonwealth of Massachusetts —through any state funded
5  program, including, without limitation, Medicaid—for Apriso®.

6       300.    Through the acts described herein, Defendants knowingly presented, or caused to be
7  presented, false or fraudulent claims to the Commonwealth of Massachusetts.

8       301.    Relator cannot at this time identify all of the false claims for payment that were caused
9  by Defendants' conduct. The false claims were presented by numerous separate entities across the
10  Commonwealth of Massachusetts. Relator has no control over or dealings with such entities and has
11  no access to the records in their possession.

12       302.    The Commonwealth of Massachusetts, unaware of the falsity of the records,
13  statements and claims made or caused to be made by Defendants, paid and continues to pay the
14  claims that the Commonwealth of Massachusetts would not have paid but for Defendants' illegal
15  conduct.

16       303.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been
17  damaged, and continues to be damaged, in substantial amount to be determined at trial.

18       304.    Additionally, the Commonwealth of Massachusetts is entitled to a statutory penalty
19  for each and every violation alleged herein to be determined by the Court in accordance with the
20  relevant statutes.

21       305.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
22  Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

23
                    **Count XV**
        **Michigan Medicaid False Claims Act**
24          **Mich. Comp. Laws §§ 400.601-.615**

25       306.    Relator realleges and incorporates by reference all foregoing allegations as though
26  fully set forth herein.

27       307.    This is a claim for treble damages and penalties under the Michigan Medicaid False
28  Claims Act.

-54-

1    308.   Through the acts described above, Defendants knowingly, intentionally, and willfully
2 presented, or caused to be presented, false or fraudulent claims for payment and approval for
3 prescriptions for Apriso®.

4    309.   Through the acts described above, Defendants knowingly, intentionally, and willfully
5 made or used a false record or statement material to a false or fraudulent claim for payment and
6 approval for prescriptions for Apriso®.

7    310.   Through the acts described above, Defendants conspired to (a) present, or cause to be
8 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or
9 statement material to a false or fraudulent claim for payment and approval for prescriptions for
10 Apriso®.

11    311.   Because of Defendants' violations the false claims statutes alleged herein, Defendants
12 were not entitled to be paid by the State of Michigan —through any state funded program, including,
13 without limitation, Medicaid—for Apriso®.

14    312.   Through the acts described herein, Defendants knowingly presented, or caused to be
15 presented, false or fraudulent claims to the State of Michigan.

16    313.   Relator cannot at this time identify all of the false claims for payment that were caused
17 by Defendants' conduct. The false claims were presented by numerous separate entities across the
18 State of Michigan. Relator has no control over or dealings with such entities and has no access to the
19 records in their possession.

20    314.   The State of Michigan, unaware of the falsity of the records, statements and claims
21 made or caused to be made by Defendants, paid and continues to pay the claims that the State of
22 Michigan would not have paid but for Defendants' illegal conduct.

23    315.   By reason of Defendants' acts, the State of Michigan has been damaged, and
24 continues to be damaged, in substantial amount to be determined at trial.

25    316.   Additionally, the State of Michigan is entitled to a statutory penalty for each and
26 every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

27    317.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the
28 State of Michigan pursuant to Mich. Comp. Laws § 400.610a(1).

- 55 -

## Count XVI
### Minnesota False Claims Act
#### Minn. Stat. §§ 15C.01-.16

318.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

319.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

320.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

321.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

322.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

323.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Minnesota —through any state funded program, including, without limitation, Medicaid—for Apriso®.

324.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Minnesota.

325.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Minnesota. Relator has no control over or dealings with such entities and has no access to the records in their possession.

326.    The State of Minnesota, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Minnesota would not have paid but for Defendants' illegal conduct.

- 56 -

327.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

328.    Additionally, the State of Minnesota is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

329.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Minnesota pursuant to Minn. Stat. § 15C.05.

### Count XVII
### Montana False Claims Act
### Mont. Code Ann. §§ 17-8-401 to -413

330.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

331.    This is a claim for treble damages and penalties under the Montana False Claims Act.

332.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

333.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

334.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

335.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Montana —through any state funded program, including, without limitation, Medicaid—for Apriso®.

336.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Montana.

337.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the

- 57 -

1  State of Montana. Relator has no control over or dealings with such entities and has no access to the

2  records in their possession.

3      338.    The State of Montana, unaware of the falsity of the records, statements and claims

4  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

5  Montana would not have paid but for Defendants' illegal conduct.

6      339.    By reason of Defendants' acts, the State of Montana has been damaged, and

7  continues to be damaged, in substantial amount to be determined at trial.

8      340.    Additionally, the State of Montana is entitled to a statutory penalty for each and every

9  violation alleged herein to be determined by the Court in accordance with the relevant statutes.

10     341.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

11  State of Montana pursuant to Mont. Code Ann. § 17-8-406(1).

**Count XVIII**
**Nevada Submission of False Claims to State or Local Government**
**Nev. Rev. Stat. §§ 357.010–.250**

14     342.    Relator realleges and incorporates by reference all foregoing allegations as though

15  fully set forth herein.

16     343.    This is a claim for treble damages and penalties under the Nevada statute relating to

17  the Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250

18     344.    Through the acts described above, Defendants knowingly, intentionally, and willfully

19  presented, or caused to be presented, false or fraudulent claims for payment and approval for

20  prescriptions for Apriso®.

21     345.    Through the acts described above, Defendants knowingly, intentionally, and willfully

22  made or used a false record or statement material to a false or fraudulent claim for payment and

23  approval for prescriptions for Apriso®.

24     346.    Through the acts described above, Defendants conspired to (a) present, or cause to be

25  presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

26  statement material to a false or fraudulent claim for payment and approval for prescriptions for

27  Apriso®.

28

- 58 -

1    347.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

2    were not entitled to be paid by the State of Nevada —through any state funded program, including,

3    without limitation, Medicaid—for Apriso®.

4    348.    Through the acts described herein, Defendants knowingly presented, or caused to be

5    presented, false or fraudulent claims to the State of Nevada.

6    349.    Relator cannot at this time identify all of the false claims for payment that were caused

7    by Defendants' conduct. The false claims were presented by numerous separate entities across the

8    State of Nevada. Relator has no control over or dealings with such entities and has no access to the

9    records in their possession.

10    350.    The State of Nevada, unaware of the falsity of the records, statements and claims

11    made or caused to be made by Defendants, paid and continues to pay the claims that the State of

12    Nevada would not have paid but for Defendants' illegal conduct.

13    351.    By reason of Defendants' acts, the State of Nevada has been damaged, and continues

14    to be damaged, in substantial amount to be determined at trial.

15    352.    Additionally, the State of Nevada is entitled to a statutory penalty for each and every

16    violation alleged herein to be determined by the Court in accordance with the relevant statutes.

17    353.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

18    State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

19                              **Count XIX**
                      **New Jersey False Claims Act**
20                  **N.J. Stat. Ann. §§ 2A:32C-1 to -18**

21    354.    Relator realleges and incorporates by reference all foregoing allegations as though

22    fully set forth herein.

23    355.    This is a claim for treble damages and penalties under the New Jersey False Claims

24    Act.

25    356.    Through the acts described above, Defendants knowingly, intentionally, and willfully

26    presented, or caused to be presented, false or fraudulent claims for payment and approval for

27    prescriptions for Apriso®.

28

FIRST AMENDED COMPLAINT                                          CASE NO. 4:18-CV-01496-DMR

357.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

358.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

359.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Jersey —through any state funded program, including, without limitation, Medicaid—for Apriso®.

360.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Jersey.

361.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Jersey. Relator has no control over or dealings with such entities and has no access to the records in their possession.

362.   The State of New Jersey, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Jersey would not have paid but for Defendants' illegal conduct.

363.   By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

364.   Additionally, the State of New Jersey is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

365.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5(b).

## Count XX
## New Mexico Medicaid False Claims
### N.M. Stat. Ann. §§ 27-14-1 to -15

366. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

367. This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

368. Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

369. Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

370. Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

371. Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Mexico—through any state funded program, including, without limitation, Medicaid—for Apriso®.

372. Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Mexico.

373. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Mexico. Relator has no control over or dealings with such entities and has no access to the records in their possession.

374. The State of New Mexico, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Mexico would not have paid but for Defendants' illegal conduct.

- 61 -

1    375.    By reason of Defendants' acts, the State of New Mexico has been damaged, and

2    continues to be damaged, in substantial amount to be determined at trial.

3    376.    Additionally, the State of New Mexico is entitled to a statutory penalty for each and

4    every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

5    377.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

6    State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-7.

7
8
### Count XXI
### New Mexico Fraud Against Taxpayers Act
### N.M. Stat. Ann. §§ 44-9-1 to -14

9    378.    Relator realleges and incorporates by reference all foregoing allegations as though

10   fully set forth herein.

11   379.    This is a claim for treble damages and penalties under the New Mexico Fraud Against

12   Taxpayers Act.

13   380.    Through the acts described herein, Defendants knowingly, intentionally, and willfully

14   violated the New Mexico Fraud Against Taxpayers Act.

15   381.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

16   State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

17
18
### Count XXII
### New York False Claims Act
### N.Y. State Fin. Law §§ 187–194

19   382.    Relator realleges and incorporates by reference all foregoing allegations as though

20   fully set forth herein.

21   383.    This is a claim for treble damages and penalties under the New York False Claims

22   Act.

23   384.    Through the acts described above, Defendants knowingly, intentionally, and willfully

24   presented, or caused to be presented, false or fraudulent claims for payment and approval for

25   prescriptions for Apriso®.

26   385.    Through the acts described above, Defendants knowingly, intentionally, and willfully

27   made or used a false record or statement material to a false or fraudulent claim for payment and

28   approval for prescriptions for Apriso®.

- 62 -

386.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

387.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New York—through any state funded program, including, without limitation, Medicaid—for Apriso®.

388.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New York.

389.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New York. Relator has no control over or dealings with such entities and has no access to the records in their possession.

390.    The State of New York, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New York would not have paid but for Defendants' illegal conduct.

391.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

392.    Additionally, the State of New York is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

393.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2)(a).

**Count XXIII**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-605 to -618**

394.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

395.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

- 63 -

396.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

397.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

398.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

399.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of North Carolina—through any state funded program, including, without limitation, Medicaid—for Apriso®.

400.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of North Carolina.

401.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of North Carolina. Relator has no control over or dealings with such entities and has no access to the records in their possession.

402.    The State North Carolina, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of North Carolina would not have paid but for Defendants' illegal conduct.

403.    By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

404.    Additionally, the State of North Carolina is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

405.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

- 64 -

**Count XXIV**
**Oklahoma Medicaid False Claims Act**
**Okla. Stat. tit. 63, §§ 5053–5053.7**

406.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

407.    This is a claim for treble damages and penalties under the Oklahoma False Claims Act.

408.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

409.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

410.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

411.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Oklahoma—through any state funded program, including, without limitation, Medicaid—for Apriso®.

412.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Oklahoma.

413.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Oklahoma. Relator has no control over or dealings with such entities and has no access to the records in their possession.

414.    The State of Oklahoma, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Oklahoma would not have paid but for Defendants' illegal conduct.

- 65 -

415.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

416.    Additionally, the State of Oklahoma is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

417.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.2(B)(1).

**Count XXV**
**Rhode Island False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 to -9**

418.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

419.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

420.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

421.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

422.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

423.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Rhode Island —through any state funded program, including, without limitation, Medicaid—for Apriso®.

424.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Rhode Island.

FIRST AMENDED COMPLAINT

425.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Rhode Island. Relator has no control over or dealings with such entities and has no access to the records in their possession.

426.    The State of Rhode Island, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Rhode Island would not have paid but for Defendants' illegal conduct.

427.    By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

428.    Additionally, the State of Rhode Island is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

429.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

**Count XXVI**
**Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. §§ 7-5-181 to -185**

430.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

431.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

432.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

433.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

434.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

- 67 -

1  statement material to a false or fraudulent claim for payment and approval for prescriptions for

2  Apriso®.

3       435.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

4  were not entitled to be paid by the State of Tennessee—through any state funded program,

5  including, without limitation, Medicaid—for Apriso®.

6       436.    Through the acts described herein, Defendants knowingly presented, or caused to be

7  presented, false or fraudulent claims to the State of Tennessee.

8       437.    Relator cannot at this time identify all of the false claims for payment that were caused

9  by Defendants' conduct. The false claims were presented by numerous separate entities across the

10  State of Tennessee. Relator has no control over or dealings with such entities and has no access to

11  the records in their possession.

12       438.    The State of Tennessee, unaware of the falsity of the records, statements and claims

13  made or caused to be made by Defendants, paid and continues to pay the claims that the State of

14  Tennessee would not have paid but for Defendants' illegal conduct.

15       439.    By reason of Defendants' acts, the State of Tennessee has been damaged, and

16  continues to be damaged, in substantial amount to be determined at trial.

17       440.    Additionally, the State of Tennessee is entitled to a statutory penalty for each and

18  every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

19       441.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

20  State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b)(1).

21                              **Count XXVII**
                   **Texas Medicaid Fraud Prevention Law**
22                 **Tex. Hum. Res. Code Ann. §§ 36.001–.132**

23       442.    Relator realleges and incorporates by reference all foregoing allegations as though

24  fully set forth herein.

25       443.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud

26  Prevention Law.

27

28

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

1      444.    Through the acts described above, Defendants knowingly, intentionally, and willfully

2 presented, or caused to be presented, false or fraudulent claims for payment and approval for

3 prescriptions for Apriso®.

4      445.    Through the acts described above, Defendants knowingly, intentionally, and willfully

5 made or used a false record or statement material to a false or fraudulent claim for payment and

6 approval for prescriptions for Apriso®.

7      446.    Through the acts described above, Defendants conspired to (a) present, or cause to be

8 presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

9 statement material to a false or fraudulent claim for payment and approval for prescriptions for

10 Apriso®.

11      447.    Because of Defendants' violations the false claims statutes alleged herein, Defendants

12 were not entitled to be paid by the State of Texas—through any state funded program, including,

13 without limitation, Medicaid—for Apriso®.

14      448.    Through the acts described herein, Defendants knowingly presented, or caused to be

15 presented, false or fraudulent claims to the State of Texas.

16      449.    Relator cannot at this time identify all of the false claims for payment that were caused

17 by Defendants' conduct. The false claims were presented by numerous separate entities across the

18 State of Texas. Relator has no control over or dealings with such entities and has no access to the

19 records in their possession.

20      450.    The State of Texas, unaware of the falsity of the records, statements and claims made

21 or caused to be made by Defendants, paid and continues to pay the claims that the State of Texas

22 would not have paid but for Defendants' illegal conduct.

23      451.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to

24 be damaged, in substantial amount to be determined at trial.

25      452.    Additionally, the State of Texas is entitled to a statutory penalty for each and every

26 violation alleged herein to be determined by the Court in accordance with the relevant statutes.

27      453.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

28 State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

- 69 -

## Count XXVIII
## Vermont False Claims Act
### Vt. Stat. Ann. tit. 32, §§ 630–642

454.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

455.   This is a claim for treble damages and penalties under the Vermont False Claims Act.

456.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

457.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

458.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

459.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Vermont —through any state funded program, including, without limitation, Medicaid—for Apriso®.

460.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Vermont.

461.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Vermont. Relator has no control over or dealings with such entities and has no access to the records in their possession.

462.   The State of Vermont, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Vermont would not have paid but for Defendants' illegal conduct.

463.   By reason of Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

464.   Additionally, the State of Vermont is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

465.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

## Count XXIX
## Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §§ 8.01-216.1 to .19

466.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

467.   This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

468.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

469.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

470.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

471.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the Commonwealth of Virginia—through any state funded program, including, without limitation, Medicaid—for Apriso®.

472.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia.

473.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the Commonwealth of Virginia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

474.     The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Commonwealth of Virginia would not have paid but for Defendants' illegal conduct.

475.     By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

476.     Additionally, the Commonwealth of Virginia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

477.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(A).

### Count XXX
### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.005–.130

478.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

479.     This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

480.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

481.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

482.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or

- 72 -

1 statement material to a false or fraudulent claim for payment and approval for prescriptions for

2 Apriso®.

3       483.     Because of Defendants' violations the false claims statutes alleged herein, Defendants

4 were not entitled to be paid by the State of Washington—through any state funded program,

5 including, without limitation, Medicaid—for Apriso®.

6       484.     Through the acts described herein, Defendants knowingly presented, or caused to be

7 presented, false or fraudulent claims to the State of Washington.

8       485.     Relator cannot at this time identify all of the false claims for payment that were caused

9 by Defendants' conduct. The false claims were presented by numerous separate entities across the

10 State of Washington. Relator has no control over or dealings with such entities and has no access to

11 the records in their possession.

12       486.     The State of Washington, unaware of the falsity of the records, statements and claims

13 made or caused to be made by Defendants, paid and continues to pay the claims that the State of

14 Washington would not have paid but for Defendants' illegal conduct.

15       487.     By reason of Defendants' acts, the State of Washington has been damaged, and

16 continues to be damaged, in substantial amount to be determined at trial.

17       488.     Additionally, the State of Washington is entitled to a statutory penalty for each and

18 every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

19       489.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the

20 State of Washington pursuant to Wash. Rev. Code § 74.66.050.

21                          **Count XXXI**
                 **The District of Columbia False Claims Law**
22                 **D.C. Code §§ 2-381.01 to .09**

23       490.     Relator realleges and incorporates by reference all foregoing allegations as though

24 fully set forth herein.

25       491.     This is a claim for treble damages and penalties under the District of Columbia False

26 Claims Law.

27

28

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

492.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso®.

493.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

494.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso®.

495.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the District of Columbia —through any state funded program, including, without limitation, Medicaid—for Apriso®.

496.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the District of Columbia.

497.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the District of Columbia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

498.    The District of Columbia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that District of Columbia would not have paid but for Defendants' illegal conduct.

499.    By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

500.    Additionally, the District of Columbia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

501.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the District of Columbia pursuant to D.C. Code § 2-381.03(b)(1).

- 74 -

1

**PRAYER FOR RELIEF**

2   WHEREFORE, Relator prays for judgment against Defendants as follows:

3      A.      That Defendants cease and desist from violating 31 U.S.C. §§ 3729–3733, and the
4   relevant parts of each statute applicable to the Plaintiff States as set forth above;

5      B.      That this Court enter judgment against Defendants in an amount equal to three times
6   the amount of damages the United States has sustained because of Defendants' actions, plus a civil
7   penalty of not less than $5,500 and not more than $22,363 for each violation of 31 U.S.C. §§ 3729–
8   3733;

9      C.      That this Court enter judgment against Defendants in an amount equal to three times
10  the amount of damages the State of California has sustained because of Defendants' actions, plus a
11  civil penalty for the maximum amount allowed by statute, for each violation of the California False
12  Claims Act, Cal. Gov't Code §§ 12650–12656;

13     D.      That this Court enter judgment against Defendants in an amount equal to three times
14  the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a
15  civil penalty for the maximum amount allowed by statute, for each violation of the Colorado
16  Medicaid False Claims Act, Colo. Rev. Stat §§ 25.5-4-303.5 to -310;

17     E.      That this Court enter judgment against Defendants in an amount equal to three times
18  the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a
19  civil penalty for the maximum amount allowed by statute, for each violation of the Connecticut False
20  Claims Act, Conn. Gen. Stat. §§ 4-274 to -289;

21     F.      That this Court enter judgment against Defendants in an amount equal to three times
22  the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a
23  civil penalty for the maximum amount allowed by statute, for each violation of the Delaware False
24  Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201–1211;

25     G.      That this Court enter judgment against Defendants in an amount equal to three times
26  the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil
27  penalty for the maximum amount allowed by statute, for each violation of the Florida False Claims
28  Act, Fla. Stat. §§ 68.081–.09;

- 75 -

1          H.      That this Court enter judgment against Defendants in an amount equal to three times
2     the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil
3     penalty for the maximum amount allowed by statute, for each violation of the Georgia False
4     Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 to -168.6;

5          I.       That this Court enter judgment against Defendants in an amount equal to three times
6     the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil
7     penalty for the maximum amount allowed by statute, for each violation of the Hawaii False Claims
8     Act, Haw. Rev. Stat. §§ 661-21 to -31;

9          J.       That this Court enter judgment against Defendants in an amount equal to three times
10    the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil
11    penalty for the maximum amount allowed by statute, for each violation of the Illinois False Claims
12    Act, 740 Ill. Comp. Stat. 175/1–175/8;

13         K.      That this Court enter judgment against Defendants in an amount equal to three times
14    the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil
15    penalty for the maximum amount allowed by statute, for each violation of the Indiana False Claims
16    and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to -18;

17         L.       That this Court enter judgment against Defendants in an amount equal to three times
18    the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil
19    penalty for the maximum amount allowed by statute, for each violation of Iowa False Claims Act,
20    Iowa Code §§ 685.1–.7;

21         M.      That this Court enter judgment against Defendants in an amount equal to three times
22    the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a
23    civil penalty for the maximum amount allowed by statute, for each violation of the Louisiana Medical
24    Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437–:440;

25         N.      That this Court enter judgment against Defendants in an amount equal to three times
26    the amount of damages the State of Maryland has sustained because of Defendants' actions, plus a
27    civil penalty for the maximum amount allowed by statute, for each violation of the Maryland False
28    Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 to -611;

- 76 -

1    O.    That this Court enter judgment against Defendants in an amount equal to three times

2 the amount of damages Commonwealth of Massachusetts has sustained because of Defendants'

3 actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the

4 Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–5O;

5    P.    That this Court enter judgment against Defendants in an amount equal to three times

6 the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a

7 civil penalty for the maximum amount allowed by statute, for each violation of the Michigan

8 Medicaid False Claims Act, Mich. Comp. Laws. §§ 400.601–.615;

9    Q.    That this Court enter judgment against Defendants in an amount equal to three times

10 the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus a

11 civil penalty for the maximum amount allowed by statute, for each violation of the Minnesota False

12 Claims Act, Minn. Stat, §§ 15C.01–.16;

13    R.    That this Court enter judgment against Defendants in an amount equal to three times

14 the amount of damages the State of Montana has sustained because of Defendants' actions, plus a

15 civil penalty for the maximum amount allowed by statute, for each violation of the Montana False

16 Claims Act, Mont. Code Ann. §§ 17-8-401 to -413;

17    S.    That this Court enter judgment against Defendants in an amount equal to three times

18 the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil

19 penalty for the maximum amount allowed by statute, for each violation of the Nevada statute

20 concerning Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–

21 .250;

22    T.    That this Court enter judgment against Defendants in an amount equal to three times

23 the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a

24 civil penalty for the maximum amount allowed by statute, for each violation of the New Jersey False

25 Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 to -18;

26    U.    That this Court enter judgment against Defendants in an amount equal to three times

27 the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus

28 a civil penalty for the maximum amount allowed by statute, for each violation of the New Mexico

- 77 -

1 Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 to -15; and the New Mexico Fraud Against
2 Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14.

3      V.    That this Court enter judgment against Defendants in an amount equal to three times
4 the amount of damages the State of New York has sustained because of Defendants' actions, plus a
5 civil penalty for the maximum amount allowed by statute, for each violation of the New York False
6 Claims Act, N.Y. State Fin. Law §§ 187–194;

7      W.   That this Court enter judgment against Defendants in an amount equal to three times
8 the amount of damages the State of North Carolina has sustained because of Defendants' actions,
9 plus a civil penalty for the maximum amount allowed by statute, for each violation of the North
10 Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 to -618;

11      X.    That this Court enter judgment against Defendants in an amount equal to three times
12 the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a
13 civil penalty for the maximum amount allowed by statute, for each violation of the Oklahoma
14 Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7;

15      Y.    That this Court enter judgment against Defendants in an amount equal to three times
16 the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus
17 a civil penalty for the maximum amount allowed by statute, for each violation of the Rhode Island
18 False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9;

19      Z.    That this Court enter judgment against Defendants in an amount equal to three times
20 the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a
21 civil penalty for the maximum amount allowed by statute, for each violation of the Tennessee
22 Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to -185;

23     AA.   That this Court enter judgment against Defendants in an amount equal to three times
24 the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil
25 penalty for the maximum amount allowed by statute, for each violation of the Texas Medicaid Fraud
26 Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001–.132;

27     BB.   That this Court enter judgment against Defendants in an amount equal to three times
28 the amount of damages the State of Vermont has sustained because of Defendants' actions, plus a

- 78 -

1   civil penalty for the maximum amount allowed by statute, for each violation of the Vermont False

2   Claims Act, Vt. Stat. Ann. tit. 32, §§ 630–642;

3       CC.    That this Court enter judgment against Defendants in an amount equal to three times

4   the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions,

5   plus a civil penalty for the maximum amount allowed by statute, for each violation of the Virginia

6   Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to .19;

7       DD.    That this Court enter judgment against Defendants in an amount equal to three times

8   the amount of damages the State of Washington has sustained because of Defendants' actions, plus a

9   civil penalty for the maximum amount allowed by statute, for each violation of the Washington State

10  Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005–.130;

11      EE.    That this Court enter judgment against Defendants in an amount equal to three times

12  the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a

13  civil penalty for the maximum amount allowed by statute, for each violation of the District of

14  Columbia False Claims Act, D.C. Code §§ 2-381.01 to .09;

15      FF.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C.

16  § 3730(d), and the relevant provisions of each statute applicable to the Plaintiff States as set forth

17  above;

18      GG.    That Relator be awarded all costs of this action;

19      HH.    That the Relator be awarded reasonable attorneys' fees; and

20      II.    That Relator recover such further and other relief as the Court deems just and proper.

21                              **DEMAND FOR JURY TRIAL**

22      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial

23  by jury.

24

25

26

27

28

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR

Dated: October 23, 2018

Joseph R. Saveri (State Bar No. 130064)
Nicomedes Sy Herrera (State Bar No. 275332)
Steven N. Williams (State Bar No. 175489)
Kevin Rayhill (State Bar No. 267496)
Kyla Gibboney (State Bar No. 301441)
V Chai Oliver Prentice (State Bar No. 309807)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

By: _____
        Joseph R. Saveri

*Attorneys for Plaintiffs*

United States of America; the States of California,
Colorado, Connecticut, Delaware, Florida, Georgia,
Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland,
Michigan, Minnesota, Montana, Nevada, New Jersey,
New Mexico, New York, North Carolina, Oklahoma,
Rhode Island, Tennessee, Texas, Vermont, and
Washington; the Commonwealths of Massachusetts
and Virginia; and the District of Columbia, *ex rel.*
Zachary Silbersher

FIRST AMENDED COMPLAINT                                    CASE NO. 4:18-CV-01496-DMR