1 | Nicomedes Sy Herrera (State Bar No. 275332)
Andrew Purdy (State Bar No. 261912)
2 | Laura E. Seidl (State Bar No. 269891)
HERRERA PURDY LLP
3 | 1300 Clay Street, Suite 600
Oakland, California 94612
4 | Telephone: (510) 422-4700

5 | Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
6 | 7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
7 | Telephone: (202) 362-0636

8 | *Attorneys for Plaintiff-Relator Zachary Silbersher*

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA**

11 | **SAN FRANCISCO DIVISION**

12 | UNITED STATES OF AMERICA; STATES
OF CALIFORNIA, COLORADO,
13 | CONNECTICUT, DELAWARE, FLORIDA,
GEORGIA, HAWAII, ILLINOIS, INDIANA,
14 | IOWA, LOUISIANA, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
15 | JERSEY, NEW MEXICO, NEW YORK,
NORTH CAROLINA, OKLAHOMA, RHODE
16 | ISLAND, TENNESSEE, TEXAS, VERMONT,
AND WASHINGTON; THE
17 | COMMONWEALTHS OF
MASSACHUSETTS AND VIRGINIA; AND
18 | THE DISTRICT OF COLUMBIA,

19 | *ex rel.* ZACHARY SILBERSHER,

20 | Plaintiffs,

21 | v.

22 | VALEANT PHARMACEUTICALS
INTERNATIONAL, INC., VALEANT
23 | PHARMACEUTICALS INTERNATIONAL,
SALIX PHARMACEUTICALS, LTD., SALIX
24 | PHARMACEUTICALS, INC., AND DR. FALK
PHARMA GMBH,

25 | Defendants.

Case No.: 3:18-cv-01496-JD

**NOTICE OF SUPPLEMENTAL
AUTHORITY REGARDING
PLAINTIFF-RELATOR'S
OPPOSITIONS TO THE MOTIONS TO
DISMISS BY THE VALEANT
DEFENDANTS AND DR. FALK
PHARMA GMBH [DKTS. 45 & 55]**

Date:          August 8, 2019
Time:          10:00 am
Courtroom:  11, 19th Floor

PLAINTIFF-RELATOR'S NOTICE OF SUPPLEMENTAL AUTHORITY

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL:

Plaintiff-Relator Zachary Silbersher lodges this Notice of Supplemental Authority in support of Plaintiff-Relator's oppositions (Dkts. 45 & 55) to the motions to dismiss filed by the Valeant defendants and Dr. Falk Pharma GmbH (Dkts. 36 & 43).

1. Attached as **Exhibit A** is an Information filed on May 30, 2019 by the United States against Heritage Pharmaceuticals Inc., 2:19-cv-00316-RBS (E.D. Pa.). The Information charges the defendant pharmaceutical manufacturer under Section 1 of the Sherman Act, 15 U.S.C. § 1, for fixing prices, allocating customers, and engaging in conduct intended to suppress or eliminate competition.

2. Attached as **Exhibit B** is a Settlement Agreement dated May 30, 2019, between the United States, acting through the Department of Health and Human Services, the Defense Health Agency, and the Department of Veterans Affairs, on the one hand; and Heritage Pharmaceuticals Inc., on the other hand. The Settlement Agreement provides for the execution of a Deferred Prosecution Agreement in connection with Heritage's alleged conspiracy "to suppress and eliminate competition" as set forth in the Information. (Ex. B, ¶ B, at 1) In consideration of the payments by Heritage under the Settlement Agreement, the United States agreed to release its civil and administrative monetary claims under the False Claims Act, 31 U.S.C. §§ 3729-3733, in connection with Heritage's anticompetitive conduct suppressing and eliminating competition with respect to the drugs for which it received payment or reimbursement from the government. (Ex. B, ¶ 2, at 2-3)

3. The foregoing supplemental authority are relevant to whether the government views false claims based on inflated prices for pharmaceutical products resulting from the suppression and elimination of competition as "material" to its payment decisions within the meaning of the False Claims Act.

1

Dated: July 3, 2019

HERRERA PURDY LLP

2

3

By:  */s/ Nicomedes Sy Herrera*
         Nicomedes Sy Herrera

4

Nicomedes Sy Herrera (State Bar No. 275332)
Laura E. Seidl (State Bar No. 269891)
HERRERA PURDY LLP

5

1300 Clay Street, Suite 600
Oakland, California 94612

6

Telephone: (510) 422-4700
Facsimile:  (855) 969-2050

7

Email:  NHerrera@HerreraPurdy.com
        LSeidl@HerreraPurdy.com

8

9

Andrew Purdy (State Bar No. 261912)
HERRERA PURDY LLP
4590 MacArthur Boulevard, Suite 500

10

Newport Beach, California 92660
Telephone: (949) 791-9700

11

Email:  APurdy@HerreraPurdy.com

12

13

GOLDSTEIN & RUSSELL, P.C.

14

Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850

15

Bethesda, Maryland 20814
Telephone: (202) 362-0636

16

Email: TSingh@GoldsteinRussell.com

17

18

*Attorneys for Plaintiff-Relator Zachary Silbersher*

19

20

21

22

23

24

25

26

27

28

PLAINTIFF-RELATOR'S NOTICE OF SUPPLEMENTAL AUTHORITY

# Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: |
| v. | ) | |
| | ) | Violation: 15 U.S.C. § 1 |
| | ) | (conspiracy in restraint of trade)  (1 count) |
| HERITAGE PHARMACEUTICALS INC., | ) | |
| | ) | Filed: |
| Defendant. | ) | |

## INFORMATION

15 U.S.C. § 1 (Conspiracy in Restraint of Trade)

The United States of America, acting through its attorneys, charges that:

### DEFENDANT AND CO-CONSPIRATORS

1.      HERITAGE PHARMACEUTICALS INC. is hereby made a defendant on the charges contained in this Information.

2.      During the period covered by this Information, the defendant was a corporation organized and existing under the laws of Delaware and with its principal place of business in Eatontown, New Jersey.

3.      During the period covered by this Information, the defendant was a generic pharmaceutical company engaged in the acquisition, licensing, production, marketing, sale, and distribution of generic pharmaceutical products, including glyburide, and was engaged in the sale of those drugs in the United States.  Glyburide is a generic drug used in the treatment of diabetes.

4.     Various corporations and individuals, not made defendants in this Information, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance thereof.

5.     Whenever in this Information reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## DESCRIPTION OF THE OFFENSE

6.     From in or about April 2014 and continuing until at least December 2015, the exact dates being unknown to the United States, in the Eastern District of Pennsylvania and elsewhere, the defendant and co-conspirators knowingly entered into and engaged in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including glyburide, a purpose of which was to allocate customers and fix and maintain prices of glyburide sold in the United States.  The combination and conspiracy engaged in by the defendant and co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

7.     The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial terms of which were to allocate customers and fix and maintain prices for glyburide sold in the United States.

2

## MEANS AND METHODS OF THE CONSPIRACY

8.     For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do, including, among other things:

   (a)     participated in meetings, conversations, and communications with co-conspirators to discuss the sale of glyburide in the United States;

   (b)     participated in meetings, conversations, and communications with co-conspirators to allocate customers related to the sale of glyburide sold in the United States;

   (c)     agreed during those meetings, conversations, and communications to allocate customers for glyburide sold in the United States;

   (d)     agreed during those meetings, conversations, and communications on price strategies, and exchanged information about prices, to accomplish the agreed-upon allocations of customers for glyburide sold in the United States;

   (e)     submitted price proposals and issued price announcements in accordance with the agreements reached;

   (f)     sold glyburide in the United States and elsewhere at collusive and noncompetitive prices; and

   (g)     accepted payment for glyburide sold in the United States at collusive and noncompetitive prices.

## TRADE AND COMMERCE

9.    During the time period covered by this Information, the business activities of the defendant and its co-conspirators were within the flow of, and substantially affected, interstate trade and commerce.  For example, the defendant sold substantial quantities of generic pharmaceutical products, including glyburide, to customers located in various states in the United States.  In addition, substantial quantities of equipment and supplies necessary to the production and distribution of generic pharmaceutical products sold by the defendant and its co-conspirators, including glyburide, as well as payments for generic pharmaceutical products sold by the defendant and its co-conspirators, including glyburide, traveled in interstate trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

Dated:

MAKAN DELRAHIM
Assistant Attorney General

KALINA M. TULLEY
Acting Chief, Chicago Office

ANDREW C. FINCH
Principal Deputy Assistant Attorney General

RICHARD A. POWERS
Deputy Assistant Attorney General

MARVIN N. PRICE, JR.
Director of Criminal Enforcement

CHESTER C. CHOI
Trial Attorney, Chicago Office

Antitrust Division
United States Department of Justice

Antitrust Division
United States Department of Justice
209 S. LaSalle Street, Suite 600
Chicago, IL 60302
(312) 984-7200

WILLIAM M. MCSWAIN
United States Attorney for the
Eastern District of Pennsylvania

# Exhibit B

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS); the Defense Health Agency (DHA), acting on behalf of the TRICARE program; and the United States Department of Veterans Affairs (VA) (collectively, the "United States"), and Heritage Pharmaceuticals Inc. ("Heritage") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

### RECITALS

A.    Heritage is a pharmaceutical manufacturer located in New Jersey and incorporated in Delaware.  Heritage manufactures the drugs listed on Attachment A to this Agreement.

B.    Heritage will execute a Deferred Prosecution Agreement ("DPA") with the Antitrust Division of the United States Department of Justice in connection with a one-count criminal Information in the United States District Court for the Eastern District of Pennsylvania ("the Criminal Action").  The Information will charge Heritage with conspiring to suppress and eliminate competition by allocating customers, rigging bids, and fixing and maintaining prices in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

C.    The United States contends that Heritage submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); the TRICARE Program, 10 U.S.C. §§ 1071-1110b ("TRICARE"); and caused purchases by the Department of Veterans Affairs, Veterans Health Administration, 38 U.S.C. Chapter 17.

D.     The United States contends that it has certain civil claims against Heritage arising from (1) its payment and receipt of remuneration through arrangements on price, supply, and allocation of customers with other pharmaceutical manufacturers for the generic drugs listed in Attachment A (the "Covered Drugs") in return for arranging for the sale of the Covered Drugs, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(B); and (2) its sale of Covered Drugs which resulted in claims submitted to or purchases by federal healthcare programs during the time periods identified in Attachment A.  That conduct is referred to below as the "Covered Conduct."

E.     With the exception of any admissions made by Heritage in connection with the DPA in the Criminal Action, this Settlement Agreement is neither an admission of liability by Heritage nor a concession by the United States that its claims are not well founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1.     Heritage shall pay to the United States $7,132,915 ("Settlement Amount"), of which $3,444,236 is restitution, plus interest on the Settlement Amount at a rate of 3.125 percent accruing from February 20, 2019, no later than seven days after the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice.

2.     Subject to the exceptions in Paragraph 5 (concerning excluded claims) below, and conditioned upon Heritage's full payment of the Settlement Amount, the United States releases Heritage, together with its predecessors, current and former parents, direct and indirect affiliates, divisions, subsidiaries, successors, transferees, heirs, and assigns from any civil or administrative

monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

3.      In consideration of the obligations of Heritage in this Agreement and conditioned upon Heritage's full payment of the Settlement Amount, the OIG-HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Heritage under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the Covered Conduct, except as reserved in this Paragraph and in Paragraph 5 (concerning excluded claims), below.  The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Heritage from Medicare, Medicaid, and other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct.  Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 5, below.

4.      In consideration of the obligations of Heritage set forth in this Agreement, and conditioned upon Heritage's full payment of the Settlement Amount, DHA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from the TRICARE Program against Heritage under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in this Paragraph and in Paragraph 5 (concerning excluded claims), below. DHA expressly reserves authority to exclude Heritage from the TRICARE Program under 32 C.F.R. §§ 199.9 (f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii) (mandatory exclusion), based upon the

3

Covered Conduct.  Nothing in this Paragraph precludes DHA or the TRICARE Program from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 5, below.

5.      Notwithstanding the releases given in paragraphs 2-4 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

        a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

        b.      Any criminal liability;

        c.      Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs and the suspension and debarment rights of any federal agency;

        d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

        e.      Any liability based upon obligations created by this Agreement;

        f.      Any liability of individuals;

        g.      Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

        h.      Any liability for failure to deliver goods or services due; and

        i.      Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

6.      Heritage waives and shall not assert any defenses Heritage may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth

Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

7.      Heritage fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Heritage has asserted, could have asserted, or may assert in the future against the United States, and its agencies, officers, agents, employees, and servants related to the Covered Conduct and the United States' investigation and prosecution thereof.

8.      The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare or TRICARE contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered Conduct; and Heritage agrees not to resubmit to any Medicare or TRICARE contractor or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

9.      Heritage agrees to the following:

a.      Unallowable Costs Defined:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Heritage, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1)      the matters covered by this Agreement and the DPA;

(2)     the United States' audit(s) and civil and any criminal investigation(s) of
the matters covered by this Agreement;

(3)     Heritage's investigation, defense, and corrective actions undertaken in
response to the United States' audit(s) and civil and any criminal
investigation(s) in connection with the matters covered by this Agreement
(including attorney's fees);

(4)     the negotiation and performance of this Agreement and the DPA; and

(5)     the payment Heritage makes to the United States pursuant to this
Agreement,

are unallowable costs for government contracting purposes and under the Medicare Program,
Medicaid Program, TRICARE Program, Federal Employees Health Benefits Program (FEHBP)
or any program of the VA (hereinafter referred to as Unallowable Costs).  However, nothing in
paragraph 9.a.(6) affects the status of costs that are not allowable based on any other authority
applicable to Heritage.

b.      Future Treatment of Unallowable Costs:  Unallowable Costs shall be
separately determined and accounted for in nonreimbursable cost centers by Heritage, and
Heritage shall not charge such Unallowable Costs directly or indirectly to any contracts with the
United States or any State Medicaid program, or seek payment for such Unallowable Costs
through any cost report, cost statement, information statement, or payment request submitted by
Heritage or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, FEHBP or
VA Programs.

c.      Treatment of Unallowable Costs Previously Submitted for Payment:
Heritage further agrees that within 90 days of the Effective Date of this Agreement it shall
identify to applicable Medicare, TRICARE or VA fiscal intermediaries, carriers, and/or

contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Heritage or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Heritage agrees that the United States, at a minimum, shall be entitled to recoup from Heritage any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Heritage or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Heritage or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Heritage's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

10.     Heritage agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, Heritage shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights

7

and privileges of such individuals. Heritage further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

11.   This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for elsewhere in this Agreement.

12.   Heritage agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

13.   Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

14.   Each Party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

15.   This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Eastern District of Pennsylvania. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

16.   This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

17.   The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

8

18.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

19.     This Agreement is binding on Heritage's successors, transferees, heirs, and assigns.

20.     All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

21.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA


WILLIAM M. McSWAIN
U.S. Attorney, E.D. Pa.

GREGORY B. DAVID
Chief, Civil Division, E.D. Pa.


CHARLENE KELLER FULLMER
Deputy Chief, Civil Division, E.D. Pa.

ANTHONY D. SCICCHITANO
LANDON Y. JONES III
Asst. U.S. Attorneys, E.D. Pa.


DATED: 5/30/19      BY:

JENNIFER L. CIHON
LAURIE A. OBEREMBT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice


DATED: 05/29/2019 BY:

LISA M. RE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services


DATED: 05/29/2019      BY:

BLEY.PAUL.NICHO Digitally signed by
LAS.1099873821 BLEY.PAUL.NICHOLAS.109987382
1
Date: 2019.05.29 10:08:05 -04'00'

LEIGH A. BRADLEY
for   General Counsel
Defense Health Agency
United States Department of Defense

10

HERITAGE PHARMACEUTICALS INC.


DATED: May 28, 2019      BY:

GARY J. RUCKELSHAUS
Senior Vice President, General Counsel &
Chief Compliance Officer
Heritage Pharmaceuticals Inc.


DATED: 5/28/19      BY:

SCOTT HAMMOND
JONATHAN M. PHILLIPS
JEREMY ROBISON
Counsel for Heritage Pharmaceuticals Inc.

## ATTACHMENT A

| | | | | | |
|---|---|---|---|---|---|
| **ACETAZOLAMIDE ER** | 23155012001 | 500MG | 100CT | 6/1/2014 | 12/31/2015 |
| **DOXYCYCLINE HYCLATE DR** | 23155014101 | 75MG | 100CT | 4/1/2013 | 12/31/2015 |
| | 23155014201 | 100MG | 100CT | 4/1/2013 | 12/31/2015 |
| | 23155014301 | 150MG | 100CT | 4/1/2013 | 12/31/2015 |
| **DOXYCYCLINE MONO** | 23155013301 | 50MG | 100CT | 3/1/2013 | 12/31/2015 |
| | 23155013401 | 75MG | 100CT | 3/1/2013 | 12/31/2015 |
| | 23155013525 | 100MG | 50CT | 3/1/2013 | 12/31/2015 |
| | 23155013603 | 150MG | 30CT | 3/1/2013 | 12/31/2015 |
| **FOSINOPRIL HCL/HCTZ** | 23155006001 | 10/12.5MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155006101 | 20/12.5MG | 100CT | 6/1/2014 | 12/31/2015 |
| **GLIP MET** | 23155011501 | 2.5MG/250MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155011601 | 2.5MG/500MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155011701 | 5MG/500MG | 100CT | 6/1/2014 | 12/31/2015 |
| **GLYBURIDE** | 23155005601 | 1.25MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155005701 | 2.5MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155005801 | 5MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155005810 | 5MG | 1000CT | 6/1/2014 | 12/31/2015 |
| **GLYBURIDE-METFORMIN** | 23155023301 | 1.25/250MG | 100CT | 4/1/2014 | 6/30/2014 |
| | 23155023305 | 1.25/250MG | 500CT | 4/1/2014 | 6/30/2014 |
| | 23155023401 | 2.5/500MG | 100CT | 4/1/2014 | 6/30/2014 |
| | 23155023405 | 2.5/500MG | 500CT | 4/1/2014 | 6/30/2014 |
| | 23155023501 | 5/500MG | 100CT | 4/1/2014 | 6/30/2014 |
| | 23155023505 | 5/500MG | 500CT | 4/1/2014 | 6/30/2014 |
| **HYDRALAZINE** | 23155000101 | 10MG | 100CT | 8/1/2014 | 12/31/2015 |
| | 23155000110 | 10MG | 1000CT | 8/1/2014 | 12/31/2015 |
| | 23155000201 | 25MG | 100CT | 8/1/2014 | 12/31/2015 |
| | 23155000210 | 25MG | 1000CT | 8/1/2014 | 12/31/2015 |
| | 23155000301 | 50MG | 100CT | 8/1/2014 | 12/31/2015 |
| | 23155000310 | 50MG | 1000CT | 8/1/2014 | 12/31/2015 |
| | 23155000401 | 100MG | 100CT | 8/1/2014 | 12/31/2015 |
| **LEFLUNOMIDE** | 23155004303 | 10MG | 30CT | 6/1/2014 | 12/31/2015 |
| | 23155004403 | 20MG | 30CT | 6/1/2014 | 12/31/2015 |
| **MEPROBAMATE** | 23155012801 | 200MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155012901 | 400MG | 100CT | 6/1/2014 | 12/31/2015 |
| **METHIMAZOLE** | 23155007001 | 5MG | 100CT | 4/1/2014 | 6/30/2014 |
| | 23155007101 | 10MG | 100CT | 4/1/2014 | 6/30/2014 |
| **METRONIDAZOLE** | 23155006401 | 250MG | 100CT | 6/1/2014 | 12/31/2015 |
| | 23155006405 | 250MG | 500CT | 6/1/2014 | 12/31/2015 |
| | 23155006501 | 500MG | 100CT | 6/1/2014 | 12/31/2015 |

|  | 23155006505 | 500MG | 500CT | 6/1/2014 | 12/31/2015 |
|  | 23155006625 | 375MG | 50CT | 6/1/2014 | 12/31/2015 |
| NIMODIPINE | 23155010800 | 30MG | 100CT | 3/1/2015 | 12/31/2015 |
|  | 23155010800 | 30MG | 100CT | 6/1/2012 | 1/1/2013 |
|  | 23155010830 | 30MG | 30CT | 3/1/2015 | 12/31/2015 |
|  | 23155010830 | 30MG | 30CT | 6/1/2012 | 1/1/2013 |
| NYSTATIN | 23155005101 | 500000IU | 100CT | 6/1/2014 | 12/31/2015 |
| PAROMOMYCIN | 23155003801 | 250MG | 100CT | 6/1/2014 | 12/31/2015 |
| THEOPHYLLINE ER | 23155006201 | 300MG | 100CT | 6/1/2014 | 12/31/2015 |
|  | 23155006301 | 450MG | 100CT | 6/1/2014 | 12/31/2015 |
| VERAPAMIL | 23155002601 | 80MG | 100CT | 4/1/2014 | 6/30/2014 |
|  | 23155002701 | 120MG | 100CT | 4/1/2014 | 6/30/2014 |
|  | 23155005901 | 40MG | 100CT | 4/1/2014 | 6/30/2014 |