1  Nicomedes Sy Herrera (State Bar No. 275332)
   Andrew Purdy (State Bar No. 261912)
2  Laura E. Seidl (State Bar No. 269891)
   HERRERA PURDY LLP
3  1300 Clay Street, Suite 600
   Oakland, California 94612
4  Telephone: (510) 422-4700

5  Tejinder Singh
   GOLDSTEIN & RUSSELL, P.C.
6  7475 Wisconsin Avenue, Suite 850
   Bethesda, Maryland 20814
7  Telephone: (202) 362-0636

8  *Attorneys for Plaintiff-Relator Zachary Silbersher*

9            **UNITED STATES DISTRICT COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA**

11             **SAN FRANCISCO DIVISION**

12  UNITED STATES OF AMERICA; STATES OF        Case No.: 3:18-cv-01496-JD
    CALIFORNIA, COLORADO, CONNECTICUT,
13  DELAWARE, FLORIDA, GEORGIA, HAWAII,
    ILLINOIS, INDIANA, IOWA, LOUISIANA,
14  MICHIGAN, MINNESOTA, MONTANA,
    NEVADA, NEW JERSEY, NEW MEXICO,
15  NEW YORK, NORTH CAROLINA,                  **STATEMENT OF RECENT DECISION**
    OKLAHOMA, RHODE ISLAND,                    **RELATING TO THE MOTIONS TO**
16  TENNESSEE, TEXAS, VERMONT, AND             **DISMISS BY THE VALEANT**
    WASHINGTON; THE COMMONWEALTHS              **DEFENDANTS AND DR. FALK**
17  OF MASSACHUSETTS AND VIRGINIA; AND         **PHARMA GMBH [DKTS. 36 & 43] AND**
    THE DISTRICT OF COLUMBIA,                  **RELATOR'S OPPOSITIONS THERETO**
18                                             **[DKTS. 45 & 55)**
    *ex rel.* ZACHARY SILBERSHER,
19
              Plaintiffs,
20
           v.                                  Date:        August 8, 2019
21                                             Time:        10:00 am
    VALEANT PHARMACEUTICALS                    Courtroom:   11, 19th Floor
22  INTERNATIONAL, INC., VALEANT
    PHARMACEUTICALS INTERNATIONAL,
23  SALIX PHARMACEUTICALS, LTD., SALIX
    PHARMACEUTICALS, INC., AND DR. FALK
24  PHARMA GMBH,

25            Defendants.

26

27

28
                                                      Case No. 3:18-cv-01496-JD

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL:

Plaintiff-Relator Zachary Silbersher lodges this Statement of Recent Decision in support of Plaintiff-Relator's oppositions (Dkts. 45 & 55) to the motions to dismiss filed by the Valeant defendants and Dr. Falk Pharma GmbH (Dkts. 36 & 43).

1.     Attached as **Exhibit A** is the recent decision in *U.S.* ex rel. *Integra Med Analytics LLC v. Providence Health & Servs.*, No. CV 17-1694 PSG (SSX), 2019 WL 3282619 (C.D. Cal. July 16, 2019).

2.     The foregoing supplemental authority is primarily relevant to Defendants' public disclosure arguments (Valeant MTD, Dkt. 36, at 10-12;  Dr. Falk MTD, Dkt. 43, at 1) In particular, Defendants argue that: (a) scientific studies published in an online library; and (b) patent prosecution dockets available on a government Website constitute public disclosure *via* "news media" under 31 U.S.C. § 3730(e)(4)(A)(iii). (Valeant MTD, Dkt. 36, at 11). The *Integra* court assessed and determined similar arguments at 2019 WL 3282619, **11-14. The *Integra* court also analyzed the requirements for determining when a report that a representative of a government agency specifically prepares in response to a particular inquiry qualifies as a "Federal report" under § 3730(e)(4)(A)(ii). *See* 2019 WL 3282619, at *6. Finally, the *Integra* court discussed whether publication of a case docket on the Internet—such as through PACER or some other private source such as Twitter—is a public disclosure. *See Integra*, 2019 WL 3282619, at **11-12.

3.     The *Integra* decision also includes relevant holdings concerning (a) the required specificity for pleading False Claims Act violations under Rule 9, *see* 2019 WL 3282619, at *21; and (b) scienter, *see* 2019 WL 3282619, at *22.

PLAINTIFF-RELATOR'S STATEMENT OF RECENT DECISION

1    Dated: July 30, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HERRERA PURDY LLP


By:  */s/ Nicomedes Sy Herrera*
            Nicomedes Sy Herrera

Nicomedes Sy Herrera (State Bar No. 275332)
Laura E. Seidl (State Bar No. 269891)
HERRERA PURDY LLP
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
Facsimile:  (855) 969-2050
Email:  NHerrera@HerreraPurdy.com
         LSeidl@HerreraPurdy.com

Andrew Purdy (State Bar No. 261912)
HERRERA PURDY LLP
4590 MacArthur Boulevard, Suite 500
Newport Beach, California 92660
Telephone: (949) 791-9700
Email:  APurdy@HerreraPurdy.com


GOLDSTEIN & RUSSELL, P.C.
Tejinder Singh (*Pro Hac Vice*)
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
Telephone: (202) 362-0636
Email: TSingh@GoldsteinRussell.com


*Attorneys for Plaintiff-Relator Zachary Silbersher*

PLAINTIFF-RELATOR'S STATEMENT OF RECENT DECISION

# Exhibit A

2019 WL 3282619
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

United States ex rel. Integra Med Analytics LLC
v.
Providence Health and Services, et al.

Case No. CV 17-1694 PSG (SSx)
|
Filed 07/16/2019

**Attorneys and Law Firms**

Wendy Hernandez, Deputy Clerk, Attorneys Present for
Plaintiff(s): Not Present

Not Reported, Court Reporter, Attorneys Present for
Defendant(s): Not Present

**Proceedings (In Chambers): Order GRANTING in part
and DENYING in part Defendants' motions to dismiss**

The Honorable Philip S. Gutierrez, United States District
Judge

**\*1** Before the Court are a motion to dismiss filed by
Defendant Providence Health & Services ("Providence" or
"Providence H&S") and its affiliate hospitals [1] (collectively
the "Hospital Defendants"), *see* Dkt. # 56 ("*Hosp. Mot.*"),
and a motion to dismiss filed by Defendant J.A. Thomas
and Associates, Inc. ("JATA"), *see* Dkt. # 57 ("*JATA Mot.*").
Relator Integra Med Analytics LLC ("Relator" or "Integra")
has opposed both motions. *See* Dkts. # 61 ("*Hosp. Opp.*"),
#62 ("*JATA Opp.*"). Defendants have filed replies. *See* Dkts.
# 67 ("*JATA Reply*"), # 68 ("*Hosp. Reply*"). The Court held
a hearing on this matter on February 13, 2019. Following
the hearing, the parties submitted supplemental briefs at the
Court's request. *See* Dkt. # 77 ("*Def. Supp.*"); #78 ("*Integra
Supp.*"). The Court then held a second hearing on July 1, 2019.
Having considered the moving papers and the arguments
made at the hearings, the Court **GRANTS** the motions in part
and **DENIES** them in part.

I. Background

In this case, Relator Integra alleges that Defendants conspired
to submit, and did submit, false claims to Medicare in
violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq.

A. Factual Background

Defendant Providence H&S is "one of the nation's largest
health systems, operating 34 hospitals and 600 clinics
across five states." *Second Amended Complaint*, Dkt. # 39
("*SAC*"), ¶ 2. The seven other Hospital Defendants are
affiliates of Providence H&S. *Id.* Providence H&S's business
relies in large part on reimbursements from Medicare. For
example, of Providence H&S's $14.4 billion in revenue
in 2015, approximately $6.2 billion came from Medicare
reimbursements. *Id.*

Medicare pays hospitals on a "per-discharge" basis—that is,
it makes a single payment for each inpatient hospital stay.
*Id.* ¶ 21. This payment is "designed to cover the average
cost of resources needed to treat each patient's needs." *Id.*
As part of the payment calculation, Medicare assigns each
hospital discharge to a "diagnosis related group" ("DRG").
*Id.* According to Relator, the DRG "is the single most
impactful factor in determining the average payment for a
claim." *Id.* The DRG is primarily determined by three types
of codes: (1) the principal diagnosis code (defined as the
"condition established after study to be chiefly responsible
for occasioning the admission of the patient to the hospital
for care"), (2) the surgical procedure code (representing any
surgical procedures performed), and (3) secondary diagnosis
codes (which represent "all conditions that coexist at the time
of admission, that develop subsequently, or that affect the
treatment received and/or the length of the stay"). *Id.* ¶ 22.

These codes produce more than 330 base DRGs. *Id.* ¶ 23.
Adding another level of complexity, each DRG can have
up to three severity levels: (1) "without Complication or
Major Complication," (2) "with Complication," or (3) "with
Major Complication." *Id.* The severity level of a DRG is
determined by the secondary diagnoses present. *Id.* Each year,
the Centers for Medicare and Medicaid Services ("CMS"),
the federal agency that administers the Medicare program,
publishes a list of codes that, when added to a claim, result
in the claim being considered a Complication or Comorbidity
(a "CC") or a Major Complication or Comorbidity ("MCC").
*Id.* Adding a CC or MCC code to a claim can increase the
severity level of the DRG from the base level of "without
Complication or Major Complication" to the higher levels
of "with Complication" or "with Major Complication." *Id.*
Importantly, increasing the severity level can increase the

amount of the reimbursement that the hospital receives from Medicare. For example, Relator alleges that adding a CC secondary code can increase the value of the reimbursement by $1,000 to $10,000 and adding an MCC secondary code can increase the value by $1,000 to $25,000. *Id.*

**\*2** To translate the clinical language that medical professionals use during treatment into codes that satisfy Medicare's coding standards, the Hospital Defendants, like many hospitals, have a "clinical documentation improvement" ("CDI") program. *Id.* ¶ 24. The Hospital Defendants retained Defendant JATA to assist with that program. *Id.* JATA is a company that provides CDI consulting services, purporting to help hospitals "ensure the accuracy of clinical documentation reflecting the appropriate severity of illness." *Id.*

Relator alleges that JATA and the Hospital Defendants worked together to train doctors to describe medical conditions with language that would support adding secondary CCs and MCCs, thereby allowing the Hospital Defendants to increase the severity level of the DRGs they reported to Medicare, leading to larger reimbursements. *Id.* Because the "documentation tips" that JATA provided to Providence doctors "often bore no relation to the clinical realities," Relator alleges that they resulted in "upcoding" of CCs and MCCs—in other words, adding CCs and MCCs to claims when the clinical circumstances did not merit such designations—leading to Defendants receiving more money from Medicare than they were entitled to.

Integra is not a prototypical False Claims Act relator. Parties bringing *qui tam* cases under the FCA are often insiders who claim knowledge of false claims from their previous relationships and/or interactions with the defendant. *See United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 119 (D.D.C. 2003). Integra was not an insider of Defendants or the Government and has no first-hand knowledge of the upcoding that it alleges. Instead, it bases its claims on analysis it performed on data it received from CMS regarding inpatient claims from short term acute care hospitals as well as information it has gathered about JATA's business practices. *See SAC* ¶ 49.

Integra's analysis compared the rate at which the Hospital Defendants submitted claims with certain MCCs accompanying certain diagnoses to the rates at which those MCCs accompanied the same diagnoses in claims submitted by other hospitals. *See id.* Integra describes its methodology

as follows. It first formed groupings corresponding to 312 specific principal diagnosis codes. *Id.* ¶ 50. For each of these diagnosis codes—what Integra refers to as comparative "bins"—it compared the rates at which specific MCCs were used at hospitals in the Providence system to the usage rates in other acute care inpatient hospitals. *Id.* "To ensure that only the truly fraudulent claims were analyzed," Integra excluded any diagnosis codes for which adding an MCC did not increase the value of the Medicare reimbursement.[2] *See id.* ¶ 50 and n.8. To account for natural variation in usage among hospitals and to "further ensure that it identified truly abnormal usage" of MCCs, Integra labeled the use of a particular MCC a false claim only when it was either (1) used at more than twice the national rate or (2) at a rate three percentage points higher than in other hospitals. *Id.* ¶ 51.

Using this methodology, Integra alleges that it "identified 271 combinations of principal diagnosis codes and Misstated MCCs in which Providence excessively upcodes." *Id.* Its claims in this case focus on three categories of secondary MCC codes that it alleges the Hospital Defendants, in consultation with JATA, used to increase the value of their claims: (1) encephalopathy[3] (including toxic encephalopathy), (2) respiratory failure (including pulmonary insufficiency), and (3) severe malnutrition. *Id.* ¶ 55. As one example of the disparity Relator alleges between Providence's claims and the claims of other hospitals, among Providence's more than 11,000 claims involving a "Fracture of the Neck of the Femur" (i.e. the hip), 12.34 percent of them were coded with a secondary MCC of encephalopathy. *Id.* ¶ 52. In contrast, of the more than 1.1 million femoral neck fracture claims submitted by other hospitals, only 4.46 percent of them were coded with a secondary MCC of encephalopathy. *Id.* In other words, Integra alleges that the Hospital Defendants coded encephalopathy in conjunction with femoral neck fracture claims at a rate 2.77 times higher than comparable hospitals and "profited nearly $7,500 each time it did so." *Id.*

**\*3** Relator alleges that this upcoding was driven in part by tip sheets created by Defendant JATA, which trained Providence doctors on how to document conditions so that the medical records would support adding an MCC to the diagnosis code. *Id.* ¶ 29. For example, one tip sheet informed doctors that encephalopathy is an MCC, whereas "delirium" is not a CC unless specified as a certain type, and "altered MS [mental state] is a *symptom*—not even a CC." *Id.* The same sheet also informed doctors that "acute respiratory failure" is an MCC, whereas "respiratory distress" is "low severity." *Id.* And another tip sheet instructed doctors to "document *severe*

*malnutrition*—it not only adds severity as an MCC, it will likely prolong the post-op course thereby aligning the illness severity with length of stay." *Id.* ¶ 30. In short, these tip sheets informed Providence doctors of the diagnoses that would support adding CCs and MCCs, and therefore potentially increase the hospitals' reimbursements. Relator alleges that the physicians then went on to use the MCCs emphasized in the JATA tips sheets at a rate disproportionate to comparable hospitals. *See id.* ¶ 41.

Relator also alleges that Defendants' practice of using "leading queries" led to miscoding of these MCCs. Hospitals may only add CCs or MCCs to a claim when information supporting them is sufficiently documented in the patient's medical files. *Id.* ¶ 32. Relator alleges that Providence's CDI specialists sent "queries" to doctors that were phrased in a manner "designed to push them to change their initial assessments in ways that would justify coding of a CC or MCC." *Id.* The practice of querying doctors in a way that directs them to specific diagnoses allegedly failed to conform to industry standards. *Id.* ¶ 33 n.6. Relator also alleges that Defendants pressured doctors "to document for higher severity to the point of acquiescence." *Id.* ¶ 38. JATA's regional director allegedly taught Providence doctors that the only way to avoid being queried would be to initially document an MCC. *Id.* This sometimes led to contradictory medical records as doctors initially documented a less severe condition before "hastily adding [an MCC] to the bottom of the chart." *Id.* ¶ 38. Relator alleges that the pressure Defendants put on doctors predictably led them to code MCCs at excessive rates. *Id.* ¶ 39.

### B. Procedural History

Relator brings this case under the FCA, which allows individuals having knowledge of false claims submitted to the federal government to bring suit on behalf of the government, and, if successful, to receive a percentage of the money recovered. *See* 31 U.S.C. § 3730(b). It asserts two causes of action, both against all Defendants:

First Cause of Action: Violation of the FCA, arising from falsifying patient diagnoses, complications, and comorbidities. This also contains allegations of a "reverse" FCA claim and a claim of a conspiracy to violate the FCA. *SAC* ¶¶ 129–33.

Second Cause of Action: Violation of the FCA, arising from the Defendants' violations of the Anti-Kickback Statute. *Id.* ¶¶ 134–42.

The United States declined to exercise its statutory right to intervene and prosecute the action. *See* Dkt. # 28; 31 U.S.C. § 3730(b)(4). Defendants now move to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the allegations in the Second Amended Complaint ("SAC") fail to state a claim upon which relief can be granted. *See generally Hosp. Mot.*; *JATA Mot.*

### II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

**\*4** Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about the statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud.

### III. Judicial Notice

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)

2019 WL 3282619

Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 8 of 25

JATA has asked the Court to take judicial notice of thirty-three exhibits it has proffered with its motion to dismiss. *JATA Request for Judicial Notice*, Dkt. # 59 ("*RJN*").

"Generally, the scope of review on a motion to dismiss ... is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see also Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."). Courts may also, however, consider "attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014).

Under *Federal Rule of Evidence 201*, the court "can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG (POR), 2009 WL 6598891, at *2 (S.D. Cal. Dec. 23, 2009)); *see also L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 937–38 (C.D. Cal. 2011) (noting that public records from the internet are "generally considered not to be subject to reasonable dispute") (internal quotation marks omitted).

The documents for which JATA seeks judicial notice fall into three categories: (1) documents incorporated by reference into the SAC, (2) government documents available from reliable sources, and (3) other documents available on the internet for which JATA asks the Court only to take judicial notice of the fact that they are publicly available. *See RJN*, Addendum A.

The Court will discuss the online sources in the third category further below. As for the other two categories, Relator has not opposed JATA's request. In light of this non-opposition and the fact that many of the documents are not helpful in deciding the current motions, the Court does not analyze here whether each document is a proper subject for judicial notice. Rather, to the extent the Court relies on a document, it finds that judicial notice is proper and therefore **GRANTS** judicial notice as to that document.

## IV. Discussion

Defendants' arguments for dismissal fall into five categories: (1) Relator's suit is barred by the FCA's "public disclosure bar"; (2) Relator has failed to adequately allege elements of

its FCA claim (falsity, materiality, and scienter) under *Federal Rules of Civil Procedure 9(b)* and *12(b)(6)*; (3) Relator has not adequately pleaded a "reverse FCA" claim; (4) Relator has not adequately pleaded a conspiracy to violate the FCA; and (5) Relator has not adequately pleaded an FCA claim based on violation of the Anti-Kickback Statute. *See generally Hosp. Mot.*; *JATA Mot.* [4] The Court addresses each in turn.

### A. Public Disclosure Bar

**\*5** As explained above, Integra is not a prototypical FCA relator in that it had no insider relationship with Defendants. This on its own, however, is not enough to bar its suit. While "[i]t is generally contemplated than an FCA relator will be an insider ... the statute contains no such requirement." *McGready*, 251 F. Supp. at 119. Instead, "[a]ny person who can muster significant evidence of fraud, that is not publicly disclosed, and be the first to file a complaint alleging that fraud, may maintain a *qui tam* suit." *Id.*

Whether information has previously been publicly disclosed is a key factor in determining whether a relator may bring suit under the FCA. If there has been a public disclosure, the suit may be maintained only if the relator was the "original source" of the information. *See* 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section ... if substantially the same allegations or transactions as in the action or claim were publicly disclosed [through specified channels].."); *United States ex rel. Lee v. Corinthian Colls.*, No. CV 07-1984 PSG (MANx), 2013 WL 12114015, at *3 (C.D. Cal. Mar. 15, 2013). "This public disclosure bar is based on the proposition that, where the government is already in possession of information regarding allegations or transactions that would put it on notice that some person is obtaining government funds through fraud or false pretenses, no public benefit is derived from permitting the private party to proceed with the case unless that party was the source of the information." *Lee*, 2013 WL 12114015, at *3.

The FCA's public disclosure bar is triggered only if three conditions are met: (1) the disclosure occurred through one of the channels specified in the statute, (2) the disclosure was "public," and (3) the lawsuit is "based upon" the allegations or transactions publicly disclosed. *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018). The public disclosure bar is an affirmative defense. *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017). The Court may consider it on a motion to dismiss only when the allegations in the complaint or materials that are subject

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
2019 WL 3282619

Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 9 of 25

to judicial notice are sufficient to establish the defense. *See Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013).

Defendants argue that Relator's claims are barred by the public disclosure bar because they are based on information gleaned from three categories of public disclosures: (1) the Medicare claims data that CMS provided to Relator, (2) information about JATA's business practices, which was available from online sources, and (3) reports issued by the Department of Health and Human Services Office of the Inspector General ("HHS OIG") relating to improper use of the diagnosis code of kwashiorkor, a form of malnutrition. *See JATA Mot.* 26:15–30:23.

The Court first addresses whether each of the three categories of information were publicly disclosed through a channel specified in the FCA before turning to the question of whether Plaintiff's complaint was based upon publicly disclosed information such that it is precluded by the public disclosure bar.

### i. Public Disclosure

#### a. Medicare Claims Data

The public disclosure bar applies to, among other things, lawsuits based upon information publicly disclosed in a "Federal report." 31 U.S.C. § 3730(e)(4)(A)(ii). Defendants argue that the claims data Relator received from Medicare falls within this provision. *See JATA Mot.* 26:15–28:2. The Court will first analyze whether the claims data was a "Federal report" within the meaning of the statute before determining whether it was publicly disclosed.

### 1. Federal Report

**\*6** The Court's analysis of whether the Medicare claims data was disclosed in a "Federal report" is guided by the Supreme Court's decision in *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401 (2011), which construed that term in the FCA. The relator in *Schindler Elevator* alleged that the defendant submitted false claims by failing to file required reports with its claims and including false information in the reports it did file. *See id.* at 405. To support his allegations, the relator relied on information that his wife had received from the relevant government agency via Freedom of Information

Act ("FOIA") requests, which had been used to obtain copies of the reports at issue as well as information about the years in which the defendant failed to file the required reports. *See id.* at 406. The case presented the question of whether the responses to the FOIA requests were "reports" within the meaning of the FCA's public disclosure bar. *Id.*

As the term "report" is not defined in the FCA, the Supreme Court first looked to its ordinary meaning, finding that a "report" is "something that gives information" or a "notification," or is "an official or formal statement of facts or proceedings." *See id.* at 407–08 (cleaned up) (quoting Webster's Third New International Dictionary (1986) and Black's Law Dictionary (6th ed. 1990)). The Court noted that this definition, which it acknowledged was "broad," was "consistent with the generally broad scope of the FCA's public disclosure bar." *Id.* at 408. Relying on this definition, the Court held that the FOIA responses were "reports," because "[e]ach response was an 'official or formal statement' that 'gave information' and 'notified [the requestor]' of the agency's resolution of [the] FOIA request." *Id.* at 410–11.

With *Schindler Elevator* as a guide, the Court now turns to the question of whether the Medicare data Relator received from CMS was disclosed through a federal report because it "gave information" or was "an official or formal statement of facts or proceedings." *See id.* at 407–08. There are many similarities between the relator's actions in *Schindler Elevator* and Integra's actions here. As in that case, Integra had no previous relationship with Defendants and received the information underlying its claims via a request to a government agency. In arguing that the Medicare data should not be considered a federal report, Integra focuses heavily on the fact that unlike information discovered through a FOIA request, the Medicare data was released only to researchers who intend to "improve the quality of life for Medicare beneficiaries or improve the administration of the Medicare program" and was subject to various restrictions designed to preserve the confidentiality of Medicare beneficiaries. *See Hosp. Opp.* 12:9–22 (citing Ctrs. for Medicare & Medicaid Servs., Instructions for Completing the Limited Data Set Data Use Agreement, *available at* https://goo.gl/HJMiro; *CMS Cell Size Suppression Policy*, Ctrs. for Medicare & Medicaid Servs., Research Data Assistance Ctr., https://www.resdac.org/articles/cms-cell-size-suppression-policy (last updated May 8, 2017)).[5] But this conflates two separate elements of the public disclosure bar analysis: whether the data was disclosed in a federal report and whether the disclosure was "public."

*See Solis,* 885 F.3d at 626. The restrictions placed on the Medicare data will be discussed further below in the context of determining whether it was publicly disclosed, but they say nothing about whether the data was disclosed through a means that "gave information" or was "an official or formal statement of facts or proceedings." *See Schindler Elevator,* 563 U.S. at 407–08.

Relator additionally argues that "[t]he data [it] obtained from CMS was not part of any kind of report ... [but] was simply confidential, raw data provided to researchers." *See Hosp. Opp.* 14:9–11. This argument is similar to the position taken by the dissent in *Schindler Elevator. See* 563 U.S. at 419 (Ginsburg, J., dissenting) (favorably citing the Court of Appeals's conclusion that the FOIA responses were not reports because they "merely assembled and duplicated records, or noted the absence of records" and did not "synthesize the documents or their contents with the aim of ... gleaning any insight or information"). But the majority rejected this proposition, instead taking the broad view that a report is "something that gives information" or is "an official or formal statement of facts or proceedings." *Id.* at 407–08 (cleaned up). Just as the FOIA responses in *Schindler Elevator* disclosed the contents of reports filed with the government, the Medicare data that CMS provided to Integra disclosed the contents of Medicare claims filed with the government. As the disclosure gave Integra information about Medicare claims and was an official statement of the claims that had been filed, the Court concludes that it constituted a federal report within the meaning of the public disclosure bar. *See id.*

### 2. Public Disclosure

**\*7** Having concluded that the Medicare claims data was disclosed to Relator in a federal report, the Court now turns to the question of whether that disclosure was "public." *See* 31 U.S.C. § 3730(e)(4)(A); *Solis,* 885 F.3d at 626. As detailed above, Relator argues that Medicare claims data was not disclosed publicly because it was given only to researchers seeking to improve the life of Medicare beneficiaries or the administration of the Medicare system and was subject to various privacy provisions. *See Hosp. Opp.* 12:9–22

In this Circuit, "a disclosure need not be made to the public at large to qualify as 'public' " under the FCA. *Malhotra v. Steinberg,* 770 F.3d 853, 858 (9th Cir. 2014) (citing *Seal 1 v. Seal A,* 255 F.3d 1154, 1161–62 (9th Cir. 2001)). To evaluate

whether information was publicly disclosed, the Ninth Circuit has looked to whether the individual receiving the disclosure was an "insider" or "outsider" with regard to the information's subject matter. *See Malhotra,* 770 F.3d at 858–60; *Seal 1,* 255 F.3d at 1161–62.

For example, in *Seal 1,* the relator developed a relationship with lawyers from the U.S. Attorney's Office who were investigating fraud committed by his former employer. *See* 255 F.3d at 1156. Over the course of this relationship, the government lawyers allowed the relator to view internal documents that revealed that one of his employer's competitors, Zenith, was likely committing the same type of fraud. *See id.* The court concluded that this sharing of information was a public disclosure because the relator "was an outsider to the Zenith investigation at the time he received the information [from] the U.S. Attorney's office." *Id.* at 1161. It rejected the relator's contention that the disclosure was not public because he had signed a declaration requiring him to keep the information confidential, finding that a determination that the disclosure was public was "consistent with Congress' intent that the FCA not be used by people attempting to 'free ride' in information obtained from the government." *Id.* at 1161–62.

The Ninth Circuit elaborated on this insider/outsider distinction in *Malhotra. See* 770 F.3d at 858–61. The relators in that case believed that the trustee appointed to administer their bankruptcy, named Steinberg, was engaging in fraudulent conduct. *See id.* at 855. They began conducting their own investigation into his conduct, reviewing thousands of pages of bankruptcy court and county assessor records. *Id.* The relators shared the fruits of their investigation with the Office of the United States Trustee, which eventually decided to depose an associate of Steinberg's. *Id.* at 856. At the deposition, which the relators attended, the associate revealed information that led the relators to believe that Steinberg had engaged in fraudulent conduct with regard to several other bankruptcies. *Id.* On the basis of this information, they filed an FCA case against Steinberg. *Id.* The Ninth Circuit determined that the information the relators had received at the deposition was a public disclosure. While recognizing that the relators had conducted their own investigation into Steinberg's actions and that they might be considered insiders with regard to their *own* bankruptcy, the court held that they were outsiders with regard to the U.S. Trustee's investigation into Steinberg's conduct *in other bankruptcies* and therefore could not rely on the information as the basis for their FCA claims. [6] *Id.* at 860.

**\*8** The Court believes that it is clear under *Seal 1* and *Malhotra* that Integra was an outsider for purposes of the allegations against Defendants, and therefore CMS's disclosure of Medicare claims data to Integra was a public disclosure. Integra was neither an employee of Defendants nor an employee of the government. *See id.* at 859. Nor was it in anyway deputized by the government to conduct an investigation into Medicare fraud. Integra's contention that the data would not have been released to just anyone is therefore beside the point. *See Hosp. Opp.* 12:9–14:11. The Ninth Circuit has expressly held that "[d]isclosure of information to one member of the public, when that person seeks to take advantage of that information by filing an FCA action, is public disclosure" because Congress did not intend for the FCA to be "used by people attempting to 'free ride' on information obtained from the government." *Seal 1*, 255 F.3d at 1162. As for Integra's argument that the privacy and confidentiality restrictions render the disclosure private, the Ninth Circuit rejected an essentially identical argument in *Seal 1. See Seal 1*, 255 F.3d at 1162 ("[The relator] signed a 'Declaration' requiring him to keep confidential the information he obtained from the USAO, but this does not undermine our conclusion that [he] is a member of the public for purposes of his suit.").

Relator largely ignores *Seal 1* and *Malhotra*, instead arguing that the Ninth Circuit's decision in *Berg v. Honeywell Int'l, Inc.*, 502 F. App'x 674 (9th Cir. 2012), "expressly limited the holding" in *Seal 1. See Hosp. Opp.* 13 n.6. However, as an unpublished memorandum disposition, *Berg* cannot limit *Seal 1*, a published decision. It certainly cannot limit *Malhotra*, a published precedential decision *that postdated it.* But even taking Relator's argument at face value, the Court finds it unconvincing.

In *Berg*, the Ninth Circuit found that a government report was not publicly disclosed when it was given to a private company hired by the government to conduct an audit. 502 F. App'x at 676. The court reached this conclusion because the recipient of the report "was not an 'outsider' to the investigation, but rather was acting on behalf of the government and had an incentive to keep confidential the information learned during its audit." *Id.* In contrast, Integra was not hired by the government or otherwise acting on its behalf. Instead, it was given the information for its own purposes. And beyond complying with the confidentiality provisions designed to protect the privacy of Medicare beneficiaries, Integra had no incentive to keep the information it learned during its

analysis confidential. Indeed, it turned around and used that information as the basis of this suit.

Relator relies heavily on the decision in *United States ex rel. Spey v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012), *see Hosp. Opp.* 12:23–13:9, but *Spey* addressed an entirely different issue. In that case, the defendants argued that various reports should be considered publicly disclosed because the defendants themselves had submitted them to the government, at which point members of the public theoretically could have obtained them by making a request. *Spey*, 913 F. Supp. at 182–84. The court rejected this argument, finding that it would be tantamount to saying that the mere act of submitting a false claim via the reports would immunize the defendant from liability. *Id.* at 183. The argument made by the *Spey* defendants is quite different than the one Defendants make here. An analogous scenario in this case would be if Defendants were arguing that the mere act of filing (allegedly) false Medicare claims constituted a public disclosure because claim data could later be obtained by researchers like Integra. But that is not the argument before the Court. Instead, Defendants argue that the data became publicly disclosed only when the CMS *actually* provided it to Integra, an outsider. *Spey* is simply inapposite.

For the foregoing reasons, the Court concludes that the Medicare claims data was publicly disclosed in a federal report within the meaning of the FCA.

### b. HHS OIG Reports

Relator does not dispute that information in the HHS OIG reports regarding the improper coding of kwashiorkor was publicly disclosed in a federal report. Accordingly, the Court concludes that this information was publicly disclosed within the meaning of the public disclosure bar.

### c. The JATA Business Practice Information

**\*9** The public disclosure bar applies to information "publicly disclosed ... from the news media." 31 U.S.C. § 3730(e)(4)(A)(iii). Defendants argue that seven categories of information regarding JATA's business practices were publicly disclosed from the news media by virtue of being available on the internet:

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)

2019 WL 3282619

Case 3:18-cv-01496-JD   Document 84   Filed 07/30/19   Page 12 of 25

**Case Mix Guarantee**—In the SAC, Relator alleges that JATA "guaranteed an increase in its clients' Case Mix Index ("CMI"), which is influenced by a hospital's CC and MCC rates." *SAC* ¶ 24. In support, it includes a screenshot of text from JATA's website that reads "**Guaranteed to increase CMI** .... See how we're helping hospitals achieve a 4–8% increase in their Case Mix Index through better documentation." *Id.*; *Exhibit 13 to RJN*, Dkt. # 59-14, at 202–03.

**Return on Investment Sales Pitch**—Relator alleges that JATA gave a sales pitch promising "guaranteed return on investment if [the hospital] followed [JATA]'s process." *SAC* ¶ 25. This quote was taken from a case study put together by JATA and another hospital that is publicly available on the website of Becker Hospital Review, a hospital industry trade publication. *Exhibit 14 to RJN*, Dkt. # 59-15, at 227.

**Documentation Tip Sheets**—The documentation tip sheets cited in the SAC—which, as explained above, informed Providence doctors about clinical language that would and would not support adding MCCs and CCs to diagnoses—are available on the website of Providence Health & Services Southern California. *See SAC* ¶¶ 26–27, 29–30; *Exhibits 15–18 to RJN*, Dkts. # 59-16–59-19.

**Newsletter**—A monthly hospital newsletter that Relator alleges is evidence that "Providence gave CDI and doctors financial incentives for successful queries and ... made clear to doctors and staff that it closely tracked their responsiveness," *SAC* ¶ 41, is available on the website of Defendant Swedish/Edmonds. *Exhibit 19 to RJN*, Dkt. # 59-20.

**Training Video**—A JATA training video described in the complaint is publicly available on YouTube. *See SAC* ¶ 31; *Exhibit 20 to RJN*, Dkt. # 59-21.

**Message Board Posts**—The complaint quotes several statements made by CDI specialists, questioning JATA's coding practices. *See SAC* ¶¶ 36–37, 45. These statements were taken verbatim from discussions on a message board that is hosted on the website of the Association of Clinical Documentation Improvement Specialists ("ACDIS"), a trade publication. *See Exhibits 21–25 to RJN*, Dkts. #59-22–59-26.

**JATA Audit Presentation**—The SAC references a presentation in which JATA staff "coached hospitals to avoid being audited." *SAC* ¶ 40. This presentation is available on the ACDIS website. *See Exhibit 26 to RJN*, Dkt. # 59-27, at 304–05.

*See JATA Mot.* 28:3–29:3.

Relator does not dispute that this information was publicly available on the internet. Instead, it argues that the websites containing this information are not "news media" within the meaning of the FCA. *See Hosp. Opp.* 14:14–15:23; *JATA Opp.* 28:10–29:17.

The public disclosure bar, read as a whole, provides context for the Court's discussion of whether the online information in this case was publicly disclosed "from the news media." The bar applies if "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

**\*10** (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media."

31 U.S.C. § 3730(e)(4)(A). This framework does not capture all information that could be described as "public" in common parlance. Instead, "[b]y its plain terms, the public disclosure bar applies to some methods of public disclosure and not to others." *Schindler Elevator*, 563 U.S. at 414.

As described above, the information about JATA's business practices comes from websites operated by industry groups, websites operated by Defendants, and an online message board. None of these would traditionally be described as "news media." But this is not necessarily dispositive. Courts have generally taken a broad view of the term "news media." For example, the Eleventh Circuit has held that a health clinic's publicly available websites qualified as news media because they were "intended to disseminate information about the clinics' programs." *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 813 (11th Cir. 2015). And applying differing but related standards, numerous other decisions cited by Defendants have held that various online sources were "news media." *See United States ex rel. Carter v. Bridgeport Educ., Inc.*, No. 10-CV-1401 JLS (WVG), 2015 WL 4892259, at *6 n.4 (S.D. Cal. Aug. 17, 2015) (holding that an online comment on the San Diego Reader website was

disclosed from the news media because the site was a "well-established website designed to convey news to the public"); *United States ex rel. Green v. Serv. Contract Educ. & Training Tr. Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012) (concluding that the term includes "readily accessible websites"); *United States ex rel. Brown v. Walt Disney World Co.*, No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975, at *4 (M.D. Fla. June 24, 2008) (finding that Wikipedia is a news media outlet); *United States ex rel. Unite Here v. Cintas Corp.*, No. C 06-2413 PJH, 2007 WL 4557788, at *14 (N.D. Cal. Dec. 21, 2007) (holding that information about contracts between the defendant and the government was publicly disclosed because it "was available on the Internet"); *see also United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 n.6 (4th Cir. 2016) (stating in dicta that "[c]ourts have unanimously construed the term 'public disclosure' to include websites and online articles").

In particular, Defendants ask the Court to adopt the holding of a case from this District that stated, without further elaboration, that "[i]nformation publicly available on the Internet generally qualifies as 'news media.' " *United States ex rel. Hong v. Newport Sensors Inc.*, No. SACV 13-1164 JLS (JPRx), 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016) ("*Hong I*"). But in affirming *Hong* on other grounds, the Ninth Circuit explicitly noted that it was not adopting "the district court's broad holding that most public webpages ... generally fall within the category of 'news media.' " *United States ex rel. Hong v. Newport Sensors, Inc.*, 728 F. App'x 660, 662–63 (9th Cir. 2018) ("*Hong II*"). And the Court finds *Hong I*'s holding unpersuasive.

**\*11** "News media" is not defined in the FCA. The courts that have interpreted the term to include all, or substantially all, information available online appear to have extrapolated their holdings from the Supreme Court's description of the public disclosure bar as having a "generally broad scope." *See Schindler Elevator*, 563 U.S. at 408; *see also, e.g., Green*, 843 F. Supp. 2d at 32. Notably, none attempted to analyze whether the online sources at issue fell within the ordinary meaning of the term "news media." As the Court informed the parties at both hearings, it believes that an analysis of whether the information about JATA's business practices was "publicly disclosed ... from the news media" must start with the statute's text. *See Schindler Elevator*, 563 U.S. at 407 ("Because the [FCA] does not define 'report,' we look first to the word's ordinary meaning."). After the first hearing, the Court invited the parties to submit supplemental briefs providing their views on the ordinary meaning of the term "news media,"

and both have done so. With the issue fully briefed, the Court now turns to the question of whether the online information about JATA's business practices was publicly disclosed from the news media.

### 1. Whether *All* Online Information Is Disclosed From the News Media

The Court first addresses Defendants' argument that *all* publicly available online information has been publicly disclosed "from the news media." As explained above, the analysis must begin with the statute's text. While the compound term "news media" is not commonly defined in dictionaries, its component parts give some indication of its scope. "News" is a "report of a recent event," "what is reported in a newspaper, news periodical, or news broadcast," or "matter that is interesting to newspaper readers or news broadcast audiences ... or is suitable for news copy." Webster's Third New International Dictionary 1524 (1986). "Medium," the singular of "media," can be defined as a "channel, method, or system of communication, information, or entertainment" or "a vehicle (such as a radio or television program or a newspaper) used to carry advertising." *Id.* at 1403. Read together, these definitions suggest that "news media" includes methods of communication that are used to convey a particular type of information: information about recent events or that would otherwise commonly be found in a newspaper, news broadcast, or other news source. It follows, then, that the term cannot refer to the internet in general, a channel that is designed to be able to convey essentially anything.

That "news media" cannot encompass *all* online information is also clear as a matter of common sense. Nobody would use the term this way in everyday speech. Information is available on the internet from innumerable sources. A person might go to a restaurant's website to look at its menu. Or the Dodgers' website to find out the ticket prices for the upcoming series. Or, closer to this case, a doctor's website to determine the next available appointment. In none of these circumstances would it be natural, or really conceivable, to say that the information had been learned by consulting the news media.

Defendants' unbounded reading of the news media provision also seems likely to swallow limitations that Congress specifically placed on the scope of the public disclosure bar. For example, the bar applies to suits based on information disclosed "in a Federal criminal, civil, or administrative

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)

Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 14 of 25

2019 WL 3282619

hearing *in which the Government or its agent is a party.*" 31 U.S.C. § 3730(e)(4)(A)(i). This provision evinces Congress's intent to exclude from the public disclosure bar information disclosed at hearings in cases in which the Government is *not* a party, conceivably in part based on a presumption that the Government is less likely to learn about events that transpire in cases it is not involved with. But transcripts of hearings in cases where the Government is not a party are commonly made available to the public for a small fee through the federal courts' PACER website. And many hearings are open to the public, such that a private citizen could attend and tweet his observations afterwards.

**\*12** Under Defendants' view, the mere posting of the transcript on PACER or a tweet sent to a small handful of followers could render the information from the hearing publicly disclosed under the FCA, even though it otherwise would not be. This would run contrary to the purposes underlying the public disclosure bar, and indeed the FCA itself. *See Schindler Elevator*, 563 U.S. at 412 (describing the public disclosure bar as "narrower" than its predecessor, the Government knowledge bar, which was intended to preclude "parasitic *qui tam* actions based on evidence or information in the possession of the United States at the time such suit was brought") (cleaned up); *United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 742 (9th Cir. 1995) ("[T]he purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.") (cleaned up).

In short, the Court concludes that applying the news media provision to anything ever published publicly on the internet is contrary to the ordinary meaning of the term "news media" and has the potential to eviscerate the balance Congress struck between encouraging private parties to bring forth evidence of fraud and preventing parasitic suits. Accordingly, the Court declines to adopt Defendants' interpretation.

Defendants make several arguments to the contrary, none of which are persuasive. First, they contend that the ordinary meaning of the term "news media" must encompass all websites because "93 percent of adults get news online" and several news publishers, such as Slate.com and Vox.com, were founded on the internet. *See Def. Supp.* 10:6–23. But this fallaciously conflates the indisputable proposition that *some* websites are news media sources with a conclusion that *all* must be. Just as the fact that 93 percent of Americans may get their milk from the supermarket does not make everything

in the supermarket milk, the fact that 93 percent of adults get their news online does not make everything on the internet a news media source.

Second, Defendants assert that Congress implicitly ratified previous judicial decisions holding that everything available on the internet is disclosed through the news media when it amended the public disclosure bar in 2010 but did not alter the news media provision. *See id.* 11:7–12:25. This argument invokes the so-called "prior-construction canon," under which "[i]f a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort, or even uniform construction by inferior courts ... they are to be understood according to that construction." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012); *see also Merck & Co. v. Reynolds*, 559 U.S. at 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."); *United States v. Male Juvenile*, 280 F.3d 1008, 1016 (9th Cir. 2002) (similar).

There are two problems with Defendants' argument. First, Defendants emphasize that Congress failed to alter the news media provision when amending *other* provisions of the public disclosure bar in 2010. *See Def. Supp.* 11:7–12:25. But a mere failure to *correct* previous judicial constructions of a statute is generally not viewed as "a sound basis for believing that the legislature has 'adopted' them." Scalia & Garner, *Reading Law* 326. Even viewed in the light most favorable to Defendants, that is all Congress did here.

Further, the vast majority of decisions adopting Defendants' preferred rule—including all relevant decisions from the Courts of Appeals—were not issued until *after* the 2010 amendment. As evidence that the law was settled in their favor at the time of the amendment, Defendants point only to four pre-2010 district court decisions from the Northern District of California, Middle District of Florida, Southern District of Ohio, and Western District of Virginia. *See Def. Supp.* 12:8–16 (citing *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F. Supp. 2d 766, 772 (W.D. Va. 2008), *rev'd on other grounds*, 600 F.3d 319 (4th Cir. 2010); *United States ex rel. Brown v. Walt Disney World Co.*, No. 6:06-cv-1943-Orl-22KRS, 2008 WL 2561975 (M.D. Fla. Jun. 24, 2008); *United States ex rel. Unite Here v. Cintas Corp.*, No. C 06-2413 PJH, 2007 WL 4557788 (N.D. Cal. Dec. 21, 2007); *United States ex rel. Doyle v. Diversified Collection Servs., Inc.*, No. 2:04 CV 053, 2006 WL 3834407 (S.D. Ohio Dec. 29, 2006)). Even putting aside the fact that some of these

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
2019 WL 3282619

Case 3:18-cv-01496-JD   Document 84   Filed 07/30/19   Page 15 of 25

decisions did not go as far as adopting Defendants' rule that everything on the internet has been publicly disclosed through the news media—and indeed one explicitly declined to do so [7]—the central question in applying the prior-construction canon is whether the weight of authority is such that the construction of the statutory term can be considered "settled law." *See* Scalia & Garner, *Reading Law* 325. The Court does not believe that four scattered district court decisions sufficiently settled the law such that Congress should be presumed to have adopted their constructions of the term "news media" when it amended some provisions of the public disclosure bar but not others. *See United States v. Davis*, 139 S. Ct. 2319, 2331 (2019) ("[I]nterpretations of three courts of appeals 'may not have 'settled' the meaning' of a statute ....") (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 590 (2010)). Accordingly, the prior-construction canon has little to no persuasive value in this case.

*\*13* Finally, Defendants point to more than thirty cases that held that various forms of online information were publicly disclosed through the news media. *See Def. Supp.* 12:27–16:25. These decisions applied differing rationales to reach their conclusions. Some looked to the extent to which the purpose of an online source was to disseminate information. *See, e.g., Osheroff*, 776 F.3d at 813 (information on a clinic's websites was disclosed through the news media because the websites were "intended to disseminate information about the clinics' programs"); *United States ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 125 (D.D.C. 2015) (information on the websites of two military entities was disclosed through the news media notwithstanding the fact that the websites did not contain a "news header," because the purpose of the pages "was clearly to give the public an accurate account of those entities' contracting requirements"). Others looked at the number of visitors to the website. *Green*, 843 F. Supp. 2d at 33 (information was disclosed through the news media when "thousands" of visitors would have come across it during the relevant time period). Still others have focused upon the ease with which an online source can be accessed. *See United States ex rel. Liotine v. CDW Gov't, Inc.*, No. 05-33-DRH, 2009 WL 3156704, at *6 n.5 (S.D. Ill. Sept. 29, 2009) (information in an internal employee newsletter posted online was *not* disclosed through the news media in part because several steps needed to be taken before it could be located on the organization's website). And some have adopted the broad position that Defendants urge here, that all publicly available information on the internet has been disclosed through the news media within the meaning of the

FCA. *See Hong I*, 2016 WL 8929246, at *5; *United States v. Honeywell Int'l, Inc.*, No. CV 12-2214 JAK (JCGx), 2013 WL 12122693, at *9 (C.D. Cal. Nov. 8, 2013) ("Documents that are publicly available on the internet generally qualify as 'publicly disclosed' documents under [the public disclosure bar].").

The Court does not lightly depart from what appears to be a general consensus in the federal courts that the news media provision of the public disclosure bar encompasses information from at least some types of online sources that might not traditionally be described as news media. But none of these decisions are binding on this Court. And their persuasive value is diminished by two factors.

First, most of the cases Defendants cite did not undertake their own independent analysis of the meaning and scope of the news media provision and instead simply cited to previous decisions of other courts (that themselves often contained sparse analysis) with little additional explanation. *See, e.g., United States ex rel. Cherwenka v. Fastenal Co.*, Civ. No. 15-187 (PAM/BRT), 2018 WL 2069026, at *7 (D. Minn. May 6, 2018); *Hong I*, 2016 WL 8929246, at *5. Second, and more importantly, none of the decisions Defendants cite attempted to define the ordinary meaning of the term "news media" or to otherwise ground their interpretation in the statutory text. Most began their analysis with the Supreme Court's description of the news media provision as having a "broad[ ] sweep," *Graham Cty.*, 559 U.S. at 290, and proceeded to interpret it to encompass information from a broad swath of online sources without pausing to consider whether those sources could reasonably be defined as "news media" within any ordinary meaning of the term. *See, e.g., Osheroff*, 776 F.3d at 813. Some appear to have gone so far as to suggest that information falls within the scope of the news media provision simply because it is publicly known, *see United States ex rel. Cervantes v. Deere & Co.*, No. CV-10-3034-RMP, 2011 WL 5325466, at *5 (E.D. Wash. Nov. 3, 2011), a conclusion that is at odds with the Supreme Court's description of the public disclosure bar as applying "to some methods of public disclosure and not to others," *see Schindler Elevator*, 563 U.S. at 402.

The Court believes that this approach improperly strays from the Supreme Court's instruction that interpretation of the undefined term "news media" must begin with its ordinary meaning. *See id.* at 407. While the Court in *Schindler Elevator* acknowledged the "generally broad scope" of the public disclosure bar in giving the term "report" a broad

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
2019 WL 3282619

Case 3:18-cv-01496-JD   Document 84   Filed 07/30/19   Page 16 of 25

construction, the documents in that case—written letters and emails from the Department of Labor containing information about records the agency found in response to FOIA requests—could still be considered "reports" within some ordinary meaning of the term because they were official government communications that conveyed information. *See id.* at 406–07. In contrast, as the Court illustrated above, there are many types of sources on the internet that cannot be realistically described as "news media."

**\*14** A desire to carry out what may appear to be the purposes of the public disclosure bar or to update the statute for the Internet Age, while perhaps understandable, does not provide the judiciary with a license to jettison the actual text that Congress enacted. Because many types of online sources clearly fall outside the ordinary meaning of the term news media, the news media provision cannot be read to encompass all publicly available online information.

Having reached this conclusion, the Court turns to the question of what the news media provision *does* encompass.

### 2. Scope of the News Media Provision

In a world where the line between what is and is not considered news media has become increasingly blurred, attempting to set forth a single conclusive definition of the term may be an impossible task.[8] Nevertheless, the Court believes that several factors provide useful guideposts in determining whether information from an online source has been disclosed "from the news media" within the meaning of the FCA's public disclosure bar.

*First*, as explained above, combining the dictionary definitions of the terms "news" and "media" suggests that the compound term "news media" describes methods of communication that are used to convey information about recent events or other information that would commonly be found in a newspaper, news broadcast, or other news source. Accordingly, the extent to which the information typically conveyed by a source would be considered newsworthy is relevant to whether it is a news media source.

*Second*, the term "news media" generally carries with it a connotation of editorial independence, or at least some separation, between the original source of information and the medium that conveys it. Along these lines, Relator points to FOIA, which defines "a representative of the news media"

for purposes of that statute as "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *See* 5 U.S.C § 552(a)(4)(A)(ii)(III); *see also Integra Supp.* 15:9–15. While the Court does not simply import this definition from FOIA into the FCA, it believes that it accurately reflects the sense in which a news media entity is ordinarily viewed as one that collects information from outside sources, exercises some editorial judgment in deciding what to publish, and then transmits the published information to an audience—put more simply, it curates information—in contrast to an entity that simply publishes information about itself.

*Third*, the Court believes that a source's intent to disseminate information widely, as opposed to only to a few individuals, is relevant to whether it is acting as a news media entity.

**\*15** *Fourth*, traditional news outlets like newspapers and radio and television stations unquestionably fall within the news media provision of the public disclosure bar. Accordingly, the more that an online source functions like one of these traditional outlets, the more likely it is to be news media under the FCA. Relevant to this consideration is the extent to which the conveyance of newsworthy information is the primary purpose of entity publishing the online source or whether the dissemination of such information is merely ancillary to some other purpose.

*Finally*, consistent with the Supreme Court's approach in *Schindler Elevator*, the Court believes that the most important consideration is whether the source in question falls within the "broad ordinary meaning" of the term "news media"—in other words, whether it could reasonably be described as "news media" as at least some people would that term in everyday speech. *See Schindler Elevator*, 363 U.S. at 408. Accordingly, while there may be some debate in society about whether non-traditional sources, like blogs, should be considered part of the news media, the fact that at least some people would describe them as such is likely enough to bring them within the public disclosure bar's "broad scope." *See id.* In contrast, the fact that nobody would describe a menu on a restaurant website as coming from the news media is strong evidence that it falls outside the reach of the public disclosure bar.

None these factors on their own are necessarily dispositive of whether an online source should be considered news media, and other factors may be relevant in a given case. But taken

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 17 of 25

2019 WL 3282619

together, the Court believes that they provide guidance on how to adhere to the Supreme Court's description of the news media provision as evidencing the public disclosure bar's "broad sweep," *see id.* (cleaned up), while still ensuring that any application of the provision remains tethered to the text —"news media"—that Congress has chosen.

### 3. Application

Having set forth a framework for determining the contours of the public disclosure bar's news media provision as applied to online sources, the Court now turns to whether it can decide at the current stage whether the online sources containing information about JATA's business practices constitute "news media." It concludes that it cannot. The public disclosure bar is an affirmative defense, and an affirmative defense can only be adjudicated on a motion to dismiss when the allegations in the complaint or information that the court can take judicial notice of are sufficient to establish the defense. *See Sams,* 713 F.3d at 1179. The complaint does not describe the sources of the JATA business practice information. [9] Accordingly, the Court could decide now whether that information has been publicly disclosed from the news media only if this fact is "not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy is not in question." *See* Fed. R. Evid. 201(b)(2) (standard for judicial notice). These conditions are not present here.

**\*16** Relator very much disputes the extent to which several of the online sources qualify as "news media." For example, it contends that information about JATA's "Documentation Tips" was marked "Proprietary and Confidential" and was posted only on "internal staff homepages." *See Integra Supp.* 17:11–19. Likewise, it argues that information in Providence's internal newsletters was not publicly disclosed from the news media because the newsletters were only intended for Providence's own medical staff. *See id.* 18:2–10. Additionally, it appears that at least some of the information comes from online sources that were not easily accessible. For example, according to Relator, a presentation hosted on the webpage of Becker's Hospital Review can only be accessed "by typing in a precise URL," which brings up a list of hundreds of folders, one of which contains the presentation, which is labeled only by a gibberish file name. *See id.* 19:20–20:9.

These facts, which in some instances seem to be in dispute, could be relevant to whether the sources at issue were "news media" sources within the meaning of the FCA.

Further, Defendants have largely ignored them in the briefing currently before the Court, instead resting on their contention that everything on the Internet falls within the scope of public disclosure bar. Without evidence and briefing from both sides about the specific nature of each source, the Court is not able to determine which sources constitute "news media" and which do not. Accordingly, adjudication of whether the information about JATA's business practices was publicly disclosed from the news media will have to await a later stage of the case.

### ii. Substantial Similarity

Defendants argue that regardless of whether the JATA business practice information was publicly disclosed through the news media, the case should *still* be dismissed because Relator's claims are based on substantially the same information contained in the Medicare claims data and HHS OIG reports, which, as explained above, were publicly disclosed in federal reports within the meaning of the FCA. [10] *See Def. Supp.* 4:16–7:18.

The FCA's public disclosure bar provides that a case should be dismissed "if substantially the same allegations or transactions" were publicly disclosed through the channels listed in the statute. 31 U.S.C. § 3730(e)(4)(A). In deciding whether a case falls within the scope of the public disclosure bar, a court must determine (1) whether the publicly disclosed information contains an " 'allegation or transaction' of fraud" and (2) whether the claims in the complaint are " 'based upon' said 'allegation or transaction.' " *United States ex rel. Mateski v. Raytheon Co.,* 816 F.3d 565, 570 (9th Cir. 2016). An "allegation" is a "direct claim of fraud," while a transaction refers to "facts from which fraud can be inferred." *Id.* at 571.

The Court begins with the Medicare claims data. It is undisputed that this raw data does not contain an "allegation" of fraud—that is, "a direct claim of fraud." *Id.* But "the substance of the disclosure need not contain an explicit 'allegation' of fraud so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." *Id.* (cleaned up). As the Ninth Circuit has explained:

> **\*17** If X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
2019 WL 3282619

Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 18 of 25

transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Id.* (quoting *United States ex rel. Found. Aiding the Elderly v. Horizon W.*, 265 F.3d 1011, 1015 (9th Cir. 2001)). "[I]n a fraud case, X and Y inevitably stand for but two elements: a misrepresented state of facts and a true state of facts." *Id.* (cleaned up). Therefore, unless the information at issue reveals *both* the misrepresented state of facts and the true state of facts, the fraudulent transaction has not been publicly disclosed. *See id.*

The Medicare claims data undoubtedly contains the alleged misrepresented state of facts: it reveals the extent to which Defendants submitted Medicare claims that included MCCs for encephalopathy, respiratory failure, and severe malnutrition—codes that the SAC alleges were not merited by the clinical circumstances. The question is whether the data also reveals the *true* state of facts, i.e. whether it reveals that the use of the codes was not merited.

The Court does not believe that it does. The most that can be determined from the data alone is that the Hospital Defendants submitted claims with MCCs for encephalopathy, respiratory failure, and severe malnutrition at rates that far exceeded their peers. The data itself does not provide an explanation for the high coding rates.

At other points in their motions, Defendants appear to agree. They argue strenuously that these allegations of statistical disparities in the Medicare claims data are not enough to plead fraud under the relevant pleading standards.[11] As discussed further below, the Court agrees with Defendants that the statistics alone are likely not enough to state a viable fraud claim. *See infra* IV.B.i. This does not end up being fatal to Relator's claims here, however, because the complaint contains more than just numbers. Specifically, the complaint alleges facts—taken from the JATA business practice information—that explain why the high coding rates for the three MCCs are plausibly attributable to fraud, as opposed to some other cause. The JATA business practice information is therefore key to Relator's fraud claim; without it, there likely *would be no claim*.

For this same reason, then, the Court concludes that the Medicare claims data alone does not reveal the alleged true state of facts that would allow readers to "infer ... the conclusion that fraud has been committed." *See Mateski*, 816 F.3d at 571. Nothing in the claims data reveals JATA's role in the alleged scheme, or even JATA's existence. Accordingly, public disclosure of the Medicare claims data alone did not publicly disclose "substantially the same allegations or transactions" of fraud that are alleged in Relator's complaint. *See* 31 U.S.C. § 3730(e)(4)(A).

**\*18** Nor does the public disclosure of the OIG reports regarding kwashiorkor coding change the analysis. These reports addressed industry-wide miscoding of kwashiorkor caused by a discrepancy in the ICD-9 coding guidelines[12] that created ambiguity as to whether a code that was intended only for kwashiorkor could be used to code other forms of malnutrition. *See* Dep't Health & Human Servs. OIG, *CMS Did Not Adequately Address Discrepancies in the Coding Classification for Kwashiorkor* (Dec. 2017), *Exhibit 31 to RJN*, Dkt. # 59-35 ("*Dec. 2017 OIG Report*"), at 731–32. While a 2014 OIG report specifically addressed Providence Portland Medical Center's overcoding of kwashiorkor, it did not draw a conclusion about the cause of the overcoding, and the hospital attributed it to confusion about the ICD-9 guidelines. *See* Dep't Health & Human Servs. OIG, *Providence Portland Medical Center Incorrectly Billed Medicare Inpatient Claims With Kwashiorkor* (Sept. 2014), *Exhibit 10 to RJN*, Dkt. # 59-11 ("*Sept. 2014 OIG Report*"), at 188–94. The industry-wide miscoding of kwashiorkor, which was attributed to ambiguous ICD-9 guidelines, is far different than the scheme alleged by Relator: that Providence and JATA specifically instructed doctors to code kwashiorkor —even though it is "not typically found in the United States"—in order to increase reimbursements. *See* SAC ¶¶ 26–27. Accordingly, the OIG reports, even taken together with the Medicare claims data, did not publicly disclose the "substantially the same allegations or transactions" of fraud that are alleged in Relator's complaint. *See* 31 U.S.C. § 3730(e)(4)(A).

Because Relator's claims are not substantially based on the information revealed in the Medicare claims data and HHS OIG reports alone, and because the Court cannot determine on the current record and briefing whether the online information about JATA's business practices was publicly disclosed, the Court **DENIES** Defendants' motion to dismiss based on the public disclosure bar.

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)

Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 19 of 25

2019 WL 3282619

The Court now proceeds to address Defendants' arguments that Relator has nonetheless failed to sufficiently plead its claims.

### B. Primary FCA Claims

To state a claim under the FCA, Relator must allege the following elements: "(1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012).

Because FCA claims sound in fraud, they must satisfy both the plausibility requirement of Rule 8 *and* the particularity requirement of Rule 9(b). *See United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016). Accordingly, Relator's complaint must "set forth what is false or misleading about a statement, and why it is false"; in other words, "the who, what, when, where, and how" of the misconduct charged. *Vess*, 317 F.3d at 1106; *see also Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) ("To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.") (internal quotation marks omitted). In the context of the FCA, Rule 9(b) requires "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir. 2010) (quoting *United States ex rel. Grubbs v. Kannegati*, 565 F.3d 180, 190 (5th Cir. 2009)).

Defendants argue that Relator failed to adequately plead the elements of falsity, materiality, and scienter.

### i. Falsity

Relator alleges that the Hospital Defendants submitted false claims to Medicare by including unwarranted MCCs for encephalopathy, respiratory failure, and severe malnutrition. *See generally SAC.* For each of these three categories, the complaint contains a table listing specific claims that Relator alleges were false. *See id.* ¶¶ 66, 74, 81. Among other information, the tables list the claim ID number, the hospital, the principal diagnosis, the alleged MCC false claim,

and the false claim amount. *See id.* While the complaint does not contain allegations about the medical conditions of specific patients—i.e. the symptoms they exhibited or their medical test results—because Relator does not have access to patient medical records, it alleges, based on its proprietary statistical analysis, that there is only a 1 in 1,000 to 1 in 100 million probability (depending on the diagnosis) that Providence's use of the encephalopathy, respiratory failure, and severe malnutrition MCCs at rates disproportionate to other hospitals is attributable to chance. *See JATA Opp.* 18:14–24. Importantly, Relator provides an explanation for this disparity, alleging that the MCCs Providence used at high rates line up with Defendant JATA's documentation tips, which instructed Providence doctors that these were MCCs that could result in increased reimbursement. *See SAC* ¶ 29. And Relator further alleges that Defendants' use of leading queries and the incentives doctors had to code MCCs give rise to a plausible inference that false claims were submitted. *See id.* ¶¶ 32–39.

**\*19** Defendants argue that this is not enough. They contend that without information about the actual medical conditions of specific patients, Relator cannot plausibly allege that any particular use of an MCC was not supported by the clinical circumstances. Relator's attempt at identifying false Medicare claims through statistical analysis appears to be novel. Neither side has identified any cases precisely on point. But the Third Circuit has relied on similar statistical data in determining that a relator had adequately pleaded its FCA claims. *See United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 258 (3d Cir. 2016).

In *Victaulic*, the relator alleged that the defendant had failed to properly mark pipe fittings it had imported from abroad (only imported fittings had to be marked). *See id.* at 247–48. In support of its claims, it relied principally on two sources of information: (1) an analysis of shipping manifest data that showed the majority of the defendant's pipe fittings were imported from abroad and (2) a study that showed that most of the defendant's products in the marketplace did not have the proper markings. *Id.* Notably, the complaint did not identify any specific pipe fittings that were alleged to be both imported from abroad and improperly marked; instead, it alleged that the number of pipe fittings the defendant imported combined with the number of unmarked fittings on the market gave rise to an inference that at least some imported fittings did not have the proper markings. *Id.* The Third Circuit found this sufficient to allege falsity under both Rule 8 and Rule 9(b). *See id.* at 256–58. It determined at the motion to dismiss

stage that it had to credit the relator's expert's conclusion that the only possible explanation for the lack of markings on products in the marketplace was that unmarked goods were being imported. *Id.* at 257. And it concluded that the relator did not need to identify specific shipments of unmarked goods under Rule 9(b) because only the defendant had "access to the documents that could prove or disprove [Relator's] well-pled allegations." *Id.* at 258.

The Court finds the Third Circuit's analysis persuasive. At this stage, it must credit Relator's allegations that the Hospital Defendants' high rates of coding for encephalopathy, respiratory failure, and severe malnutrition are highly unlikely to be caused by chance. And while the coding rates alone likely would not be enough to state a claim for fraud, Relator's allegations about the documentation tips that JATA gave to Providence's doctors, along with JATA's promotion of leading queries [13] and its guarantee that it would increase hospitals' case mix, are enough to give rise to a plausible inference that the increased coding rates were plausibly caused by the Hospital Defendants submitting claims with MCCs that were not supported by the clinical realities.

**\*20** Defendants' arguments to the contrary are unpersuasive. *See JATA Mot.* 24:14–28:14. First, they rely on three out-of-circuit cases that they contend stand for the proposition that relators cannot rely on statistical analyses to allege falsity. *See United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.,* 707 F.3d 451 (4th Cir. 2013); *United States ex rel. Crews v. NCA Healthcare of Ill., Inc.,* 460 F.3d 853 (7th Cir. 2006); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899 (5th Cir. 1997). But these cases are inapposite.

In *Thompson,* the defendant alleged only that "in reasonable probability, based on statistical studies performed by the Government and others approximately 40 percent of claims submitted by defendants ... were for services that were not medically necessary." 125 F.3d at 903. The Fifth Circuit found that this bare reference to statistical studies was not enough to allege falsity because the studies did not show that the defendants were the cause of the disparity. *Id.* In contrast, Relator here has provided detailed allegations explaining why JATA and the Hospital Defendants were responsible for the allegedly false claims reflected by the statistical analysis.

In *Nathan,* the Fourth Circuit found that the statistical inferences the relator was making to connect various data points were "implausible and unsupported by the stated

facts." 707 F.3d at 460. Here, however, the Court believes the Hospital Defendants' use of certain MCC codes at rates that far exceed other hospitals, when combined with allegations about JATA's business practices, renders Relator's inferences at least plausible.

Finally, in *Crews,* the Seventh Circuit found that a statistical analysis was not enough to show that any given claim was false. *See* 460 F.3d at 856–57. But in the Ninth Circuit, unlike in the Seventh Circuit, relators need not identify a specific false claim; instead, they may "allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid,* 616 F.3d at 998–99. Accordingly, *Crews*'s holding is simply not relevant in this circuit.

Defendants also point to the fact that while Medicare conducts similar statistical analyses of claims as part of its auditing practices, its contractors are not permitted to deny claims on the basis of statistics without first reviewing the relevant medical record. *See Hosp. Mot.* 27:9–28:10 (citing CMS, *Medicare Program Integrity Manual,* Pub. 100-08 Ch. 2 —Data Analysis (rev. June 22, 2016) ("PIM")). However, Defendant cannot argue that statistical analysis of the type performed by Relator is entirely irrelevant. Medicare's manual itself specifically notes that "Data Analysis is an essential first step in determining whether patterns of claims submissions and payments indicate potential problems. Such data should include identification of statistical outliers in billing patterns within a well-defined group, or more sophisticated detection of patterns within claims or groups of claims that might suggest improper billing or payment." PIM § 2.1.C.

Defendants view this Medicare guidance as a point in their favor, arguing that that if statistical analyses "are not even enough to deny a claim, they are certainly not enough to initiate an FCA action." *Hosp. Mot.* 28:11–14. But the argument proceeds from a faulty premise. On a motion to dismiss, Relator does not need to have enough evidence to justify denying a claim—i.e. to *prove* that a claim is false —because it does not need to prove its case at this stage. Instead, it need only allege facts sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 545. Relator's statistical analysis, which Medicare itself has acknowledged can suggest improper billing, combined with its allegations about JATA's practices, take its claims out of the realm of the speculative.

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
2019 WL 3282619

Case 3:18-cv-01496-JD Document 84 Filed 07/30/19 Page 21 of 25

**\*21** Defendants also argue that Relator has failed to satisfy the particularized pleading requirements of Rule 9(b). *See JATA Reply*, 6:15–7:22. But the Court agrees with Relator that it has adequately alleged the "who, what, when, where, and how" of the alleged fraud: the "who" is JATA and the Providence hospitals, the "what" is the upcoding of three categories of MCCs (encephalopathy, respiratory failure, and severe malnutrition), the "when" is between 2011 and 2017, and the "how" is by training doctors to use language supporting the MCCs and steering them into using that language through leading queries and incentives. *See Hosp. Opp.* 30:9–20; *see also Vess*, 317 F.3d at 1106. Defendants argue that Relator has not alleged the "who" because it has "failed to identify a single Providence affiliate who engaged in misconduct or a single physician who went against her own medical judgement to diagnose a patient with a condition she did not have." *Hosp. Mot.* 10:21. But this is not entirely correct. Relator has provided a list of 125 alleged false claims and has identified the hospital at issue for each of them. *See id.* ¶¶ 66, 74, 81. As for the names of the doctors who provided the diagnoses that led to these specified claims, their names can be easily determined by Defendants and therefore did not need to be alleged in the complaint. *See United States ex rel. Mei Ling v. City of L.A.*, No. CV 11-974 PSG (JCx), 2018 WL 3814498, at \*11 (C.D. Cal. July 25, 2018) ("The individuals who signed the claims and statements can be divined by [Defendants]; the Government need not include them in its complaint when its allegations already provide Defendants with the notice required by Rule 9(b)" (cleaned up)). In short, the Court concludes that the detailed allegations in the complaint provide Defendants with sufficient notice of the allegedly fraudulent conduct, satisfying the requirements of Rule 9(b).

### *ii. Materiality*

A falsehood is material under the False Claims Act if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

Defendants contend that Relator has not adequately alleged materiality because "coding an MCC does not necessarily change reimbursement." *Hosp. Mot.* 32:22–23. This is because while each claim can have multiple secondary diagnoses, there are only three severity levels: (1) "without Complication or Major Complication," (2) "with Complication," or (3) "with Major Complication."

*SAC* ¶ 23. Defendants argue that even if some MCCs for encephalopathy, respiratory failure, and severe malnutrition were coded incorrectly, it is possible that the severity level of the claim—and consequently the reimbursement—would not have changed because it could have been adequately supported by other, legitimately coded, MCCs. *See JATA Mot.* 20:1–11. In support, it points to an audit that HHS OIG performed of Providence Portland Medical Center's claims using the diagnosis code for kwashiorkor, a type of severe malnutrition. *See id.* 20:12–25; *Sept. 2014 OIG Report*. HHS OIG identified 90 claims that improperly used the kwashiorkor code but determined that for 87 of those 90 claims, the severity level of the claim was unaffected because it was adequately supported by other diagnosis codes that had a similar or greater severity level. *Sept. 2014 OIG Report at* 189–90.

However, Relator alleges that for each of the 125 specific claims identified in the SAC, adding the MCC increased the severity level and the reimbursement amount. *See Hosp. Opp.* 26:7–12; *see SAC* ¶¶ 66, 74, 81. At the motion to dismiss stage, the Court must take these allegations as true, and they are enough to adequately plead materiality.

### *iii. Scienter*

A defendant is liable under the FCA only if it acted "knowingly." 31 U.S.C. § 3729(b)(1). The defined term "knowingly" is somewhat of a misnomer because it includes both acting with "actual knowledge of the information" and acting with "deliberate ignorance" or "reckless disregard of the truth or falsity of the information. *See id.* § 3729(b)(1)(i)–(iii). Mere negligence, however, is insufficient to state a claim under the FCA. *See United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) ("Congress specifically expressed its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.") (internal quotation marks omitted). Although "knowledge must [ ] be pleaded sufficiently to make entitlement to relief plausible," *United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1012 (C.D. Cal. 2015), it need not be pleaded with particularity. *See id.* at 1011–12; *see also United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011) ("[M]alice, intent, knowledge, and other conditions of a person['s] mind, including scienter, can be alleged generally.") (internal quotation marks omitted).

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)

2019 WL 3282619

Case 3:18-cv-01496-JD   Document 84   Filed 07/30/19   Page 22 of 25

**\*22** Defendants' argument for lack of scienter is essentially that Relator has not adequately alleged that Defendants knew the claims they were submitting to Medicare contained MCCs that were not justified by the clinical circumstances. *See JATA Mot.* 21:1–22:9. But the Court is not persuaded. Relator has alleged that Defendants implemented a coding program that was intended to increase Medicare revenue by leading physicians to use language that would support coding of certain MCCs. *SAC* ¶¶ 26–31. They did so by training physicians to use such language and by sending allegedly leading queries, in contravention of industry practices, that physicians responded to in a manner that supported the addition of an MCC. *Id.* ¶¶ 33–39. Further, JATA's Regional Director allegedly taught Providence physicians that the only way to avoid being harassed by queries would be to document an MCC in the first place. *Id.* ¶ 38. All of these allegations taken together are enough to give rise to a plausible inference that Defendants were primarily focused on increasing their Medicare revenue such that they at least recklessly disregarded the possibility that the tactics they used could lead to improper upcoding. Because acting with reckless disregard is enough to satisfy the FCA's "knowingly" requirement, Relator has adequately alleged scienter.

### C. Conspiracy Claims

The FCA claims described above provide for liability if the defendant acts "knowingly," which is defined as having actual knowledge *or* acting in deliberate ignorance or with reckless disregard. *See* 31 U.S.C. § 3729(b)(1). However, the FCA's reference to *conspiracy* claims does *not* have this "knowingly" requirement. *See id.* § 3729(a)(1)(C). Accordingly, most courts have concluded that general civil conspiracy principles apply to the conspiracy provision of the FCA. *See United States ex rel. Rizzo v. Horizon Lines, LLC,* No. CV 10-7409 PA (AJWx), 2013 WL 12131171, at \*4 (C.D. Cal. Oct. 23, 2013); *see also United States ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 n.3 (7th Cir. 1999). Under these principles, Relator "must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful agreement." *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir. 1999) (cleaned up). As the alleged object of this conspiracy was to submit false claims to Medicare, Relator must show that Defendants jointly intended to do so. For conspiracy, reckless disregard is not enough.

The Court concludes that the allegations in the SAC are not sufficient to make this showing. While Relator adequately alleges that Defendants may have recklessly disregarded the possibility that their actions would lead to false claims, nothing in the SAC—beyond a conclusory allegation of conspiracy—alleges that the Hospital Defendants and JATA set out with a joint purpose to submit false claims. It instead alleges that they intended to increase the Hospital Defendants' Medicare reimbursements. That, in and of itself, is not illegal. If the Hospital Defendants were previously underbilling Medicare, then it would be legitimate to attempt to increase the billing rate. While Relator has plausibly alleged Defendants' plan was executed in a manner that predictably led to false claims, such that it was reckless for Defendants to disregard the fact that false claims were submitted, this does not necessarily mean that submitting false claims was Defendants' goal at the outset.

Because Relator has not adequately alleged an agreement between the Hospital Defendants and JATA to submit false claims, it has not adequately alleged a conspiracy. Accordingly, the Court **GRANTS** Defendants' motion to dismiss the conspiracy claims.

### D. Reverse FCA Claims

In 2009, Congress expanded the scope of the FCA by making it unlawful to "knowingly conceal[ ] or knowingly and improperly avoid[ ] ... an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). These claims based on failure to pay money owed to the Government are known as "reverse FCA claims."

Relator's reverse FCA claim is predicated upon Defendants' statutory obligation to report and return Medicare overpayments. *See Hosp. Opp.*; 42 U.S.C. § 1320a-7k. Essentially, Relator alleges that after overcharging Medicare, Defendants further violated the FCA by failing to return the overpayments. However, "[i]n cases where a plaintiff alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the [reverse FCA] claim as redundant." *United States v. Kinetic Concepts, Inc.,* No. CV 08-1885 BRO (AGRx), 2017 WL 2713730, at \*13 (C.D. Cal. Mar. 6, 2017).

**\*23** Relator argues that its reverse FCA claim is not redundant because the Court could find that Defendants did not knowingly submit false claims but did "knowingly conceal" false claims by avoiding Medicare audits. *See Hosp. Opp.* 28:19–26. But the Court does not believe this theory

is supported by the single allegation Relator cites from the SAC, which alleges that a JATA official advised hospitals at an industry event to avoid single CC or single MCC diagnoses to avoid triggering audits. *See SAC* ¶ 40. The complaint does not allege that this advice was ever given *to Defendants*, and in any event, Relator has not explained how Defendants could knowingly attempt to avoid audits by manipulating CC or MCC codes without at least recklessly disregarding whether the codes it used were accurate (which would give rise to a primary FCA claim).

Because the Court finds that Relator's reverse FCA claim is redundant of its primary claims, it **GRANTS** Defendants' motion to dismiss this claim.

### E. Anti-Kickback Claims
Relator's second cause of action alleges that Defendants violated the FCA by submitting claims that were tainted by violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). *See SAC* ¶¶ 134–42. The statute prohibits paying or receiving kickbacks in exchange for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made ... under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

Relator's theory of liability on this claim is that JATA and the Hospital Defendants conspired to pay JATA kickbacks, in the form of increased remuneration, in exchange for a guarantee that JATA would increase the hospitals' Medicare billing. But under the plain text of the Anti-Kickback Statute, this is not a violation. The statute applies only to kickbacks paid in exchange for "referring *an individual*" for health care services. *See id.* There are no allegations that JATA referred individuals to the Hospital Defendants for treatment; nor could there be because JATA is a coding consultant, not a physician.

As Relator has not adequately alleged a violation of the Anti-Kickback Statute, it likewise has not alleged an FCA violation based on violation of that statute. Accordingly, the Court **GRANTS** Defendants' motion to dismiss the FCA claims in the second cause of action.

### F. Summary
For the foregoing reasons, the Court concludes that Relator has adequately pleaded its FCA claims against both Defendants based on the submission of false claims to

Medicare but has not adequately pleaded its claims based on conspiracy or violation of the Anti-Kickback Statute. The Court further concludes that the reverse FCA claims should be dismissed as redundant. And it finds that resolution of the question of whether the public disclosure bar prohibits Relator's claims must wait for further factual development.

Accordingly, Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part. The Court **DISMISSES** the conspiracy, reverse FCA, and Anti-Kickback Statute claims. Relator may proceed on its other claims.

### V. Leave to Amend
Whether to grant leave to amend rests in the sound discretion of the trial court. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). The Court considers whether leave to amend would cause undue delay or prejudice to the opposing party, and whether granting leave to amend would be futile. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). Generally, dismissal without leave to amend is improper "unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

The Court **GRANTS** leave to amend in part and **DENIES** it in part. As the defects in Relator's conspiracy claims could be cured by additional allegations about the nature of the agreement between JATA and the Hospital Defendants, the Court **GRANTS** leave to amend the conspiracy claims. As for the reverse FCA claims, the Court is skeptical that Relator will be able to allege a claim that is not redundant of its primary claims, but it concludes that it should at least be given an opportunity to do so. Accordingly, the Court **GRANTS** leave to amend the reverse FCA claims. However, the Court concludes that amendment of the Anti-Kickback Statute claims would be futile and therefore **DENIES** leave to amend these claims.

**\*24** Relator must amend its conspiracy and reverse FCA claims no later than **August 16, 2019** or they will be dismissed with prejudice.

### VI. Conclusion
For the foregoing reasons, Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part. The Anti-Kickback Statute claims are **DISMISSED** with prejudice. The conspiracy and reverse FCA claims are **DISMISSED** without prejudice to amendment. The motions to dismiss

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)
2019 WL 3282619

Case 3:18-cv-01496-JD   Document 84   Filed 07/30/19   Page 24 of 25

are **DENIED** as to Relator's primary FCA claims based on Defendants' alleged knowing submission of false claims to Medicare.

Relator must amend its conspiracy and reverse FCA claims no later than **August 16, 2019** or they will be dismissed with prejudice.

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2019 WL 3282619

Footnotes

1    The affiliate Hospital Defendants joining this motion are Providence Health System—Southern California, Providence Health & Services—Washington, Providence Health & Services—Oregon, Providence Saint John's Health Center, Providence Health & Services—Montana, Swedish Health Services, and Swedish Edmonds.

2    Integra also excluded claims involving patients who died during treatment as it alleges that "these claims tend to involve patients that are sicker and have higher rates of MCCs." *SAC* ¶ 50.

3    According to the allegations in the complaint, "[e]ncephalopathy is a term for brain disease or damage to the brain where the brain is regarded as 'altered in its structure or function.' The telltale symptom is an altered mental state, but altered mental state alone is insufficient for diagnosing encephalopathy .... [Encephalopathy] commonly manifests as confusion, agitation, or lethargy, but may include aphasia (altered speech), ataxia (altered gait) and memory loss." *SAC* ¶ 59.

4    For sake of brevity, where both motions address the same issue, the Court cites to only one of the motions.

5    The Court takes judicial notice of these government documents, which are publicly available on the agencies' websites.

6    In *Malhotra*, the Ninth Circuit appears to have held that only employees of the target of an investigation or employees of the government can be considered "insiders," such that a disclosure of information to them is not a public disclosure. *See* 770 F.3d at 859 ("In *Seal 1*, we had no occasion to define with precision the meaning of 'outsider.' [The relator in that case] was neither an employee of the target of the investigation (Zenith) nor an employee of the government—the two categories of individuals who, even under the broadest reading of our precedents, could be considered insiders. That made it easy to conclude that [the relator] was an 'outsider' to the Zenith investigation.") It is not clear, however, whether the Ninth Circuit was contemplating situations in which there is no existing government investigation into the defendant in the FCA case. Ultimately, the Court does not need to decide if insider status is limited to employees of targets of investigations or the government because it concludes that Integra was an outsider under any definition.

7    *See* Radcliffe, 582 F. Supp. 2d at 772 ("I am not ready to conclude that anything posted online would automatically constitute a public disclosure within the meaning of [the public disclosure bar].")

8    Citing this difficulty, Defendants suggested at the second hearing that the Court could avoid attempting to determine the ordinary meaning of the term news media and instead simply analyze the websites in this case by comparing them to online sources in other cases. But the Court believes that it is important to provide an ordinary meaning definition. As discussed above, none of the dozens of cases cited by both sides conducted an analysis that was anchored in the statutory text. While there may be room to disagree with the contours of the "news media" analysis that the Court sets forth below, perhaps this attempt to fashion an ordinary meaning definition of the term will lead others to attempt the same. *See* Schindler Elevator, 563 U.S. at 407.

9    Defendants argue that the websites containing the JATA business practice information have been incorporated by reference into the SAC. *See Def. Supp.* 25:8–18. In support, they cite to cases holding that a court adjudicating a motion to dismiss can take into account "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *See* Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (cleaned up); *see also* Oaktree Principal Fund V, LP v. Warburg Pincus LLC, No. CV 15-8574 PSG (MRWx), 2016 WL 6782768, at *8 (C.D. Cal. Aug. 9, 2016). However, the incorporation by reference doctrine is most commonly applied when the allegations in the complaint clearly implicate a document but the document is not attached to the pleading, for example when claims are based on a contract or insurance policy. *See* Knievel, 393 F.3d at 1076. Here, there appears to be at least some dispute about the extent to which the information underlying the allegations in the SAC came from the websites Defendants have put forward, as opposed to interviews with former JATA employees. *See Pl. Supp.* 22:5–23:8; *SAC* ¶ 1 (alleging that information about the fraud came in part from "interviewing former employees"). In any event, even assuming for the sake of argument that the online sources were incorporated by reference, a determination of

United States ex rel. Integra Med Analytics LLC v. Providence..., Slip Copy (2019)

2019 WL 3282619

Case 3:18-cv-01496-JD   Document 84   Filed 07/30/19   Page 25 of 25

whether any source constitutes "news media" within the meaning of the public disclosure bar will require more than simply looking at the screenshots Defendants have put forward. *See* Dkt. # 76. Accordingly, the issue is not ripe for adjudication.

10    Defendants had originally taken the position that Relator's claims would be precluded by the public disclosure bar as substantially similar to publicly disclosed information only if the Medicare claims data, HHS OIG reports, *and* the online information about JATA's business practices were *all* publicly disclosed. *See, e.g*, *JATA Reply*, 17:15–19. But at the February 13 hearing, they argued for the first time that public disclosure of the Medicare claims data and HHS OIG reports *alone* would be enough to trigger the public disclosure bar, regardless of whether the information about the JATA business practices was publicly disclosed. At the Court's request, the parties submitted supplemental briefs addressing this argument, *see Def. Supp.* 4:16–7:18; *Relator Supp.* 6:1–12:27, and it is now ripe for adjudication.

11    *See, e.g.*, *Hosp. Mot.* 24:17–21 ("Relator's central allegation is that Providence had a statistically significant higher incidence of coding for three MCCs than other hospitals. From this, Relator makes the inferential leap that the claims that use those codes are fraudulent. This lack of a claim-specific analysis is fatal to its complaint.")

12    The ICD or "International Classification of Diseases" is maintained by the World Health Organization and is the "international standard diagnostic tool for epidemiology, health management, and clinical purposes." *Dec. 2017 OIG Report* at 728. ICD-9 was the ninth revision of the ICD.

13    Defendants argue that Relator cannot base its FCA claims on allegedly leading queries because there is no CMS or other government guidance on the use of queries. *See Hosp. Mot.* 30:16–32:13. But while the Court agrees that merely violating industry practices that are not codified in any government regulation cannot create liability, that is not what Relator alleges here. Relator instead points to Defendants' alleged non-conformance with the practices of the industry to explain *why* Defendants coded MCCs at rates that far exceeded other hospitals. If these allegations are true, they could tend to show that the queries predictably led Providence doctors to code MCCs that were not supported by a patient's condition. In other words, Relator does not ground its FCA claim in violations of industry standards; it instead points to Defendants' query practices as evidence that supports its theory that false claims were submitted.

---

**End of Document**                                                 © 2019 Thomson Reuters. No claim to original U.S. Government Works.