Nicomedes Sy Herrera (State Bar No. 275332)
Shawn M. Kennedy (State Bar No. 218472)
Bret D. Hembd (State Bar No. 272826)
Laura E. Seidl (State Bar No. 269891)
**HERRERA KENNEDY LLP**
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
Facsimile: (855) 969-2050
Email: NHerrera@HerreraKennedy.com
        SKennedy@ HerreraKennedy.com
        BHembd@ HerreraKennedy.com
        LSeidl@ HerreraKennedy.com

*Attorneys for Plaintiff-Relator Zachary Silbersher*

[Additional Counsel on the Signature Page]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, AND WASHINGTON; THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA; AND THE DISTRICT OF COLUMBIA, *ex rel.* ZACHARY SILBERSHER, <br><br> Plaintiffs, <br><br> v. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, INC., VALEANT PHARMACEUTICALS INTERNATIONAL, SALIX PHARMACEUTICALS, LTD., SALIX PHARMACEUTICALS, INC., AND DR. FALK PHARMA GMBH, <br><br> Defendants. | Case No.: 3:18-cv-01496-JD <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF:** <br><br> **1. THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729–3733; AND** <br><br> **2. THE FALSE CLAIMS ACTS OF THE PLAINTIFF STATES, COMMONWEALTHS, AND THE DISTRICT OF COLUMBIA** <br><br><br> **JURY TRIAL DEMANDED** |

CONTENTS

I.    INTRODUCTION ........................................................................... 1

        A.    Overview of Defendants' False Claims ............................... 1

        B.    The Federal and State False Claims Acts ............................ 9

II.   PARTIES ................................................................................... 13

III.  JURISDICTION AND VENUE .................................................... 15

IV.   FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS ............... 16

        A.    Medicare ............................................................................ 16

        B.    Medicaid ............................................................................ 17

        C.    Other Government-Funded Health Programs ................... 17

V.    THE REGULATORY STRUCTURE THAT DEFENDANTS
      MANIPULATED TO BLOCK GENERIC COMPETITORS TO APRISO ...... 17

        A.    The Regulatory Structure for Approval of Generic Drugs ...... 17

        B.    United States Patent Law ................................................. 19

        C.    The Economic Benefits of Blocking Generic Entry, Even When
              Frivolous ............................................................................ 21

VI.   ALLEGATIONS CONCERNING DEFENDANTS' FALSE CLAIMS ............ 22

        A.    Defendants Fraudulently Obtained the '688 Patent Through False
              and Misleading Statements ............................................... 22

        B.    The Otterbeck Patents are Invalid Based on Prior Art that
              Defendants Failed to Disclose to the Patent Office ........... 31

        C.    Defendants Wrongfully Blocked Generic Competition ...... 36

        D.    Defendants' Fraudulent Scheme Has Resulted in Tens of Thousands
              of False Claims .................................................................. 40

        E.    Defendants Made False Statements to The Federal And State
              Governments Regarding Fair And Reasonable Pricing That Was
              Material to The Government's Payments. .......................... 43

        F.    Defendants' Conduct Was Material. ................................... 47

VII.  CLAIMS ................................................................................... 49

Plaintiff-Relator Zachary Silbersher ("Relator"), through his attorneys Herrera Kennedy LLP, Burns Charest LLP, and Sparacino PLLC, on behalf of the United States of America; the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington; the Commonwealths of Massachusetts and Virginia; and the District of Columbia (the foregoing states, commonwealths and the District of Columbia collectively, "the Plaintiff States"), for his Complaint against defendants Bausch Health Companies Inc. (formerly known as Valeant Pharmaceuticals International, Inc.) and Valeant Pharmaceuticals International (together, "Bausch" or "Valeant"); Salix Pharmaceuticals, Ltd. and Salix Pharmaceuticals, Inc. (together, "Salix"); and Dr. Falk Pharma GmbH ("Dr. Falk") (Bausch, Salix, and Dr. Falk collectively, "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

# I.    INTRODUCTION

## A.    Overview of Defendants' False Claims

1.    Like many other cases under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, this one is about overpriced prescription drugs. The exorbitant cost of many drugs is one of the most serious problems facing the American healthcare system. In recent years, it has become increasingly clear that one of the most significant contributors to this problem is the abuse of the patent system by drug manufacturers to prevent competitors from entering the market.

2.    Because a monopoly on a widely prescribed branded drug can be extraordinarily lucrative, manufacturers in some cases attempt to obtain or extend a patent monopoly by engaging in deceptive conduct, such as misrepresenting key facts to the Patent Office, or failing to disclose information that would cause the Patent Office to reject a patent application.

3.    When manufacturers dishonestly obtain such a monopoly, they fraudulently impose massive costs on the Government, which continues to pay wrongfully inflated monopoly prices. This case is about Defendants' acquisition of a patent through fraud, and Defendants' use of that fraudulently obtained patent to overcharge the government for an important prescription drug. Relator sues on behalf of the United States of America and the Plaintiff States (collectively, the "Government") to recover for violations of the federal False Claims Act, 31 U.S.C. §§ 3729–3733 (the "Federal FCA"); and the false claims acts of the Plaintiff States (the "State FCAs").

4.    Defendants manufacture, sell, and distribute Apriso® (mesalamine) Extended Release Capsules, the application for which was approved by the FDA on October 31, 2008. The active-pharmaceutical ingredient in Apriso is mesalamine. Mesalamine is sometimes also referred to as mesalazine, 5-aminosalicylic acid, or 5-ASA. Mesalamine has been widely used for decades in numerous pharmaceutical formulations to treat ulcerative colitis, and it has long been off-patent. Doctors widely prescribe Apriso to treat patients with ulcerative colitis. Ulcerative colitis is an inflammatory-bowel disease that causes inflammation and ulcers within the colon.

5.    Mesalamine acts topically upon the sores within the colon. When orally administered, mesalamine must travel through the stomach and reach the colon to be therapeutically effective. The difficulty, however, is that mesalamine is easily metabolized in the stomach. When metabolized, mesalamine will be absorbed into the blood stream, which is known as "systemic" absorption. When systemically absorbed, the drug will not pass through the stomach and into the colon. Thus, oral mesalamine drugs are typically formulated so that the drug can pass through the stomach, without being metabolized, and eventually reach the colon, where it can act topically upon the ulcers. The extent to which the drug is released in the colon is sometimes referred to as "colonic bioavailability."

6. To increase colonic bioavailability, Apriso encases the drug within an enteric coating to delay release of the drug. Apriso also uses a polymer matrix core to extend release of the drug through as much of the colon as possible. An enteric coating will only dissolve above a certain pH-threshold. Thus, because the pH of the stomach is typically lower than that of the colon, enteric coatings have been used with oral mesalamine formulations so that the drug can pass through the stomach without being metabolized. When the drug reaches the colon, where the pH is higher, the enteric coating dissolves, and the drug is released.

7. Defendants held a fraudulently-obtained patent that they used to exclude generic alternatives to Apriso. As more fully described below, the patent was obtained through fraudulent and misleading statements to the United States Patent and Trademark Office (the "Patent Office"). As a result of Defendants' unlawful conduct that has excluded generic competition for Apriso, Defendants were able to charge artificially high price for the drug.

8. Apriso is covered by Medicare, Medicaid, and various federal and state government-funded health programs. Government health funds pay a significant portion of Apriso's artificially high prices. Each and every claim submitted to one of these government agencies for payment or reimbursement for Apriso is a false claim in violation of the Federal FCA and (where applicable) a relevant State FCA, because Defendants knowingly and intentionally caused each claim to be submitted for an artificially high price that Defendants charged as a result of their fraudulently-obtained patent, and at the exclusion of generic competitors. Defendants also gave the federal government and the Plaintiff States multiple express and implied assurances that the price Defendants were charging for Apriso was "fair and reasonable." It was not. The federal government and the Plaintiff States materially relied on Defendants' false and misleading statements and certifications when granting Defendants' patent application, and in paying or reimbursing claims for Apriso.

9.     There are two sets of patents relating to Apriso. The first set consists of a single method of use patent: U.S. Patent No. 8,865,688 ("the '688 Patent"). The '688 Patent was issued on October 21, 2014 and would not have expired until May 1, 2030 (if it had not been invalidated by the United States Patent Office's Patent Trial and Appeal Board ("PTAB"), and the courts).

10.     The '688 Patent claimed a method for administering certain granulated mesalamine formulations *without* food. The Apriso formulation was covered by the granulated mesalamine formulation claimed in the '688 Patent. As previously discussed, the granulated mesalamine formulation combines an enteric pH-dependent coating, which provides for delayed release, and a polymer matrix core, which provides for extended release.

11.     During prosecution of the '688 Patent application, Defendants argued to the Patent Office that administering the claimed granulated mesalamine formulation without food was *not* obvious. After a lengthy prosecution, the Patent Office granted the '688 Patent based on this purported novelty. Defendants, however, intentionally withheld material information demonstrating that it was obvious in light of prior art that Defendants' claimed granulated mesalamine formulation would be effective when administered without food. Defendants intentionally withheld such information for the purpose of obtaining the '688 Patent, excluding generic competitors, and charging supracompetitive prices for Apriso.

12.     First, Defendants withheld disclosure of two scientific studies—published before Defendants applied for the '688 Patent—that disclosed administering granulated mesalamine formulations, such as those in Apriso, would be effective without food. These studies were Martin Brunner, *et al.*, "Gastrointestinal Transit and Release of 5-Aminosalicylic Acid From 153Sm-Labelled Mesalazine Pellets vs. Tablets in Male Healthy Volunteers," *Aliment Pharmacol. Ther.* 17:1163-1169 (2003) ("Brunner"); and Yuri Marakhouski *et al.*, "A Double-Blind Dose-Escalating Trial

Comparing Novel Mesalazine Pellets With Mesalazine Tablets in Active Ulcerative Colitis." *Aliment Pharmacol. Ther.* 21:133-140 (2005) ("Marakhouski").

13.     Defendants not only were aware of these studies: they *participated* in them. Dr. Falk's head of research and development, Roland H. Greinwald, Ph.D., was a co-author of both studies. In addition, Dr. Falk provided the granulated mesalamine formulations used in the Brunner study, and it underwrote the Marakhouski study. Yet, Defendants failed to disclose the studies to the Patent Office during prosecution of the '688 Patent.

14.     Second, Defendants withheld information showing that the colonic bioavailability of other pH-dependent mesalamine drugs using enteric coatings decreased when administered with food. This was all the more shocking because Defendants had disclosed these other drugs to the Patent Office a few years earlier when Defendants argued the *opposite* position: that it was not obvious to administer a different mesalamine drug *with* food.

15.     Specifically, on July 16, 2009, in connection with Defendants' prosecution of an earlier patent, Defendants told the Patent Office: "one of ordinary skill in the art, upon review of all the information available at the time the instant application was filed, would have expected the bioavailability [at the colon] of balsalazide to decrease when taken with food, and not increase, as maintained by the Examiner." At that time, Defendants also gave the Patent Office data demonstrating that for three other commercially available mesalamine formulations (including Lialda, Claversal and Asacol), colonic bioavailability (*i.e.*, efficacy) *decreased* when taken *with food*. In other words, Defendants had represented to the Patent Office in 2009 that administration of mesalamine *with* food was unexpected and novel (because those possessing ordinary skill in the relevant arts would have expected to administer mesalamine *without* food, because doing so would have increased the colonic bioavailability and therefore efficacy of the drug).

16.     Five years later, however, while prosecuting the '688 Patent, Defendants claimed the opposite, falsely representing to the Patent Office that administering mesalamine *without food* was unexpected. Defendants knowingly and intentionally omitted information that did not support their new claim, including information about similar mesalamine formulations they had relied on in their earlier and inconsistent arguments to the Patent Office. Defendants' omissions during prosecution of the '688 Patent were intentional. Indeed, the '688 Patent and the earlier patent each shared an inventor (Lorin Johnson), and they were prosecuted by the same patent attorney (Jonathan Sparks).

17.     On May 19, 2017, the PTAB invalidated the '688 Patent on the grounds it was obvious in light of the Brunner and Marakhouski articles. *See GeneriCo, LLC v. Dr. Falk Pharma GmbH*, No. IPR2016-00297, Final Written Decision, Dkt. 55 at 21-22 (P.T.A.B. May 19, 2017) ("*GeneriCo*"). Specifically, the PTAB held that administration of Apriso "without food" would have been obvious in light of the Brunner and Marakhouski articles.

18.     Bausch appealed the PTAB's decision and a district court opinion (*Salix Pharmaceuticals Inc. v. Mylan Pharmaceuticals, Inc.*, No. 1:15-cv-00109-IMK, Slip Op., Dkt. 255 (N.D.W. Va. Sept. 12, 2017)) to the Federal Circuit. The Federal Circuit affirmed the PTAB's decision invalidating the '688 Patent. *Dr. Falk Pharma GmbH v. GeneriCo, LLC*, 774 F. App'x 665 (Fed. Cir. 2019).

19.     The second set of patents are known collectively as the "Otterbeck Patents." The Otterbeck Patents are U.S. Patent Nos. 6,551,620 ("the '620 Patent"), 8,337,886 ("the '886 Patent"), 8,496,965 ("the '965 Patent"), 8,911,778 ("the '778 Patent"), 8,940,328 ("the '328 Patent") and 8,956,647 ("the '647 Patent").

20.     The Otterbeck Patents all expired on or around April 20, 2018. However, Defendants have not asserted (or have withdrawn their assertions) that the Otterbeck Patents restrict certain pharmaceutical manufacturers from introducing generic alternatives to Apriso. On information and belief, Defendants did not press the

1   Otterbeck Patents against generic competitors because they knew that the Otterbeck

2   Patents either were invalid, or could not reasonably have been asserted to exclude

3   generic competitors. As set forth in greater detail below, Defendants did not disclose

4   material information that would have shown that the allegedly novel innovations

5   claimed in the Otterbeck Patents had been disclosed in or were obvious in light of prior

6   art. Specifically, at least four prior art patents anticipate all or nearly all of the alleged

7   inventions claimed in the Otterbeck Patents, rendering them unpatentable.

8   Defendants failed to disclose this prior art to the Patent Office.

9       21.   Apriso was originally approved by the United States Food and Drug

10  Administration (the "FDA") on October 31, 2008 (Application No. N022301). Apriso's

11  FDA-approved exclusivity expired on October 31, 2011. Generic manufacturers were

12  ready to enter the market soon after the FDA exclusivity period expired, and they

13  would have been able to adequately to supply the commercial quantities of generic

14  Apriso necessary to meet market demand.

15      22.   The first generic manufacturer to file an Abbreviated New Drug

16  Application ("ANDA") for FDA approval to introduce a generic version of Apriso was

17  Lupin Pharmaceuticals, Inc. ("Lupin"). Lupin filed its ANDA in July 2012, and

18  Defendants filed an infringement action asserting the Otterbeck Patents against Lupin

19  on September 7, 2012 (the '688 Patent had not yet issued at that time). On September

20  11, 2014, the Patent Office notified Defendants that it would issue the '688 Patent

21  upon payment of the issue fee. The next day, on September 12, 2014, Lupin and

22  Defendants reached a settlement under which Valeant dismissed all claims relating to

23  the Otterbeck Patents, and Lupin agreed not to introduce a generic until 2022.

24      23.   But for the fraudulently acquired '688 Patent, Lupin would not have

25  agreed to stay out of the market until four years after the Otterbeck Patents were due

26  to expire. Moreover, but for the '688 Patent, the FDA would have granted Lupin's

27  ANDA at or around the same time as Defendants' withdrawal of the claims relating to

28  the Otterbeck Patents, if not earlier.

24.    Because the '688 Patent was fraudulently obtained and unenforceable, Lupin would have entered the market soon after Defendants ceased enforcing the Otterbeck Patents.

25.    After dismissing its infringement claims relating to the Otterbeck Patents against Lupin, Defendants dismissed their infringement claims relating to the Otterbeck Patents against other generic manufacturers who were seeking to introduce lower-priced generic versions of Apriso. These generic competitors include, without limitation, Mylan and Teva. As explained in greater detail below, but for the '688 Patent, Mylan and Teva would have also introduced generic alternatives to Apriso soon after Defendants' withdrawal of their claims relating to the Otterbeck Patents against them, and the FDA would have granted their pending ANDAs sooner.

26.    In addition, several other generic manufacturers introduced generic versions of Apriso after the Federal Circuit affirmed the PTAB's decision invalidating the '688 Patent. These other generic competitors—including, without limitation, Alembic Pharmaceuticals, Alken Laboratories, AMTA Labs Limited, Aurobindo Pharma USA, NOVAST Laboratories, and Zydus Pharmaceuticals—upon information and belief, had refrained from filing ANDAs to introduce generic Apriso until after freedom to operate under the '688 Patent was established when the Federal Circuit affirmed the PTAB's decision invalidating the patent.

27.    Such generic competition would have reduced the price of the drug by at least 80%, and Defendants would have reasonably expected to lose at least 90% of Apriso's market share. Defendants' misconduct has allowed them unlawfully to set and maintain artificially inflated prices for Apriso. The federal government and the Plaintiff States, through Medicare, Medicaid, and their various health services, have paid artificially inflated prices for Apriso and generic Apriso throughout the intervening time. Because Defendants were able to charge inflated prices for Apriso due to their false or misleading statements, each claim for Apriso is a violation of the False Claims Act. Moreover, through Defendants' unlawful conduct, they have been

able to obtain payment or reimbursement for prescriptions of Apriso that would have otherwise been filled with less expensive generic alternatives.

28.    The additional protection granted by the '688 Patent gave Defendants added leverage in litigation with potential generic manufacturers of Apriso. Defendants used this leverage to continue excluding generic alternatives to Apriso from entering the market.

29.    The delay caused by Defendants' manipulation of the regulatory structure for generic approval (described below) has allowed Defendants to reap a windfall of hundreds of millions of dollars in additional Apriso revenue. But for Defendants' fraud, the Government would have saved hundreds of millions of dollars of healthcare funds, and Defendants would have lost most of their market share.

**B.    The Federal and State False Claims Acts**

30.    The Federal FCA and the State FCAs provide a mechanism for the federal and state governments to protect their health care funds from unlawful predation. Relator brings this *qui tam* action to do so.

31.    As set forth below, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by the United States Government and each of the Plaintiff States in connection with the sale of Apriso (each, a "False Claim"). These False Claims include, without limitation: (a) claims for Medicare and Medicaid reimbursement for Apriso prescriptions; and (b) claims for payment for direct purchases of Apriso under certain government programs.

32.    Defendants willfully made false and materially misleading statements to the Patent Office to fraudulently obtain the '688 Patent. Defendants unlawfully used the '688 Patent to exclude generic competition from the market. As a result, Defendants were able to charge artificially inflated prices for Apriso. Moreover, each and every claim for payment or reimbursement for Apriso that would have been substituted for a less expensive generic equivalent also constituted a False Claim, entitling the Government to recover the full invoice amount.

- 9 -

33.    Each and every False Claim for payment or reimbursement for Apriso submitted by (or caused to be submitted by) Defendants violated the Federal FCA and the respective State FCAs because, among other reasons, each False Claim was for an unlawfully elevated, maintained, or stabilized price contrary to express representations and implied certifications by Defendants to the federal government that the price of Apriso reflected in each False Claim was "fair and reasonable," and not unlawfully elevated, maintained or stabilized in violation of applicable law, including applicable antitrust laws. Despite knowing their prices were unlawfully inflated, Defendants gave the federal government and the Plaintiff States multiple express representations and implied assurances that the prices Defendants were charging for Apriso were "fair and reasonable," which the federal government and the Plaintiff States materially relied upon when paying or reimbursing claims for Apriso. Moreover, Defendants made false, fraudulent, and misleading statements to the Patent Office in connection the submission of each False Claim because the price of Apriso reflected in each False Claim was unlawfully elevated as a result of Defendants' false, fraudulent, and misleading statements to the Patent Office. Finally, each claim for reimbursement or payment for a prescription of Apriso that would have been filled by a generic alternative had Defendants not unlawfully excluded such competitors from entering the market also constituted a False Claim.

34.    As explained below, Defendants' application for the "688 Patent also constituted a false claim and is itself actionable under the FCA, apart from any claims for payment of Apriso, because the fraudulent application itself constituted a false claim presented to the government requesting or demanding property. Accordingly, Defendants are also liable for all the reasonably foreseeable injuries to the Government that were proximately caused by that false claim, including, without limitation, all downstream claims for payment for Apriso or generic Apriso that included an inflated price for mesalamine.

35. According to the Centers for Medicare & Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services ("DHHS"), between 2011 and 2016, Medicare reimbursed approximately 462,491 claims for Apriso for approximately $183 million. By 2019—when the Federal Circuit affirmed the invalidation of the '688 Patent—Medicare reimbursed over 200,000 prescriptions and paid nearly $136 million for brand Apriso in that year alone. By 2022, after generic entry, Defendants' share of the Medicare market plummeted to only 10,649 prescriptions for $8.5 million, and the price for mesalamine dropped substantially.

36. Apriso is also covered by Medicaid programs for all Plaintiff States, making payments relating to Apriso purchases and reimbursements a substantial burden on Medicaid funds. Between 2012 and 2016, Medicaid reimbursed 177,213 claims for Apriso for approximately $65 million. The number of claims for Apriso paid by Medicaid increased by an average of 41% per year between 2012 and 2016, and total reimbursements increased by an average of 58% per year during that time. By 2019, Medicaid reimbursed over 66,500 prescriptions and paid over $32 million for brand Apriso in that year alone. By 2022, after generic entry, Defendants' share of the Medicaid market plummeted to only 21,000 prescriptions for $11 million, and the price for mesalamine dropped substantially.

37. The United States Government also purchases Apriso through government-funded health programs, including, without limitation, CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System; the healthcare programs of the United States Department of Defense Military Health System (TRICARE); and the Coast Guard's Office of Health Services.

38. Each and every time that Defendants submitted, or caused to be submitted, any False Claim for payment or reimbursement for Apriso or generic Apriso to the United States Government or any of the Plaintiff States, Defendants violated the federal False Claims Act, 31 U.S.C. §§ 3729–3733 (the "Federal FCA"), and the state

1  false claims act of the respective Plaintiff State (each, a "State FCA") in which such
2  submission was made, as applicable.

3      39.    As set forth herein, Defendants' actions alleged in this Complaint violate
4  the Federal FCA and the following State FCAs: The California False Claims Act, Cal.
5  Gov't Code §§ 12650–12656; Colorado Medicaid False Claims Act, Colo. Rev. Stat
6  §§ 25.5-4-303.5 to -310; Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 to -
7  289; Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1211;
8  District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to .09; Florida False
9  Claims Act, Fla. Stat. §§ 68.081–.09; Georgia False Medicaid Claims Act, Ga. Code
10  Ann. §§ 49-4-168 to 168.6; Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 to -31;
11  Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1–175/8; Indiana False Claims and
12  Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to -18; Iowa False Claims Act,
13  Iowa Code §§ 685.1–.7; Louisiana Medical Assistance Programs Integrity Law, La. Rev.
14  Stat. §§ 46:437–:440; Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–
15  5O; Michigan Medicaid False Claims Act, Mich. Comp. Laws. §§ 400.601–.615;
16  Minnesota False Claims Act, Minn. Stat, §§ 15C.01–.16; Montana False Claims Act,
17  Mont. Code Ann. §§ 17-8-401 to -413; Nevada statute concerning Submission of False
18  Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250; New Jersey
19  False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 to -18; New Mexico Medicaid False
20  Claims Act, N.M. Stat. Ann. §§ 27-14-1 to -15, and New Mexico Fraud Against
21  Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14; New York False Claims Act, N.Y.
22  State Fin. Law §§ 187–194; North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605
23  to -618; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7;
24  Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9; Tennessee Medicaid
25  False Claims Act, Tenn. Code Ann. §§ 71-5-181 to -185; Texas Medicaid Fraud
26  Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001–.132; Vermont False Claims Act,
27  Vt. Stat. Ann. tit. 32, §§ 630–642; Virginia Fraud Against Taxpayers Act, Va. Code

28

§§ 8.01-216.1 to .19; and Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005–.130.

## II.   **PARTIES**

40.    The Relator Zachary Silbersher is a citizen of New York. The allegations or transactions alleged in this action are not substantially the same as the allegations or transactions that have been publicly disclosed in any of the enumerated public disclosure channels specified in 31 U.S.C. § 3730(e)(4)(A)(i)-(iii) and applicable state statutes for the Plaintiff States. *Silbersher v. Valeant Pharms. Int'l, Inc.*, 89 F.4th 1154, 1168 (9th Cir. 2024), *cert. denied sub nom. Valeant Pharms. v. Silbersher*, No. 23-1093, 2024 WL 4426551 (U.S. Oct. 7, 2024).

41.    Moreover, Relator is also an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and applicable state statutes for the Plaintiff States. Relator has knowledge, including specialized expertise in pharmaceutical patents, that is independent of and materially adds to any publicly disclosed allegations or transactions. Such knowledge has allowed Relator, for example, to stitch together the material elements of Defendants' fraudulent scheme to reveal fraud that was hidden or difficult to discern without such knowledge. *Cf.  Valeant*, 89 F.4th at 1168. Relator also voluntarily provided the information on which the allegations or transactions alleged herein are based to the Government and the Plaintiff States on or about February 6, 2018, before filing this action on March 8, 2018.

42.    Relator seeks to recover all available damages, civil penalties, and other relief for federal and state-law violations alleged herein. In particular, Relator sues to recover on behalf of the United States Government and its various agencies administering federally-funded health care programs, including, without limitation, Medicare and Medicaid; the Veterans Health Administration; CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the healthcare programs of the United States Department of Defense Military Health System (TRICARE); and the Coast Guard's Office of Health Services. Relator also sues to

recover on behalf of the Plaintiff States and their respective agencies administering State programs for prescription drug coverage, including, without limitation, Medicaid contributions.

43.     Defendant Bausch Health Companies, Inc., formerly known as Valeant Pharmaceuticals International, Inc., is a corporation organized and existing under the laws of British Columbia, Canada, with its principal place of business in the United States at 400 Somerset Corporate Boulevard, Bridgewater, NJ 08807, and principal executive offices at 2150 St. Elzéar Boulevard West, Laval, Quebec H7L 4A8. The company's shares trade on the New York Stock Exchange and Toronto Stock Exchange under the trading symbol BHC. At all times relevant to the purposes of this litigation, Bausch sold Apriso either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

44.     Defendant Valeant Pharmaceuticals International is a Canadian corporation with its principal place of business at 2150 St. Elzéar Boulevard West, Laval, Quebec H7L 4A8. At all relevant times, Valeant Pharmaceuticals International was and is an indirect subsidiary of Bausch.

45.     Defendant Salix Pharmaceuticals, Ltd. is a corporation organized under the laws of California, having its principal place of business at 8510 Colonnade Center Drive, Raleigh, North Carolina 27615. Salix Pharmaceuticals, Ltd. was acquired by Valeant Pharmaceuticals International, Inc. on April 1, 2015, and is an indirect, wholly owned subsidiary of Bausch.

46.     Defendant Salix Pharmaceuticals, Inc. is a corporation organized under the laws of California, having its principal place of business at 8510 Colonnade Center Drive, Raleigh, North Carolina 27615. Salix is a wholly-owned subsidiary of Salix Pharmaceuticals, Ltd., which was acquired by Valeant Pharmaceuticals International, Inc., on April 1, 2015. At all times relevant to the purposes of this litigation, Salix Pharmaceuticals, Inc. has been the exclusive licensee of all United States patents relating to Apriso and is an indirect, wholly owned subsidiary of Bausch.

- 14 -

47.    Defendant Dr. Falk Pharma GmbH is a German corporation having its principal place of business at Leinenweberstr. 5, 79108 Freiburg im Breisgau, Germany. At all times relevant to the purposes of this litigation, Dr. Falk has been the sole assignee of all rights pertaining to all United States patents relating to Apriso.

48.    Defendants sell Apriso in the United States pursuant to New Drug Application ("NDA") No. N022301, which was approved by the United States Food and Drug Administration ("FDA") on October 31, 2008.

### III.    **JURISDICTION AND VENUE**

49.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. In addition, 31 U.S.C. § 3732(b) specifically confers jurisdiction on this Court over the state law claims.

50.    Under 31 U.S.C. § 3730(e), and under the comparable provisions of the Plaintiff State statutes, there has been no statutorily relevant public disclosure of substantially the same allegations or transactions in this Complaint. Moreover, whether or not such a disclosure had occurred, Relator would qualify as an "original source" of the information in this Complaint. Relator has independent knowledge of the information on which the allegations herein are based; such knowledge materially adds to any publicly disclosed allegations or transactions; and Relator voluntarily provided the information to the Government before filing this action.

51.    This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintains minimum contacts with the United States. Each of the Defendants can be found, transacts business, and has presented or caused to be presented and continues to present or cause to be presented false or fraudulent claims for payment in this District.

52.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted substantial business within this District and made significant sales within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729–3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

53.    Many of the acts underlying the false claims allegations herein occurred in this District.

## IV.    FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS

54.    Government-funded health care programs cover medical services and prescriptions for one-third of the United States population.

### A.    Medicare

55.    Medicare is a federally-funded health insurance program primarily benefitting the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted.

56.    The Medicare program has four parts: Part A, Part B, Part C, and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans. Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

57.    Medicare provides benefits for patients being treated with Apriso.

58.    The Medicare program is administered through CMS at the DHHS.

**B.    Medicaid**

59.    Medicaid is jointly administered by the United States and each of the separate states, including the Plaintiff States.

60.    Individual state Medicaid programs are administered by each individual state, subject to oversight by the United States in accordance with statutes and regulations promulgated by the United States and the Secretary of the DHHS. Pursuant to these statutes and regulations, the United States provides financial assistance to each of the state Medicaid programs by providing each state with financing equal to at least 50% of the costs incurred by the state Medicaid programs. In some instances, the United States provides financing equal to as much as 75% of program costs incurred, including the costs incurred for reimbursing providers for dispensing prescription drug products (such as Apriso) to Medicaid beneficiaries.

61.    Each state Medicaid program obtains federal financial assistance by submitting quarterly claims to the United States for federal financial assistance related to the costs incurred for administering the state Medicaid programs.

**C.    Other Government-Funded Health Programs**

62.    The other major government-funded health programs—including CHIP; the Indian Health Service; the Federal Bureau of Prisons' Health Services Division; the Veterans Health Administration; the Military Health System; the healthcare programs of the United States Department of Defense Military Health System (TRICARE); and the Coast Guard's Office of Health Services—purchase significant amounts of Apriso for their covered patients.

**V.    THE REGULATORY STRUCTURE THAT DEFENDANTS MANIPULATED TO BLOCK GENERIC COMPETITORS TO APRISO**

**A.    The Regulatory Structure for Approval of Generic Drugs**

63.    Under the Food, Drug, and Cosmetic Act ("FDCA"), a manufacturer must obtain FDA approval to sell a new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301–392. An NDA must include submission of specific data concerning the

- 17 -

safety and efficacy of the drug, and it must also identify any patent that could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the approved drug. See 21 U.S.C. § 355(a), (b).

64.    When the FDA approves an NDA, it publishes the patents identified by the brand manufacturer in a database of "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book." The Orange Book is an official publication of the FDA. Patents issued after NDA approval may be listed in the Orange Book within thirty days of issuance. 21 U.S.C. § 355(b)(1), (c)(2).

65.    By listing a patent in the Orange Book, a pharmaceutical company is representing, in an official government publication, that the patent is both valid and enforceable. The FDA relies completely on the manufacturer's truthfulness about patent validity and applicability when listing patents in the Orange Book. That is because the agency has neither the resources nor the authority to independently verify the scope and validity of each manufacturer's patents. In listing patents in the Orange Book, the FDA merely performs a ministerial act. Therefore, pharmaceutical companies have a duty to list only patents they believe in good faith can be validly asserted to restrict the entry of generics onto the market.

66.    The Hatch-Waxman Amendments to the FDCA, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. A generic manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"), which relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA.

67.    As part of the application process, a generic manufacturer must certify that either no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification"); that the patent for the brand drug has expired (a "Paragraph II certification"); that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product

before that date (a "Paragraph III certification"); or that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

68.    Because ANDAs with Paragraph I, II, or III certifications face no potential patent challenge, FDA approval of these ANDAs is relatively expeditious. When generic manufacturers file Paragraph IV certifications, however, brand manufacturers can trigger extensive regulatory delays that will block FDA approval of generic entry—potentially for years.

69.    When a generic drug manufacturer files a Paragraph IV certification, it must promptly provide notice to the brand manufacturer. Filing an ANDA with a Paragraph IV certification gives rise to a cause of action for patent infringement regardless of the merits of the action. If the brand manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification, the FDA will not grant final approval to the ANDA until the earlier of: (a) the passage of 30 months from the notification date, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. Therefore, as a practical matter, the filing of a patent infringement action provides a brand manufacturer with the equivalent of an automatic 30-month injunction that prevents competition from the generic manufacturer—irrespective of the underlying merits in the infringement action.

70.    This dynamic creates an incentive for brand manufacturers to list patents in the Orange Book that will force would-be generic competitors to file Paragraph IV certifications.  Because such certifications substantially delay generic entry, they effectively extend the brand manufacturer's monopoly while the patent litigation runs its course.

## B.    United States Patent Law

71.    The Patent Office will reject an application for a patent if the invention was "patented, described in a printed publication, or in public use, on sale, or otherwise

available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102. Even if the invention was not disclosed in detail, a claim is unpatentable if the prior art is such that the subject matter, as a whole, would have been obvious to a person having ordinary skill in the art. 35 U.S.C. § 103.

72.    The term "prior art" broadly encompasses certain publicly available information that might be material to a patent's claims purported novelty. If the Patent Office uncovers prior art that satisfies sections 102 or 103, it establishes a prima facie case of invalidity. To overcome the prima facie case, the patent applicant has several options, including: (i) narrowing the invention to distinguish over the prior art; (ii) arguing the prior art does not render the claim invalid; or (iii) submitting objective evidence of secondary considerations, including commercial success, long-felt but unsolved need, and failure of others.

73.    Patent applicants have an affirmative duty of candor and good faith, which includes the duty to disclose all information material to patentability. 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."). This includes an obligation to correct material errors located in the patent specification. The U.S.P.T.O.'s Manuel of Patent Examining Procedure ("M.P.E.P.") also emphasizes that the "duty of candor and good faith" is "broader than the duty to disclose material information." M.P.E.P. § 2001.04. Section 1.56 further provides that persons who owe a duty of candor and good faith include "[e]ach inventor named in the application"; "[e]ach attorney or agent who prepares or prosecutes the application"; and "[e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application." Section 1.56 further states that "no patent will be granted on an application in connection with which fraud on the Office was practiced or

attempted or the duty of disclosure was violated through bad faith or intentional misconduct." *See, e.g.*, *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1367 (Fed. Cir. 1998) ("Fraud in obtaining a United States patent is a classical ground of invalidity or unenforceability of the patent."). Moreover, 37 C.F.R. § 11.18(b) requires that a reasonable inquiry be conducted to confirm that statements made in documents filed with the Patent Office are true or believed to be true, and do not include any attempt to conceal a material fact.

74.    A person or entity can challenge the validity of an issued patent by filing a petition for inter partes review ("IPR") proceedings before the Patent Trial and Appeal Board ("PTAB"). 35 U.S.C. § 311.

**C.    The Economic Benefits of Blocking Generic Entry, Even When Frivolous**

75.    AB-rated generic drugs contain the same active ingredient—and are determined by the FDA to be just as safe and effective—as their branded counterparts. The only material difference between generic drugs and branded drugs is their price: when multiple generic drug manufacturer competitors enter the market for a given branded drug, generic drugs cost, on average, 80%-85% lower than the branded drug prior to generic entry. Moreover, the Federal Trade Commission (FTC) estimates that about one year after market entry, a generic drug takes over 90% of the branded drug's unit sales.

76.    When multiple generics enter the market, competition accelerates, and prices drop to their lowest levels. Competition from several generic sellers drives drug prices down toward marginal manufacturing costs. Defendants prevented this from happening with Apriso by applying for and obtaining the '688 Patent, which would have excluded generic alternatives to Apriso through 2030 if it were not invalidated. The '688 Patent was obtained through false and misleading statements to the Patent Office. But for the '688 Patent, generics would have entered the marketplace much sooner, which would have substantially lowered prices for Apriso and generic Apriso.

## VI.    ALLEGATIONS CONCERNING DEFENDANTS' FALSE CLAIMS

### A.    Defendants Fraudulently Obtained the '688 Patent Through False and Misleading Statements.

#### i.    About Apriso

77.    Defendants manufacture, sell, and distribute Apriso (mesalamine), which doctors prescribe widely to patients with ulcerative colitis, a chronic inflammatory gastrointestinal disorder affecting the colon. Patients typically take Apriso on a prolonged basis to maintain remission of ulcerative colitis. There are a number of ulcerative colitis drugs on the market that use mesalamine, and mesalamine itself has been off patent protection for years (if not decades), as Defendants concede in their patents. *See e.g.*, U.S. Patent No. 6,551,620 at col. 5, lines 15-19.

78.    Apriso is a granulated mesalamine formulation that combines an enteric pH-dependent coating, which provides for delayed release; and a polymer matrix core, which provides for extended release.

79.    Mesalamine works topically on the affected areas of the colon, meaning it requires targeted and sustained delivery to the colon. This challenge is complicated because mesalamine is quickly metabolized in the stomach and absorbed into the bloodstream (referred to as "systemic absorption") before it reaches the colon, negating its effectiveness. Some orally administered mesalamine drugs on the market today typically accomplish targeted delivery by using an enteric coating. An enteric coating will resist dissolution in the stomach (where the pH is more acidic), but it will permit dissolution in the colon (where the pH is more basic). Apriso uses a pH-sensitive enteric coating that will not dissolve in pH levels found in the stomach but will dissolve in pH levels found further down in the digestive tract, where the mesalamine will then be released within the colon.

80.    A one-month prescription of Apriso in the United States has an average retail price of $595. During the period in which Defendants unlawfully excluded

1  generic competitors, Defendants generated well over $200 million in Apriso sales
2  annually in the United States.

3       81.    Defendants jointly collaborate in the development, manufacture, sale and
4  distribution of Apriso.

5            **ii.**    **Defendants' Fraudulent Prosecution of the '688 Patent**

6       82.    Defendants applied for a new patent relating to Apriso on October 2, 2009,
7  which eventually issued as the '688 Patent on October 21, 2014. During the five years
8  it took to prosecute the '688 Patent, the application was rejected and amended at least
9  six times. Defendants also submitted two additional office-action responses that
10 included unsuccessful attempts to persuade the Examiner to allow the patent without
11 amendment.

12      83.    On May 9, 2014, Defendants amended the claims in the pending '688
13 Patent application so that the claimed methods for "maintaining the remission of
14 ulcerative colitis" included administering the claimed granulated mesalamine
15 formulation "with or without food." On June 5, 2014, the Examiner maintained the
16 rejection of the claims despite this amendment.

17      84.    On June 20, 2014, Defendants further amended the '688 claims to include
18 a method for administering the claimed granulated mesalamine formulation "without
19 food." In support of this amendment, Defendants stated: "unlike other 5-mesalamine
20 drugs available at the time of the invention, Defendants has demonstrated that the
21 claimed methods are equally safe and effective when granulated mesalamine is
22 administered to a subject without food."

23           **iii.**    **Defendants Withheld the Brunner and Marakhouski Studies.**
24      85.    Two studies published several years before Defendants applied for the
25 '688 Patent showed that Apriso could be taken without food. First, in the Brunner
26 study, mesalamine pellets were taken orally after an overnight fast, leading the
27 authors to conclude mesalamine could be taken "independent of concomitant food
28 intake." *Id*. at 1167. Second, in the Marakhouski study, subjects took granulated

1  mesalamine pellets an hour before meals, leading the authors to conclude that
2  mesalamine "can be taken independent of meals." *Id*. at 134.

3      86.    Defendants were aware of the Marakhouski and Brunner studies. Indeed,
4  one of the studies used mesalamine pellets provided by Dr. Falk (the assignee of the
5  '688 Patent) and the other was underwritten by Dr. Falk, and both studies were co-
6  authored by Dr. Falk's head of research and development, Roland Greinwald.
7  Defendants have conceded, and the PTAB found, that Marakhouski and Brunner relate
8  to Defendant Falk's Salofalk® Granu-Stix® formulation, which is similar to the Apriso
9  granulated mesalamine formulation, and Defendants admitted, and the PTAB found,
10 that Marakhouski, and Brunner relate to a granulated mesalamine formulation within
11 the scope of the '688 Patent claims.

12     87.    Despite being aware of the Marakhouski and Brunner studies, and in fact
13 participating in them, Defendants failed to disclose either of these papers to the Patent
14 Office during its prosecution of the '688 Patent.

15     88.    Under 37 C.F.R. § 1.56, each individual involved in the prosecution of
16 Defendants' patents has "a duty of candor and good faith in dealing with the [Patent]
17 Office, which includes a duty to disclose to the Office all information known to that
18 individual to be material to patentability . . . ." Information is material when it is not
19 cumulative and either compels a conclusion that a claim is unpatentable or it refutes or
20 is inconsistent with a position an applicant takes in support of a patent claim. *Id*.
21 Defendants failed to meet their duty of candor and good faith by failing to disclose the
22 Marakhouski and Brunner studies, both of which are clearly material to Defendants'
23 claim that taking the granulated mesalamine formulation claimed in the '688 Patent
24 without food was not obvious in light of prior art. Defendants' omission of these studies
25 amounts to a false and misleading statement that the Patent Office relied on in
26 approving the '688 Patent.

27     89.    Indeed, on May 19, 2017, the '688 Patent was held invalid by the United
28 States Patent and Trademark Office's Patent Trial and Appeal Board ("PTAB"), which

relied on the Brunner and Marakhouski studies as primary prior art references to find that taking the claimed granulated mesalamine formulation without food would have been obvious to a person of skill in the art based on prior art. *GeneriCo, LLC v. Dr. Falk Pharma GmbH*, No. IPR2016-00297, Final Written Decision, Dkt. 55 at 22 (P.T.A.B. May 19, 2017).

      **iv.**    **Defendants' Claims in Prosecuting the '688 Patent Were Inconsistent With Claims Defendants had Previously Made to the Patent Office.**

90.    Other statements Defendants made while prosecuting the '688 Patent are contradicted by statements Defendants made while prosecuting another 5-aminosalicylic acid (*i.e.*, mesalamine) patent. In 2006, Defendants filed a patent application that was allowed on December 30, 2014 and issued as United States Patent No. 8,921,344 ("the '344 Patent"). The '344 Patent described a "method of decreasing the systemic absorption of balsalazide and metabolites 5-aminosalicylic acid (5-ASA) and N-acetyl-5-ASA (NASA) comprising administering to a subject a therapeutically effective amount of at least one tablet or capsule comprising balsalazide with food, wherein the systemic adsorption of balsalazide, 5-ASA or NASA is decreased compared to administering balsalazide without food." The '344 Patent states that the disclosed "invention is due, in part, to the *unexpected* finding that administration of balsalazide w*ith food* increases both the [colonic] bioavailability and decreases the systemic adsorption of 5-ASA [*i.e.*, mesalamine] . . . ." (col. 1:60-63, emphasis added). While prosecuting the '344 Patent to the Patent Office, Defendants stated:

> [O]ne of ordinary skill in the art, upon review of all the information available at the time the instant application was filed, would have expected the bioavailability of balsalazide to *decrease* when taken with food, and not increase, as maintained by the Examiner. Said another way, based on the data available at the time of the filing, the ordinary skill artisan would have expected the systemic absorption of balsalazide to increase when taken with food. In contrast, it was unexpectedly discovered that the systemic absorption decreased when taken with food. These unexpected results rebut any *prima facie* case of obviousness raised by the Examiner.

1 Defendants' *Response to Final Office Action*, filed with the Patent Office on Defendants'

2 behalf by attorney Jonathan Sparks, Ph.D., July 16, 2009 (emphasis in original).

3    91.    The "data available at the time" included the following **Table 1** that

4 Defendants disclosed to the Patent Office. Defendants told the Patent Office that Table

5 1 "shows that when each of the other drugs in the same class as balsalazide was

6 administered with food, the colonic bioavailability of those drugs in the colon decreased

7 or remained unchanged." Yet, when Defendants prosecuted the '688 Patent, they

8 intentionally obscured this same information, knowing it would be material to the

9 patentability of the '688 Patent. As shown in Table 1, Defendants characterized the

10 same mesalamine drugs to which they referred when prosecuting the '688 Patent (*i.e.,*

11 Claversal®, Asacol®, and Lialda®) as also being within the same class as balsalazide

12 and demonstrating that bioavailability and therefore efficacy *decreased* when taken

13 *with* food.

Table 1

| Generic Name | Brand Name | Delivery Site | Food Effect on 5-ASA Colonic Bioavailability | Reference |
|---|---|---|---|---|
| **Azo-bonded Drugs** | | | | |
| Balsalazide | Colazal capsule® | Colon | Increases | USSN 11/835,897/Colazal® Package Insert |
| Balsalazide | GI-azo tablet® | Colon | Increases | USSN 11/835,897 |
| Sulfasalazine | Azulfadine® | Colon | Unknown | - |
| Olsalazine | Dipentum® | Colon | Decreases | *Eur J Clin Pharmacol.* 1988;34(5):481-8. |
| **Mesalamine Drugs** | | | | |
| Suspension | 5-ASA | Small bowel | N/A | *Clin Pharmacol Ther.* 1990 Jul;48(1):26-33. |
| Extended release Capsules | Pentasa® | Small Bowel | N/A | Summary Basis of Approval |
| pH-dependent delayed release tablets | Claversal® | Ileum-Colon | Decreases | *Br J Clin Pharmacol.* 1992 Feb;33(2):179-82. |
| pH-dependent delayed release tablets | Asacol® | Ileum-Colon | Decreases | Summary Basis of Approval |
| pH/Extended release granules | Falk GranuStix® | Ileum - Colon | No effect | Salix study No. MPPK1002 |
| pH/Hydrophobic Matrix | Lialda® | Colon | Decreases | Lialda®, Approved Package Insert, February 2007 |

During prosecution of the '688 Patent, Defendants were clearly aware of the data from Table 1 for at least two reasons.  First, the same patent attorney, Jonathan Sparks, prosecuted both the '344 Patent and the '688 Patent. Second, both the '344 Patent and the '688 Patent share an inventor, Lorin Johnson. As a prosecuting attorney and inventor of the '688 patent, respectively, both Mr. Sparks and Mr. Johnson owed a duty of candor and good faith to the Patent Office during prosecution of the '688 patent.

### v.    Defendants Intentionally Withheld Material Information Regarding Lialda®.

92.    While prosecuting the '688 Patent, Defendants stated that "one of ordinary skill in the art would look to the teachings of the most similar formulation to determine if administration with food is required." Defendants, however, represented to the Patent Office: "unlike other 5-mesalamine drugs available at the time of the invention, Applicant has demonstrated that the claimed methods are equally safe and effective when granulated mesalamine is administered to a subject *without food*" (emphasis added). Defendants focused on Lialda®, which they claimed was the only other "delayed and extended-release oral mesalamine" formulation approved by the FDA. Defendants relied on Lialda®'s prescribing information, which purportedly states that Lialda® should be taken "with food." However, as Table 1 from the '344 Patent prosecution history shows, Defendants intentionally withheld information material to that statement. Table 1 shows that Defendants were aware that the colonic bioavailability of Lialda® (*i.e.*, its efficacy) decreased when administered with food. This fact was material to the determination by the Patent Office to allow the '688 Patent. Indeed, the Examiner's Reasons for Allowance stated, "[o]ne skilled in the art would reasonably expect the formulation to be administered with food, since similar mesalamine formulations are directed to be administered with food (see Lialda® information pamphlet, submitted by Applicants with response to filed 20 June 2014)."

### vi.   Defendants Intentionally Withheld Material Information Regarding Claversal® and Asacol®.

93.   During prosecution of the '688 Patent, on June 14, 2014, Defendants' attorney Dr. Jonathan Sparks told the Patent Office that "[a]t the time of the invention, one of ordinary skill in the art would look to the teachings of the most similar formulation to determine if administration with food is required." Defendants disclosed (albeit incomplete) information regarding Lialda® and Pentasa®. Defendants also emphasized that one reason that Lialda® and the pending claims were "similar formulations" is because each is directed to delayed and extended-release formulations.

94.   Defendants intentionally withheld information regarding Claversal® and Asacol®. In 2009, in connection with prosecuting the '344 Patent, the same prosecuting attorney (Dr. Sparks) disclosed the information summarized in Table 1 (*supra*), which indicates that colonic bioavailability of mesalamine (5-ASA) from both Claversal® and Asacol® decreased when administered with food. ('854 Application, July 16, 2009 Amendment Response, Table 1). Further, both Claversal® and Asacol® are "pH-dependent delayed release" formulations that use enteric coatings similar to the granulated mesalamine formulation claimed in the '688 Patent, which also uses an enteric coating for pH-dependent for delayed release. Additional distinctions between Apriso's formulations of Claversal® and Asacol® are irrelevant.

95.   Moreover, during prosecution of the '688 Patent, Defendants expressly argued that persons of skill would purportedly have to look to other oral mesalamine formulations for guidance on whether it was obvious to administer oral mesalamine with food. (*See* Defendants' *Amendment and Response to Office Action*, in connection with the '688 Patent application (U.S. Patent Application No. 12/573,081), June 20, 2014, pg. 6.) Defendants disclosed Lialda® and Pentasa®, but withheld disclosure of Claversal® and Asacol®. They did so despite previously disclosing Claversal® and Asacol® in connection with the '344 Patent to argue that taking certain mesalamine formulations *with* food was not obvious.

96.     Both Claversal® and Asacol® are pH-dependent delayed release mesalamine formulations, as shown in Table 1. Indeed, the Patent Office subsequently found that the pH-dependent delayed release feature of Apriso is particularly material to whether it can be efficaciously administered with food. In its Final Written Decision invalidating the '688 Patent, the PTAB concluded, based upon expert testimony, that the presence of food in the stomach raises its pH and suppresses gastric emptying. *See* IPR2016-00297 (Paper 55) May 19, 2017, pp. 41-42. Because pH-dependent enteric coatings dissolve at higher pH, the PTAB found that administering the drug with food likely keeps it in the stomach at higher pH for a longer period of time, and thus risks premature release and systemic absorption. On information and belief, Defendants were aware of these facts given their development of a pH-dependent delayed release formulation for an oral mesalamine drug that can be administered without food. Indeed, this is evident from the fact, as disclosed by Defendants in Table 1, that Claversal® and Asacol®—two pH-dependent drugs utilizing enteric coatings—showed decreased colonic availability when administered with food. Defendants thus knew this information, which would have been material to the patentability of the '688 Patent in light of the Examiner's Reasons for Allowance, but nonetheless withheld it from the Patent Office.

97.     Given the foregoing facts, and in light of the important relationship between the potential impact of food on Apriso's enteric coating, any differences between the formulations for Apriso on the one hand, and Claversal® and Asacol® on the other, were immaterial to the patentability of the '688 Patent. Defendants' withholding of their knowledge that Claversal® and Asacol® had decreased colonic bioavailability when administered with food were therefore material omissions that rendered Defendants' submissions to the Patent Office misleading and fraudulent.

98.     Defendants—and Defendants' prosecuting attorney—were clearly knowledgeable of data showing that the colonic bioavailability (*i.e.*, efficacy) of two additional pH-dependent delayed release formulations (Claversal® and Asacol®)

- 29 -

decreased when administered with food. Yet, Defendants intentionally withheld this information from the Patent Office during prosecution of the '688 Patent.

99.    Defendants' omission of these facts was material to the determination by the Patent Office to allow the '688 Patent, and the Patent Office relied on Defendants' false and misleading representations when it issued the '688 Patent. The Examiner's "Reasons for Allowance" stated:

> [t]he cited prior art is silent with respect to whether or not the mesalamine formulation is administered with or without food. One skilled in the art would reasonably expect the formulation to be administered with food, since similar mesalamine formulations are directed to be administered with food (see Lialda® information pamphlet, submitted by Applicants with response to filed 20 June 2014).

100.    The Examiner further stated:

> [a]dditionally, one skilled in the art would be motivated to administer the mesalamine formulation with food, since 5-aminosalicylate compounds, including mesalamine, are known to have increased bioavailability when administered with food.

101.    In sum, the '688 Patent was obtained on the basis of false and misleading statements made to the Patent Office. Defendants knowingly and deliberately withheld the Marakhouski and Brunner papers because they knew these papers would render the patent invalid as obvious in light of prior art. Defendants' withholding these articles misled the Patent Office into approving the '688 Patent based on incomplete information. Defendants created the false impression that taking Apriso without food was not obvious in light of prior art, a statement that was directly at odds with statements and data Defendants knew and previously had provided to the Patent Office in connection with a different patent application, when such disclosure benefited Defendants.

### B.    The Otterbeck Patents are Invalid Based on Prior Art that Defendants Failed to Disclose to the Patent Office

102.    The Otterbeck Patents consist of six patents, all of which descend from a common parent application. While the claims in the Otterbeck Patents vary slightly, they all relate to the same formulation as described in Claim 1 of the first Otterbeck Patent to be approved, United States Patent No. 6,551,620 ("the '620 Patent"). The '620 Patent issued on April 22, 2003. Thus, it was the only patent in effect when the FDA approved Apriso in 2008 and when the first generic ANDA was filed in July 2012. The rest of the Otterbeck Patents issued between December 2012 and February 2015.

103.    The '620 Patent describes:

> 1. An orally administrable pharmaceutical pellet formulation having a controlled release profile for the treatment of the intestinal tract, which comprises a core and an enteric coating and optionally pharmaceutically tolerable additives, the core including, as a pharmaceutical active compound, aminosalicylic acid or a pharmaceutically acceptable salt, wherein the active compound is present in the core in a non gel-forming polymer matrix which is essentially insoluble in the intestinal tract and permeable to intestinal fluids and the active compound, the matrix-
> forming polymer making up at least 1% by weight of the total weight of the core, and wherein the matrix-forming polymer is selected from the group consisting of poly(ethyl acrylate, methyl methacrylate) and poly(ethyl acrylate, methyl methacrylate, trimethylammonioethyl methacrylate chloride).

*Id*. at col. 9, lines 31-44.

104.    The Otterbeck Patents all share the same specification, wherein Defendants conceded that some of the characteristics described above were already known in the prior art, including the use of enteric coatings to delay release of the active ingredient, and the use of mesalamine to treat ulcerative colitis. *Id*. at col. 5, lines 15-19, 47-50. However, many of the allegedly novel aspects of Claim 1 were also obvious in light of prior art that Defendants failed to disclose to the Patent Office during prosecution of the Otterbeck Patents.

105.    Defendants concede that use of enteric coatings to target delivery to the colon was widely known in the prior art. Sustained delivery is accomplished by

embedding the mesalamine within a polymer matrix, wherein the matrix is insoluble in intestinal fluids, but the active ingredient is not. The polymer matrix is permeable, allowing the intestinal fluids to gradually enter and disperse the active ingredient, ensuring that the mesalamine is released gradually and consistently to increase exposure to more of the colon. Defendants concede that use of polymer matrices to ensure sustained release of an active ingredient was previously known in the prior art, but they assert that use of a "non gel-forming" polymer matrix "surprisingly" decreased systemic absorption and increased targeted delivery of the mesalamine. As set forth in more detail below, the use of non gel-forming polymer matrices was disclosed in prior art that Defendants failed to disclose to the Patent Office

106.    Thus, the Otterbeck Patents state that "it has now been found that pellet formulations are particularly suitable" for the purpose of "spread[ing] the pharmaceutical form reproducibly over wide areas of the intestine[,] and are thus particularly suitable for treatment of inflammatory processes, which often affect relatively large sections of the intestinal tract." *Id*. at col. 2, lines 40-46. The description concedes that "[i]n the prior art, tablets and pellets are known which are coated with an enteric coating in order to thus prevent a premature release of the active compounds." *Id*. at col. 1, lines 48-50. While making this concession, however, Defendants did not disclose prior art that specifically rendered obvious the claims in the Otterbeck patents that Defendants represented were surprising and therefore not obvious.

107.    Claim 1 of the '620 Patent describes the core as having a "active compound is present in the core in a non gel-forming polymer matrix which is essentially insoluble in the intestinal tract and permeable to intestinal fluids and the active compound." *Id*. at col. 9, lines 36-39. Despite Defendants' misrepresentations concerning the "surprising" effect of such a non gel-forming polymer matrix on efficacy, each of the claimed elements were in fact disclosed in the prior art and not at all surprising.

108.    United States Patent No. 6,290,990 ("the '990 Patent"), approved on September 18, 2001, describes slow-release matrix pellets, "preferably for pharmaceutical purposes, from which the active substance is released with an adjustable release profile, ie. [*sic*] as slow as required, but completely." *Id.* at col. 2, lines 26-29. The '990 Patent also disclosed at col. 3, lines 6-7 that the "polymer matrix according to the invention for matrix slow-release pellets is a novel combination . . . .").

109.    U.S. Patent No. 4,892,742 at col. 1, lines 6-10 (filed Nov. 18, 1985) ("the '742 Patent") disclosed "a controlled release composition  . . . comprising a table core containing a water soluble active ingredient in a water insoluble polymeric matrix surrounded with a rate controlling membrane coating").

110.    U.S. Patent No. 4,784,858 at col. 1, lines 29-31 (filed Aug. 22, 1986) ("the '858 Patent") disclosed "at least one water-soluble pharmaceutically active substance which is dispersed in a water-insoluble, nondigestible polymeric excipient."

111.    European Patent 0169821A2 at 6, lines 1-4 (issued Feb. 6, 1991) (the "EP0169821A2 Patent") disclosed a "delivery device for zero-order release of an active principle into a dissolution fluid therefor comprises a solid matrix-type reservoir formed of a polymer material." *See also*, Gwen M. Jantzen and Joseph R. Robinson, *Sustained- and Controlled-Release Drug Delivery Systems*, Modern Pharmaceuticals, 586-587 (Gilbert S. Banker & Christopher T. Rhodes eds., 3rd Ed. 1996) ("A matrix device . . . consists of [a] drug dispersed throughout a polymer matrix . . . .").

112.    Defendants knew that '990 Patent, the '742 Patent, the '858 Patent, and the EP0169821A2 Patent patents were all in the prior art when Defendants prosecuted the Otterbeck Patents. Yet, Defendants intentionally failed to disclose any of these patents to the Patent Office.

113.    Moreover, use of a "non gel-forming" polymer matrices was well-known in the prior art. The Description section of the Otterbeck Patents asserts "it has surprisingly been found" that use of an insoluble non gel-forming polymer matrix resulted in lower systemic absorption into the bloodstream and increased targeted

1   delivery to the colon as compared with gel-forming polymer matrices allegedly found in

2   the prior art. '990 Patent at col. 2, lines 49-51. Defendants allege that "use of a

3   swellable, gel-forming matrix . . . is not suitable" because the mesalamine "would . . . be

4   released virtually immediately (about 30 min)." '620 Patent at col. 2, lines 52-57. This

5   statement is in conflict with the '990 Patent, which claims it is "possible to achieve

6   release profiles which can be adjusted over wide ranges solely by the composition of the

7   polymer matrix . . ." using a swellable polymer matrix. '990 Patent at col. 2, lines 49-51.

8   Moreover, prior art available when Defendants were prosecuting the '620 Patent

9   demonstrates that insoluble and non-swellable polymer matrices were known to the

10  industry to achieve delayed and controlled release of an active pharmaceutical

11  ingredient. For example, the EP0169821A2 Patent describes a "solid matrix-type

12  reservoir formed of a polymer material which is insoluble and unswellable in the

13  dissolution fluid." *Id*. at 6, lines 3-5. "The polymer material should be unswellable and

14  insoluble in the active principle's dissolution fluid in order to avoid alterations of the

15  release rate-controlling membrane." *Id*. at 6, lines 7-9. And the '742 Patent describes a

16  controlled-release tablet that employs an insoluble polymer matrix and an enteric

17  coating to release the active ingredient at a slow and constant rate (a so-called "zero

18  order release"). '742 Patent at col. 1, lines 6-13. All of these patents anticipate

19  Defendants' claim for a "non gel-forming polymer matrix." Yet, Defendants failed to

20  disclose any of them to the Patent Office.

21      114.    The use of polymers that are "insoluble in the intestinal tract and

22  permeable to intestinal fluids and the active compound" were also widely known in the

23  prior art when Defendants prosecuted the Otterbeck Patents. The '858 Patent

24  describes "an elastic, water-insoluble and semipermeable diffusion film of a polymer."

25  *Id*. at col. 5, lines 1-3. And the EP0169821A2 Patent describes a "film-forming polymer

26  material insoluble in the dissolution fluid and permeable to the substance." *Id*. at 6,

27  lines 16-17.

28

115.    The chemical compounds specified in the Otterbeck Patents were also widely known in the prior art for the uses indicated in the Otterbeck Patents. For example, the '620 Patent states that "the matrix-forming polymer is selected from the group consisting of poly(ethyl acrylate, methyl methacrylate) and poly(ethyl acrylate, methyl methacrylate, trimethylammonioethyl methacrylate chloride)." *Id*. at col. 9, lines 41-44. These chemicals were disclosed in the '858 Patent, which describes a "polymeric excipient being a member of the group consisting of (i) polyvinylchloride and (ii) a homo- or copolymer of lower alkyl acrylates, lower alkyl methacrylates, or lower alkyl acrylate and lower alkyl methacrylate." *Id*. at col. 5, lines 8-13. Similarly, the EP0169821A2 Patent states, "[t]ypical materials [for the polymer matrix] include . . . polymethacrylates." *Id*. at 10, lines 11-13. Thus, the polymer matrix and its potential component materials were known in the prior art. Yet Defendants did not disclose the '858 Patent or the EP0169821A2 Patent during prosecution of any of the Otterbeck Patent applications.

116.    The '620 Patent enumerates several possible chemicals for an enteric coating, including "a methacrylic acid copolymer or methylhydroxypropyl cellulose phthalate," or a "methacrylic acid containing copolymer comprises co-poly(methacrylic acid, methyl methacrylate)." *Id*. at col. 10, lines 4-5. Ten years earlier, the EP0169821A2 Patent described a "release rate-controlling membrane" and cited "vinyl polymers and copolymers, . . . acrylic polymers and copolymers and the like" as suitable materials for the membrane. *Id*. at 13, lines 5-8. Indeed, EP0169821A2 calls for use of the same commercially available enteric coating (Eudragit RL) that the Otterbeck Patents specify. Similarly, the '858 Patent posited an "ethyl acrylate/methyl methacrylate copolymer" as a potential coating." *Id*. at col. 5, line 25. These potential coatings are all identical to or closely related to the coatings described by Defendants. Once again, Defendants omitted these patents from the Otterbeck Patent applications.

117.    The Otterbeck Patents also describe Apriso's pellet formulation and a process for manufacturing the pellets. For example, the '886 Patent describes mixing

1    the core ingredients into a moist mass, extruding and cutting the moist mass into 1

2    mm pieces which a shaped by a spheronizer and dried at 60° C. The pieces are then

3    coated with the enteric coating, including poly(methacrylic acid, methylmethacrylate).

4    *Id*. at col. 9, lines 30-67; col. 10, lines 1-12. The pellets are described as being 0.1 - 3

5    mm in size. *Id*. at col. 10, lines 35-37. Yet another pre-existing patent, the '990 Patent,

6    specifies slow-release spherical pellets with uniform maximum diameters in the range

7    of from 0.5 to 4 mm containing a biologically active element. *Id*. at col. 13, lines 50-52.

8    Both patents specify dispersion of an active pharmaceutical ingredient in a polymer

9    matrix. Both patents describe extruding and shaping of the pellets at 60°C. Yet,

10   Defendants never disclosed the '990 Patent to the Patent Office.

11       118.    Additional prior art that likely invalidates the Otterbeck Patents include

12   European Patent Application No. 0 453 001 A1; PCT Publication No. WO 91/07949;

13   European Patent Application No. 0 377 477 A1; U.S. Patent No. 6,004,581.

14       **C.    Defendants Wrongfully Blocked Generic Competition**

15       119.    When the FDA approved Defendants' NDA for Apriso on October 31, 2008,

16   it granted Defendants a three-year exclusivity period, which ended on October 31,

17   2011. The Otterbeck Patents expired on or around April 20, 2018. Defendants'

18   fraudulently obtained '688 Patent would have excluded generic competition for another

19   twelve years, through 2030. If the '688 Patent had been upheld, Defendants would

20   have excluded generic competition for Apriso for a total of 22 years, despite having

21   made no changes to the formulation or dosage of Apriso.

22       120.    Several generic manufacturers were ready to enter the market soon after

23   Valeant's FDA-granted exclusivity expired in 2011. Lupin, Novel Laboratories, Inc.

24   (later replaced by G & W Laboratories), Mylan Pharmaceuticals, Inc. and Teva

25   Pharmaceuticals USA, Inc. all filed ANDAs for generic versions of Apriso that included

26   Paragraph IV Certifications that Valeant's patents were invalid. In addition, GeneriCo

27   LLC, Mylan, and MycoNovo, Inc. filed petitions for *Inter Partes* review of the '688

28

1  Patent with the PTAB. The petitions were consolidated and resulted in the PTAB's

2  decision invalidating the '688 Patent.

3      121.    In July 2012, Lupin filed an ANDA for a generic version of Apriso.

4  Valeant initiated its infringement action against Lupin on September 7, 2012. On

5  September 11, 2014, the Patent Office mailed its notice of allowance stating that it

6  would approve the '688 Patent. The very next day, on September 12, 2014, Valeant

7  dismissed all claims against Lupin relating to the Otterbeck Patents without prejudice,

8  and Lupin agreed to refrain from introducing a generic version of Apriso until 2022 (or

9  earlier under certain circumstances), four years after the expiration of the Otterbeck

10  Patents. Because the Otterbeck patents were scheduled to expire in or around April

11  2018, Lupin agreed to a later entry date—i.e., 2022—only because of the allowance of

12  the '688 patent. But for the delays caused by Defendants' obtaining the '688 Patent

13  through fraud, listing the patent in the Orange Book, and asserting the patent in

14  litigation, Lupin would have been able to obtain ANDA approval and launch a generic

15  version of Apriso years earlier based on the Lupin's resources, capabilities, and the

16  usual time period for ANDA approval of similar pharmaceutical substances.

17      122.    In or around January 2014, Novel Laboratories filed an ANDA for Apriso

18  and was sued by Salix on February 18, 2014.  Salix asserted both the Otterbeck patents

19  and the '688 patent against Novel.  Novel was subsequently replaced as plaintiff in the

20  litigation by G&W Laboratories.  On October 19, 2017, Salix dismissed all claims

21  related to the Otterbeck patents **with** prejudice, and Salix dismissed all claims related

22  to the '688 patent **without** prejudice.  (*Salix Pharmaceuticals, Inc. et al v. Novel*

23  *Laboratories, Inc.*, 1:14-cv-00213 (D. Del.) (ECF 191)).

24      123.    In or around May 2015, Mylan filed an ANDA for Apriso and was sued by

25  Salix on June 26, 2015.  Salix asserted both the Otterbeck Patents and the '688 Patent.

26  On May 4, 2017, Salix dismissed with prejudice all claims related to the Otterbeck

27  patents.  (*Salix Pharmaceuticals, Inc. v. Mylan Pharmaceuticals, Inc.*, 1:15-cv-00109

28  (N.D. W.Va.) (ECF 224). Mylan continued to litigate the '688 patent through appeal at

- 37 -

1   the Federal Circuit.  On July 31, 2019, the Federal Circuit issued its mandate with

2   respect to the invalidity of claim 1 of the '688 patent. (ECF 279). On August 6, 2019,

3   the district court signed a consent judgment between the parties dismissing the case.

4   (ECF 281).

5          124.   On November 20, 2019, Mylan's ANDA for generic Apriso received FDA

6   final approval. On November 27, 2019, Mylan launched a generic Apriso. But for the

7   delays caused by Defendants' obtaining the '688 Patent through fraud, listing the

8   patent in the Orange Book, and asserting the patent in litigation,, Mylan would have

9   been able to obtain ANDA approval and launched a generic version of Apriso years

10  earlier based on the Mylan's resources, capabilities, and the usual time period for

11  ANDA approval of similar pharmaceutical substances.

12         125.   In or around February 2017, Teva filed an ANDA for Apriso and was sued

13  by Salix on March 27, 2017. *Salix Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA,*

14  *Inc.*, 1:17-cv-00329 (D. Del.). Salix asserted only the '688 patent, and Salix did not

15  assert any of the Otterbeck Patents.

16         126.   On July 11, 2018, Teva's ANDA received tentative approval.  But for the

17  delays caused by Defendants' obtaining the '688 Patent through fraud, listing the

18  patent in the Orange Book, and asserting the patent in litigation, Teva would have

19  been able to obtain ANDA approval and launched a generic version of Apriso years

20  earlier based on the Teva's resources, capabilities, and the usual time period for ANDA

21  approval of similar pharmaceutical substances.

22         127.   On July 31, 2019—the same day that the mandate from the Federal

23  Circuit affirming the invalidation of the '688 Patent—Salix announced that it had

24  settled its patent infringement action against Teva. Under the terms of the settlement,

25  Teva would be permitted to enter on October 1, 2021, or earlier "if another generic

26  0.375g extended release mesalamine product is granted approval and starts selling or

27  distributing such generic mesalamine product before Oct. 1, 2021."  After Lupin

28

introduced an authorized generic in May 2020, Teva launched a generic version in January 2021.

128.    Additionally, several other generic competitors have introduced generic Apriso. Based on their approval dates, Relator believes and alleges that these other competitors refrained from filing ANDAs until after the Federal Circuit affirmed the invalidation of the '688 Patent, and that but for the'688 Patent, these generic competitors would have filed their ANDAs sooner and obtained approval to introduce lower cost generic alternatives years earlier than they actually did. These generic competitors include, without limitation: Alembic (ANDA approved October 28, 2022); Alkem Labs (ANDA approved July 15, 2021); AMTA (ANDA approved June 6, 2023); Aurobindo (ANDA approved March 31, 2023); Novast (ANDA approved August 22, 2024); and Zydus (ANDA approved August 12, 2021).

129.    After fraudulently obtaining the '688 Patent, Defendants listed the patent in the FDA's Orange Book, even though they knew that the patent had been obtained by fraud and could not reasonably be asserted to exclude generic competitors from introducing generic Apriso. Defendants' listing of the '688 Patent in the Orange Book therefore also constituted a false and fraudulent statement to the U.S. government.

130.    Because Defendants fraudulently obtained the '688 Patent and improperly listed it in the Orange Book, Defendants forced the ANDA Filers to file Paragraph IV certifications. Defendants instituted litigation against the ANDA Filers, alleging infringement of Defendants' invalid, unenforceable, and fraudulently-obtained '688 Patent. By filing the infringement lawsuits based on a patent they knew to have been fraudulently obtained or was otherwise invalid, Defendants triggered the 30-month stays on FDA approval of the ANDA Filers' applications to market generic alternatives to Apriso. Defendants commenced these litigations for the anticompetitive and unlawful purpose of implementing their fraudulent scheme to delay or prevent generic entry into the relevant market.

131.    Accordingly, Defendants have unlawfully but successfully blocked generics from entering the market since at least September 12, 2014, and possibly as early as July 2012, when the first generic manufacturer filed for FDA approval.

132.    But for Defendants' misconduct as alleged herein, one or more of the ANDA Filers would have been able to supply the commercial quantities of generic Apriso necessary to meet market demand since at least September 12, 2014, and possibly as early as July 2012.

133.    Because of Defendants' false and misleading statements to the Patent Office in procuring the '688 Patent, consumers have been deprived of lower-cost generic forms of Apriso.

**D.    Defendants' Fraudulent Scheme Has Resulted in Tens of Thousands of False Claims**

134.    The FCA imposes liability for presenting, or causing another to present, a "false or fraudulent claim," and for making or using a "false statement or record" that is material to such a claim. 31 U.S.C. § 3729(a).

135.    As relevant here, a "claim" is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property" that "is presented to an officer, employee, or agent of the United States," or to made to a "contractor, grantee, or other recipient, if the money or property is to be spent or used . . . to advance a Government program or interest," if the government provides any portion of the money. 31 U.S.C. § 3729(b)(2)(A).

136.    A "false or fraudulent" claim includes any improper attempt to obtain money or property from the government. This includes when an upstream fraud on the government taints later claims for payment. For example, if a government contractor obtains a contract by fraud, claims for payment later submitted under that contract are actionable under the FCA, or, if a manufacturer obtains FDA approval for a new drug by defrauding the FDA, claims for payment for that drug are tainted by fraud and actionable under the FCA.

- 40 -

137.    Similarly, when drug manufacturers manipulate drug prices to overcharge the government, the resulting claims for payment are false or fraudulent, just like any other overcharge.

138.    In this case, Defendants presented, or caused others to present, false claims—and made false statements that were material to those claims. They did so in multiple ways.

139.    First, by fraudulently obtaining and unlawfully maintaining an extended patent monopoly protecting Apriso, Defendants unlawfully caused the United States and the Plaintiff States to pay inflated monopoly prices for mesalamine. This conduct is indistinguishable from a defendant who obtains a contract by fraud: Defendants prevented their competitors from fairly competing for opportunities to earn the Government's business, and thereby harmed the Government in the process. Indeed, the unlawful exclusion of generic competitors is especially damaging to the Government because many Government programs require patients to use or consider using generic alternatives before using more expensive name-brand drugs. Thus, each and every claim for payment or reimbursement for Apriso that would have been substituted for a less expensive generic equivalent constituted a false claim.

140.    Second, by fraudulently and unlawfully maintaining an extended patent monopoly protecting Apriso, Defendants inflated the market price of the drug. That tainted input was critical to the Government's determination of how much to pay for Apriso: instead of paying a fair market price determined by competition, the Government had to pay unlawfully inflated monopoly prices (or prices derived from unlawfully inflated monopoly prices). This effect on prices was not an incidental consequence of Defendants' fraud, but instead one of its principal aims. This upstream fraud tainted each and every claim for payment submitted to the United States and the Plaintiff States during the unlawfully extended monopoly period, rendering these claims false or fraudulent under the FCA and its state counterparts.

141.    Third, Defendants' fraudulent procurement of the '688 Patent, is itself actionable under the FCA, apart from any claims for payment of Apriso, because the fraudulent application itself constituted a false claim presented to the government requesting or demanding property.

142.    Fourth, Defendants intentionally withheld material prior art from the Patent Office to obtain the '688 Patent. This omission was material to the decision by the Patent Office to grant the 688 Patent, which in turn was material to the amounts the United States and Plaintiff States paid during the damages period.

143.    Fifth, Defendants defrauded the government by impliedly certifying to certain Government payors, such as the Medicaid program and the Department of Veterans Affairs, that the price they were charging the government for Apriso was "fair and reasonable," or at least not tainted by fraud, when they knew or should have known that the price was not fair or reasonable given the 688 Patent was procured through fraud and was invalid.

144.    Sixth, by delaying and suppressing generic competition, Defendants caused the price of generic Apriso to be inflated during the time of suppressed competition.

145.    Defendants initiated the fraudulent scheme alleged herein to allow them to continue selling Apriso at supracompetitive prices after the expiration of the FDA exclusivity period. Defendants knew and intended unlawfully to sell Apriso at supracompetitive prices during the 30-month stay and pending the Hatch-Waxman litigations resulting from Defendants' improper listing of the '688 Patent in the Orange Book.

146.    Defendants' fraudulent scheme erected significant barriers to the introduction of generic alternatives to Apriso in interstate commerce and constitutes a willful attempt to exclude generic competition in the relevant market. Defendants' wrongful conduct has enabled Defendants to charge the United States Government and the Plaintiff States illegally-inflated prices for mesalamine. Defendants' wrongful

- 42 -

conduct has also enabled Defendants to charge the United States Government and the Plaintiff States for Apriso, when the prescriptions would have otherwise been filled by much lower-cost generic alternatives.

147.    Defendants knew that the United States and the Plaintiff States would be purchasers and third-party payers for Apriso through direct or indirect sales of Apriso or the payment of claims for prescription drug reimbursement submitted by providers under government programs, including Medicare and Medicaid.

148.    Defendants knew that they would be submitting claims to the United States and the Plaintiff States and causing or inducing others to submit claims based on Defendants' illegally-inflated pricing for Apriso. Defendants were also well-aware of the statutory structures that govern the methods by which the United States and the Plaintiff States reimbursed outpatient drugs covered under Medicare and Medicaid.

149.    Defendants, their employees and agents, individually and in concert, knowingly submitted or caused to be submitted false claims to the United States Government and the Plaintiff States to secure payments for illegally-inflated prices for mesalamine. Through their planning and coordination, Defendants conspired to violate the False Claims Act under 31 U.S.C. § 3729(a)(1)(C).

150.    The United States Government and the Plaintiff States were unaware of Defendants' fraudulent scheme, misrepresentations to the Patent Office, and wrongful listing of the '688 Patent in the Orange Book at the time they paid False Claims.

**E.    Defendants Made False Statements to The Federal And State Governments Regarding Fair And Reasonable Pricing That Was Material to The Government's Payments.**

151.    For a drug manufacturer to sell pharmaceutical products to the federal government under certain government programs—either directly through sales to a government agency such as the Veterans Health Administration, or indirectly by receiving reimbursement for sales through Medicaid—the manufacturer must enter into several agreements with the federal government in which the manufacturer reports prices and business practices that establish the purchase price or

1  reimbursement amounts are "fair and reasonable" under federal acquisition

2  regulations.

3          152.    For Defendants to market Apriso to federal agencies or otherwise qualify

4  Apriso for reimbursement under certain government programs, Defendants must list

5  Apriso prices on the Federal Supply Schedule ("FSS"), a program run by the General

6  Services Administration ("GSA"). To do so, Defendants were required to sign a

7  standard Master Agreement ("MA") and a Pharmaceutical Price Agreement ("PPA").

8  See 38 U.S.C. § 8126(a). The PPA must be renewed annually and include the non-

9  federal average manufacturer price ("AMP") for the prior year.

10          153.    Moreover, drug manufacturers are required to update their AMP

11  information to CMS every calendar quarter. See 42 C.F.R. § 414.804(a) (5). The AMP is

12  used to calculate the Federal Ceiling Price ("FCP"), which is 76 percent of the AMP

13  plus a discount pegged to the cost of living index. As part of this process, Defendants

14  must periodically provide the federal government with Apriso's commercial list price,

15  the lowest price charged to any commercial customer (the "Most Favored Customer"),

16  and the name and pricing information for a "Tracking Customer," which is the

17  "customer or class of customers whose pricing is tracked against the awarded FSS

18  pricing for the purposes of ensuring that prices remain fair and reasonable throughout

19  the life of the contract" (emphasis added). See GSA Drugs, Pharmaceuticals &

20  Hematology Related Products Solicitation, 02 – Vendor Response Document, p. 40.

21          154.    As part of the GSA's assessment of Apriso pricing, Defendants were

22  required to supply a written justification for offered pricing, a mechanism for future

23  potential pricing adjustments, and proof that the price is fair and reasonable.

24          155.    Drug manufacturers such as Defendants have an express obligation to

25  provide truthful information about AMP pricing to the government, and such

26  manufacturers may be subject to substantial penalties if they provide inaccurate AMP

27  information. For example, the FSS Solicitation Document relating to drugs,

28  pharmaceuticals and hematology related products provides that: "[a]ccuracy of

- 44 -

1  information and computation of prices is the responsibility of the Contractor . . . .

2  Inclusion of incorrect information will cause the Contractor to resubmit/correct and

3  redistribute the Federal Supply Schedule Price List, and may constitute sufficient

4  cause for Cancellation . . . and application of any other remedies as provided by law—

5  including monetary recovery." GSA Drugs, Pharmaceuticals & Hematology Related

6  Products Solicitation, 01 – Solicitation Document, pp. 39–40.

7       156.    Moreover, to receive payment or reimbursement under Medicaid for

8  Apriso, Defendants must participate in the Medicaid Drug Rebate Program ("MDRP").

9  Under the MDRP, the manufacturer must submit product and pricing data for all of its

10  drugs that are eligible for coverage under Medicaid to CMS via the Drug Data

11  Reporting for Medicaid ("DDR") system. Under the agreement, the manufacturer must

12  supply the AMP and the number of units sold to DHHS. Drug manufacturers are

13  required to provide truthful information and are subject to substantial civil penalties if

14  they provide false information to the government. See 42 U.S.C. § 1396r 8(b)(3)(C)(ii).

15  When providing the AMP to CMS, Defendants impliedly certify that the average

16  manufacturer price reported has not been unlawfully inflated through the exclusion of

17  competitors.

18       157.    Defendants are also required to participate in the Section 340B Drug

19  Pricing Program, administered by the Office of Pharmacy Affairs in the DHHS. Under

20  this program, Defendants are required to provide drugs to eligible healthcare

21  organizations and certain other entities at reduced prices based on pricing data

22  supplied to the federal government, including with respect to the foregoing information

23  provided to the DHHS and the GSA through the DDR and FSS, respectively.

24       158.    Defendants violated their obligations under these programs because the

25  prices they negotiated with the government for Apriso were based on illegally obtained

26  patent protection, and thus manifestly were not "fair and reasonable." Even if the

27  information Defendants provided to the government was literally accurate, Defendants

28  misleadingly omitted the critical fact that their pricing was the product of an unlawful

- 45 -

1   patent monopoly, *i.e.*, a fraud on the government. That omission goes directly to

2   whether the prices the government paid for Apriso were fair and reasonable.

3          159.    Finally, when Defendants listed the '688 Patent and the Otterbeck

4   Patents in the Orange Book, Defendants expressly certified that the patents were valid

5   and enforceable. Defendants certified in U.S. Department of Health and Human

6   Services Form 3542 that they were "familiar with 21 CFR 314.53" and that their

7   submission "complie[d] with the requirements of the regulation." Pursuant to 21 C.F.R.

8   314.53, Defendants attested that, with respect to any listed patent, "a claim of patent

9   infringement could reasonably be asserted" against any person not licensed to sell the

10  drug. This express certification was false for the '688 Patent that Defendants listed in

11  the Orange Book because Defendants knew it was fraudulently obtained and thus

12  could not be "reasonably asserted" against generic competitors. Defendants also knew

13  that the Otterbeck Patents were invalid and could not reasonably be asserted to block

14  generic competitors from entering the market, which is why Defendants dismissed

15  claims relating to the Otterbeck Patents during the patent infringement litigations. As

16  a direct result of these false certifications, Defendants were able to list the fraudulent

17  '688 Patent and the Otterbeck Patents in the Orange Book, which automatically

18  triggered the 30-month stay of FDA approval that blocked the generic manufacturers

19  from introducing lower-priced alternatives.

20         160.    The United States government and the Plaintiff States were unaware of

21  Defendants' fraudulent scheme, misrepresentations and omissions to the Patent Office,

22  and wrongful listing of the '688 Patent and the Otterbeck Patents in the Orange Book

23  at the time they paid false claims.

24         161.    Defendants' fraudulent manipulation of the market price for Apriso

25  caused each and every claim presented to the government for Apriso from at least

26  September 12, 2014, and possibly as early as July 2012, to the present time to be false

27  or fraudulent because each and every such claim incorporated pricing terms or

28  reimbursement amounts that were unlawfully inflated as an intended and foreseeable

result of Defendants' fraud, or sought reimbursement for a prescription that would have otherwise been filled by a generic competitor.

162.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the United States. Relator has no control over, nor dealings with, such entities, and has no access to the records in their possession. But it is not necessary to identify each specific false claim because the nature of Defendants' misconduct taints each and every claim for payment to the government where the price is based, directly or indirectly, on the market price of Apriso—which includes each and every claim for payment.

**F.    Defendants' Conduct Was Material.**

163.   Defendants' misrepresentations and omissions were material, both to the Patent Office's decision to grant the '688 Patent, as well as to the government's subsequent payment decisions.

164.   Defendants' fraud was material to the payment or receipt of money from the government. 31 U.S.C. § 3729(b)(4). The price of a good that the government pays is *per se* material to the government's payment of money. Had the price been less, the government would have paid less.

165.   In this case, the government would have paid a lot less. The United States and the Plaintiff States spent hundreds of millions of dollars for Apriso and generic Apriso during the damages period. Studies demonstrate that the entry of generics lowers prices for the drug by 85%, and generics quickly capture 90% of the market. Defendants prevented this from happening with Apriso by applying for, obtaining, maintaining, and asserting the '688 Patent. But for this illegally acquired patent, generic competitors could have entered the market for generic Apriso at least by September 12, 2014, and possibly as early as July 2012.

166.   But for Defendants' fraudulent conduct, at least one or more of the many generic would have introduced a generic alternative to Apriso sufficient to have

satisfied demand for the drug. But for Defendants' unlawful misconduct, competition would have lowered prices for Apriso substantially, and lower-priced generics would have filled up to 90% of Apriso prescriptions. Instead, Defendants used their fraudulently acquired patents to delay generic competitors from marketing and selling lower-priced alternatives.

167.    The government has repeatedly confirmed, by word and deed, that drug price manipulation is material to its payment decisions.

168.    The government objects to the abuse of patents to exclude generic competitors. *See, e.g., Fed. Trade Com'n v. AbbVie Inc.*, 329 F. Supp. 3d 98 (E.D. Pa. 2018), *aff'd in part, rev'd in part & remanded sub nom. Fed. Trade Com'n v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020). And the government views overcharging through anticompetitive conduct as a serious problem, as confirmed through numerous civil and criminal law enforcement actions, including more than two decades of enforcement efforts by the Federal Trade Commission, the Department of Justice, and various state Attorneys General against various efforts to delay generic entry[1]; multiple letters from Congress to the FDA and the Patent Office (and between the FDA and the Patent Office) of the urgency to prevent massive waste of government healthcare funds caused by drug companies' abuse of the patent system to exclude generic competition[2]; executive orders from the President[3]; concerted action by the Federal Trade

---

[1] *See, e.g., Major Generic Drug Companies to Pay Over Quarter of a Billion Dollars to Resolve Price-Fixing Charges and Divest Key Drug at the Center of Their Conspiracy* (2023), at https://www.justice.gov/opa/pr/major-generic-drug-companies-pay-over-quarter-billion-dollars-resolve-price-fixing-charges.

[2] Letter from Senators Leahy, Wyden, Stabenow, Warrren and Blumenthal and Representatives Rush, Issa, Eshoo, Tiffany, Jayapal and Spartz to Untied States Patent and Trademark Office Director Andrew Hirshfeld (Sep. 16, 2021); Letter from Senators Leahy & Tillis to PTO Director Andrew Hirshfeld (Sep. 9, 2021).

[3] Executive Order on Promoting Competition in the American Economy, July 9, 2021, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/.

1  Commission to prevent brand drug companies from improperly listing patents in the

2  Orange Book; and studies and advocacy filings by the FTC on generic entry.

3     169.   Finally, in purchasing drugs or reimbursing prescriptions as an end-payor

4  for certain government healthcare programs, the United States and the Plaintiff States

5  require manufacturers to report accurate prices to them for purposes of calculating the

6  "fair and reasonable" price that the government will pay. Those calculations

7  necessarily assume that the inputs given to the government are not tainted by fraud

8  that would inflate the price and cause the government to pay more than it otherwise

9  would have.

10  **VII.   CLAIMS**

11  **Count I**<br>**False Claims Act**<br>**31 U.S.C. §§ 3729–3733**

12

13     170.   Relator realleges and incorporates by reference all foregoing allegations as

14  though fully set forth herein.

15     171.   This is a claim for treble damages and penalties under the False Claims

16  Act, 31 U.S.C. §§ 3729–3733, as amended.

17     172.   Through the acts described above, Defendants knowingly presented, or

18  caused to be presented, false or fraudulent claims to be granted the '688 Patent.

19     173.   Through the acts described above, Defendants knowingly presented, or

20  caused to be presented, false or fraudulent claims for payment of Apriso.

21     174.   Through the acts described above, Defendants conspired to commit

22  violations of the False Claims Act.

23     175.   Relator cannot at this time identify all of the false claims for payment that

24  were caused by Defendants' conduct. The false claims were presented by numerous

25  separate entities across the United States. Relator has no control over, or dealings

26  with, such entities, and has no access to the records in their possession.

27

28

176.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Government would not have paid but for Defendants' illegal conduct.

177.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

178.    Additionally, the United States is entitled to a maximum penalty of up to $22,363 for each and every violation alleged herein.

**Count II**
**California False Claims Act**
**Cal. Gov't Code §§ 12650–12656**

179.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

180.    This is a claim for treble damages and penalties under the California False Claims Act.

181.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

182.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

183.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

184.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of California—through any state funded program, including, without limitation, Medicaid—for Apriso.

185.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of California.

186.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

187.   The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

188.   By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

189.   Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

190.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

## Count III
### Colorado Medicaid False Claims Act
### Colo. Rev. Stat. §§ 25.5-4-303.5 to -310

191.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

192.   This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

193.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

194.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

195.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

196.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Colorado—through any state funded program, including, without limitation, Medicaid—for Apriso.

197.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Colorado.

198.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Colorado. Relator has no control over or dealings with such entities and has no access to the records in their possession.

199.    The State of Colorado, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Connecticut would not have paid but for Defendants' illegal conduct.

200.    By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

201.    Additionally, the State of Colorado is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

202.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

**Count IV**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**

203.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

- 52 -

204.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

205.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

206.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

207.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

208.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Connecticut—through any state funded program, including, without limitation, Medicaid—for Apriso.

209.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Connecticut.

210.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Connecticut. Relator has no control over or dealings with such entities and has no access to the records in their possession.

211.    The State of Connecticut, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Connecticut would not have paid but for Defendants' illegal conduct.

212.    By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

213.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Connecticut pursuant to Conn. Gen. Stat. § 4-277(a).

**Count V**
**Delaware False Claims and Reporting Act**
**Del. Code Ann. tit. 6, §§ 1201–1211**

214.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

215.   This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

216.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

217.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

218.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

219.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Delaware —through any state funded program, including, without limitation, Medicaid—for Apriso.

220.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Delaware.

221.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Delaware. Relator has no control over or dealings with such entities and has no access to the records in their possession.

222.    The State of Delaware, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Delaware would not have paid but for Defendants' illegal conduct.

223.    By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

224.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b)(1).

**Count VI**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081–.09**

225.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

226.    This is a claim for treble damages and penalties under the Florida False Claims Act.

227.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

228.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

229.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

230.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Florida —through any state funded program, including, without limitation, Medicaid—for Apriso.

231. Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Florida.

232. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Florida. Relator has no control over or dealings with such entities and has no access to the records in their possession.

233. The State of Florida, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Florida would not have paid but for Defendants' illegal conduct.

234. By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

235. Additionally, the State of Florida is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

236. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Florida pursuant to Fla. Stat. § 68.083(2).

### Count VII
### Georgia False Medicaid Claims Act
### Ga. Code Ann. §§ 49-4-168 to -168.6

237. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

238. This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

239. Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

240. Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

- 56 -

241.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

242.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Georgia —through any state funded program, including, without limitation, Medicaid—for Apriso.

243.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Georgia.

244.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Georgia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

245.    The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Georgia would not have paid but for Defendants' illegal conduct.

246.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

247.    Additionally, the State of Georgia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

248.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.2(b).

**Count VIII**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21 to -31**

249.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

250.   This is a claim for treble damages and penalties under Hawaii False Claims Act.

251.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

252.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

253.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

254.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Hawaii —through any state funded program, including, without limitation, Medicaid—for Apriso.

255.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Hawaii.

256.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Hawaii. Relator has no control over or dealings with such entities and has no access to the records in their possession.

257.   The State of Georgia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Hawaii would not have paid but for Defendants' illegal conduct.

258.   By reason of Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

259.   Additionally, the State of Hawaii is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

260.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Hawaii pursuant to Haw. Rev. Stat. § 661-25(a).

**Count IX**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1–175/8**

261.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

262.   This is a claim for treble damages and penalties under the Illinois False Claims Act.

263.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

264.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

265.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

266.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Illinois —through any state funded program, including, without limitation, Medicaid—for Apriso.

267.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Illinois.

268.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

- 59 -

separate entities across the State of Illinois. Relator has no control over or dealings with such entities and has no access to the records in their possession.

269.    The State of Illinois, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Illinois would not have paid but for Defendants' illegal conduct.

270.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

271.    Additionally, the State of Illinois is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

272.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b)(1).

### Count X
### Indiana False Claims and Whistleblower Protection Act
### Ind. Code §§ 5-11-5.5-1 to -18

273.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

274.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

275.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

276.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

277.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

- 60 -

278.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Indiana —through any state funded program, including, without limitation, Medicaid—for Apriso.

279.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Indiana.

280.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Indiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

281.   The State of Indiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Indiana would not have paid but for Defendants' illegal conduct.

282.   By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

283.   Additionally, the State of Indiana is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

284.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Indiana pursuant to Ind. Code § 5-11-5.5-4(a).

**Count XI**
**Iowa False Claims Act**
**Iowa Code §§ 685.1–.7**

285.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

286.   This is a claim for treble damages and penalties under the Iowa False Claims Act.

287.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

- 61 -

288.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

289.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

290.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Iowa —through any state funded program, including, without limitation, Medicaid—for Apriso.

291.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Iowa.

292.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Iowa. Relator has no control over or dealings with such entities and has no access to the records in their possession.

293.    The State of Iowa, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Iowa would not have paid but for Defendants' illegal conduct.

294.    By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

295.    Additionally, the State of Iowa is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

296.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2)(a).

**Count XII**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. §§ 46:437–:440**

297.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

298.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

299.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

300.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

301.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

302.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Louisiana —through any state funded program, including, without limitation, Medicaid—for Apriso.

303.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana.

304.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Louisiana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

305.    The State of Louisiana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the

1  claims that the State of Louisiana would not have paid but for Defendants' illegal

2  conduct.

3      306.    By reason of Defendants' acts, the State of Louisiana has been damaged,

4  and continues to be damaged, in substantial amount to be determined at trial.

5      307.    Additionally, the State of Louisiana is entitled to a statutory penalty for

6  each and every violation alleged herein to be determined by the Court in accordance

7  with the relevant statutes.

8      308.    Relator has standing as a *qui tam* relator to bring this cause of action on

9  behalf of the State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

10
11
**Count XIII**
**Massachusetts False Claims Act**
**Mass. Gen. Laws ch. 12, §§ 5A–5O**

12     309.    Relator realleges and incorporates by reference all foregoing allegations as

13  though fully set forth herein.

14     310.    This is a claim for treble damages and penalties under the Massachusetts

15  False Claims Act.

16     311.    Through the acts described above, Defendants knowingly, intentionally,

17  and willfully presented, or caused to be presented, false or fraudulent claims for

18  payment and approval for prescriptions for Apriso.

19     312.    Through the acts described above, Defendants knowingly, intentionally,

20  and willfully made or used a false record or statement material to a false or fraudulent

21  claim for payment and approval for prescriptions for Apriso.

22     313.    Through the acts described above, Defendants conspired to (a) present, or

23  cause to be presented, false or fraudulent claims for payment and approval; and (b)

24  make or use a false record or statement material to a false or fraudulent claim for

25  payment and approval for prescriptions for Apriso.

26     314.    Because of Defendants' violations the false claims statutes alleged herein,

27  Defendants were not entitled to be paid by the Commonwealth of Massachusetts —

28  through any state funded program, including, without limitation, Medicaid—for Apriso.

- 64 -

315.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Commonwealth of Massachusetts.

316.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the Commonwealth of Massachusetts. Relator has no control over or dealings with such entities and has no access to the records in their possession.

317.    The Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Commonwealth of Massachusetts would not have paid but for Defendants' illegal conduct.

318.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

319.    Additionally, the Commonwealth of Massachusetts is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

320.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

**Count XIV**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws §§ 400.601–.615**

321.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

322.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

323.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

324.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

325.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

326.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Michigan —through any state funded program, including, without limitation, Medicaid—for Apriso.

327.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Michigan.

328.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Michigan. Relator has no control over or dealings with such entities and has no access to the records in their possession.

329.    The State of Michigan, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Michigan would not have paid but for Defendants' illegal conduct.

330.    By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

331.    Additionally, the State of Michigan is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

332.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 400.610a(1).

**Count XV**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01–.16**

333.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

334.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

335.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

336.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

337.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

338.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Minnesota —through any state funded program, including, without limitation, Medicaid—for Apriso.

339.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Minnesota.

340.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Minnesota. Relator has no control over or dealings with such entities and has no access to the records in their possession.

341.    The State of Minnesota, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Minnesota would not have paid but for Defendants' illegal conduct.

342.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

343.    Additionally, the State of Minnesota is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

344.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Minnesota pursuant to Minn. Stat. § 15C.05.

**Count XVI**
**Montana False Claims Act**
**Mont. Code Ann. §§ 17-8-401 to -413**

345.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

346.    This is a claim for treble damages and penalties under the Montana False Claims Act.

347.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

348.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

349.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

350.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Montana —through any state funded program, including, without limitation, Medicaid—for Apriso.

351.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Montana.

352.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Montana. Relator has no control over or dealings with such entities and has no access to the records in their possession.

353.    The State of Montana, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Montana would not have paid but for Defendants' illegal conduct.

354.    By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

355.    Additionally, the State of Montana is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

356.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Montana pursuant to Mont. Code Ann. § 17-8-406(1).

## Count XVII
### Nevada Submission of False Claims to State or Local Government
### Nev. Rev. Stat. §§ 357.010–.250

357.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

358.    This is a claim for treble damages and penalties under the Nevada statute relating to the Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250

- 69 -

359.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

360.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

361.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

362.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Nevada —through any state funded program, including, without limitation, Medicaid—for Apriso.

363.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Nevada.

364.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Nevada. Relator has no control over or dealings with such entities and has no access to the records in their possession.

365.   The State of Nevada, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Nevada would not have paid but for Defendants' illegal conduct.

366.   By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

367.   Additionally, the State of Nevada is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

368.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

**Count XVIII**
**New Jersey False Claims Act**
**N.J. Stat. Ann. §§ 2A:32C-1 to -18**

369.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

370.   This is a claim for treble damages and penalties under the New Jersey False Claims Act.

371.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

372.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

373.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

374.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Jersey —through any state funded program, including, without limitation, Medicaid—for Apriso.

375.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Jersey.

376.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Jersey. Relator has no control over or dealings with such entities and has no access to the records in their possession.

377.    The State of New Jersey, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Jersey would not have paid but for Defendants' illegal conduct.

378.    By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

379.    Additionally, the State of New Jersey is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

380.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5(b).

### Count XIX
### New Mexico Medicaid False Claims
### N.M. Stat. Ann. §§ 27-14-1 to -15

381.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

382.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

383.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

384.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

385.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

386.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New Mexico—through any state funded program, including, without limitation, Medicaid—for Apriso.

387.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New Mexico.

388.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of New Mexico. Relator has no control over or dealings with such entities and has no access to the records in their possession.

389.    The State of New Mexico, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of New Mexico would not have paid but for Defendants' illegal conduct.

390.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

391.    Additionally, the State of New Mexico is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

392.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-7.

**Count XX**
**New Mexico Fraud Against Taxpayers Act**
**N.M. Stat. Ann. §§ 44-9-1 to -14**

393.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

394.    This is a claim for treble damages and penalties under the New Mexico Fraud Against Taxpayers Act.

395.     Through the acts described herein, Defendants knowingly, intentionally, and willfully violated the New Mexico Fraud Against Taxpayers Act.

396.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

**Count XXI**
**New York False Claims Act**
**N.Y. State Fin. Law §§ 187–194**

397.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

398.     This is a claim for treble damages and penalties under the New York False Claims Act.

399.     Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

400.     Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

401.     Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

402.     Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of New York—through any state funded program, including, without limitation, Medicaid—for Apriso.

403.     Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of New York.

404.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

1    separate entities across the State of New York. Relator has no control over or dealings
2    with such entities and has no access to the records in their possession.

3        405.   The State of New York, unaware of the falsity of the records, statements
4    and claims made or caused to be made by Defendants, paid and continues to pay the
5    claims that the State of New York would not have paid but for Defendants' illegal
6    conduct.

7        406.   By reason of Defendants' acts, the State of New York has been damaged,
8    and continues to be damaged, in substantial amount to be determined at trial.

9        407.   Additionally, the State of New York is entitled to a statutory penalty for
10   each and every violation alleged herein to be determined by the Court in accordance
11   with the relevant statutes.

12       408.   Relator has standing as a *qui tam* relator to bring this cause of action on
13   behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2)(a).

**Count XXII**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-605 to -618**

16       409.   Relator realleges and incorporates by reference all foregoing allegations as
17   though fully set forth herein.

18       410.   This is a claim for treble damages and penalties under the North Carolina
19   False Claims Act.

20       411.   Through the acts described above, Defendants knowingly, intentionally,
21   and willfully presented, or caused to be presented, false or fraudulent claims for
22   payment and approval for prescriptions for Apriso.

23       412.   Through the acts described above, Defendants knowingly, intentionally,
24   and willfully made or used a false record or statement material to a false or fraudulent
25   claim for payment and approval for prescriptions for Apriso.

26       413.   Through the acts described above, Defendants conspired to (a) present, or
27   cause to be presented, false or fraudulent claims for payment and approval; and (b)

28

1    make or use a false record or statement material to a false or fraudulent claim for

2    payment and approval for prescriptions for Apriso.

3        414.    Because of Defendants' violations the false claims statutes alleged herein,

4    Defendants were not entitled to be paid by the State of North Carolina—through any

5    state funded program, including, without limitation, Medicaid—for Apriso.

6        415.    Through the acts described herein, Defendants knowingly presented, or

7    caused to be presented, false or fraudulent claims to the State of North Carolina.

8        416.    Relator cannot at this time identify all of the false claims for payment that

9    were caused by Defendants' conduct. The false claims were presented by numerous

10   separate entities across the State of North Carolina. Relator has no control over or

11   dealings with such entities and has no access to the records in their possession.

12       417.    The State North Carolina, unaware of the falsity of the records,

13   statements and claims made or caused to be made by Defendants, paid and continues

14   to pay the claims that the State of North Carolina would not have paid but for

15   Defendants' illegal conduct.

16       418.    By reason of Defendants' acts, the State of North Carolina has been

17   damaged, and continues to be damaged, in substantial amount to be determined at

18   trial.

19       419.    Additionally, the State of North Carolina is entitled to a statutory penalty

20   for each and every violation alleged herein to be determined by the Court in accordance

21   with the relevant statutes.

22       420.    Relator has standing as a *qui tam* relator to bring this cause of action on

23   behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

24   **Count XXIII**
**Oklahoma Medicaid False Claims Act**
25   **Okla. Stat. tit. 63, §§ 5053–5053.7**

26       421.    Relator realleges and incorporates by reference all foregoing allegations as

27   though fully set forth herein.

28

SECOND AMENDED COMPLAINT            CASE NO. 3:18-CV-01496-JD

422.    This is a claim for treble damages and penalties under the Oklahoma False Claims Act.

423.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

424.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

425.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

426.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Oklahoma—through any state funded program, including, without limitation, Medicaid—for Apriso.

427.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Oklahoma.

428.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Oklahoma. Relator has no control over or dealings with such entities and has no access to the records in their possession.

429.    The State of Oklahoma, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Oklahoma would not have paid but for Defendants' illegal conduct.

430.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

431.   Additionally, the State of Oklahoma is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

432.   Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.2(B)(1).

## Count XXIV
## Rhode Island False Claims Act
### R.I. Gen. Laws §§ 9-1.1-1 to -9

433.   Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

434.   This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

435.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

436.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

437.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

438.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Rhode Island —through any state funded program, including, without limitation, Medicaid—for Apriso.

439.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Rhode Island.

440.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

- 78 -

separate entities across the State of Rhode Island. Relator has no control over or dealings with such entities and has no access to the records in their possession.

441.    The State of Rhode Island, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Rhode Island would not have paid but for Defendants' illegal conduct.

442.    By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

443.    Additionally, the State of Rhode Island is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

444.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

**Count XXV**
**Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. §§ 7-5-181 to -185**

445.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

446.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

447.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

448.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

449.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b)

- 79 -

make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

450.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Tennessee—through any state funded program, including, without limitation, Medicaid—for Apriso.

451.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Tennessee.

452.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Tennessee. Relator has no control over or dealings with such entities and has no access to the records in their possession.

453.    The State of Tennessee, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Tennessee would not have paid but for Defendants' illegal conduct.

454.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

455.    Additionally, the State of Tennessee is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

456.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b)(1).

### Count XXVI
### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §§ 36.001–.132

457.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

458.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

459.   Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

460.   Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

461.   Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

462.   Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Texas—through any state funded program, including, without limitation, Medicaid—for Apriso.

463.   Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Texas.

464.   Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Texas. Relator has no control over or dealings with such entities and has no access to the records in their possession.

465.   The State of Texas, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Texas would not have paid but for Defendants' illegal conduct.

466.   By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

467.   Additionally, the State of Texas is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

468.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

**Count XXVII**
**Vermont False Claims Act**
**Vt. Stat. Ann. tit. 32, §§ 630–642**

469.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

470.    This is a claim for treble damages and penalties under the Vermont False Claims Act.

471.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

472.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

473.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

474.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Vermont —through any state funded program, including, without limitation, Medicaid—for Apriso.

475.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Vermont.

476.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Vermont. Relator has no control over or dealings with such entities and has no access to the records in their possession.

477.    The State of Vermont, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Vermont would not have paid but for Defendants' illegal conduct.

478.    By reason of Defendants' acts, the State of Vermont has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

479.    Additionally, the State of Vermont is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

480.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

## Count XXVIII
### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §§ 8.01-216.1 to .19

481.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

482.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

483.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

484.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

485.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

486.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the Commonwealth of Virginia—through any state funded program, including, without limitation, Medicaid—for Apriso.

487.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia.

488.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the Commonwealth of Virginia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

489.    The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Commonwealth of Virginia would not have paid but for Defendants' illegal conduct.

490.    By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

491.    Additionally, the Commonwealth of Virginia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

492.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(A).

## Count XXIX
### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.005–.130

493.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

494.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

- 84 -

495.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

496.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

497.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

498.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the State of Washington—through any state funded program, including, without limitation, Medicaid—for Apriso.

499.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the State of Washington.

500.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of Washington. Relator has no control over or dealings with such entities and has no access to the records in their possession.

501.    The State of Washington, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of Washington would not have paid but for Defendants' illegal conduct.

502.    By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

503.    Additionally, the State of Washington is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

504.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050.

**Count XXX**
**The District of Columbia False Claims Law**
**D.C. Code §§ 2-381.01 to .09**

505.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

506.    This is a claim for treble damages and penalties under the District of Columbia False Claims Law.

507.    Through the acts described above, Defendants knowingly, intentionally, and willfully presented, or caused to be presented, false or fraudulent claims for payment and approval for prescriptions for Apriso.

508.    Through the acts described above, Defendants knowingly, intentionally, and willfully made or used a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

509.    Through the acts described above, Defendants conspired to (a) present, or cause to be presented, false or fraudulent claims for payment and approval; and (b) make or use a false record or statement material to a false or fraudulent claim for payment and approval for prescriptions for Apriso.

510.    Because of Defendants' violations the false claims statutes alleged herein, Defendants were not entitled to be paid by the District of Columbia —through any state funded program, including, without limitation, Medicaid—for Apriso.

511.    Through the acts described herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the District of Columbia.

512.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous

separate entities across the District of Columbia. Relator has no control over or dealings with such entities and has no access to the records in their possession.

513.    The District of Columbia, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that District of Columbia would not have paid but for Defendants' illegal conduct.

514.    By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

515.    Additionally, the District of Columbia is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

516.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the District of Columbia pursuant to D.C. Code § 2-381.03(b)(1).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.    That Defendants cease and desist from violating 31 U.S.C. §§ 3729–3733, and the relevant parts of each statute applicable to the Plaintiff States as set forth above;

B.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty applicable for each false claim as of the time of assessment (currently not less than $13,946 and not more than $27,894 for each violation of 31 U.S.C. §§ 3729–3733);

C.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the California False Claims Act, Cal. Gov't Code §§ 12650–12656;

D.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Colorado Medicaid False Claims Act, Colo. Rev. Stat §§ 25.5-4-303.5 to -310;

E.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 to -289;

F.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201–1211;

G.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Florida False Claims Act, Fla. Stat. §§ 68.081–.09;

H.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 to -168.6;

I.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 to -31;

J.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1–175/8;

K.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1 to -18;

L.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Iowa has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of Iowa False Claims Act, Iowa Code §§ 685.1–.7;

M.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437–:440;

N.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages Commonwealth of Massachusetts has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A–5O;

O.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Michigan Medicaid False Claims Act, Mich. Comp. Laws. §§ 400.601–.615;

P.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Minnesota False Claims Act, Minn. Stat, §§ 15C.01–.16;

Q.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 to -413;

R.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Nevada statute concerning Submission of False Claims to State or Local Government, Nev. Rev. Stat. §§ 357.010–.250;

S.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 to -18;

T.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1 to -15; and the New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. §§ 44-9-1 to -14.

U.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of

Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the New York False Claims Act, N.Y. State Fin. Law §§ 187–194;

V.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 to -618;

W.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053–5053.7;

X.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 to -9;

Y.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to -185;

Z.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001–.132;

AA.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Vermont has sustained because of

Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, §§ 630–642;

BB.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to .19;

CC.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005–.130;

DD.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the District of Columbia False Claims Act, D.C. Code §§ 2-381.01 to .09;

EE.   That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), and the relevant provisions of each statute applicable to the Plaintiff States as set forth above;

FF.   That Relator be awarded all costs of this action;

GG.   That the Relator be awarded reasonable attorneys' fees; and

HH.   That Relator recover such further and other relief as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: November 27, 2024

**HERRERA KENNEDY LLP**

_____

By: Nicomedes Sy Herrera

Nicomedes Sy Herrera (State Bar No. 275332)
Shawn M. Kennedy (State Bar No. 218472)
Bret D. Hembd (State Bar No. 272826)
Laura E. Seidl (State Bar No. 269891)
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
Facsimile: (855) 969-2050
Email: NHerrera@HerreraKennedy.com
          SKennedy@HerreraKennedy.com
          BHembd@HerreraKennedy.com
          LSeidl@HerreraKennedy.com

**SPARACINO PLLC**
Tejinder Singh (*pro hac vice*)
1920 L Street, NW, Suite 835
Washington, DC 20036
Telephone: (202) 629-3530
Email: Tejinder.Singh@sparacinopllc.com

**BURNS CHAREST LLP**
Warren T. Burns (*pro hac vice*)
Christopher Cormier (*pro hac vice*)
Matthew Strauser (*pro hac vice*)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
Email: wburns@burnscharest.com
          ccormier@burnscharest.com
          mstrauser@burnscharest.com

*Attorneys for Plaintiff-Relator Zachary Silbersher*

SECOND AMENDED COMPLAINT                              CASE NO. 3:18-CV-01496-JD