1  Nicomedes Sy Herrera (State Bar No. 275332)
   Shawn M. Kennedy (State Bar No. 218472)
2  Laura E. Seidl (State Bar No. 269891)
   **HERRERA KENNEDY LLP**
3  1300 Clay Street, Suite 600
   Oakland, California 94612
4  Telephone: (510) 422-4700
   Facsimile:  (855) 969-2050
5  Email: NHerrera@HerreraKennedy.com
          SKennedy@ HerreraKennedy.com
6          LSeidl@ HerreraKennedy.com

7  *Attorneys for Plaintiff-Relator Zachary Silbersher*

8  [Additional Counsel on the Signature Page]

                **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
10

11 UNITED STATES OF AMERICA; STATES          Case No.: 3:18-cv-01496-JD
   OF CALIFORNIA, COLORADO,
12 CONNECTICUT, DELAWARE, FLORIDA,
   GEORGIA, HAWAII, ILLINOIS, INDIANA,
13 IOWA, LOUISIANA, MICHIGAN,
   MINNESOTA, MONTANA, NEVADA, NEW
14 JERSEY, NEW MEXICO, NEW YORK,
   NORTH CAROLINA, OKLAHOMA, RHODE         **PLAINTIFF-RELATOR'S BRIEF IN**
15 ISLAND, TENNESSEE, TEXAS, VERMONT,       **OPPOSITION TO THE MOTION TO**
   AND WASHINGTON; THE                       **DISMISS FILED BY DR. FALK**
16 COMMONWEALTHS OF                          **PHARMA GMBH (ECF 182)**
   MASSACHUSETTS AND VIRGINIA; AND
17 THE DISTRICT OF COLUMBIA,                 **ORAL ARGUMENT REQUESTED**

18 *ex rel.* ZACHARY SILBERSHER,
                                            Hearing Date: Nov. 13, 2025
19              Plaintiffs,                 Hearing Time: 10:00 a.m.
                                            Courtroom: 11
20       v.                                 Hon. James Donato, U.S.D.J.

21 VALEANT PHARMACEUTICALS
   INTERNATIONAL, INC., VALEANT
22 PHARMACEUTICALS INTERNATIONAL,
   SALIX PHARMACEUTICALS, LTD., SALIX
23 PHARMACEUTICALS, INC., AND DR.
   FALK PHARMA GMBH,
24
                Defendants.
25

26

27

28
                                    - i -

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

THE ALLEGATIONS AGAINST FALK ............................................................................. 2

ARGUMENT .................................................................................................................... 4

I. RELATOR PLEADS FRAUD WITH PARTICULARITY AGAINST FALK. ...................... 4

    A. Falk's "Group Pleading" Argument Is Wrong ........................................... 4

    B. Falk's Patent Prosecution, FDA, and Ownership-Related Arguments Fail ............ 5

    C. Relator Sufficiently Pleads Scienter for Falk ............................................ 7

II. RELATOR ALLEGES VALID FCA CLAIMS AGAINST FALK ................................ 8

    A. Defendants' Concealment of Marakhouski and Brunner Is Sufficient to Establish Liability .. 9

    B. Defendants' Concealment of the Critical Portions of the '344 Patent Application Is
       Sufficient to Establish Liability. ......................................................... 11

    C. Relator Sufficiently Pleads the Otterbeck Patents Were Fraudulent. ................. 13

    D. Relator Sufficiently Pleads Falsity Regarding Claims for Reimbursement. ........... 14

    E. Relator Sufficiently Pleads Scienter ..................................................... 14

III. THE STATE LAW CLAIMS SURVIVE ............................................................. 15

CONCLUSION ............................................................................................................... 15

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS       CASE NO. 3:18-CV-01496-JD

# TABLE OF AUTHORITIES
## CASES

*Akzo, N.V. v. U.S. Int'l Trade Comm'n*
  808 F.2d 1471 ....................................................................................................... 13

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ................................................................................................. 4

*Avid Identification Sys., Inc. v. Crystal Imp. Corp.*
  603 F.3d 967 (Fed. Cir. 2010) .................................................................................. 5

*Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.*
  104 F. Supp. 3d 1023 (E.D. Cal. 2015) ..................................................................... 5

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*
  620 F.2d 1360 (9th Cir. 1980) .................................................................................. 6

*Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*
  267 F.3d 1370 (Fed. Cir. 2001) ................................................................................ 8

*Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs. Ltd.*
  394 F.3d 1348 (Fed. Cir. 2005) ................................................................................ 8

*Cook Cnty. v. United States ex rel. Chandler*
  538 U.S. 119 (2003) ................................................................................................. 1

*Mendocino Env't Ctr. v. Mendocino Cnty.*
  192 F.3d 1283 (9th Cir. 1999) .................................................................................. 7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
  575 U.S. 175 (2015) ................................................................................................. 13

*Praxair, Inc. v. Atmi, Inc.*
  543 F.3d 1306 (Fed. Cir. 2008) ................................................................................ 6

*Silbersher v. Allergan Inc.*
  506 F. Supp. 3d 772 (N.D. Cal. 2020) ................................................................... 1, 9

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
  501 F.3d 493 (6th Cir. 2007) .................................................................................... 8

*United States ex rel. Durkin v. Cnty. of San Diego*
  2018 WL 3361148 (S.D. Cal. 2018) ......................................................................... 7

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*
  352 F.3d 908 (4th Cir. 2003) .................................................................................... 8

*United States ex rel. Heath v. AT&T, Inc.*
  791 F.3d 112 (D.C. Cir. 2015) .................................................................................. 8

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*
  498 F. Supp. 2d 25 (D.D.C. 2007) ........................................................................ 6, 14

- iii -

*United States ex rel. Loughren v. Unum Grp.*,
   613 F.3d 300 (1st Cir. 2010) ......................................................................... 13

*United States ex rel. Ormsby v. Sutter Health*
   444 F. Supp. 3d 1010 (N.D. Cal. 2020) ........................................................... 7

*United States ex rel. Polukoff v. St. Mark's Hosp.*
   895 F.3d 730 (10th Cir. 2018) .................................................................... 5, 8

*United States ex rel. Silbersher v. Janssen Biotech, Inc.*
   576 F. Supp. 3d 212 (D.N.J. 2021) ........................................................ 1, 9, 14

*United States v. Allergan, Inc.*
   46 F.4th 991 (9th Cir. 2022) .......................................................................... 1

*United States v. Bingham*
   653 F.3d 983 (9th Cir. 2011) ......................................................................... 7

*United States v. Care Alternatives*,
   952 F.3d 89 (3d Cir. 2020) ........................................................................... 13

*United States v. Hart* No. 419CV00332JAJCFB
   2020 WL 6051599 (S.D. Iowa Apr. 1, 2020) ............................................... 14

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
   953 F.3d 1108 (9th Cir. 2020) ...................................................................... 13

*Young v. Lumenis, Inc.*
   492 F.3d 1336 (Fed. Cir. 2007) .................................................................... 13

### STATUTES, RULES, AND REGULATIONS

31 U.S.C. § 3729 ................................................................................................. 1

31 U.S.C. § 3729(a)(1)(A) ................................................................................. 2

31 U.S.C. § 3729(a)(1)(B) ............................................................................... 14

31 U.S.C. § 3729(b)(1) ....................................................................................... 8

31 U.S.C. § 3729(b)(2)(A) ............................................................................... 14

35 U.S.C. § 1.56 ............................................................................................... 11

37 C.F.R. § 1.98 ................................................................................................. 9

37 C.F.R. § 1.98(a) ..................................................................................... 10, 12

Cal. Gov't Code § 12652 ................................................................................. 15

M.P.E.P. § 2001.01 ............................................................................................ 6

M.P.E.P. § 2001.04. ........................................................................................... 9

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS    CASE NO. 3:18-CV-01496-JD

M.P.E.P. § 2004, ¶ 7 ....................................................................................................... 9

M.P.E.P. § 609.04(a) ..................................................................................................... 10

Tex. Hum. Res. Code § 36.002 ...................................................................................... 15

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS          CASE NO. 3:18-CV-01496-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTRODUCTION

Relator's Third Amended Complaint ("TAC," cited as "¶_") (ECF 166), alleges that Dr. Falk Pharma GmbH ("Falk"), together with its co-defendants, caused the United States and Plaintiff States (collectively, the "Government") to pay hundreds of millions of dollars more for the ulcerative colitis medication Apriso (mesalamine), than they should have. Falk and its co-defendants accomplished this through false statements and misleading omissions to the United States Patent and Trademark Office, which caused the office to grant invalid patents protecting Apriso (described in the TAC as the '688 patent and the Otterbeck Patents). Falk and its co-defendants asserted those patents in lawsuits against generic competitors, prolonging Defendants' exclusive market share and monopoly prices. As a result, the Government paid millions of dollars more than it should have paid for Apriso. This misconduct violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, and its state counterparts.

Multiple courts have issued well-reasoned decisions concluding that the FCA applies to defendants making false statements (including material omissions) to the Patent Office to inflate drug prices. *See United States ex rel. Silbersher v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 228-30 (D.N.J. 2021), *mot. to certify appeal denied*, 2022 WL 225475; *Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772, 826 (N.D. Cal. 2020) ("Defendants' false statements to obtain a government benefit [*i.e.,* issuance of a pharmaceutical patent] are sufficient to render their later claims false for the purposes of the FCA.")*, rev'd on other grounds and remanded sub nom. United States v. Allergan, Inc.,* 46 F.4th 991 (9th Cir. 2022). These decisions are correct because the FCA seeks to redress "all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted). This includes situations where upstream deception of one government agency causes harm to another agency downstream. *See United States ex rel. Campie v. Gilead Scis., Inc.,* 862 F.3d 890, 902–04 (9th Cir. 2017) (fraud during FDA approval process tainted claims for payment later made to CMS).

Falk's motion downplays its involvement in the scheme—but as this Court itself recognized when denying Falk's prior motion to dismiss for lack of jurisdiction, "Falk's involvement in obtaining the ['688] patent, and its lawsuits, are a critical part of the alleged scheme." ECF 108, at 2. Moreover,

- 1 -

1    the law does not require Falk to have itself accomplished or even participated in all parts of the

2    scheme for Falk to be liable. That is because the FCA imposes liability not only on those who present

3    false claims—but also on those who cause others to do so. *See* 31 U.S.C. § 3729(a)(1)(A). This applies

4    to Falk, which played a causal role in its agents' and co-defendants' misconduct before the Patent

5    Office, as well as in the downstream presentment of false claims. Independently, the FCA imposes

6    liability on any person or entity that conspires to violate the statute. *Id.* § 3729(a)(1)(C). This applies

7    to Falk because the TAC plausibly alleges Falk agreed with its co-defendants to present a false patent

8    application so that Defendants collectively could reap the benefits of the unlawful monopoly.

9    <center>**THE ALLEGATIONS AGAINST FALK**</center>

10    Falk, the owner of the '688 patent, played a central role in fraudulently obtaining that patent by

11    having its agent make false representations to the Patent Office about the novelty of administering

12    Apriso without food—and by withholding critical prior art contradicting those misrepresentations.

13    Although Salix initiated the patent prosecution, Falk "acquired the rights to the '688 patent application

14    on April 1, 2011, and thus was a real party-in-interest liable for the failure to disclose material facts of

15    invalidity." (¶ 110; ¶ 73.) In 2014, during prosecution of the '688 patent application, Falk and Salix

16    claimed that administering their granulated mesalamine formulation "without food" was non-obvious

17    because "unlike other 5-mesalamine drugs available at the time of the invention, Applicant has

18    demonstrated that the claimed methods are equally safe and effective when granulated mesalamine is

19    administered to a subject without food"—while they "intentionally withheld material information

20    demonstrating that … the claimed granulated mesalamine formulation would be effective when

21    administered without food." (¶¶ 10-11, 85, 95.) The Patent Office relied on this representation, with

22    the Examiner mistakenly stating in the Reasons for Allowance that "[o]ne skilled in the art" would

23    have been "motivated to administer the mesalamine formulation with food." (¶¶ 95, 102-103.)

24    Falk knew the core premise of the '688 patent was false, but concealed it. Falk deliberately

25    withheld the Brunner and Marakhouski studies, which had demonstrated years earlier that granulated

26    mesalamine formulations like Apriso were effective when specifically administered without food.

27    (¶¶ 12-13, 86.) Falk's withholding of these studies, including their specific protocols and results, was

<center>- 2 -</center>

1    particularly egregious because Falk had direct involvement in both: it provided the formulations for

2    Brunner, underwrote Marakhouski, and its head of research, Roland Greinwald, co-authored both.

3    (¶¶ 13, 87, 112.) The materiality of these omissions are confirmed because the Patent Trial and Appeal

4    Board ("PTAB") invalidated the '688 patent when presented with the studies' results. (¶¶ 18-19, 91.)

5        Independently, Falk and Salix knew it was not inventive to take mesalamine without food

6    because of work done in connection with a prior application for an unrelated patent (the '344 patent).

7    There, in 2009, the same prosecuting attorney, Jonathan Sparks, presented a table (Table 1) showing

8    that taking similar pH-dependent mesalamine formulations with food decreased the colonic

9    bioavailability of the drug—showing that taking mesalamine without food would be the preferred

10   approach. (¶¶ 93-94.) Indeed, Table 1 showed that Lialda, a drug that was specifically referenced in

11   the '688 patent prosecution, had decreased colonic bioavailability when taken with food. (¶ 94.) Falk

12   and Salix also withheld similar information relating to other drugs, Claversal and Asacol. (¶¶ 97-101).

13       Falk's fraudulent conduct extended beyond the patent prosecution. After obtaining the '688

14   patent through fraud, Falk actively enforced it to exclude generic competitors and maintain Apriso's

15   artificially inflated prices. As the patent owner, Falk asserted the fraudulent patent in multiple

16   infringement actions against generic manufacturers including Lupin, Novel Labs, Mylan, and Teva.

17   (¶¶ 108, 111, 139-145.) These enforcement actions triggered automatic 30-month stays under the

18   Hatch-Waxman Act that prevented FDA approval of generic alternatives, even though Falk knew the

19   patent was invalid due to fraud. (¶¶ 69, 148, 163, 177.) Falk also defended the invalid patent against

20   Inter Partes Review (IPR) challenges, further prolonging the exclusion of generic competition. (¶ 111.)

21   Through this misconduct, Falk caused pharmacies, patients, and other entities to submit false claims to

22   government healthcare programs at inflated prices—each prescription claim incorporating fraudulently

23   inflated prices resulting from Falk's unlawful patent monopoly. (¶¶ 157-158, 179.) As this Court

24   recognized, "Falk not only was assigned ownership rights under United States law for the mesalamine

25   patent in issue, but has also vigorously asserted those rights by bringing suit against multiple generic

26   drug makers." ECF 108, at 2. These suits "played a critical role in allowing Valeant to maintain

27   inflated prices for Apriso—a key element of the alleged false claims." *Id*.

28
- 3 -
RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS        CASE NO. 3:18-CV-01496-JD

Falk's fraudulent scheme involved extensive coordination with its co-defendants. Falk and Salix shared "all of the data" related to Apriso development, ensuring both companies knew about the Brunner and Marakhouski studies they deliberately withheld from the Patent Office, as well as other evidence that it was obvious to take mesalamine without food. (¶¶ 88, 114.) They jointly prosecuted the '688 Patent application through the same patent attorney, Jonathan Sparks, who had previously taken contradictory positions about similar mesalamine formulations administered with food when prosecuting the '344 patent. (¶¶ 15-17, 93-95, 115.) Falk and Salix jointly enforced the fraudulent patents in litigation, with both Falk and Salix acting as named plaintiffs, and both named as real parties-in-interest in the patent defense proceedings. (¶¶ 106, 108-111, 136, 139-145.) This coordinated effort to obtain and maintain an unlawful monopoly through fraud constitutes a conspiracy to violate the False Claims Act, causing the submission of hundreds of millions of dollars in false claims to federal and state healthcare programs. (¶¶ 167, 192.)

<div align="center">ARGUMENT</div>

When evaluating a Rule 12(b)(6) motion, the Court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in plaintiff's favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**I.    RELATOR PLEADS FRAUD WITH PARTICULARITY AGAINST FALK.**

A. Falk's "Group Pleading" Argument Is Wrong

Falk argues first that the TAC impermissibly groups Falk and Salix together (Mot. 5-6.) But group pleading is permissible when the defendants allegedly engaged in the same misconduct. Here, the only examples Falk identifies relate to the prosecution of the '688 Patent—an endeavor that Falk and Salix engaged in jointly through their mutual agent, Jonathan Sparks (¶ 115), while sharing all of the data (¶ 114), as well as the benefits. As explained *supra* (and admitted by Falk, *see* Mot. 3), Salix initiated the patent prosecution, then assigned its interest to Falk, which ultimately became the patent owner, and licensed the patent back to Salix. Then, when defending the patent before the PTAB, the inventor, Lorin Johnson, "testified to the beliefs of both Salix *and Dr. Falk* . . . which shows extensive

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS    CASE NO. 3:18-CV-01496-JD

collaboration among Dr. Falk and Salix over the '688 patent." (¶ 113.) Thus, Defendants were inextricably intertwined throughout the patent prosecution, and it makes sense to address their liability collectively. That Salix engaged in misconduct for Falk's benefit does not diminish Falk's culpability —nor deprive Falk of notice of the claims against it, which is all that Rule 9(b) requires. *See United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018).

Independently, the TAC explains what Falk itself did wrong during the patent prosecution. In addition to alleging that Falk and Salix conspired to present the fraudulent patent application, the TAC explains that Falk was obligated to disclose Marakhouski and Brunner, but deliberately withheld them. (¶¶ 110, 112 116.) And then, after Falk became the owner of the '688 patent, the TAC explains that Falk initiated lawsuits in its own name to block generic competition using that patent. (¶ 111.) These allegations specific to Falk either constitute false claims or at least caused them to be presented.

B.  Falk's Patent Prosecution, FDA, and Ownership-Related Arguments (Mot. 6-7) Fail

Falk argues that it made no false statements in the patent prosecution or to the FDA (Mot. 6.) That is incorrect, as the TAC alleges that Falk's agent Sparks made false statements and misleading omissions to the Patent Office on Falk's behalf. Falk responds that Sparks was only "Salix's counsel" (Mot. 6), but the TAC plausibly alleges that he was Falk's agent, too (¶ 115.) Indeed, Sparks was prosecuting a patent application that Falk owned, for a patent that was assigned to Falk, based on science that Falk co-authored, and lead—and so an agency relationship is *at least* plausible. Indeed, given that Salix was pursuing a patent that Falk would own and license back to Salix, there is a better-than-good argument that Salix was also acting as Falk's agent. That alone is sufficient to allege scienter against Falk because when individuals act as corporations' agents before the Patent Office, the "individual's actions may be imputed to a corporate patent owner." *Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.*, 104 F. Supp. 3d 1023, 1036 (E.D. Cal. 2015) (citing *Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010)). More generally, principals are liable for frauds their agents commit. *See, e.g., Polukoff*, 895 F.3d at 745 n.9.

An agency relationship may not even be necessary for liability to attach in this context. The Federal Circuit's decision in *Praxair, Inc. v. Atmi, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008), *abrogated on*

- 5 -

1   *other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014), is instructive. The

2   Federal Circuit affirmed a finding of patent fraud against Praxair based on the knowledge and intent of

3   two individuals, an outside attorney and inventor, even though neither individual "worked[ed] for

4   Praxair," and even though "Praxair was not involved in prosecution" of the patent. *Id.* at 1317. Here,

5   the TAC directly alleges Falk's participation in the prosecution of the '688 patent, but even if it did

6   not, under *Praxair,* that is unnecessary to state a claim against Falk.[1]

7        Falk argues that Salix's statements cannot be imputed to it (Mot. 6), but the cases it cites are

8   inapposite. Those cases hold that statements of a subsidiary cannot be imputed to a parent company

9   without more. The TAC here alleges liability for Falk's own actions. This includes dishonestly

10  withholding Marakhouski and Brunner in violation of duties of candor and good faith—a duty that

11  "extends broadly" to those "associated with the filing and prosecution of a patent application" and

12  "every person who is substantively involved in the preparation or prosecution of the application and

13  who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an

14  obligation to assign the application." M.P.E.P. § 2001.01. It also includes asserting fraudulently

15  obtained patents to shore up an illegal monopoly—which this Court already recognized was a

16  "critical" component of the overall scheme. ECF 108, at 2. In this regard, it is immaterial that Falk did

17  not engage in *all* of the alleged misconduct. That is because, as cases cited by Falk explain, a

18  "defendant can be liable for its role in causing a false claim to be submitted, whether or not it

19  physically presents the claim itself." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,

20  498 F. Supp. 2d 25, 58 n.22 (D.D.C. 2007).

21       Furthermore, Salix's misconduct *is* imputable to Falk as a co-conspirator. *See, e.g.*, *Beltz*

22  *Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) (co-conspirators are

23  "liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the

24

25  ───────────────

    [1] In prior motions, Falk incorrectly argued that Relator's complaint was required to allege inequitable
    conduct, which has much stricter requirements. (*E.g.*, ECF 141, at 7-9) In opposing those motions,

26  Relator pointed out that Falk's argument had been rejected by every court to consider it. (ECF 151, at
    5). Falk has finally (correctly) abandoned this argument by failing to raise it in its motion. But because

27  inequitable conduct has more demanding requirements than FCA, *Praxair* is *a fortiori* to this case.

28
RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS          CASE NO. 3:18-CV-01496-JD

nature of [the defendant's] own actions"); *cf. United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011) (co-conspirators are "liable for reasonably foreseeably overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not"). Here, even if Salix was the one that made false statements during patent prosecution (and, to be clear, the TAC alleges Falk and Salix *both* did), and even if Salix was the one that made FDA applications and ultimately overcharged payors, those actions were undertaken pursuant to an agreement with Falk whereby Falk would own the patents and reap benefits from Salix's unlawful acts. That is enough to infer a conspiracy and render Falk liable for Salix's acts in furtherance of the conspiracy. *Cf. Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (civil conspiracy "may be inferred on the basis of circumstantial evidence such as the actions of the defendants" including that the defendants committed acts that "are unlikely to have been undertaken without an agreement").

Falk also argues there is nothing unlawful about co-authoring Marakhouski and Brunner, and insists that because the TAC alleges Falk shared those studies with Salix, there can be no intent to conceal them. But what matters is that Falk did not disclose these studies—which it clearly knew about, and which were highly material to patentability—to the Patent Office. The fact that Falk disclosed the studies to its co-conspirators is not exculpatory; it is evidence of conspiracy!

C. <u>Relator Sufficiently Pleads Scienter for Falk</u>

Falk cites *United States ex rel. Durkin v. Cnty. of San Diego*, 2018 WL 3361148, at *5-6 (S.D. Cal. 2018), for the proposition that "false statements must plead scienter of the speaker." The TAC does just that—*i.e.*, scienter on the part of Mr. Sparks, who acted as Falk's agent, and Dr. Greinwald, co-author of the withheld Brunner and Marakhouski studies that were highly material to the non-patentability of the '688 patent. (¶¶ 112, 115-16).

In any event, Falk overreads the precedent it cites. As subsequent authority explains, "[t]he putative prohibition on 'collective scienter' (or 'collective knowledge') … does not require the government to identify the specific individuals who submitted claims or signed certifications and plead or prove that those individuals had scienter." *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1084 n.499 (N.D. Cal. 2020). Instead, "[i]t is sufficient to plead that the defendant

1    organization had scienter (whether imputed knowledge from any employee who had scienter or

2    otherwise), regardless of whether the individuals who submitted the claims or certifications were

3    wholly innocent and had no scienter themselves." *Id*. Indeed, appellate cases routinely hold that Rule

4    9(b) does not mandate the identification of any specific individual to spell out the "who" of a fraud.

5    *See, e.g.*, *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) (complaint

6    satisfied Rule 9(b) by naming the responsible entity, without naming specific employees); *United*

7    *States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (rejecting argument that

8    plaintiff was required to identify "which employees handle federal billing" to plead fraud with

9    particularity); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir.

10   2007) (rejecting the argument that "parties must plead the identity of the specific individual employees

11   within the defendant corporation who submitted false claims to the government"); *United States ex rel.*

12   *Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 919 (4th Cir. 2003) (rejecting rule that a

13   single person must possess all the required guilty knowledge).

14          The TAC alleges scienter against Falk because Falk knew that Brunner and Marakhouski were

15   highly material to the patentability of the '688 patent, and it withheld them from the Patent Office.

16   (¶ 116.) *See Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1354 (Fed.

17   Cir. 2005*)* ("[A] fair inference of deceptive intent may be drawn, in view of the high materiality of the

18   [withheld prior art.]"); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1381 (Fed. Cir.

19   2001) ("When balanced against high materiality, the showing of intent can be proportionally less.").

20   Because Relator's allegations satisfy the heightened standards applicable to inequitable conduct, they

21   necessarily satisfy the FCA's broader statutory standards, which do not require specific intent, and

22   may even be satisfied by reckless disregard or deliberate ignorance. *See* 31 U.S.C. § 3729(b)(1).

23   **II.    RELATOR ALLEGES VALID FCA CLAIMS AGAINST FALK**

24          The TAC alleges three theories of liability: (1) that the '688 patent application, which is a

25   request for property presented to a Government agent, is itself a false claim (¶ 35), *see Janssen*, 576 F.

26   Supp. 3d at 228; (2) that Falk and its co-defendants used false statements to the Patent Office and FDA

27   to maintain an unlawful monopoly, using an upstream fraud to overcharge government paying

28   RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS          CASE NO. 3:18-CV-01496-JD

1    agencies downstream, *see Janssen,* 576 F. Supp. 3d at 229; *Allergan*, 506 F. Supp. 3d at 824-26;

2    *Campie*, 862 F.3d at 898-99; and (3) that the Bausch defendants implicitly falsely certified that

3    Apriso's prices were "fair and reasonable," while knowing that they were the product of an unlawful

4    monopoly, *Janssen*, 576 F. Supp. 3d at 229; *Allergan*, 506 F. Supp. 3d at 820-24. The TAC alleges

5    both primary and secondary liability for these violations. Falk's responses lack merit.

6        A.    Defendants' Concealment of Marakhouski and Brunner Is Sufficient to Establish Liability.

7            Falk asserts that the Marakhouski and Brunner studies were "cited to the patent examiner"; and

8    that the substance of Marakhouski and Brunner was cumulative of disclosed prior art. (Mot. at 9-11.)

9    Taking the second point first, the TAC alleges that "[i]nformation is material when it is not cumulative

10   and either . . . refutes or is inconsistent with a position an applicant takes in support of a patent claim,"

11   and then specifically lays out how Marakhouski and Brunner were "material" (*i.e.*, not cumulative),

12   and why Falk and Salix breached their duties to the Patent Office by knowingly withholding them.

13   (¶ 90.) Those allegations of materiality are plausible because the TAC alleges those studies were the

14   "primary prior art references" used to invalidate the '688 patent. (¶ 91; *see also* ¶¶ 11-13, 86-91).[2]

15   Falk identifies no evidence that would justify a contrary conclusion at the pleading stage. (Mot. at 11).

16           Falk's claim that the studies were disclosed is contrary to the TAC and should be disregarded

17   on that basis alone. Even on its own terms, the argument fails. The patent prosecution team never

18   actually disclosed Marakhouski and Brunner as relevant prior art. To argue otherwise, Falk cites a

19   *Medical News Today* article listed in an Information Disclosure Statement ("IDS"),[3] which in turn

20   drops footnotes citing Marakhouski and Brunner. (*Id.*) But disclosing an article that footnotes

21   Marakhouski and Brunner is not the same as disclosing Marakhouski and Brunner. The patent rules to

22   that effect are clear. Thus, 37 C.F.R. § 1.98 provides that "[a]ny information disclosure statement

---

23   [2] Falk's cases do not stand for the proposition that a complaint must disprove ahead of time any
24   possibility of cumulativeness—those cases instead address instances whether certain prior art was in
     fact cumulative, or whether the purported omissions were even plausibly material. (*See* Mot. at 9-10).

25   [3] An IDS is a bibliography of references and citations, often without any context or commentary. As set
26   forth on page 11, *infra,* while listing a specific reference in an IDS satisfies an applicant's *duty of
     disclosure*, it does **not** by itself the *broader* duty of "candor and good faith," which requires that any
27   references in an IDS must be "properly described" and "not incorrectly or incompletely characterized."
     Manuel of Patent Examining Procedure § 2004, ¶ 7; *see also* TAF ¶ 73; M.P.E.P. § 2001.04.

- 9 -

… shall include … [a] list of all patents, publications, applications, or other information submitted for consideration by the Office." 37 C.F.R. § 1.98(a). If an IDS does not comply with § 1.98, it will not be deemed cited to the examiner. (M.P.E.P.[4] § 609.04(a)). This makes sense because a pharmaceutical patent application may cite hundreds of studies and articles, each of which may cite dozens or even hundreds of additional citations—and it would be unrealistic to expect examiners to review all of those additional materials when the applicant does not identify them as relevant according to the rules.[5]

Falk also claims that the critical portions of Marakhouski and Brunner were correctly "summarized for" the examiner in the *Medical News Today* article. (Mot. at 11.) The opposite is true. The *Medical News Today* article—the central focus of which was merely to report the much earlier launch of Salofalk granules (*i.e.*, a precursor to Apriso) to treat ulcerative colitis in 2008—states that "Salofalk granules . . . can be taken with or without food," citing Marakhouski in a footnote. (*Id.*) This does not disclose the key facts. Marakhouski's teaching is *not* that mesalamine can be taken "with or without food"—nor does that fact undermine the '688 patent. Instead, as the PTAB explained when it invalidated the patent, Marakhouski and Brunner "described as an advantage" taking the drug specifically "without food." *See* Marakhouski (reporting results of drug taken "1 h before meals"); Brunner (reporting results of drug taken "after an overnight fast").[6] (ECF 179-4, Todisco Decl. Ex. C at 22.) This critical language (or the protocols described only in the Markahouski and Brunner studies specifying administration of Salofalk under fasting conditions) were not mentioned in the *Medical News Today* article, and that article accordingly was not cited by the PTAB. In contrast, Marakhouski and Brunner studies were analyzed prominently, front and center, in the IPR decision. Despite listing dozens of references in the patent specifications (and many more in the application), Falk and Salix never even mentioned Marakhouski and Brunner, which were *the most important* references of all.

---

[4] Manuel of Patent Examining Procedure, available at: https://www.uspto.gov/web/offices/pac/mpep/index.html.

[5] Indeed, by *not* properly disclosing Marakhouski and Brunner as references, Falk and Salix were misleading the Patent Office into believing those studies were *not* material to patentability.

[6] The Marakhouski and Brunner studies have been entered in the record as ECF 37-18 & 37-19.

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS        CASE NO. 3:18-CV-01496-JD

Saying that there was an advantage to taking the drug "without food" is different from saying that a drug can be taken "with or without food." During prosecution of the '688 patent, after the application had already been rejected multiple times, Falk and Salix narrowed the patent claims to describe the drug as being taken "with or without food." (Herrera Decl. Ex. A [Appl. 12/573,081, Office Action, June 5, 2014, at 4-5]).[7] The patent examiner rejected these claims, and Defendants subsequently amended the claims to limit taking the drug "without food" *only*, emphasizing that a drug taken "with or without food" is patentably distinct from one that must be taken "without food." (*Id.*) Thus, the *Medical News Today* article does not reveal the materiality of Marakhouski and Brunner; it obscures it.[8] Falk cannot argue that a reference stating the claimed drug can be taken "with or without food" is the same as "without food" since Falk tried to patent "with or without food," but was denied.

Defendants never attempted to correct the mischaracterization of Marakhouski and Brunner in the *Medical News Today* article. This was a violation of the duty of candor and good faith under 35 U.S.C. § 1.56 (*see* TAC ¶ 73) because the version of the M.P.E.P.[9] in force during prosecution of the '688 patent provided: "[c]are should be taken to see that prior art or other information cited in a specification or in an information disclosure statement is properly described and that the information is not incorrectly or incompletely characterized." (§ 2004 ¶ 7.) Falk's failure to correct the misstatement in the article demonstrates why the specific teachings, protocols (*e.g.*, administration under fasting conditions), and results of Marakhouski and Brunner are not cumulative with disclosed prior art.

B.  Defendants' Concealment of the Critical Portions of the '344 Patent Application Is Sufficient to Establish Liability.

Repeating Bausch's argument, Falk incorrectly states that "the '344 application" was cited during the '688 patent prosecution without defining what "the '344 application" refers to. (Mot. at 11-

---

[7] Declaration of Nicomedes Sy Herrera, sworn to September 22, 2025. To the extent the Court is inclined to consider Falk's argument (which reaches beyond the TAC) at the pleading stage (which it should not), Relator provides the Court with the relevant documents from the '688 patent prosecution that demonstrates why Falk's arguments are factually and legally wrong.

[8] Indeed, the Patent Office *issued* the '688 patent even though the *Medical News Today* article was disclosed. It wasn't until the Marakhouski and Brunner studies were later disclosed during the IPR that the Patent Office reversed course and invalidated the '688 patent.

[9]  M.P.E.P. Ninth Edition E9R-11.2013, March 2014, available at:
https://www.uspto.gov/web/offices/pac/mpep/old/e9r0/mpep-2000.pdf

- 11 -

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS          CASE NO. 3:18-CV-01496-JD

12) Like Bausch, Falk gets the facts wrong. *See* ECF 181, at 2-4. The "document" that Falk claims was disclosed to the examiner during prosecution of the '688 patent is U.S. Patent Application Publication No. 2007/0167416 ("the '416 Publication"). (Mot. at 11.) This is ***not*** the document that the TAC alleges was withheld during the '688 Patent's prosecution. The '416 Publication does not include the file wrapper (*i.e.*, prosecution history) for the '344 Patent, any of the examiner's office actions, the applicant's responses, the Amendment filed by Mr. Sparks on July 16, 2009 ("the Sparks Amendment"), or Table 1 discussed in the TAC (¶¶ 92–104.) Thus, it includes none of the facts regarding the food effects of Lialda, Claversal and Asacol that Relator alleges Defendants knew about during prosecution of the '688 patent, but withheld from the examiner (¶¶ 99-104).

Falk claims facts regarding the food effects of these prior art drugs disclosed in the Sparks Amendment are cumulative simply because the *existence* of the '344 patent was known to the examiner. (Mot. at 11.) The '344 patent itself does not disclose, teach or suggest these food effect facts regarding prior art drugs that were material to the patentability of the '688 patent. Like Bausch, Falk claims that because the '344 patent itself may have been known to the examiner, that was tantamount to disclosing every statement in the extensive file wrapper for the '344 patent. Yet Table 1 from the Sparks Amendment (¶ 94) was not listed in an IDS filed in the file wrapper for the '688 patent (*see supra* at Section II.A discussing 37 C.F.R. § 1.98(a)), and Falk cites nothing to suggest that a simple reference to a patent discloses every fact and statement made in the patents' file wrapper.[10]

Falk also argues that the information withheld from the Patent Office relating to the '344 Patent was "attorney argument" or "opinion" and therefore not fraud. (Mot. 12-13, 15) That is wrong and mischaracterizes Relator's argument. The TAC doesn't take issue with Falk's characterization of

---

[10] Falk joins Bausch's motion, and Bausch's reply doubles-down on its incorrect reading of the TAC. (ECF 183). Bausch assumes that the TAC alleges the invention of the '344 patent contradicted the purported invention of the '688 patent. That is not what the TAC alleges (*see* ¶¶ 92-104). Instead, the TAC alleges that material information regarding the food effects of prior art drugs, Lialda, Claversal and Asacol, were known to Defendants because they were disclosed in the Sparks Amendment, but withheld during prosecution of the '688 patent. Bausch suggests this is "superfluous" information (ECF 183 at 2), but it is not superfluous—it is in fact *the critical information* withheld during prosecution of the '688 patent but not disclosed in the '416 Publication. Bausch and Falk therefore are mistakenly arguing the '416 Publication discloses a fraud theory different from the one actually alleged in the TAC.

- 12 -

anything—but rather with the objective concealment of material information regarding the food effects of prior art drugs known to Defendants. But even if Falk's concealment and omissions could be characterized as opinions rather than factual assertions, they would still be actionable. Statements of opinion constitute false claims where "the speaker knows facts which would preclude such an opinion." *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 310 (1st Cir. 2010) (citations omitted). More broadly, "the expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015) (citations omitted). Heeding this guidance, courts have frequently allowed FCA cases asserting false opinions to proceed past the pleading stage. *See, e.g.*, *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1117 (9th Cir. 2020) (the FCA does not "carve out an exception for clinical judgments and opinions"); *United States v. Care Alts.*, 952 F.3d 89, 98 (3d Cir. 2020) (similar). Here, the TAC at least plausibly alleges that Falk knew that it was wrong to withhold Marakhouski and Brunner, and to claim that it was inventive to take the claimed mesalamine formulation without food.

Falk cites *Akzo, N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482, but in that case, the applicant disclosed prior art but argued it was not invalidating. That is distinguishable from this case, where the prior art was not disclosed, even though Defendants knew it was material. Indeed, *Akzo* cuts against Falk, because the court emphasized "the more material the omission . . . the less intent that must be shown" to support scienter. *Id.* Here, the '688 patent was only allowed after the "without food" limitation was added, and the food effect information regarding the prior art drugs disclosed in the file wrapper for the '344 patent were clearly material to that alleged point of novelty. For the same reason, *Young v. Lumenis, Inc.*, 492 F.3d 1336 (Fed. Cir. 2007) does not apply.

C. Relator Sufficiently Pleads the Otterbeck Patents Were Fraudulent.

Falk asserts, without argument, that the TAC does not identify "how" the examiner would have used the withheld references to assess patentability, or "what" claims those references would have invalidated. (Mot. 13-14) Falk also says that the TAC does not identify who at Falk knew of the

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS    CASE NO. 3:18-CV-01496-JD

1  alleged prior art. (*Id.*) None of this is true. Falk does not contend with TAC's explanation over several

2  pages regarding what each non-disclosed prior art reference teaches and how those teachings would

3  have anticipated the claims of the Otterbeck patents. (¶¶ 119-136.)

4      Moreover, Falk's argument attempts to impose pleading requirements that go well beyond even

5  the heightened pleading requirements imposed on FCA claims by Rule 9(b). It is clear from the FCA

6  and Rule 9(b) pleading standards set out, above, that those requirements relate to the *defendants* and

7  the *defendants' conduct, not* the identity or conduct of others involved (such as specific employees at

8  the drug-testing companies) or any agreement with those others to engage in a scheme.

9  *United States v. Hart*, No. 4:19-CV-00332, 2020 WL 6051599, at *6 (S.D. Iowa Apr. 1, 2020).

10     D.  Relator Sufficiently Pleads Falsity Regarding Claims for Reimbursement.

11     Falk claims the TAC does not allege Falk manufactured or sold Apriso in the U.S. or submitted

12  claims for payment to Medicare. (Mot. 14.) But Falk owned the '688 patent application during

13  prosecution, and as discussed above at page 8, a patent application itself is a false claim because it

14  requests "property." *See* § 3729(b)(2)(A); *Janssen*, 576 F. Supp. 3d at 228–29. It is also irrelevant that

15  Falk did not present claims for payment, because the FCA's plain language makes Falk liable if it

16  "causes" a false claim "to be presented." § 3729(a)(1); *Hockett*, 498 F. Supp. 2d at 58 n.22 ("defendant

17  can be liable for its role in causing a false claim to be submitted, whether or not it physically presents

18  the claim itself"). Falk's clear role in the causal chain leading to fraud is enough to render it liable.

19  *See, e.g.*, *Campie*, 862 F.3d at 903. The FCA also establishes liability for anyone who "makes, uses, or

20  causes to made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C.

21  § 3729(a)(1)(B). And it applies to anybody who conspires to violate the statute. *Id*. § 3729(a)(1)(C).

22  These provisions must be construed "broadly" to "reach all types of fraud, without qualification, that

23  might result in financial loss to the Government." *Campie*, 862 F.3d at 899 (quotation marks omitted).

24     E.  Relator Sufficiently Pleads Scienter

25     Falk argues that the TAC fails to plead scienter because it does not plead any facts showing a

26  Falk employee acted with intent to deceive. (Mot. at 14.) That is not true. The TAC alleges that Mr.

27  Sparks, the prosecuting attorney for the '688 patent, acted with knowledge an intent, and he was Falk's

28

- 14 -

1   agent as the owner the patent application (¶ 115.) Falk does not dispute that Sparks acted as its agent.

2   Rather, in connection with the TAC's allegations regarding the food effects of prior art drugs disclosed

3   during prosecution of the '344 patent, Falk argues that Relator failed to plead these food effects were

4   non-cumulative or that these food effects were in reality just attorney argument or debatable opinions.

5   As discussed above (*supra* at pages 9 & n.2; and 12-13), both arguments are wrong.

6          In connection with the failure to disclose Marakhouski and Brunner, Falk acknowledges that

7   the TAC alleges Falk's employee, Dr. Greinwald, was a co-author on these studies and thus clearly

8   knew about them. (Mot. at 14-15.) The TAC further alleges facts showing that Falk and the Salix

9   defendants collaborated closely on prosecution of the '688 patent (*see supra* at pages 4-7). Falk claims

10  that there is no allegation that Dr. Greinwald understood the materiality of the "food effect" teachings

11  in Marakhouski and Brunner. (Mot. at 15.) That is not credible. Falk is essentially claiming that its

12  head of R&D failed to appreciate something that both the PTAB and the Federal Circuit clearly

13  understood, *i.e.*, how Falk's own drug might work when taken without food.

14         Finally, the TAC alleges Falk's participation in the fraud in connection with the '688 patent,

15  and that is sufficient to defeat Falk's motion even if the TAC alleges no particular allegations against

16  Falk with respect to the Otterbeck patents. Falk also argues the regulatory duty of candor applies only

17  to individuals, not organizations. (Mot. 13-14.) Here, Falk was the listed assignee of the patent, *i.e.*,

18  the party that stood to receive all the rights under the patent if it was granted. It is a plausible

19  allegation and reasonable inference the individuals working to obtain the patent acted as Falk's agents.

## III.    THE STATE LAW CLAIMS SURVIVE

21         Falk offers no independent reason to dismiss any state claim. (Mot. 15.) State FCAs sometimes

22  differ from their federal counterpart, *see, e.g.,* Cal. Gov't Code § 12652(d)(3) (public disclosure

23  triggered only by state sources); Tex. Hum. Res. Code § 36.002 (permissive materiality standard).

### CONCLUSION

25         Falk's motion to dismiss should be denied in its entirety. In the alternative, if the Court finds

26  any deficiency in the TAC, the Court should permit Relator to amend his pleading.

- 15 -

Respectfully submitted,

Dated: September 22, 2025

**HERRERA KENNEDY LLP**

By: Nicomedes Sy Herrera

Nicomedes Sy Herrera (State Bar No. 275332)
Shawn M. Kennedy (State Bar No. 218472)
Laura E. Seidl (State Bar No. 269891)
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
Facsimile:  (855) 969-2050
Email: NHerrera@HerreraKennedy.com
            SKennedy@HerreraKennedy.com
            LSeidl@HerreraKennedy.com

**SPARACINO PLLC**
Tejinder Singh (*pro hac vice*)
1920 L Street, NW, Suite 835
Washington, DC 20036
Telephone: (202) 629-3530
Email: Tejinder.Singh@sparacinopllc.com

**BURNS CHAREST LLP**
Warren T. Burns (*pro hac vice*)
Christopher Cormier (*pro hac* vice)
Clayton Mahaffey (*pro hac vice*)
Matthew Strauser (*pro hac vice*)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
Email: wburns@burnscharest.com
            ccormier@burnscharest.com
            cmahaffey@burnscharest.com
            mstrauser@burnscharest.com

*Attorneys for Plaintiff-Relator Zachary Silbersher*

- 16 -

RELATOR'S OPPOSITION TO DR. FALK'S MOTION TO DISMISS          CASE NO. 3:18-CV-01496-JD